UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

MARY K. JONES, Individually and on Behalf :    Civil Action No.  10-cv-03864-AKH
of All Others Similarly Situated,    :

                 :    <u>CLASS ACTION</u>

           Plaintiff,    :

                 :    AMENDED COMPLAINT FOR

     vs.                :    VIOLATION OF THE FEDERAL
                    SECURITIES LAWS

PFIZER INC., et al.,    :

                 :

          Defendants.    :

                 :

———————————————————— x    <u>DEMAND FOR JURY TRIAL</u>

## INTRODUCTION AND OVERVIEW

1.    This is a class action for violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of the publicly traded securities of Pfizer Inc. ("Pfizer" or the "Company") between January 19, 2006 and January 23, 2009 (the "Class Period"), who were damaged thereby (the "Class").

2.    Pfizer is a pharmaceutical company engaged in the discovery, development, manufacture, and marketing of prescription medicines for humans and animals worldwide. The Company is also involved in the contract manufacturing and bulk pharmaceutical chemicals businesses, serving doctors, nurse practitioners, physician assistants, pharmacists, hospitals, pharmacy benefits managers, managed care organizations, and government agencies.

3.    At various times during the Class Period, Pfizer manufactured, marketed, and sold many types of drugs, including Bextra, an anti-inflammatory, Geodon, an anti-psychotic, Zyvox, an antibiotic, and Lyrica, an anti-epileptic drug. During the Class Period, defendants misled investors by failing to disclose that they were engaged in an ongoing course of conduct designed to illegally promote the sale of Pfizer drugs. By such conduct, Pfizer caused hundreds of millions of dollars in false or fraudulent claims to be submitted to several federal healthcare programs, thus exposing the Company to untold legal liability. Specifically, defendants failed to disclose the following materially adverse facts:

        (a)    From February 1, 2002, though April 30, 2005, Pfizer illegally promoted the sales and use of Bextra for conditions (including acute pain and various types of surgical pain) and at dosages other than those for which its use was approved by the FDA. Pfizer also offered and paid illegal kickbacks to healthcare professionals to induce them to promote and prescribe Bextra. As a result of this conduct, Pfizer knowingly caused false or fraudulent claims for Bextra to be submitted to, or caused purchases by, Medicaid and other federal healthcare programs.

(b)     From February 1, 2001, though December 31, 2007, Pfizer illegally promoted the sales and use of Geodon for conditions (including depression, bipolar maintenance, mood disorder, anxiety, aggression, dementia, attention deficit hyperactivity disorder, obsessive compulsive disorder, autism, and post-traumatic stress disorder) and at dosages other than those for which its use was approved by the FDA. Pfizer also offered and paid illegal kickbacks to healthcare professionals to induce them to promote and prescribe Geodon. As a result of this conduct, Pfizer knowingly caused false or fraudulent claims for Geodon to be submitted to, or caused purchases by, Medicaid and other federal healthcare programs.

(c)     From February 1, 2001, though February 28, 2008, Pfizer illegally promoted the sales and use of Zyvox for conditions (including infections caused by methicillin-resistant Staphylococcus aureus ("MRSA") generally, rather than only those types of MRSA for which Zyvox was FDA-approved) and at dosages other than those for which its use was approved by the FDA. Pfizer also offered and paid illegal kickbacks to healthcare professionals to induce them to promote and prescribe Zyvox. As a result of this conduct, Pfizer knowingly caused false or fraudulent claims for Zyvox to be submitted to, or caused purchases by, Medicaid and other federal healthcare programs.

(d)     From September 1, 2005 through October 31, 2008, Pfizer illegally promoted the sales and use of Lyrica for conditions (including chronic pain, certain types of neuropathic pain, peri-operative pain, and migraine) and at dosages other than those for which its use was approved by the FDA. Pfizer also offered and paid illegal kickbacks to healthcare professionals to induce them to promote and prescribe Lyrica. As a result of this conduct, Pfizer knowingly caused false or fraudulent claims for Lyrica to be submitted to, or caused purchases by, Medicaid and other federal healthcare programs.

