of 106% compared to the same period in 2006, Geodon sales of $216 million, and Zyvox sales of $258 million.

60. On April 20, 2007, on the Company's first quarter 2007 earnings conference call, defendant Read made the following statements:

> On Lyrica, we had a great quarter on Lyrica. We doubled the sales globally and in the US, a tremendous scrip growth, also a contribution from price. I think when you look at Lipitor's performance – Lyrica's performance, sorry, there's a huge potential still in the market of DPN and PHN. On top of that, look at the scrips and look at the number of units per scrip. We're seeing significant growth in the number of units per scrip, up almost 20% in this quarter against prior quarters. So that's a fundamental factor in understanding the volume drivers with Lyrica.

61. On May 4, 2007, Pfizer filed a Form 10-Q with the SEC setting forth the drug sales described in the April 20, 2007 press release. The Form 10-Q was accompanied by certifications signed by defendants Kindler and Levin substantially identical to those quoted above.

62. On June 21, 2007, the Company issued a press release entitled "Pfizer's Lyrica Receives FDA Approval for Fibromyalgia Based on Expedited Review," which stated in part:

> Pfizer announced today that the Food and Drug Administration (FDA) approved Lyrica® (pregabalin) capsules CV for the management of fibromyalgia, one of the most common chronic, widespread pain conditions in the United States. The approval of Lyrica, which received a priority review, represents a breakthrough for the more than six million Americans who suffer from this debilitating condition who previously had no FDA approved treatment options.

63. On October 18, 2007, Pfizer issued a press release reporting the Company's third quarter 2007 financial results. That release reported Lyrica revenues of $465 million, Geodon sales of $228 million, and Zyvox sales of $232 million.

64. On October 18, 2007, on the Company's third quarter 2007 earnings conference call, defendants made the following statements:

> [Kindler:] Geodon is growing at a rate of two times the market for atypical antipsychotics.

* * *

> [D'Amelio:] Revenues of Lyrica, our medicine for the management of neuropathic pain and most recently fibromyalgia, increased 37% to $465 million.

65. On November 5, 2007, Pfizer filed a Form 10-Q with the SEC setting forth the drug sales described in the October 18, 2007 press release. The Form 10-Q was accompanied by certifications signed by defendants Kindler and D'Amelio substantially identical to those quoted above.

66. On January 23, 2008, Pfizer issued a press release reporting the Company's full year 2007 financial performance. That release reported Lyrica sales of $564 million for the fourth quarter and $1.8 billion for the full year 2007; Geodon sales of $232 million for the fourth quarter and $854 million for the full year 2007; and Zyvox sales of $252 million for the fourth quarter and $944 million for the full year 2007.

67. On January 23, 2008, on the Company's fourth quarter 2007 earnings conference call, defendant D'Amelio made the following statement:

> Lyrica, our medicine for the management of neuropathic pain and, more recently, fibromyalgia, delivered revenues of [$]564 million, an increase of 60% compared with the year-ago quarter.

68. On February 29, 2008, Pfizer filed a Form 10-K with the SEC setting forth the drug sales described in the January 23, 2008 release. The Form 10-K was accompanied by certifications signed by defendants Kindler and D'Amelio substantially identical to those quoted above.

69. The Company's Form 10-K also stated:

> **Legal Proceedings**
>
> We and certain of our subsidiaries are involved in various patent, product liability, consumer, commercial, securities, environmental and tax litigations and claims, government investigations, and other legal proceedings that arise from time to time in the ordinary course of our business. Litigation is inherently unpredictable, and excessive verdicts do occur. Although we believe we have substantial defenses in these matters, we could in the future incur judgments or enter into settlements of claims that could have a material adverse effect on our results of operations in any particular period.

* * *

**Contingencies**

We and certain of our subsidiaries are involved in various patent, product liability, consumer, commercial, securities, environmental and tax litigations and claims; government investigations; and other legal proceedings that arise from time to time in the ordinary course of our business. Except for income tax contingencies, we record accruals for contingencies to the extent that we conclude their occurrence is probable and the related damages are estimable . . . .

* * *

**D. Government Investigations and Requests for Information**

Like other pharmaceutical companies, we are subject to extensive regulation by national, state and local government agencies in the U.S. and in other countries in which we operate. As a result, we have interactions with government agencies on an ongoing basis. Among the investigations and requests for information by government agencies are those discussed below. It is possible that criminal charges and fines and/or civil penalties could result from pending government investigations, including but not limited to those discussed below.

The Department of Justice continues to actively investigate the marketing and safety of our COX-2 medicines, particularly Bextra. The investigation has included requests for information and documents. We also have received requests for information and documents in connection with threatened claims concerning the marketing and safety of Bextra and Celebrex from a group of state attorneys general. We have been considering various ways to resolve these matters.