4.      On January 26, 2009, Pfizer announced that it was paying $2.3 billion to resolve several ongoing investigations. These investigations included the improper promotion of and kickbacks involving Bextra, Geodon, Zyvox and Lyrica, as set forth above.

5.      After the cost of resolving these investigations became public, the price of Pfizer common stock declined from $17.45 at the previous trading day's close to $15.65 on January 26, 2009, as the artificial inflation caused by defendants' false and misleading statements came out of the stock price.

## JURISDICTION AND VENUE

6.      The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act. Venue is proper pursuant to §27 of the 1934 Act. Pfizer's headquarters are located in New York, New York, and false statements were made in this District and acts giving rise to the violations complained of occurred in this District.

## THE PARTIES

7.      Plaintiff Mary K. Jones purchased Pfizer securities during the Class Period as set forth in certification previously filed with the Court and was damaged thereby.

8.      Defendant Pfizer is a pharmaceutical company with its headquarters located in New York. Pfizer's stock is traded under the symbol PFE on the New York Stock Exchange, which is an efficient market.

9.      Defendant Jeffrey B. Kindler ("Kindler") has served in various executive positions with Pfizer since 2002. He has served as CEO of the Company since 2006 and Chairman of the Board since February 2007.

10.     Defendant Henry A. McKinnell ("McKinnell") served in various executive positions with Pfizer from 1971 to 2007.  McKinnell was the Company's Chief Executive Officer ("CEO") from 2001 to 2006 and Chairman of the Board from 2001 until his retirement in February 2007.

11.     Defendant Frank D'Amelio ("D'Amelio") has served as the Company's Chief Financial Officer ("CFO") since September 2007.

12.     Defendant David L. Shedlarz ("Shedlarz") was, from January 1999 to July 2005, the Company's Executive Vice President and CFO, and served as Vice Chairman from March 2005 until his retirement in December 2007.

13.     Defendant Alan G. Levin ("Levin") was, from March 2005 to September 2007, Senior Vice President and CFO of the Company.

14.     Defendant Ian C. Read ("Read") has served in various executive positions with Pfizer since 1978 and as Senior Vice President and Group President, Worldwide Biopharmaceutical Operations of the Company since 2006.

15.     The defendants named in ¶¶9-14 are referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Pfizer publicly traded securities during the Class Period (the "Class").  Excluded from the Class are defendants and their families, directors and officers of Pfizer and their families and affiliates.

17.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Pfizer had more than 8 billion shares of stock outstanding, owned by thousands of persons.

18.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the 1934 Act was violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    Whether the prices of Pfizer securities were artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

19.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

20.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

21.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## SCIENTER

22.    During the Class Period, the defendants had both the motive and opportunity to conduct fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, the

defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Pfizer securities during the Class Period.

## PRE-CLASS PERIOD STATEMENTS

23.    On October 20, 2004, Pfizer issued a press release reporting the Company's third quarter 2004 financial performance. That release reported Bextra sales of $324 million, Geodon sales of $125 million, and Zyvox sales of $120 million.

24.    On November 5, 2004, Pfizer filed a Form 10-Q with the SEC setting forth the drug sales described in the October 20, 2004 press release. The Form 10-Q was accompanied by certifications signed by defendants McKinnell and Shedlarz, which stated:

I, [Henry A. McKinnell/David L. Shedlarz], certify that:

1.    I have reviewed this report on Form 10-Q of Pfizer Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the

effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

      c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

      5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

25.    On January 19, 2005, the Company issued a press release reporting its 2004 financial results. This release reported worldwide Bextra sales of nearly $1.3 billion in 2004, Geodon global sales of $467 million, and Zyvox sales of $463 million.

26.    On February 28, 2005, Pfizer filed a Form 10-K with the SEC setting forth the drug sales described in the January 19, 2005 release. The Form 10-K was accompanied by certifications signed by defendants McKinnell and Shedlarz, substantially identical to those quoted above.

27.    The Company's Form 10-K also stated:

- We and certain of our subsidiaries are involved in various patent, product liability, consumer, commercial, securities, environmental and tax litigations and claims; government investigations; and other legal proceedings that arise from time to time in the ordinary course of our business. ***We do not believe any of them will have a material adverse effect on our financial position***. Litigation is inherently unpredictable, and excessive verdicts to occur. Although we believe we have substantial defenses in these matters, we could in the future incur judgments or enter into settlements or claims that could have a material adverse effect on our results of operations in any particular period.