Separately, the Department of Justice continues to actively investigate certain physician payments budgeted to our prescription pharmaceutical products. The investigation has included requests for information and documents.

70. On April 17, 2008, Pfizer issued a press release reporting the Company's first quarter 2008 financial performance. That release reported Lyrica sales of $582 million, Geodon sales of $241 million, and Zyvox sales of $259 million.

71. On May 2, 2008, Pfizer filed a Form 10-Q with the SEC setting forth the drug sales described in the April 17, 2008 release. The Form 10-Q was accompanied by certifications signed by defendants Kindler and D'Amelio substantially identical to those quoted above.

72. On July 23, 2008, Pfizer issued a press release reporting the Company's second quarter 2008 financial performance. That release reported Lyrica sales of $614 million, Geodon sales of $232 million, and Zyvox sales of $292 million.

73. On August 8, 2008, Pfizer filed a Form 10-Q with the SEC setting forth the financial results described in the July 23, 2008 release. The Form 10-Q was accompanied by certifications signed by defendants Kindler and D'Amelio substantially identical to those quoted above.

74. On October 21, 2008, Pfizer issued a press release reporting the Company's third quarter 2008 financial performance. That release reported Lyrica sales of $675 million, Geodon sales of $258 million, and Zyvox sales of $281 million.

75. On October 21, 2008, on the Company's third quarter 2008 earnings conference call, defendant D'Amelio made the following statements:

> Lyrica continued to deliver strong performance with revenues of $675 million, an increase of 45% year over year.
>
> *    *    *
>
> We continue to see steady growth from several key products including Lyrica . . . and Geodon.

76. On October 22, 2008, the Company issued a press release entitled "Pfizer Completes Settlement Agreements with State Attorneys General Regarding its NSAID Pain Medications," which stated in part:

> Pfizer Inc announced today that it has finalized agreements with 33 states and the District of Columbia to resolve claims primarily related to alleged promotional practices for Bextra, a medication Pfizer voluntarily withdrew from the United States market in 2005. Last week Pfizer announced agreements in principle to resolve these state claims, indicating that it would pay $60 million and adopt compliance measures as part of the settlement that complement policies and procedures previously established by the Company.

77. On November 7, 2008, Pfizer filed a Form 10-Q with the SEC setting forth the drug sales described in the October 21, 2008 release. The Form 10-Q was accompanied by certifications signed by defendants Kindler and D'Amelio substantially identical to those quoted above.

**DEFENDANTS' CLASS PERIOD STATEMENTS WERE FALSE AND MISLEADING**

78. Defendants misled investors by failing to disclose that they were engaged in an ongoing course of conduct designed to illegally promote the sale of Pfizer drugs. By such conduct, Pfizer caused hundreds of millions of dollars in false or fraudulent claims to be submitted to several federal healthcare programs, thus exposing the Company to untold legal liability. Specifically, defendants failed to disclose the following:

(a) From February 1, 2002, though April 30, 2005, Pfizer illegally promoted the sales and use of Bextra for conditions (including acute pain and various types of surgical pain) and at dosages other than those for which its use was approved by the FDA. Pfizer also offered and paid illegal kickbacks to healthcare professionals to induce them to promote and prescribe Bextra. As a result of this conduct, Pfizer knowingly caused false or fraudulent claims for Bextra to be submitted to, or caused purchases by, Medicaid and other federal healthcare programs.

(b) From February 1, 2001, though December 31, 2007, Pfizer illegally promoted the sales and use of Geodon for conditions (including depression, bipolar maintenance, mood disorder, anxiety, aggression, dementia, attention deficit hyperactivity disorder, obsessive compulsive disorder, autism, and post-traumatic stress disorder) and at dosages other than those for which its use was approved by the FDA. Pfizer also offered and paid illegal kickbacks to healthcare professionals to induce them to promote and prescribe Geodon. As a result of this conduct, Pfizer knowingly caused false or fraudulent claims for Geodon to be submitted to, or caused purchases by, Medicaid and other federal healthcare programs.

(c) From February 1, 2001, though February 28, 2008, Pfizer illegally promoted the sales and use of Zyvox for conditions (including infections caused by MRSA generally, rather than only those types of MRSA for which Zyvox was FDA-approved) and at dosages other than those for which its use was approved by the FDA. Pfizer also offered and paid illegal kickbacks to healthcare professionals to induce them to promote and prescribe Zyvox. As a result of this conduct, Pfizer knowingly caused false or fraudulent claims for Zyvox to be submitted to, or caused purchases by, Medicaid and other federal healthcare programs.

(d) From September 1, 2005 through October 31, 2008, Pfizer illegally promoted the sales and use of Lyrica for conditions (including chronic pain, certain types of neuropathic pain, peri-operative pain, and migraine) and at dosages other than those for which its use was approved by the FDA. Pfizer also offered and paid illegal kickbacks to healthcare professionals to induce them to promote and prescribe Lyrica. As a result of this conduct, Pfizer knowingly caused false or fraudulent claims for Lyrica to be submitted to, or caused purchases by, Medicaid and other federal healthcare programs.