\*     \*     \*

**Contingencies**

     We and certain of our subsidiaries are involved in various patent, product liability, consumer, commercial, securities, environmental and tax litigations and claims; government investigations; and other legal proceedings that arise from time to time in the ordinary course of our business.  We record accruals for such contingencies to the extent that we conclude their occurrence is probable and the related damages are estimable.

28.     On April 7, 2005, the Company issued a press release entitled "New FDA Labeling for Pfizer's Celebrex and All Other NSAIDs to Reflect Similar Cardiovascular Profile; Pfizer Separately Agrees to Suspend Sales of Bextra Due to FDA Evaluation of Risks of Rare but Serious Skin Reactions."  The release stated in part:

> Pfizer said today it will work with the U.S. Food and Drug Administration (FDA) to add expanded risk information in the Celebrex label following an FDA decision announced this morning to require boxed warnings of potential cardiovascular risk for all COX-2 pain relievers and all NSAIDs, including older non-specific drugs such as ibuprofen and naproxen.

\*     \*     \*

> Regarding Bextra, Pfizer's other oral Cox-2 inhibitor, the FDA informed Pfizer late yesterday that, in the agency's view, Bextra's cardiovascular risk could not be differentiated from other NSAIDs.  However, the agency has concluded that the additional, increased risk of rare but serious skin reactions associated with Bextra, already described in its label, warrants its withdrawal from the market.

> Pfizer respectfully disagrees with FDA's position regarding the overall risk/benefit profile of Bextra.  However, in deference to the agency's views, the company has agreed to suspend sales of the medicine pending further discussions with the FDA.  Pfizer said it will explore options with the agency under which the company might be permitted to resume making Bextra available to physicians and patients.  For now, patients should stop taking Bextra and contact their physicians about appropriate treatment options.

> In addition, at the request of European regulators, Pfizer will also suspend sales of Bextra in the European Union.  The company is in contact with other regulatory agencies around the world and will take appropriate measures based on those discussions.

29.     On April 19, 2005, Pfizer issued a press release reporting the Company's first quarter 2005 financial results. That release reported Geodon sales of $138 million, Lyrica sales of $20 million, Bextra sales of $56 million, and Zyvox sales of $143 million.

30.     On April 19, 2005, on the Company's first quarter 2005 earnings conference call, defendants made or permitted Pfizer employees to make the following statements:

> [Karen Katen ("Katen"), Vice Chairman/Human Health:] First, Lyrica, now launched in the UK, Germany and Mexico, is showing strong first-year market performance and rapid uptake with 8.1% revenue share of the total antiepileptic market in Germany and 5.3% share in the UK after just five months on these markets. It should launch later in 2005 in the United States for diabetic peripheral neuropathy and posttraumatic (ph) neuralgia, pending the completion of a scheduling designation.

*          *          *

> Geodon continues to outperform the market and was up 56% in the first quarter with revenue of $138 million. The recently launched bipolar mania indication expands the potential Geodon patient pool and the market is welcoming the very distinct benefits of this agent over older products.

31.     On May 6, 2005, Pfizer filed a Form 10-Q with the SEC setting forth the drug sales described in the April 19, 2005 release. The Form 10-Q was accompanied by certifications signed by defendants McKinnell and Levin substantially identical to those quoted above.

32.     On June 13, 2005, the Company issued a press release entitled "FDA Approves Pfizer's Lyrica as Epilepsy Add-On Treatment for Partial Onset Seizures," which stated in part:

> Pfizer Inc said today that it has received U.S. Food and Drug Administration (FDA) approval to market Lyrica™ (pregabalin) for adjunctive treatment of partial onset seizures in adults with epilepsy.

> Partial onset seizures represent over half of all seizures in patients with epilepsy, a chronic neurological condition affecting nearly three million Americans. While epilepsy can be caused by genetic predisposition or head injuries, in most cases the cause is unknown. Despite the availability of current treatments, many patients still experience uncontrolled seizures.