**THE TRUTH COMES TO LIGHT**

79. On January 26, 2009, the Company issued a press release entitled "Pfizer Reports Fourth-Quarter and Full-Year 2008 Results and 2009 Financial Guidance," which stated in part:

> For fourth-quarter 2008, Pfizer posted reported net income of $266 million, a decline of 90% compared with the prior-year quarter, and reported diluted EPS of $0.04, a decrease of 90% compared with the prior-year quarter. ***Fourth-quarter 2008 results were impacted by a $2.3 million pre-tax and after-tax charge resulting from an agreement in principle with the Office of Michael Sullivan, the United States Attorney for the District of Massachusetts, to resolve previously disclosed investigations regarding allegations of past off-label promotional practices concerning Bextra, as well as other open investigations.***

80. On January 26, 2009, on the Company's conference call, defendant D'Amelio made following statement:

> These significant year-over-year decreases were primarily driven by a $2.3 billion pretax and after-tax charge resulting from an agreement in principle to resolve previously disclosed investigations regarding allegations of past off-label promotional practices concerning Bextra, as well as other open investigations.

81. As a result of these disclosures, the price of Pfizer common stock declined from a closing price of $17.45 on January 23, 2009, the previous trading day, to close at $15.65 on January 26, 2009 as the artificial inflation caused by defendants' false and misleading statements came out of the stock price.

82. On September 2, 2009, the United States Department of Justice issued a press release entitled "Justice Department Announces Largest Health Care Fraud Settlement in Its History; Pfizer to Pay $2.3 Billion for Fraudulent Marketing." The release stated in part:

> American pharmaceutical giant Pfizer Inc. and its subsidiary Pharmacia & Upjohn Company Inc. (hereinafter together "Pfizer") have agreed to pay $2.3 billion, the largest health care fraud settlement in the history of the Department of Justice, to resolve criminal and civil liability arising from the illegal promotion of certain pharmaceutical products, the Justice Department announced today.
>
> Pharmacia & Upjohn Company has agreed to plead guilty to a felony violation of the Food, Drug and Cosmetic Act for misbranding Bextra with the intent to defraud or mislead. Bextra is an anti-inflammatory drug that Pfizer pulled from the market in 2005. Under the provisions of the Food, Drug and Cosmetic Act, a company must specify the intended uses of a product in its new drug application to FDA. Once approved, the drug may not be marketed or promoted for so-called "off-label" uses – i.e., any use not specified in an application and approved by FDA. Pfizer promoted the sale of Bextra for several uses and dosages that the FDA specifically declined to approve due to safety concerns. The company will pay a criminal fine of $1.195 billion, ***the largest criminal fine ever imposed in the United States for any matter***. Pharmacia & Upjohn will also forfeit $105 million, for a total criminal resolution of $1.3 billion.
>
> In addition, Pfizer has agreed to pay $1 billion to resolve allegations under the civil False Claims Act that the company illegally promoted four drugs – Bextra; Geodon, an anti-psychotic drug; Zyvox, an antibiotic; and Lyrica, an anti-epileptic drug – and caused false claims to be submitted to government health care programs for uses that were not medically accepted indications and therefore not covered by those programs. The civil settlement also resolves allegations that Pfizer paid kickbacks to health care providers to induce them to prescribe these, as well as other, drugs. The federal share of the civil settlement is $668,514,830 and the state

Medicaid share of the civil settlement is $331,485,170. ***This is the largest civil fraud settlement in history against a pharmaceutical company***.

* * *

The U.S. Attorney's offices for the District of Massachusetts, the Eastern District of Pennsylvania, and the Eastern District of Kentucky, and the Civil Division of the Department of Justice handled these cases.

* * *

"Illegal conduct and fraud by pharmaceutical companies puts the public health at risk, corrupts medical decisions by health care providers, and costs the government billions of dollars," said Tony West, Assistant Attorney General for the Civil Division. "This civil settlement and plea agreement by Pfizer represent yet another example of what penalties will be faced when a pharmaceutical company puts profits ahead of patient welfare."

"***The size and seriousness of this resolution, including the huge criminal fine of $1.3 billion, reflect the seriousness and scope of Pfizer's crimes***," said Mike Loucks, acting U.S. Attorney for the District of Massachusetts. "Pfizer violated the law over an extensive time period. Furthermore, ***at the very same time Pfizer was in our office negotiating and resolving the allegations of criminal conduct by its then newly acquired subsidiary, Warner-Lambert, Pfizer was itself in its other operations violating those very same laws. Today's enormous fine demonstrates that such blatant and continued disregard of the law will not be tolerated***."

83. On September 2, 2009, Pfizer issued a press release entitled "Pfizer Concludes Previously Disclosed Settlement Agreement with U.S. Department of Justice Regarding Past Promotional Practices," which stated in part:

> Pfizer Inc today announced that it has finalized a previously reported agreement in principle with the U.S. Department of Justice (DOJ) to settle an investigation regarding past off-label promotional practices related to Bextra, which Pfizer voluntarily withdrew from the market in 2005. The final agreement also resolves other DOJ investigations involving alleged past off-label promotional practices concerning Zyvox, Geodon and Lyrica, allegations related to certain payments to healthcare professionals involving these and nine other Pfizer medicines, and several related qui tam actions. Pfizer previously disclosed a related $2.3 billion charge to its fourth-quarter and full-year 2008 earnings in connection with the DOJ agreement in principle on January 26, 2009. No additional charge to the company's earnings will be recorded in connection with this settlement.
>
> In addition, the company has reached agreements with attorneys general in 42 states and the District of Columbia to settle state civil consumer protection

allegations related to its past promotional practices concerning Geodon. The company will pay a total of $33 million to the settling states and will take a charge in that amount to third-quarter 2009 earnings.

"These agreements bring final closure to significant legal matters and help to enhance our focus on what we do best – discovering, developing and delivering innovative medicines to treat patients dealing with some of the world's most debilitating diseases," said Amy W. Schulman, senior vice president and general counsel of Pfizer. "We regret certain actions taken in the past, but are proud of the action we've taken to strengthen our internal controls and pioneer new procedures so that we not only comply with state and federal laws, but also meet the high standards that patients, physicians and the public expect from a leading worldwide company dedicated to healing and better health. Corporate integrity is an absolute priority for Pfizer, and we will continue to take appropriate actions to further enhance our compliance practices and strengthen public trust in our company."

Under the agreement with the DOJ, Pfizer will pay a previously disclosed total of $2.3 billion ($1.0 billion in civil payments related to a number of medicines, and a $1.3 billion criminal penalty related only to Bextra), and a Pfizer subsidiary, Pharmacia Upjohn Company, Inc., will plead guilty to one criminal count of violating the U.S. Food, Drug, and Cosmetic Act related to its past promotion of Bextra. A portion of the civil payments will be distributed to 49 states and the District of Columbia pursuant to agreements with each state's Medicaid division.

The terms of the DOJ settlement require Pfizer to pay approximately $503 million to resolve civil allegations concerning past promotional practices related to Bextra. In addition, the company will make payments to resolve other civil allegations involving past promotional practices as follows: approximately $301 million for Geodon, approximately $98 million for Zyvox, and approximately $50 million for Lyrica. The settlement also includes a civil payment of approximately $48 million to resolve allegations relating to certain payments to healthcare professionals involving nine other Pfizer medicines.

Pfizer expressly denies all of these civil allegations, with the exception that Pfizer acknowledges certain improper actions related to the promotion of Zyvox.

## LOSS CAUSATION/ECONOMIC LOSS

84. During the Class Period, as detailed herein, defendants made false and misleading statements regarding their illegal promotion and sale of Pfizer drugs and engaged in a scheme to deceive the market. This artificially inflated Pfizer's stock price and operated as a fraud or deceit on the Class. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Pfizer's stock price fell precipitously, as the prior artificial inflation came out of the

stock price over time. As a result of their purchases of Pfizer securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

85.  Pfizer's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

86.  The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Pfizer who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

87.  Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)  The omissions and misrepresentations were material;

(c)  The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased Pfizer securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

88.     At all relevant times, the market for Pfizer securities was efficient for the following reasons, among others:

(a)     As a regulated issuer, Pfizer filed periodic public reports with the SEC; and

(b)     Pfizer regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

89.     Plaintiff incorporates ¶¶1-88 by reference.

90.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Pfizer securities during the Class Period.

92. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Pfizer securities. Plaintiff and the Class would not have purchased Pfizer securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

93. As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Pfizer securities during the Class Period.

**COUNT II**

**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

94. Plaintiff incorporates ¶¶1-93 by reference.

95. The Individual Defendants acted as controlling persons of Pfizer within the meaning of §20 of the 1934 Act. By virtue of their positions and their power to control public statements about Pfizer, the Individual Defendants had the power and ability to control the actions of Pfizer and its employees. Pfizer controlled the Individual Defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B. Awarding plaintiff and the members of the Class damages and interest;

C. Awarding plaintiff's reasonable costs, including attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: May 25, 2010

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
DAVID C. WALTON
CATHERINE J. KOWALEWSKI
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

KENDALL LAW GROUP, LLP
JOE KENDALL
HAMILTON LINDLEY
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: 214/744-3000
214/744-3015 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Pfizer10_Amended.doc