**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| MARY K. JONES, Individually and on Behalf of All Others Similarly Situated, |
| |
| Plaintiff, |
| |
| – v. – |
| |
| PFIZER INC., et al., |
| |
| Defendants. |

**Case No. 10-cv-03864 (AKH)**

ECF Case

**DEFENDANT PFIZER INC.'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................... 1

UNDISPUTED FACTS ............................................................................................ 5

    A.    Legal Review and Advice Regarding Pfizer's Disclosures ................... 5

    B.    Pfizer's FAS 5 Reserve Determinations ............................................... 9

    C.    The Bextra Investigation:  February 2004 Notice to Pfizer and Early
          Stages ................................................................................................. 11

    D.    August 2006 to December 2007:  Pfizer Updates Its Warnings to Investors ........ 14

    E.    2008:  Pfizer Further Updates Its Disclosures to Investors as the Parties
          Fail To Agree on Terms of a Resolution ............................................ 18

    F.    The January 26, 2009 Announcement:  Resolution of the Investigation, the
          Wyeth Acquisition, the Dividend Cut, and the Reduced Earnings
          Guidance ............................................................................................ 22

    G.    The Market Recognizes the Negative Impact of the Wyeth Acquisition,
          Dividend Cut and Reduced Earnings Guidance, and Entirely Ignores the
          Government Settlement ....................................................................... 24

ARGUMENT ......................................................................................................... 28

I.     THE RECORD CONTAINS NO EVIDENCE OF SCIENTER, AND PFIZER'S
      UNDISPUTED RELIANCE ON ADVICE OF COUNSEL AND
      INDEPENDENT AUDITORS PRECLUDES ANY SUCH FINDING. ........................... 28

    A.    Pfizer Waived Its Attorney-Client Privilege to Reveal All Legal Advice
          Pfizer Received Concerning Its Disclosures and Reserving Decisions. ............. 29

    B.    Pfizer's Undisputed Reliance on the Advice of Messrs. Block and Fox and
          KPMG Prevents Any Finding of Scienter. ......................................... 31

          1.    Messrs. Block and Fox Advised that Pfizer's Legal Proceedings
               Disclosures Complied with the Securities Laws....................................... 32

          2.    KPMG Advised that Pfizer's FAS 5 Reserving Decisions
               Complied with GAAP.............................................................................. 35

II.    UNDER SECOND CIRCUIT LAW, THE DISCLOSURES AND
      STATEMENTS THAT PLAINTIFFS CHALLENGE CANNOT SUPPORT A
      SECURITIES FRAUD CLAIM. ................................................................... 38

A.    Pfizer Had No Duty to Disclose that Employees Had Engaged in Unlawful Promotion of Products. ........................................................................38

B.    Pfizer's Statements that Its Policy Was To Comply with All Laws and that It Was Committed to Ethical Business Practices Are "Puffery." .........................41

C.    Pfizer's Statement that It "Believed" It Had "Substantial Defenses" to the Government Investigation Concerning Bextra Is Not Actionable for Numerous Reasons............................................................................43

D.    Pfizer's Description of the Government Investigation as Involving the "Marketing" of Bextra Was Accurate and Honestly Believed. ...........................46

E.    Pfizer Statements Regarding the Safety, Efficacy, and Sales Revenue for Geodon, Lyrica, and Zyvox Were Accurate. ...........................................48

F.    Pfizer's Certification that It Maintained Effective Internal Control over Financial Reporting Was Accurate and Approved by KPMG.............................49

G.    Pfizer's Determination that the Requirements for a FAS 5 Reserve Were Not Met Until the Fourth Quarter of 2008, Which KPMG Advised Was Correct, Was an Accounting Judgment That Cannot Support a Securities Fraud Claim. ............................................................................50

III.    PLAINTIFFS CANNOT PROVE LOSS CAUSATION OR DAMAGES. .....................52

A.    On the Undisputed Facts, Plaintiffs Cannot Prove Loss Causation......................53

    1.    The Alleged "Corrective Disclosure" Did Not Reveal that Any Prior Statement Was False or Misleading.................................................53

    2.    Plaintiffs Cannot Disaggregate the Alleged Effect of the Announcement of the Agreement in Principle from the Acknowledged Effects of the Other News Announced on January 26................................................................................55

B.    On the Undisputed Facts, Plaintiffs Cannot Prove Damages. ..............................58

CONCLUSION...................................................................................62

# TABLE OF AUTHORITIES

## CASES

*Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534 (S.D. Fla. 1988), *aff'd*, 899
  F.2d 21 (11th Cir. 1990) ...................................................................................58

*Bell v. Metropolitan Transportation Authority*, No. 12 Civ. 1235 (AKH), 2013
  WL 8112461 (S.D.N.Y. Nov. 1, 2013) (Hellerstein, J.) .....................................31

*Billhofer v. Flamel Tech., S.A.*, No. 07 Civ. 9920, 2013 WL 866778 (S.D.N.Y.
  Mar. 8, 2013) ......................................................................................................31

*Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x. 32 (2d
  Cir. 2012) ...............................................................................................41, 42, 43

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*,
  853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014) .......56, 58

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277
  (S.D.N.Y. 2013) ..................................................................................................45

*City of Brockton Ret. Sys. v. Avon Products, Inc.*, No. 11 Civ. 4665 (PGG), 2014
  WL 4832321 (S.D.N.Y. Sept. 29, 2014) ............................................................42

*City of Omaha v. CBS Corp.*, 679 F.3d 64 (2d Cir. 2012) (per curiam) ...........45, 46, 51

*City of Pontiac Policemen's & Fireman's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d
  Cir. 2014) ..................................................................................................... passim

*Cruden v. Bank of New York*, 957 F.2d 961 (2d Cir. 1992) ..................................31, 33

*Dalberth v. Xerox Corp.*, 766 F.3d 172 (2d Cir. 2014) ....................................... passim

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) .............................................52

*ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d
  187 (2d Cir. 2009) ..........................................................................................42, 43

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ................................................28

*Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011) .............................45, 46, 50, 51

*Fecht v. N. Telecom Ltd. (In re Northern Telecom, Ltd. Sec. Litig.)*, 116 F. Supp.
  2d 446 (S.D.N.Y. 2000) ......................................................................................29

*Feinberg v. Benton*, No. 05-4847, 2007 WL 4355408 (E.D. Pa. Dec. 13, 2007) ........28

*Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59 (D.D.C. 2008) ........58

*Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423 (2d Cir. 2001) ................................................ 31

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ........................................... 28

*Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001) ................................................... 28

*Gissin v. Endres*, 739 F. Supp. 2d 488 (S.D.N.Y. 2010) ............................................... 45

*Gordon Partners v. Blumenthal*, No. 02 Civ. 7377 (LAK), 2007 WL 1438753
    (S.D.N.Y. May 16, 2007), *aff'd* 293 F. App'x 815 (2d Cir. 2008) ........................................ 56

*Gusinsky v. Barclays plc*, 944 F. Supp. 2d 279 (S.D.N.Y. 2013) ................................................ 55

*Hoffman v. UBS-AG*, 591 F. Supp. 2d 522 (S.D.N.Y. 2008) .......................................... 47

*In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899 (8th Cir. 2005) .......................................... 52

*In re Aegon N.V. Sec. Litig.*, No. 03 Civ. 0603 (RWS), 2004 WL 1415973
    (S.D.N.Y. June 23, 2004) ........................................................................ 45

*In re BP p.l.c. Securities Litigation*, No. 4:10-md-2185, 2013 WL 6388408 (S.D.
    Tex. Dec. 6, 2013) ............................................................................... 60

*In re Citigroup Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd sub
    nom. Albert Fadem Trust v. Citigroup Inc.*, 165 F. App'x 928 (2d Cir. 2006) ..................... 39

*In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008) ................................................ 39

*In re Fed. Nat'l Mortg. Ass'n Sec., Deriv. & "ERISA" Litig.*, 892 F. Supp. 2d 59
    (D.D.C. 2012) ............................................................................. 31, 38

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009) ................................. 56

*In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434 (S.D.N.Y. 2006) .................................. 29

*In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541 (9th Cir. 1994) (en banc) ....................................... 52

*In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142 (C.D. Cal. 2007) ......................... 54

*In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005 (C.D. Cal.
    2003) ....................................................................................... 56

*In re Marsh & Mclennan Cos., Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006) ..................... 49

*In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366 (S.D.N.Y.
    2009), *aff'd*, 592 F.3d 347 (2d Cir. 2010) ............................................................... 38

*In re Odyssey Healthcare, Inc. Sec. Litig.*, 424 F. Supp. 2d 880 (N.D. Tex. 2005) ..................... 55

*In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 ......................................................................................53, 56, 58

*In re Pfizer Inc. Sec. Litig.*, 4-CV-9866-LTS-HBP, 2014 WL 2136053 (S.D.N.Y. May 21, 2014) ..................................................................................................61

*In re Pfizer Inc. Sec. Litig.*, No. 4-CV-9866-LTS-HBP, 2014 WL 3291230 (S.D.N.Y. July 8, 2014) .................................................................53, 56, 59

*In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010)...................................31, 38

*In re SAIC, Inc. Sec. Litig.*, 2013 WL 5462289 (S.D.N.Y. Sept. 30, 2013) ................................49

*In re Scientific Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339 (N.D. Ga. 2010) ........................56

*In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd*, 752 F.3d 173 (2d Cir. 2014).........................................................39, 42

*In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986)...................................................................................58

*In re Williams Sec. Litig.—WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009) ........................56, 58

*In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448 (D. Conn. 2013) ........................................54

*Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ....................................................................................54

*Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005)..................................................30

*Joffee v. Lehman Bros.*, 410 F. Supp. 2d 187 (S.D.N.Y. 2006)...........................................54

*Kaess v. Deutsche Bank AG*, 572 F. App'x 58 (2d Cir. 2014)........................................45

*Kleinman v. Elan Corp., plc*, 706 F.3d 145 (2d Cir. 2013).........................................44, 47

*Kuriakose v. Fed. Home Loan Mortg. Corp.*, No. 08 Civ. 7281 (JFK), 2011 WL 1158028 (S.D.N.Y. Mar. 30, 2011) ......................................................................55

*Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55 (2d Cir. 1996) (per curiam) ........................42

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005) .....................................53, 54

*Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511 (S.D.N.Y. 2013) ................................................................................................56

*Lindsay v. Morgan Stanley (In re Morgan Stanley Info. Fund Sec. Litig.)*, 592 F.3d 347 (2d Cir. 2010)...................................................................................38

*New Orleans Emps. Ret. Sys. v. Omnicom Grp., Inc. Sec. Litig. (In re Omnicom Grp., Inc. Sec. Litig.)*, 597 F.3d 501 (2d Cir. 2010)........................................................ passim

*Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) ...............................................................48

*Pivot Point Capital Master LP v. Deutsche Bank AG*, No. 08 Civ. 2788 (AKH), 2010 WL 9452230 (S.D.N.Y. Dec. 9, 2010) (Hellerstein, J.)..................................28

*Raskin v. Wyatt Co.*, 125 F.3d 55 (2d Cir. 1997)........................................................4, 53

*Reiss v. Pan Am. World Airways, Inc.*, 711 F.2d 11 (2d Cir. 1983) .............................28

*Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2d Cir. 1978).................................29

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) .........................................................45

*Steed Finance LDC v. Nomura Sec. Int'l, Inc.*, 148 F. App'x 66 (2d Cir. 2005) ....................1, 31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ..............................28

*Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186 (2d Cir. 1992) ................31

*United States v. Caronia*, 703 F.3d 149 (2d Cir. 2012)...................................11, 16, 46

*Zeid v. Kimberley*, 930 F. Supp. 431 (N.D. Cal. 1996)..................................................44

## OTHER AUTHORITIES

17 C.F.R § 229.308 ......................................................................................................49

15 U.S.C. § 78u-5(c)(1)(A).............................................................................................44

15 U.S.C. § 7241(a)(4)...................................................................................................49

21 U.S.C. § 355.......................................................................................................11, 48

Fed. R. Civ. P. 56(c)(1)..................................................................................................30

Statement of Financial Accounting Standards No. 5 (1975) ........................................51

## <u>INTRODUCTION</u>

On January 26, 2009, Pfizer announced an agreement in principle to resolve pending government investigations concerning the marketing of Bextra and several other unnamed products.  In this securities class action, Plaintiffs challenge Pfizer's disclosures relating to the investigations, as well as the company's reserving decisions reflected in its audited financial statements.

Despite extensive discovery that included the production of more than 30 million pages of documents and over 60 depositions, Plaintiffs have found no evidence to support the essential elements of their claims:  the existence of a false or misleading statement, made with scienter, that caused Plaintiffs' alleged losses.  Pfizer is entitled to summary judgment for three reasons, any one of which is independently sufficient to result in dismissal under clear Second Circuit authority:

- Pfizer relied on unequivocal advice from outside disclosure counsel (Dennis Block), inside disclosure counsel (Lawrence Fox), and outside auditors (KPMG) that its disclosures and reserving judgments were proper; Plaintiffs thus cannot prove scienter, *see Steed Finance LDC v. Nomura Sec. Int'l, Inc.*, 148 F. App'x 66, 69 (2d Cir. 2005) (affirming summary judgment based on lack of scienter where defendant "relied on the expertise of counsel");

- Pfizer disclosed the investigations at issue and those disclosures were adequate as a matter of law, *see City of Pontiac Policemen's & Fireman's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("[b]y disclosing its involvement in multiple legal proceedings and government investigations and indicating that its involvement could expose UBS" to civil and criminal penalties and other consequences, "UBS complied with its disclosure obligations under our case law"); and

- Plaintiffs cannot prove loss causation because they have failed to disaggregate any alleged loss relating to the disclosure at issue from other factors that they concede caused a decline in Pfizer's stock price, *see New Orleans Emps. Ret. Sys. v. Omnicom Grp., Inc. Sec. Litig. (In re Omnicom Grp., Inc. Sec. Litig.)*, 597 F.3d 501, 512-13 (2d Cir. 2010) (affirming summary judgment on loss causation grounds).

1

Many courts in this Circuit have granted, and the Second Circuit has upheld, summary judgment in securities cases on these grounds, most recently in *Dalberth v. Xerox Corp.*, 766 F.3d 172 (2d Cir. 2014).  This Court should do the same.

Plaintiffs' failure of proof on essential elements of their claims stems from three uncontested facts.   *First*, it is undisputed that Pfizer relied upon the advice of its disclosure counsel and independent auditors in deciding what to disclose about the government investigations, the language to use in the disclosures, and whether any accounting reserves were required under GAAP.  Pfizer has taken the unusual step of waiving the attorney-client privilege as to the advice it received from disclosure counsel, and thus Plaintiffs have received ***all communications*** concerning that advice.   Plaintiffs deposed, among others, Pfizer's outside disclosure counsel (Dennis Block), its in-house disclosure counsel, and four partners from KPMG.  Every one of these professionals testified that they advised Pfizer that its disclosures and/or reserving decisions during the Class Period fully complied with applicable laws and accounting rules, and that they stand by that advice today.  Mr. Block, for example—whom the Court has rightly described as "a first-rate lawyer in the securities field" upon whose advice Pfizer had "a right to rely"[1]—reviewed, edited and approved every disclosure about the investigations before each was filed, and formally certified in writing that each filing complied with the securities laws.  Not a shred of evidence exists that anyone—within or outside the company—believed that Pfizer's disclosures or reserves were false or misleading in any respect.

*Second*, Pfizer disclosed throughout the Class Period that it was subject to investigations by the Department of Justice concerning the marketing of Bextra and other products, and that the resolution of these investigations could result in "criminal charges and/or fines and civil

---

[1]  7/19/13 Hearing Tr. 27.

penalties." Thus, the agreement in principle with the government that Pfizer announced on January 26, 2009—the sole alleged "corrective disclosure"—represented **precisely** what Pfizer had warned the market could occur: a negotiated resolution involving substantial fines and penalties. No reasonable investor could claim to be surprised by that announcement, which predated the final settlement by nearly eight months. Pfizer was not obligated, as Plaintiffs suggest, to use words of Plaintiffs' choosing in describing the investigation. *See, e.g.*, *Dalberth*, 766 F.3d at 187 ("That Plaintiffs wish that *more* was said, perhaps in more evocative language, is simply insufficient to establish a genuine dispute as to whether the market was adequately informed"). Nor was Pfizer obligated to accuse itself of wrongdoing. *See, e.g.*, *UBS AG*, 752 F.3d at 184. Here, Pfizer disclosed that the Department of Justice was investigating the company's marketing of products and that those investigations could result in criminal charges, fines and/or penalties. Nothing more was required.

*Third*, it is undisputed that on the day the tentative settlement was announced, investors also learned other critical pieces of information that caused a drop in Pfizer's stock price. But Plaintiffs have not disaggregated the losses caused by these other announcements from any losses supposedly caused by disclosure of the agreement in principle. The other events Pfizer announced that day were that (1) it would acquire Wyeth for $68 billion and, in the process, take on $22.5 billion in new debt; (2) as part of the acquisition, it would cut its dividend by 50 percent; and (3) its forward-looking earnings guidance was dramatically lower than analysts had expected (for reasons having nothing to do with the settlement). Over 200 market analyst reports concerning Pfizer were issued in the months between the January 26, 2009 announcements and the September 2, 2009 announcement of the final settlement, and **not a single one** even discussed the tentative settlement, let alone suggested that it had any impact on the stock price.

Rather, **every single one** that discussed the stock drop attributed it to the Wyeth merger, the dividend cut, and reduced 2009 earnings guidance.   Under established Second Circuit law, Plaintiffs must present a reliable and non-speculative method to quantify the losses allegedly caused by the so-called "corrective disclosure" and separate those from losses caused by other factors.   Plaintiffs' damages expert attempts to allocate losses among these various causes, but there is no factual basis in the record for doing so.   As the Second Circuit has recognized, an expert opinion cannot itself create a disputed issue of fact on loss causation.   *See, e.g.*, *Dalberth*, 766 F.3d at 189 (summary judgment affirmed where plaintiffs' proffered expert opinion on loss causation was "unsustainable on th[e] record" (internal quotation marks omitted)); *In re Omnicom Grp.*, 597 F.3d at 512-13 (same); *see also Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[A]n expert's report is not a talisman against summary judgment.").   And, here, the facts are not in dispute—there is no factual basis for asserting that the announcement regarding the agreement in principle caused a stock price decline and, even if there were such a basis, Plaintiffs cannot separate such a decline from the decline indisputably caused by other factors.

In response to this Motion, Plaintiffs likely will—as they have throughout discovery— attempt to re-litigate the underlying government investigations by accusing Pfizer of illegal marketing practices.   But such accusations are irrelevant to this case, because the only matter at issue is whether, on the record presented, and in light of Second Circuit case law under Section 10(b) and Rule 10b-5, Plaintiffs can identify a genuine issue of material fact that Pfizer committed fraud in its statements to investors.   Plaintiffs cannot do so as a matter of law.[2]

---

[2] Pfizer adopts and incorporates by reference the arguments and authorities set forth in the memoranda of law submitted by the individual defendants in this action, to the extent applicable.

## UNDISPUTED FACTS

### A.    Legal Review and Advice Regarding Pfizer's Disclosures

Pfizer's process for drafting its securities disclosures, in effect at all times during the Class Period, involved dozens of lawyers (inside and outside), accountants (inside and outside), and senior executives.  Certifications, sub-certifications, a Disclosure Committee, quarterly Certification meetings, and regular interactions between and among the various participants in the process were designed to ensure that the disclosures complied with the securities laws.  The process for disclosures about government investigations included:  (i) review and comment by the in-house lawyers responsible for supervising the company's government investigations; (ii) quarterly consultation between the lawyers handling the investigations and inside and outside disclosure counsel, as well as additional consultations whenever developments warranted; (iii) review and comment by Pfizer's outside disclosure counsel; (iv) review by KPMG, Pfizer's independent auditors; (v) review by Pfizer's Disclosure Committee; (vi) certifications attesting to the accuracy and completeness of the disclosures by the in-house lawyers and the company's outside disclosure counsel; and (vii) a quarterly Certification meeting attended by among others outside disclosure counsel, inside disclosure counsel, the Controller, and KPMG, at which the company's CEO and CFO each signed Sarbanes-Oxley certifications.[3]

Pfizer and its executives relied on two experienced securities disclosure lawyers—Dennis Block of Cadwalader, Wickersham & Taft, and Lawrence Fox of Pfizer's internal legal department—to advise on which matters to disclose and how to describe them.  Mr. Block is one of the country's most prominent securities lawyers, who has advised public companies on

---

[3] Statement of Undisputed Facts in Support of Pfizer's Motion for Summary Judgment ("SUF") ¶¶ 1, 6.

disclosure issues for more than 40 years.[4]  He reviewed, edited and approved every disclosure concerning the investigations, and formally certified in writing that each securities filing during the Class Period complied with the securities laws.[5]  Mr. Fox, for his part, had more than 35 years of experience advising public companies on disclosure obligations, and likewise advised that every Pfizer disclosure during the Class Period complied with the securities laws.[6]

As described below, immediately after Pfizer was informed of the Department of Justice's investigation concerning Bextra, the company disclosed the investigation in its securities filings.  That disclosure was updated over several years on the recommendation of Messrs. Block and Fox and KPMG, among others.[7]  In fact, in every quarter at issue, Mr. Block, Mr. Fox, KPMG, and others commented on the draft disclosures, discussed whether different or additional language should be used, or suggested changes that were incorporated.  Mr. Fox, for example, "always received a handwritten markup" of Pfizer's legal proceedings section "from Dennis [Block] every quarter with some comments," and KPMG "would often have comments on it" as well.[8]  Mr. Block likewise confirmed that he submitted comments "on what I understood was a fair disclosure of what they were trying to disclose," and that

> sometimes I would ask questions.  Sometimes I'd pick up the phone and call Larry [Fox] and/or he'd pick up the phone and call me, and we'd talk about how to accurately, adequately and appropriately disclose the given case.[9]

---

[4] SUF ¶ 3.

[5] SUF ¶¶ 4, 10–14, 16, 22.

[6] SUF ¶¶ 2, 24–25.

[7] SUF ¶¶ 11–16; *see also id.* ¶¶ 63, 70–71, 76–77, 90, 94–96, 100, 104.

[8] SUF ¶¶ 12, 13, 15.

[9] SUF ¶ 14.

Importantly, Pfizer's disclosure counsel received updates on at least a quarterly basis, and often more frequently, from the in-house lawyers—led by Douglas Lankler, the company's Chief Compliance Officer throughout most of the Class Period—responsible for overseeing the Bextra investigation.  As Mr. Lankler testified:

> [W]e explained to them that we had been advised by the government that a whistleblower complaint had been filed, that we initiated an investigation.  We would have talked to them about the major meetings we would have had with the government as the case progressed, some of the key findings of the internal investigation.
>
> We would have talked to them about, as it developed, some of the viewpoints that the government was giving us about their overall assessment of the case and some of the facts.  We would have talked to them about recommendations . . . outside counsel recommended, offer proposals and the like.[10]

Disclosure counsel were not shy about asking questions.  As Larry Fox testified, "To the extent we had questions, we would ask them.  We drilled down until we were comfortable."[11]  The purpose of these "extended conversations" between Messrs. Block and Fox and the company's government investigations lawyers was to "educate" disclosure counsel "about the status of the litigation" and to "get [the government investigations lawyers'] view on likely outcomes, potential risks, and the like."[12]

Based on all of this input, Mr. Block formally certified every quarter that, "to the best of my knowledge," Pfizer's disclosures "contain[ed] all information required to be included in the Form 10-K [or Form 10-Q]"; that they did not "contain an untrue statement of a material fact"; and that they did not "omit a material fact necessary to make the statements . . . not

---

[10] SUF ¶ 9; *see also id.*  ¶¶ 7, 70–71, 76–77, 90, 94–96, 100, 104.

[11] SUF ¶ 8.

[12] SUF ¶ 8 .

misleading."[13]   At his deposition, Mr. Block testified that he believes to this day that Pfizer's disclosures relating to the Bextra matter were not only truthful and not misleading, but also "strong," "robust," and "transparent":

> [Pfizer] had a very robust and transparent set of disclosure documents, which . . . said there was this investigation, it's heated up, we're trying to resolve it, we believe we have very strong defenses to the case; however, it could result in a substantial fine.[14]

Mr. Fox likewise testified that he advised Pfizer at the time, and believes to this day, that Pfizer's disclosures about the Department of Justice investigation were proper.[15]

Pfizer's process resulted in disclosures that adequately and accurately described both the investigation and the risks it posed to the company.  Pfizer told its investors that the Department of Justice was investigating the company's marketing of Bextra and (later) other products, and that the investigations presented a number of substantial legal risks.  Among the warnings Pfizer provided was that the investigations could result in:

- "civil and criminal sanctions";[16]

- "criminal charges and fines and/or civil penalties";[17]

- "the payment of a substantial fine and/or civil penalty";[18]

- an "excessive verdict[]" because "[l]itigation is inherently unpredictable";[19] and

---

[13] SUF ¶¶ 4, 22; *see also id.* ¶ 77.

[14] SUF ¶ 21.

[15] SUF ¶¶ 24–25.

[16] SUF ¶ 64.

[17] SUF ¶ 71.

[18] SUF ¶ 104.

[19] SUF ¶ 65.

- "judgments or . . . settlements of claims that could have a material adverse effect on our results of operations in any particular period."[20]

**B.    Pfizer's FAS 5 Reserve Determinations**

As with its securities disclosures, Pfizer evaluated its loss contingencies every quarter during the Class Period to determine whether an accounting reserve was required under Financial Accounting Standard No. 5 ("FAS 5").  FAS 5 requires a company to accrue a reserve only when a loss is both "probable" and "reasonably estimable."[21]  In consultation with KPMG, Pfizer's Controller, Loretta Cangialosi, was principally responsible for ensuring that the company's FAS 5 reserves complied with GAAP.[22]  Ms. Cangialosi received monthly updates on potentially material litigation matters, including government investigations.  She and her colleagues in the Controller's group also participated in quarterly reserve reviews attended by KPMG and Pfizer's in-house government investigations counsel responsible for the Bextra investigation.[23]

As Ms. Cangialosi explained, the purpose of the monthly meetings was "to get a status and an update on where these various matters were so that we could better understand whether or not something had happened that we would need to take a reserve, or whether or not something had happened that we need to consider revising disclosures."[24]  The Controller's office also met and conferred with Pfizer's in-house and outside investigations counsel, as well as KPMG, in response to developments in the investigations:

> Any time that . . . anything happened, no matter what, . . . if there were discussions [with the government], whether Doug [Lankler]

---

[20] SUF ¶ 65.

[21] SUF ¶ 30.

[22] SUF ¶ 31.

[23] SUF ¶ 32.

[24] SUF ¶ 32; *see also id.*  ¶ 34.

thought the discussions were going well, not going well, we
evaluated this every quarter.[25]

KPMG participated in the FAS 5 reserve judgments, and independently concluded in
writing each quarter that Pfizer's accrual determination was reasonable.  After receiving its own
updates from Pfizer's counsel, KPMG concluded at each reporting period that it concurred with
Pfizer's determination that the government investigations did not trigger a reserve obligation
under FAS 5.  For example, in connection with its 2006 audit, KPMG concluded, and advised
Pfizer's Audit Committee:

> Pfizer has not recognized a contingent liability related to the
> government's investigation of Bextra promotion as the facts and
> circumstances surrounding this matter have not yet developed to
> the point whereby an estimated range of loss can be determined
> under SFAS No. 5.  Disclosure in the 10-K is appropriate.[26]

The same was true in connection with KPMG's 2007 audit:

> Pfizer has not recognized a contingent liability related to the
> government's investigation of Bextra promotion because amounts
> of potential exposure are not estimable in accordance with SFAS
> No. 5. The facts and circumstances surrounding this matter have
> not yet developed to the point whereby an estimated range of loss
> can be determined under SFAS No. 5. This was further emphasized
> by the Bextra white paper [from Covington & Burling], which
> Pfizer submitted to the Department of Justice detailing its defenses
> to various allegations.[27]

The KPMG audit partners re-affirmed during their depositions their belief that no reserve was
required throughout the Class Period, and the fact that they had so advised Pfizer.[28]

---

[25] SUF ¶ 33; *see also id.*  ¶ 34.

[26] SUF ¶ 39; *see also id.* ¶¶ 35, 37, 40, 41, 49, 81–82.

[27] SUF ¶ 82.

[28] SUF ¶ 46.

KPMG also audited Pfizer's internal controls each year during the Class Period.  At the conclusion of every audit, KPMG opined that the company maintained "effective internal control over financial reporting."[29]  In October 2006, Pfizer and KPMG concluded that the company had a "significant deficiency"—but not a "material weakness"—in its monitoring controls over U.S. healthcare compliance.[30]  There is no requirement to disclose a significant deficiency in securities filings, and Pfizer promptly remediated the deficiency to KPMG's satisfaction.[31]

### C.  The Bextra Investigation:  February 2004 Notice to Pfizer and Early Stages

In February 2004, the Department of Justice informed Pfizer that it was investigating the company's sales and marketing practices concerning the prescription medication Bextra.[32]  In late 2001, the U.S. Food and Drug Administration had approved Bextra to treat pain associated with osteoarthritis, rheumatoid arthritis, and primary dysmenhorrea.  The product came on the market in early 2002.  One subject of the investigation was whether Pfizer sales representatives had promoted Bextra for pain associated with conditions other than osteoarthritis, rheumatoid arthritis, and primary dysmenhorrea.[33]  The lead prosecutor later described the government's theories in this regard as "nuanced."[34]

---

[29] SUF ¶ 140.

[30] SUF ¶¶ 136–138; *see also id.*  ¶ 139.

[31] SUF ¶ 139.

[32] SUF ¶ 51.

[33] SUF ¶ 51.  The FDA approves medications for specific uses, which are included in the product labeling.  *See* 21 U.S.C. § 355(a).  Doctors, however, may prescribe medications for any use that they deem beneficial to their patients.  *See United States v. Caronia*, 703 F.3d 149, 153 (2d Cir. 2012).  No statute expressly forbids pharmaceutical companies from promoting medications for such "off-label" uses.  *Id.* at 154.

[34] SUF ¶ 51.

Pfizer hired experienced government investigations counsel at Covington & Burling to investigate the company's promotion of Bextra, and the company committed to cooperate with the government.[35]  Pfizer also immediately disclosed the investigation to KPMG[36] and to the public in the "Legal Proceedings" section of its 2003 Form 10-K (filed on March 10, 2004):

> The Company recently was notified that the U.S. Department of Justice is conducting investigations relating to the marketing and sale of Genotropin and Bextra, as well as certain managed care payments.  We are cooperating in these investigations.[37]

Over the next two years, Pfizer's counsel met repeatedly with the government investigators.  In July 2004, Covington & Burling presented to the government a 50-page slide deck, entitled "Pfizer Inc. Review, Voluntary Disclosure, and Self-Assessment Methodology Relating to Bextra Allegations."[38]  By that time, Covington had interviewed more than 40 Pfizer employees and reviewed over 500,000 pages of documents.  In November 2004, Covington made a 180-page follow-up presentation, having conducted more than 70 interviews, and reported that it had found no widespread improper promotion and no evidence of an inappropriate headquarters-based strategy or involvement of senior management.[39]  In December 2004, the government formally subpoenaed Bextra-related documents, and the company produced millions of pages in response.

During its 2004 investigation, Covington discovered that four field-based sales personnel from one district of one region of one of Pfizer's sales divisions had attempted to delete Bextra-

---

[35] SUF ¶¶ 52, 55.

[36] SUF ¶ 53.

[37] SUF ¶ 53.

[38] SUF ¶ 54.

[39] SUF ¶ 54.

related electronic files, in violation of a document preservation notice Pfizer had issued when it became aware of the government investigation. Pfizer informed the government of the discovery, terminated the four employees, and turned over all investigation materials that would assist the government in prosecuting these individuals.[40]

After the 2004 presentations, despite hearing virtually nothing from the government,[41] Pfizer continued to update its securities filings. Pfizer's 2005 Form 10-K—filed on March 1, 2006, the first filing during the Class Period—disclosed that the Department of Justice had requested documents relating to the marketing of Bextra, and warned investors that Pfizer could enter into a materially adverse settlement:

> Litigation is inherently unpredictable, and ***excessive verdicts do occur***. Although we believe we have substantial defenses in these matters, ***we could in the future incur judgments or enter into settlements of claims that could have a material adverse effect on our results of operations in any particular period***. . . .
>
> In 2003 and 2004, we received requests for information and documents concerning the marketing and safety of Bextra and Celebrex from the Department of Justice and a group of state attorneys general.[42]

In the same 2004-2006 period, Pfizer's Controller and Finance group, together with KPMG, evaluated whether the status of the investigation required the company to record a reserve for loss contingencies under FAS 5.[43] They concluded that no reserve was required.[44]

---

[40] SUF ¶ 56-57.

[41] SUF ¶ 58.

[42] SUF ¶¶ 65, 67.

[43] SUF ¶ 68; *see also id.* ¶¶ 35–37.

[44] SUF ¶ 68; *see also id.* ¶¶ 35–37.

In April 2005—before the Class Period began—Pfizer voluntarily withdrew Bextra from the market for reasons unrelated to the government investigation (in response to a serious skin condition developed by a small percentage of users).[45]   There was no further promotion of Bextra after that date.

### D.   August 2006 to December 2007:  Pfizer Updates Its Warnings to Investors

In August and September 2006, after more than two years of investigation, the government presented for the first time its view of the Pfizer documents it had received concerning the marketing of Bextra.  Together with outside counsel Covington & Burling, Pfizer's Chief Compliance Officer Mr. Lankler, a former federal prosecutor in the Southern District of New York, and Pfizer's head of government investigations Carlton Wessel, also a former federal prosecutor, attended these meetings with the government.[46]

The government contended that Pfizer sales personnel had improperly marketed Bextra on a regular basis, and that headquarters-based personnel had developed a strategy to promote Bextra for general acute pain, as opposed to the specific types of pain for which it had been approved.[47]   The government identified several federal statutes that it claimed supported civil claims and criminal charges.  The government made clear, however, that its investigation was continuing, and it invited Pfizer to respond to these presentations and its views of the evidence.[48]

Pfizer's internal lawyers informed Messrs. Block and Fox, the company's Finance personnel, and KPMG of the government meetings.[49]   After following the detailed process

---

[45] SUF ¶ 50.

[46] SUF ¶ 69.

[47] SUF ¶ 69.

[48] SUF ¶ 69.

[49] SUF ¶ 70.

outlined above, and based on advice from Mr. Block, Mr. Fox, and KPMG, Pfizer again updated

its disclosures about the Bextra investigation, which now stated that various results including

criminal charges were possible, and that the company was considering ways to resolve the

matter:

> *It is possible that criminal charges and fines and/or civil*
> *penalties could result from pending government investigations.*
> . . . .
>
> Since 2003, we have received requests for information and
> documents concerning the marketing and safety of Bextra and
> Celebrex from the Department of Justice and a group of state
> attorneys general.  *We have been considering various ways to*
> *resolve these matters*.[50]

During the following year, Pfizer responded to the government's allegations, explained

the company's disagreement with the government's theories and its interpretation of certain

documents, and contested the factual basis of any claims the government might consider.

Pfizer's lawyers made detailed presentations to the government on January 30, 2007, on January

31, 2007, on March 23, 2007, and on June 20, 2007.[51]  On September 14, 2007, the parties met

again; the government indicated that the parties continued to disagree about the facts and

suggested that Pfizer make a financial proposal for a resolution.[52]

In response, Covington & Burling submitted lengthy "white papers" setting forth the

potential legal and factual defenses Pfizer could raise to criminal or civil charges.  In October

2007, Covington provided a detailed analysis of the government's "intended loss" theory of

damages, which no court has ever recognized in analogous circumstances and which Pfizer

---

[50] SUF ¶ 71.

[51] SUF ¶ 72.

[52] SUF ¶ 73.

argued could not be maintained in a case against the company.[53]  In November 2007, Covington submitted a 75-page, single-spaced legal brief discussing the numerous liability and damages defenses Pfizer would have to any charges.[54]  One of those arguments was that truthful statements made in product detailing, even if off-label, were protected by the First Amendment and thus could not be criminal[55]—an argument that has since been accepted by the Second Circuit in overturning the criminal misbranding conviction of a sales representative at another company.  See United States v. Caronia, 703 F.3d 149 (2d Cir. 2012).

Pfizer's disclosure counsel and KPMG were kept apprised of these developments.[56] Covington also provided audit response letters to KPMG and Pfizer which stated that Covington had "not concluded that the prospect of an unfavorable outcome" in the Bextra investigation was "probable" (which is a prerequisite for the recording of a FAS 5 reserve).[57]

Once again, Pfizer's disclosure lawyers and accountants advised the company that its securities disclosures—which already noted that the Bextra investigation could result in "criminal charges and fines and/or civil penalties," "excessive verdicts," and "settlements of claims that could have a material adverse effect on our results of operations in any particular period"—were proper.  These professionals also advised that no loss contingency reserve was required because the amount of any possible loss was not "reasonably estimable," a requirement under FAS 5 to record a reserve.[58]  Indeed, multiple witnesses testified that it would have been

---

[53] SUF ¶ 74.

[54] SUF ¶ 75.

[55] SUF ¶ 75.

[56] SUF ¶¶ 42, 79.

[57] SUF ¶¶ 42, 79.

[58] SUF ¶¶ 80–82; see also id. ¶¶ 35, 37, 40.

inconsistent with GAAP for Pfizer to record a reserve prior to the January 2009 settlement as the company could not have known what number to reserve.[59]

Also in 2007, separate and apart from the Bextra investigation, the government issued document subpoenas to Pfizer relating to additional medications, including Lyrica (subpoena issued in July 2007) and Geodon and Zyvox (subpoena issued in December 2007).[60]  Messrs. Block and Fox were informed of these new subpoenas and evaluated whether the subpoenas or the medications involved should be specifically disclosed.  They advised that disclosure was not yet required, because these investigations were at an early stage, and the subpoenas were encompassed within the paragraph that introduced the relevant section in the Form 10-K regarding government investigations, which was amended to state that "[i]t is possible that criminal charges and fines and/or civil penalties could result from pending government investigations, *including but not limited to those discussed below*."[61]  As Mr. Fox recounted in a later email:

> Dennis [Block], Carl [Wessel, Pfizer's lead in-house government investigations attorney], and I had a conference call in December 2007, when the subpoenas were served.  At that time, we decided that we didn't know enough to determine that this was a material matter that had to be disclosed. . . .  It was in connection with these subpoenas that we decided to beef up the introductory paragraph in the Government Investigations section of the 2007 Financial Report; that paragraph now refers to pending government investigations in general, including but not limited to the ones specifically disclosed, and notes that they could result in criminal charges and fines and/or civil penalties.[62]

---

[59] SUF ¶ 35.

[60] SUF ¶ 84.

[61] SUF ¶ 90.

[62] SUF ¶ 91.

### E.   2008:  Pfizer Further Updates Its Disclosures to Investors as the Parties Fail To Agree on Terms of a Resolution

At the start of 2008, in response to the government's suggestion that the parties attempt to resolve the Bextra matter, Covington & Burling informed the government that it was prepared to recommend to Pfizer a $50 to 70 million civil settlement.[63]  It quickly became apparent that the parties had vastly different views about a potential resolution.

On February 5, 2008, the government delivered a letter formally stating that Pfizer was a "target" of the investigation.[64]  Pfizer's lawyers did not view this as a new development, but rather as a negotiating tactic by the government.[65]  They nevertheless immediately communicated the receipt of the letter to Messrs. Block and Fox and sought advice on whether it should be disclosed in the company's securities filings.[66]  Messrs. Block and Fox advised that disclosure was not necessary.  Mr. Fox explained that "[i]n coordination with Dennis Block, our outside securities counsel, we concluded that the disclosures that were already in our SEC reports fully complied with the securities laws and that the receipt of the target letter in and of itself did not meaningfully add to the facts such that the disclosures that we made needed to be changed."[67]  As he put it, "We had already told the world criminal charges were possible and that substantial criminal fines and/or civil penalties could result."[68]  In response to questions posed by Allen Waxman, Pfizer's General Counsel, the disclosure lawyers suggested that the

---

[63] SUF ¶ 92.

[64] SUF ¶ 92.

[65] SUF ¶ 93.

[66] SUF ¶ 94.

[67] SUF ¶ 95.

[68] SUF ¶ 95.

company's Form 10-K, which was filed on February 29, 2008, be updated to state that the government's investigation remained "active," to reflect that the government had indicated it would continue to pursue the case despite the company's presentation of what the company viewed as substantial defenses to any theories of liability.[69]

In March, Covington & Burling increased its "prepared to recommend" settlement proposal to $250 million.[70]   In a letter dated April 4, 2008, the government made its first proposal for resolution of the investigation, which it described as concerning the "marketing of Bextra."  The government suggested that a large operating subsidiary of Pfizer (Pharmacia Inc.) plead guilty to a felony misbranding charge, that there be an additional "criminal resolution" as to Pfizer Inc., and that Pfizer pay almost $5 billion in fines and penalties.[71]   The contemporaneous documents reflect that Pfizer regarded the government's demand as "absurdly high and not even close to anything we would ever consider."[72]

Nonetheless, the demand was immediately discussed with Mr. Block, Mr. Fox, and KPMG, to determine whether it required additional disclosures or a reserve.[73]   Messrs. Block and Fox advised that no additional disclosure was needed.[74]   As Mr. Block testified:

> Typically if it's a demand that you believe is both irresponsible
> and unlikely to happen, and indeed since you had defense and were
> considering fighting, under those circumstances, I must tell you the

---

[69] SUF ¶ 96.

[70] SUF ¶ 98.

[71] SUF ¶ 98.

[72] SUF ¶ 99.

[73] SUF ¶ 100.

[74] SUF ¶ 100.  Even Plaintiffs' proffered disclosure expert agrees; he admitted that offers (whether final or only prepared-to-recommend), demands, and counteroffers in the context of discussing a resolution with the government need not be disclosed in securities filings. *Id.* n.148.

> government's demand is no different than any other plaintiff's
> demand for a lot of money when you're saying none.  And you
> don't see disclosure documents that talk about the ask and the
> offer, period, because it's not material until it becomes real ….
> [I]t's equally misleading to suggest higher than lower.[75]

In addition, Pfizer's Finance personnel and KPMG determined that—given the large gap
between the parties' positions with respect to both the monetary and non-monetary components
of a resolution—any range of possible loss could not be reasonably estimated.[76]

In the summer of 2008, Covington & Burling informed the government that it was
prepared to recommend that Pfizer resolve the Bextra matter with a felony plea by a non-
operating subsidiary and a payment of $750 million. The government, however, continued to
insist on a criminal resolution as to Pfizer Inc. and an amount in excess of $4 billion.[77]  The
parties were thus at a stalemate, and absent substantial concessions from the government, Pfizer
was prepared to litigate the matter.[78]

In its 2008 Second Quarter Form 10-Q (filed August 8, 2008), and on the advice of
Messrs. Block and Fox, Pfizer further updated its disclosure regarding these Department of
Justice investigations:

> It is possible that criminal charges and fines and/or civil penalties
> could result from pending government investigations. . . . .
>
> The Department of Justice continues to actively investigate the
> marketing and safety of our COX-2 medicines, particularly Bextra,
> ***and more recently has begun to investigate the marketing of
> certain other drugs***. These investigations have included requests
> for information and documents.  We have been considering various

---

[75] SUF ¶ 100 & n.148.

[76] SUF ¶ 101.

[77] SUF ¶ 102.

[78] SUF ¶ 103.

ways to resolve the COX-2 matter, **which could result in the payment of a substantial fine and/or civil penalty.**[79]

KPMG and Pfizer's Finance personnel again evaluated whether any FAS 5 reserve was required, and concluded that it was not, because the amount of any potential loss was not "reasonably estimable."[80]

The parties began moving toward a possible resolution in December 2008, after Pfizer and its counsel met with senior Department of Justice officials in Washington.  Shortly after this meeting, the prosecutors in Boston began to substantially reduce their monetary demands, and they agreed with Pfizer's position that only a non-operating subsidiary would enter a criminal plea.  Between December 2008 and January 7, 2009, the government lowered its monetary demand for the Bextra matter alone by nearly half—from over $4 billion to approximately $2.5 billion.[81]  But other issues remained unresolved.  Pfizer insisted that the parties reach a global resolution as to all four products under investigation—Bextra, Lyrica, Geodon, and Zyvox—and that the latter three investigations be resolved with civil settlements in which Pfizer denied all liability.[82]

In January 2009, it thus was still unclear whether an agreement would be reached.[83] Indeed, on January 5, 2009, Pfizer's counsel Ropes & Gray proposed to the government various ways to test Pfizer's defenses that would not require Pfizer to risk debarment from federal

---

[79] SUF ¶ 104.

[80] SUF ¶ 105.

[81] SUF ¶ 111.

[82] SOF ¶ 110.

[83] SOF ¶ 112.

healthcare programs.[84]   Brien O'Connor, the lead Ropes & Gray partner, testified that Pfizer was "saying to [the government] we'd love to have it mediated.   We'd love to have a three-judge panel hear arguments by both sides.   We would love to try the case for a [non-operating] entity like the entity that pled."[85]   Pfizer "continued to push because [it] felt so passionately about the fact that the government's positions were way over the top and really wrong in several important respects."[86]

F.     **The January 26, 2009 Announcement:  Resolution of the Investigation, the Wyeth Acquisition, the Dividend Cut, and the Reduced Earnings Guidance**

After the markets closed on Friday, January 23, 2009, Pfizer's counsel and the government broke their impasse and reached an agreement in principle to resolve the outstanding government investigations.   The government acceded to Pfizer's insistence on a global settlement, in which a non-operating subsidiary would plead guilty to one count of felony misbranding of Bextra; the government agreed not to prosecute Pfizer and agreed to resolve the Lyrica, Geodon, and Zyvox investigations through civil settlements, with no admission of liability by Pfizer.[87]   In return, Pfizer agreed to pay $2.3 billion in fines, penalties, and civil settlements.[88]   Pfizer's Board of Directors approved the agreement in principle on Sunday, January 25, 2009.[89]

---

[84] SOF ¶ 112.

[85] SOF ¶ 112.

[86] SOF ¶ 112.

[87] SUF ¶ 113.

[88] SUF ¶ 113.

[89] SUF ¶ 114.

Also on January 25, 2009, Pfizer's Board of Directors approved an agreement to acquire Wyeth for $68 billion.[90]   As part of the agreement to acquire Wyeth, which included the assumption of an additional $22.5 billion in debt, Pfizer agreed to cut its dividend ***in half***— ending 42 consecutive years of ***increased*** dividends.[91]   Uncontested testimony establishes that the Wyeth merger alone, not the government settlement, compelled Pfizer to cut its dividend.  As then-CEO Jeffrey Kindler testified:

> Q. If Pfizer had not acquired Wyeth, but had nonetheless settled the government investigation, would it have cut its dividend?
>
> A. Absolutely not. . . .   $2.3 billion is obviously a substantial amount of money, but that was a onetime event that meant $2.3 billion was being paid out.  The money that I was just describing increased obligations for dividends on the new stock issued, for cash that was required to finance the deal, for debt service, those were obligations in the billions of dollars that would have gone out for years and years and years.   So we could very easily have managed the $2.3 billion.   We would never have thought about cutting the dividend as a result of that.[92]

On Monday, January 26, 2009, before the markets opened, Pfizer issued two press releases.  One press release announced that Pfizer would acquire Wyeth and—as a consequence of the transaction and its assumption of additional debt—it would be cutting its dividend in half.[93]

The other press release reported Pfizer's results for the 2008 fiscal year and provided earnings guidance for 2009 that was significantly below what analysts had projected:  "In 2009,

---

[90] SUF ¶ 115.

[91] SUF ¶¶ 116–117.

[92] SUF ¶¶ 118–119 & n.180.

[93] SUF ¶ 120; *see also id.* ¶ 121.

Pfizer expects . . . adjusted diluted EPS of $1.85 to $1.95."[94]   The prior analyst consensus estimates for Pfizer's 2009 earnings had been $2.50 per share—31% higher than what Pfizer predicted on January 26, 2009.[95]   The company explained that the disappointing guidance reflected, among other things, "the projected impact of the strengthening of the U.S. dollar, increased pension expenses and lower interest income."[96]

This second release also reported that Pfizer's fourth quarter 2008 results "were impacted by a $2.3 billion pre-tax and after-tax charge" relating to the agreement in principle with the government "to resolve previously disclosed investigations regarding allegations of past off-label promotional practices concerning Bextra, as well as other open investigations."[97]   The release did not identify by name any of the other products that were incorporated into the settlement.

Pfizer's stock opened on January 26, 2009 at $17.45 per share and fell to $15.65 per share by market close—a drop of $1.80 per share.[98]

### G.   The Market Recognizes the Negative Impact of the Wyeth Acquisition, Dividend Cut and Reduced Earnings Guidance, and Entirely Ignores the Government Settlement

The contemporaneous reactions of market analysts, investors, and the Lead Plaintiff's own investment advisers reflect why Pfizer's stock dropped after the January 26 announcements: investors were unhappy about the dividend cut and reduced earnings guidance, and were skeptical of the Wyeth acquisition.   ***Not one*** of the more than 200 analyst reports published

---

[94] SUF ¶ 122.

[95] SUF ¶¶ 122, 128.

[96] SUF ¶ 122.

[97] SUF ¶ 123.

[98] SUF ¶ 124.

between January 26 and September 2, 2009—the date of the final settlement—discussed the agreement in principle with the government, let alone suggested that it caused the stock drop.

On the morning of January 26, 2009, following the announcements, Pfizer held a conference call for leading stock analysts in the healthcare field. Pfizer's CFO opened the call by noting, among other things, the tentative settlement.[99] The analysts' questions during the call concerned the Wyeth acquisition, the dividend cut, the new debt resulting from the acquisition and the company's future earnings and business prospects. Not one question concerned the settlement of the government investigations.[100] Similarly, at an investor luncheon the next day, the analysts' questions all focused on the Wyeth acquisition and Pfizer's earnings guidance.[101]

On January 27, 2009, the day after the announcements, representatives from BlackRock—the investment manager for Lead Plaintiff Stichting Philips Pensioenfonds—met with Pfizer executives. In preparation for the meeting, Dan Hanson—a BlackRock managing director—circulated an email outlining "major questions" to be asked. Mr. Hanson's email lists as topics of discussion: (1) the background of the merger; (2) synergies in biotechnology R&D from the merger; (3) Pfizer's target dividend after 2012; (4) cost synergies in the merger; and (5) Pfizer's R&D pipeline and its fit with Wyeth.[102] There is no mention of the government settlement.

In the two weeks after Pfizer's January 26 announcements, sixteen leading financial institutions issued reports on Pfizer. Fifteen referred to the company's acquisition of Wyeth, and

---

[99] SUF ¶ 125.

[100] SUF ¶ 125.

[101] SUF ¶ 125.

[102] SUF ¶ 126.

most discussed Pfizer's reduced 2009 earnings guidance and the 50-percent dividend cut.  A Deutsche Bank report noted that the dividend cut "has clearly angered some investors, and the holders attracted purely to the yield may clearly choose other alternatives."[103]  Credit Suisse explained that "PFE stock is down 16% post deal as the case to sell was clear (high dividend yield investors were exiting the stock)."[104]  Similarly, BMO Capital Markets concluded that "reducing its dividend reduces PFE shares attractiveness."[105]  Cowen and Company declared itself "uninspired by the merger" due to "integration risks, the 50% dividend cut, and an est[imated earnings per share] growth rate that is below other stocks."[106]  Hilliard Lyons stated, "[E]xisting shareholders are now being asked to accept the more nebulous promise of increased long-term shareholder value from the merger as opposed to receiving current income now."[107]  Many shareholders had invested in Pfizer because of its long history of paying substantial dividends, and the dramatic cut to Pfizer's dividend fundamentally changed their view of Pfizer's stock and led them to sell.[108]

In the days following the company's issuance of earnings guidance, multiple analyst reports lowered the target price for Pfizer's stock.  Two, BMO Capital Markets and Natixis Bleichroeder, reduced Pfizer's price target by $3 per share, from $19 to $16.[109]  Two others,

---

[103] SUF ¶ 127.

[104] SUF ¶ 127.

[105] SUF ¶ 117 & n.179.

[106] SUF ¶ 127.

[107] SUF ¶ 127.  Notably, the drop in Pfizer's share price after the announcement of the Wyeth acquisition is consistent with the 10.6% drop in Pfizer's share price after Pfizer announced that it would acquire Pharmacia on July 15, 2002.  SUF ¶ 130.

[108] SUF ¶ 117 & n.179.

[109] SUF ¶ 128.

Bernstein Research and Merrill Lynch, reduced their targets by \$2 per share, from \$20 to \$18—essentially the same amount that Pfizer's stock price had fallen on January 26.[110]  These analysts expressly tied their target price reductions to new earnings-per-share estimates, which had been revised downward as a result of Pfizer's reduced 2009 earnings guidance.[111]

Only four of the analyst reports from the sixteen banks even mentioned the tentative settlement.  Two merely listed the settlement as a line item, and one of those reports upgraded Pfizer to a "Buy" rating.[112]  The other two reports included a one-sentence mention of the settlement, one misreporting the settlement amount as "\$2.3 <u>million</u>."[113]  Not a single analyst report suggested that the settlement had caused the drop in Pfizer's stock price, reputational loss to Pfizer, or any adverse effect on Pfizer's future revenues or earnings.

In total, ***over 200 financial analyst reports*** concerning Pfizer were issued from January 26, 2009 through September 1, 2009 (the day before the settlement agreements with the government were executed).  ***Not a single one*** discussed the tentative settlement or suggested that it had caused Pfizer reputational harm or had affected the analysts' long-term evaluation of the company.[114]

---

[110] SUF ¶ 128.

[111] SUF ¶ 128.

[112] SUF ¶ 129.

[113] SUF ¶ 129.

[114] During the past decade, many other pharmaceutical companies—including Merck, Amgen, Abbott, Eli Lilly, and GlaxoSmithKline—also settled Department of Justice investigations related to their marketing practices.  There is no evidence that these companies experienced a "reputational penalty," as Plaintiffs claim occurred here.  In fact, in many instances, the share prices of these companies rose on the date of their announcements.  *See* Petrosinelli Decl. Y-3.

On September 2, 2009, the government and Pfizer announced the finalized settlement.[115]
The September 2 announcement disclosed many of the details of the settlement agreement for the
first time—for example, the announcement identified Geodon, Lyrica, and Zyvox by name as
part of the settlement, and disclosed that the settlement included a criminal penalty for Bextra
and that the penalty was $1.195 billion.  There was no significant move in Pfizer's stock price
that day.

## ARGUMENT

### I.   THE RECORD CONTAINS NO EVIDENCE OF SCIENTER, AND PFIZER'S UNDISPUTED RELIANCE ON ADVICE OF COUNSEL AND INDEPENDENT AUDITORS PRECLUDES ANY SUCH FINDING.

"The requisite state of mind in a Rule 10b-5 action is 'an intent to deceive, manipulate []
or defraud.'"  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst &
Ernst v. Hochfelder*, 425 U.S. 185, 191 n.7 (1976)).  Scienter requires "more than a conscious
failure to disclose . . . .   Rather, there must be proof that the non-disclosure was intended to
mislead."  *Reiss v. Pan Am. World Airways, Inc.*, 711 F.2d 11, 14 (2d Cir. 1983); *see also Pivot
Point Capital Master LP v. Deutsche Bank AG*, No. 08 Civ. 2788 (AKH), 2010 WL 9452230, at
*4 (S.D.N.Y. Dec. 9, 2010) (Hellerstein, J.).[116]

---

[115] SUF ¶ 131.

[116] Under the PSLRA, a plaintiff must plead a basis for a "strong inference" of scienter.  In *Tellabs, Inc. v.
Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007), the Supreme Court held that the strong-inference
standard requires facts giving rise to an inference that is "cogent and at least as compelling as any
opposing inference of nonfraudulent intent."  The Second Circuit has not yet decided if the *Tellabs*
standard applies at summary judgment, but several other courts have so held, *see, e.g.*, *Feinberg v.
Benton*, No. 05-4847, 2007 WL 4355408, at *6 & n.1 (E.D. Pa. Dec. 13, 2007).  Pfizer submits that the
strong-inference requirement should apply here.   "[T]he judicial reasoning applicable to imposing
heightened pleading requirements is at least as forceful, if not more so, with regard to proof requirements
that a trial judge must consider in deciding whether to allow a motion for summary judgment."  *Geffon v.
Micrion Corp.*, 249 F.3d 29, 36 (1st Cir. 2001) (internal quotation marks omitted).  Even if the strong-
inference standard does not apply, however, summary judgment is warranted because there is *no* plausible
inference of scienter.

Proof of scienter requires, at a minimum, proof of reckless conduct.  *See Fecht v. N. Telecom Ltd. (In re Northern Telecom, Ltd. Sec. Litig.)*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000).  Recklessness is defined as, "at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *Id.* at 464 (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)).  A failure to disclose information "can only constitute recklessness if there was an obvious duty to disclose that information."  *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 446 (S.D.N.Y. 2006).

The record contains no evidence that anyone at Pfizer acted with scienter.  To the contrary, the evidence shows that Pfizer followed a meticulous process in drafting its securities disclosures, and the company relied on legal advice from disclosure counsel and accounting advice from outside auditors to confirm that its securities filings complied with the law.

### A.   Pfizer Waived Its Attorney-Client Privilege to Reveal All Legal Advice Pfizer Received Concerning Its Disclosures and Reserving Decisions.

Before depositions began, Pfizer took the extraordinary step of waiving its attorney-client privilege as to the advice it received from securities disclosure counsel—Mr. Block and Mr. Fox—concerning its securities filings and FAS 5 reserving decisions relating to the Department of Justice investigation.  The Court memorialized that agreement in an Order dated January 22, 2013, and thereafter Pfizer produced to Plaintiffs an additional 7,000 pages of formerly privileged documents.[117]  Plaintiffs thus had full access to the inner workings of Pfizer's

---

[117] Order at 1, Jan. 22, 2013, ECF 150 (establishing the scope of waiver as "(i) legal advice regarding Pfizer's legal proceedings disclosures concerning the government investigations that culminated in the $2.3 billion settlement announced on January 26, 2009 and memorialized in the Settlement Agreement between the United States Department of Justice and Pfizer Inc. (the "Government Investigations") and

securities disclosure and FAS 5 reserves process, including emails, memos, letters, and other documents showing exactly how the disclosures at issue were drafted, why the disclosures were worded the way they were, why FAS 5 reserves were not established, and what the lawyers and auditors advised Pfizer should be included (or not included) in the company's SEC filings. Plaintiffs then were able to use these documents to depose Mr. Block and Mr. Fox, as well as four KPMG partners, concerning the advice they gave.

Pfizer waived its privilege precisely to ensure that, at the end of discovery, there could be no dispute about the fact that it drafted, reviewed, and issued its SEC disclosures in good faith, and in complete reliance on the advice of its disclosure counsel and auditors. That is exactly what discovery has shown. As discussed below, this evidence precludes any finding that Pfizer acted with scienter.

In addition to the discovery conducted pursuant to the waiver, Pfizer produced in this case more than 30 million pages of internal documents, and Plaintiffs were permitted to take more than 60 depositions. *Nowhere* in this vast written record is there the slightest suggestion that anyone at Pfizer believed that the company's securities disclosures were false or misleading. Plaintiffs cannot cite a single document or piece of testimony that would support such an inference. Plaintiffs cannot simply ask a jury to speculate that, even though millions of contemporaneous documents and thousands of pages of testimony contain no evidence of fraudulent intent, such intent must have been present.[118]

---

(ii) legal advice regarding Pfizer's FAS 5 reserves in connection with potential losses arising out of the Government Investigations").

[118] Rule 56 specifically requires that a party "asserting that a fact . . . is genuinely disputed must support the assertion by [] (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). Thus, at the summary judgment stage, a nonmoving party "must offer some *hard evidence* showing that its version of the events is not wholly fanciful," *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)

**B.      Pfizer's Undisputed Reliance on the Advice of Messrs. Block and Fox and KPMG Prevents Any Finding of Scienter.**

The Second Circuit and many other courts have recognized that fraud or recklessness cannot be established as a matter of law where the defendant relied on the professional judgments of lawyers and accountants.    In *Steed Finance LDC v. Nomura Securities International, Inc.*, for example, the Second Circuit affirmed the grant of summary judgment to a defendant based on lack of scienter where the defendant had "relied on the expertise of counsel from Cadwalader, Wickersham & Taft," 148 F. App'x 66, 69 (2d Cir. 2005)—the same firm that provided disclosures advice to Pfizer in this case. *See also Cruden v. Bank of New York*, 957 F.2d 961, 965 (2d Cir. 1992) (affirming summary judgment based on defendants' good faith reliance on advice of counsel where "record disclose[d] nothing beyond the 'incorrectness' of counsel's opinion to support an inference that the Trustees' reliance [on advice of counsel] was not in good faith"); *In re Fed. Nat'l Mortg. Ass'n Sec., Deriv. & "ERISA" Litig.*, 892 F. Supp. 2d 59, 72 (D.D.C. 2012) (where the defendant "relies in good faith on the professional judgment of the company's internal and external accounting and auditing personnel, and the plaintiffs have not put forth any evidence that he was notified or should have known that [his company's] accounting policies violated GAAP, summary judgment is warranted"); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1238 (S.D. Cal. 2010) (granting summary judgment where

---

(emphasis added) (internal quotation marks omitted), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted); *see also Bell v. Metropolitan Transportation Authority*, No. 12 Civ. 1235 (AKH), 2013 WL 8112461, at *1 (S.D.N.Y. Nov. 1, 2013) (Hellerstein, J.) ("[T]he non-moving party may not rely on conclusory allegations or unsubstantiated speculation to defeat the summary judgment motion."); *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir. 1992) (summary judgment cannot be defeated "on the basis of conjecture or surmise" (internal quotation marks omitted)); *Billhofer v. Flamel Tech., S.A.*, No. 07 Civ. 9920, 2013 WL 866778, at *3-4 (S.D.N.Y. Mar. 8, 2013) (granting summary judgment in a securities class action when "numerous documents" and the testimony of "[a]ll of the witnesses who were questioned" supported defendants' account of the facts).

defendant acted in reliance on company's CFO and accounting professionals with respect to "a complicated accounting analysis that is infused with the exercise of professional judgment").

1.   **Messrs. Block and Fox Advised that Pfizer's Legal Proceedings Disclosures Complied with the Securities Laws.**

There is no dispute that Pfizer followed a rigorous process for the drafting, review, and approval of the "Legal Proceedings and Contingencies" footnote to its financial statements, which involved dozens of lawyers, accountants, and other executives.  Even Plaintiffs' proffered disclosure expert acknowledges that Pfizer's process was "the process [he] used" when he was employed at one of Pfizer's competitors, GlaxoSmithKline, and that Pfizer "appear[ed] to have proper disclosure controls[.]"[119] The key part of the process was the legal advice Pfizer received from two separate securities disclosure counsel, Messrs. Block and Fox, who between them had over 75 years of experience advising public companies on their disclosure obligations.  Every single quarter during the Class Period, Messrs. Block and Fox evaluated the Bextra investigation disclosure, advised the company whether it needed to be updated, drafted any necessary updates, signed off on the final language, and (in Mr. Block's case) formally certified that the disclosures complied with the securities laws.  As noted, Plaintiffs received every scrap of paper—memos, emails, faxes, letters, and certifications—from the files of Messrs. Block and Fox (and anyone else) that reflected the advice these lawyers gave.  Those thousands of documents all reflect that (i) Messrs. Block and Fox advised Pfizer that all of the disclosures about the government investigations that Plaintiffs challenge here complied with the securities laws, and (ii) Pfizer relied on the advice in issuing its SEC filings.

---

[119] SUF ¶ 17.  Mr. Buthusiem also described the process as "very long and lengthy and involved[.]"  *Id.* & nn.32–33.

Thus, all of Plaintiffs' criticisms of the disclosures—that they should have said "off-label marketing" instead of "marketing," that they should not have referred to "substantial defenses," and whatever other quibbles Plaintiffs have with the disclosure language—are irrelevant as to the element of scienter.  Even if such arguments could support a claim that the disclosures were false or misleading (which they cannot, *see infra* II.A–D), it is undisputed that Messrs. Block and Fox drafted, edited, evaluated, and approved this precise language, and advised Pfizer that the disclosures complied with the law.  At bottom, Plaintiffs argue that Messrs. Block and Fox were incorrect in their legal advice.  But the correctness of their legal advice is not at issue here.  The issue is whether Plaintiffs can prove that Pfizer intentionally and fraudulently issued disclosures that violated the securities laws.  The legal advice Pfizer received from its lawyers, who are experts in this field, precludes any such finding.  *See Cruden*, 957 F.2d at 965 (affirming grant of summary judgment where "record disclose[d] nothing beyond the 'incorrectness' of counsel's opinion to support an inference that the Trustees' reliance [on advice of counsel] was not in good faith").

Faced with this record, Plaintiffs have suggested during discovery that they will attempt the only argument they can possibly offer:  that Messrs. Block and Fox supposedly were not provided sufficient information about the Department of Justice investigations and thus could not provide informed legal advice about disclosure of the investigations.  The record simply does not support this argument.  Numerous witnesses, including Messrs. Block and Fox themselves, testified that the government investigations lawyers provided disclosure counsel with fulsome information during their "extended conversations" about the Department of Justice investigations; that Messrs. Block and Fox asked whatever questions they needed answered in order to render their disclosure advice, "educat[ed]" themselves concerning "the status of the

litigation" and its "likely outcomes" and "potential risks"; and that disclosure counsel "drilled down until [they] were comfortable."[120]  The documents reflect the same.[121]

Most importantly, Plaintiffs deposed Messrs. Block and Fox and attempted to shake their opinions by confronting them with documents that (Plaintiffs assumed) they never saw, or information that (Plaintiffs assumed) they did not know.  But Plaintiffs' attempts to demonstrate that counsel gave uninformed advice proved just the opposite.  The depositions confirmed that Mr. Block and Mr. Fox knew the status of the various investigations and, critically, despite Plaintiffs' best efforts, both continue to stand by their advice.  Mr. Block testified that he believed that Pfizer "probably made more robust and transparent disclosure than anybody,"[122] and continues to hold that view today:

> Q.  [Plaintiffs' counsel] has asked you a number of questions today and shown you some documents.  Is there anything that he's said to you today or shown you today that changes your view as to the appropriateness of Pfizer's disclosures during the class period?
>
> A.  No.[123]

Similarly, Mr. Fox testified:

> Q.  Were you always comfortable during the class period that the legal proceedings disclosures were appropriate, adequate and in compliance with the securities laws?
>
> A.  Yes. . . .
>
> Q.  Sitting here today, do you believe that the company's litigation proceedings disclosures during the class period complied with the securities laws?
>
> A.  I do.[124]

---

[120] SUF ¶¶ 7–10 & n.16.

[121] SUF ¶¶ 7, 70–71, 76–77, 90, 94–96, 100, 104.

[122] SUF ¶¶ 21, 23.

[123] SUF ¶ 23.

Thus, both the contemporaneous documents and the testimony adduced in discovery conclusively demonstrate that Pfizer drafted, reviewed, and issued its disclosures about the Department of Justice investigations based on the advice of highly competent disclosure counsel, and with no intent to mislead investors.

### 2. KPMG Advised that Pfizer's FAS 5 Reserving Decisions Complied with GAAP.

The record likewise contains no evidence suggesting that Pfizer's judgments as to the necessity of a loss contingency reserve were made recklessly.  Throughout the Class Period, Pfizer and its independent auditor KPMG analyzed whether the FAS 5 criteria had been met and thus warranted a reserve.  In each and every quarter, the company and KPMG agreed that one or both of the requirements had not been met.  Plaintiffs have received internal e-mails and other documents from the files of Pfizer, KPMG, and Mr. Block.[125]  Nowhere in the record is there even a suggestion that any participant in this process believed then, or believes today, that a reserve should have been taken earlier than January 2009, when Pfizer and the government reached their agreement in principle.

To the contrary, the documents and testimony all reflect careful attention to this issue and a unanimous agreement by all parties that taking a reserve in a prior period would have violated GAAP.[126]  Pfizer internal memoranda beginning in September 2005, prior to the Class Period, consistently state that the amount of any loss that Pfizer might incur as a result of the government investigations was not reasonably estimable.  As late as January 2009, shortly before

---

[124] SUF ¶ 25.

[125] The productions included a memorandum that Mr. Block helped to draft in October 2007 setting forth the reasons why no loss contingency reserve should be taken in connection with the Bextra investigation. *See* Declaration of Joseph G. Petrosinelli In Support of Pfizer's Motion For Summary Judgment ("Petrosinelli Decl.") Ex. C-6 (attaching memorandum).

[126] SUF ¶ 35.

the agreement in principle, Mr. Block was drafting a new memorandum to KPMG on the subject, stating, "[A] reserve has not been taken because," in part, "the amount of the loss could not be reasonably estimated in light of . . . uncertainty over whether the matter can be settled and at what amount," and "the Boston U.S. Attorney has not indicated that he is willing to settle the matter for an amount in a range and other conditions of settlement that Pfizer would accept."[127] KPMG reached a similar conclusion when, in February 2009, it conducted an analysis to "evaluate the timing and the propriety of the charge being recorded in the fourth quarter of 2008." Based on discussions with senior management and legal counsel, independent review of relevant documents (including Pfizer's correspondence with the government), and KPMG's attendance at Pfizer's Audit Committee meetings, KPMG concluded, "Pfizer appears to have appropriately assessed the accrual and disclosure requirements and recorded a charge that is consistent with SFAS No. 5."[128]

Pfizer's management relied in good faith on KPMG's independent assessment, which confirmed the Finance Department's resolution of the reserve question. Mr. D'Amelio, Pfizer's CFO beginning in September 2007, "took comfort" from the fact that KPMG agreed with Pfizer's conclusion that no loss reserve was appropriate.[129] Mr. D'Amelio's predecessors agreed. Alan Levin, the company's CFO for the first half of the Class Period, described KPMG as "an independent set of eyes that had fiduciary responsibility to evaluate the same kinds of things that we were evaluating within the management group,"[130] and David Shedlarz, Mr.

---

[127] SUF ¶ 43.

[128] SUF ¶ 49; *see also id.* ¶¶ 35, 47.

[129] SUF ¶ 83.

[130] SUF ¶ 83.

Levin's predecessor, confirmed that he too had relied upon "KPMG's representation that FAS-5 had been followed."[131]

Again, as with the securities disclosures, Plaintiffs argue that Pfizer's judgment and KPMG's advice regarding reserving decisions was incorrect, and that a reserve should have been taken. Although Pfizer disagrees, the key point here is that nowhere in the testimony of the relevant Pfizer or KPMG witnesses, nor in the contemporaneous documents, is there any suggestion that Pfizer or KPMG believed that a reserve was appropriate. All of the record evidence is to the contrary. Plaintiffs' hindsight-driven second-guessing cannot create a genuine issue of material fact on the question of scienter.

Plaintiffs also argue that KPMG was not sufficiently informed of the status of the government investigations and thus could not provide informed FAS 5 advice. But just as with Plaintiffs' identical argument as to Messrs. Block and Fox, the testimony and documents show exactly the opposite.[132] And again, Plaintiffs questioned the KPMG audit partners at deposition about whether they believed they were fully informed, and whether any additional information that Plaintiffs claim they did not know would have changed their advice regarding reserves. All of them testified that they continue to believe, even in hindsight and after cross-examination, that their advice to Pfizer was correct and would not have changed.[133]

In sum, the record contains no evidence of the recklessness or intentional wrongdoing that would be necessary to establish a genuine issue of material fact as to scienter regarding

---

[131] SUF ¶ 83.

[132] SUF ¶¶ 7, 15, 27–29, 31–35, 37–41, 53, 70, 76, 101.

[133] SUF ¶¶ 26–29.

reserving judgments. *See, e.g.*, *In re Fed. Nat'l Mortg. Ass'n Sec., Deriv. & "ERISA" Litig.*, 892 F. Supp. 2d at 72; *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d at 1238.

## II.   UNDER SECOND CIRCUIT LAW, THE DISCLOSURES AND STATEMENTS THAT PLAINTIFFS CHALLENGE CANNOT SUPPORT A SECURITIES FRAUD CLAIM.

Plaintiffs' securities fraud claim is based on various SEC disclosures and public statements that Plaintiffs assert were false or misleading.  As discussed below, none of these disclosures or statements can support liability under Section 10(b) or Rule 10b-5.  The Second Circuit has held that the types of statements Plaintiffs challenge cannot, as a matter of law, constitute securities fraud.

### A.   Pfizer Had No Duty to Disclose that Employees Had Engaged in Unlawful Promotion of Products.

A core allegation by Plaintiffs is that Pfizer's disclosures were false and misleading because Pfizer knew its employees had engaged in unlawful off-label promotion of Bextra, Geodon, Lyrica, and Zyvox, but Pfizer did not disclose that fact to the public.  *See* First Am. Compl. ¶¶ 47-77.  Second Circuit law is clear that a company has no duty under the securities laws to accuse itself of wrongdoing.  The omission of such statements therefore cannot, as a matter of law, support a securities fraud claim.

With respect to government investigations, a duty to disclose arises under Section 10(b) only when necessary "to prevent existing disclosures from being misleading."  *Lindsay v. Morgan Stanley (In re Morgan Stanley Info. Fund Sec. Litig.)*, 592 F.3d 347, 360-66 (2d Cir. 2010).  But "[d]isclosure is not a rite of confession," *id*. at 365 (quotation omitted), and therefore companies that are subject to government investigations "have no duty to accuse themselves of unproven, allegedly illegal policies," *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 377 (S.D.N.Y. 2009), *aff'd*, 592 F.3d 347 (2d Cir. 2010), or "to speculate or disclose

38

uncharged, unadjudicated wrongdoings or mismanagement," *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012) (internal quotation marks omitted), *aff'd*, 752 F.3d 173 (2d Cir. 2014); *see also In re Citigroup Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("[T]he federal securities laws do not require a company to accuse itself of wrongdoing."), *aff'd sub nom. Albert Fadem Trust v. Citigroup Inc.*, 165 F. App'x 928 (2d Cir. 2006).  Moreover, companies being investigated by the government "are not obligated to speculate as to the myriad of consequences, ranging from minor setbacks to complete ruin, that might . . . befall[] the company if the [illegal conduct were] discovered, disclosed or terminated." *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008) (internal quotation marks omitted); *see also Citigroup*, 330 F. Supp. 2d at 377 (defendant "was not required to make disclosure predicting" uncertain litigation or regulatory activity).

Throughout the Class Period, Pfizer disclosed to the public that the Department of Justice was investigating the company's marketing of Bextra and (later) other products, and that the investigations presented a number of substantial legal risks.  Among the warnings Pfizer provided was that the investigations could result in:

- "civil and criminal sanctions";[134]

- "criminal charges and fines and/or civil penalties";[135]

- "the payment of a substantial fine and/or civil penalty";[136]

- an "excessive verdict[]" because "[l]itigation is inherently unpredictable";[137] and

---

[134] SUF ¶ 64.

[135] SUF ¶ 71.

[136] SUF ¶ 104.

[137] SUF ¶ 65.

- "judgments or . . . settlements of claims that could have a material adverse effect on our results of operations in any particular period."[138]

Under Second Circuit law, however, Pfizer was not required to accuse itself of the underlying conduct the Department of Justice was investigating, or to "confess" that some of its employees had committed wrongdoing. Where, as here, the company discloses that it is subject to a government investigation, and that the investigation might result in criminal or civil fines or penalties, such disclosure is, as a matter of law, not false or misleading—the company has no duty to state what its own investigation has found.

The Second Circuit's 2013 decision in *UBS* is directly on point. There, UBS disclosed that the DOJ and SEC were investigating whether the company helped clients evade income taxes, but did not detail the underlying conduct or speculate as to the outcome. Ultimately, UBS settled those investigations by admitting it had participated in a conspiracy to defraud the United States government, entering into a deferred prosecution agreement, and paying a $780 million fine. The plaintiffs alleged that UBS's disclosures—including its description of the investigations—were false and misleading because they "concealed that the [illegal] activities . . . were ongoing, and concealed the magnitude of UBS's exposure to liability and reputational damage." 752 F.3d at 182. Judge Sullivan dismissed the claims on the ground that these disclosures, as a matter of law, complied with the securities laws. The Second Circuit affirmed, holding that "[b]y disclosing its involvement in multiple legal proceedings and government investigations and indicating that its involvement could expose UBS" to civil and criminal penalties and other consequences, "UBS complied with its disclosure obligations under our case law." *Id.* at 184.

---

[138] SUF ¶ 65.

That decision controls here.  Like UBS, Pfizer disclosed the Department of Justice's investigations of Bextra and other products, and informed the public that these investigations exposed Pfizer to substantial criminal and/or civil fines, penalties, or settlements.  No more was required under Second Circuit law.  Notably, Plaintiffs' own proffered disclosure expert, Mr. Buthusiem, agrees.  Mr. Buthusiem was an in-house lawyer at the pharmaceutical company GlaxoSmithKline ("GSK") when GSK, like Pfizer, was the subject of a large, years-long Department of Justice investigation regarding promotion of its products.  GSK, like Pfizer, eventually resolved the investigation through a criminal plea by one of its subsidiaries and payment of a multi-billion dollar fine and penalty.  And GSK, like Pfizer, did not disclose in any of its securities filings that its employees had, in fact, engaged in the unlawful promotion that the Department of Justice was investigating—exactly what Plaintiffs here are claiming Pfizer should have disclosed.[139]  Like other companies, Pfizer had no duty under the securities laws to make such disclosures.

### B.    Pfizer's Statements that Its Policy Was To Comply with All Laws and that It Was Committed to Ethical Business Practices Are "Puffery."

Plaintiffs also allege that Pfizer violated Rule 10b-5 by referring in its SEC filings to its policies of conducting business ethically and lawfully.  First Am. Compl. ¶¶ 58-64.  For one thing, these were not false statements; it is undisputed that Pfizer had such policies and communicated them to its employees.[140]  But more importantly, "[i]t is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them."  *UBS AG*, 752 F.3d at 183 (internal quotation marks omitted). *See also Boca Raton*

---

[139] SUF ¶ 78 (citing Buthusiem testimony).

[140] SUF ¶ 134.

*Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x. 32, 37 (2d Cir. 2012) (statements such as "generalizations about a company's business practices and integrity" are "too general to cause a reasonable investor to rely upon them"); *ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (holding that statements by JP Morgan Chase such as that it "'set the standard' for 'integrity'" were mere puffery (citation omitted)); *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (per curiam) (holding that statements by utility that it would not "compromise its financial integrity" were "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable" (internal quotation marks omitted)).   Most recently, in *City of Brockton Retirement System v. Avon Products, Inc.*, Judge Gardephe reiterated this basic rule, finding that "general statements proclaiming compliance with ethical and legal standards" were "no more than 'puffery'" and "non-material."   No. 11 Civ. 4665 (PGG), 2014 WL 4832321, at *13-15 (S.D.N.Y. Sept. 29, 2014).

Again, *In re UBS* involved a virtually identical allegation.   The plaintiffs alleged that UBS violated the securities laws by stating, among other things, that it "aims to comply with all applicable provisions" of law; it and its employees "should conduct themselves in a manner that is above reproach"; it had "high ethical standards"; and it "striv[es] to . . . compl[y] with relevant regulations."   2012 WL 4471265, at *34.   Plaintiffs alleged that these statements were false and misleading because UBS was engaged in a tax fraud scheme that eventually resulted in it paying fines and penalties of $780 million.   Judge Sullivan dismissed the complaint on the ground that these statements were mere puffery, and the Second Circuit affirmed.   *UBS*, 752 F.3d at 183.   It held that the generality of the statements "prevents them from rising to the level of materiality required to form the basis for assessing a potential investment."   *Id*.

Again, Plaintiffs' own proffered expert Mr. Buthusiem agrees.   In discussing similar disclosures by his former employer, GSK, he acknowledged:

> Q.  You don't think it's implied, when [the GSK disclosure] says "the company is committed to ethical values," that everyone in the company is following that policy?
>
> A.  *I think it would be naïve to make that assumption* with a company with 150,000 employees.  *It's a statement as to our policy* . . . with respect to these marketing activities.
>
> Q.  And you think that most readers of the financial statements would understand this is a description of the policy, not a guarantee that every employee of the company is always going to follow it?
>
> A.  Correct.[141]

In short, investors cannot as a matter of law rely on vague general statements such as "Pfizer is proud of our record of compliance" or "Pfizer is committed to full healthcare law compliance globally," and such statements cannot sustain a securities fraud claim.  *See also, e.g.*, *Boca Raton*, 506 F. App'x 32 (statement that "[t]he integrity, reliability and credibility of S&P has enabled us to compete successfully" was puffery); *ECA & Local 134 IBEW Joint Pension Trust*, 553 F.3d at 205-06.

> **C.    Pfizer's Statement that It "Believed" It Had "Substantial Defenses" to the Government Investigation Concerning Bextra Is Not Actionable for Numerous Reasons.**

Although not pleaded in the Complaint, through their securities disclosure expert, Plaintiffs have suggested that Pfizer committed securities fraud by stating in its Form 10-Ks that it "believe[d]" it had "substantial defenses" in connection with the Bextra investigation.[142]   Mr.

---

[141] SUF ¶ 135.

[142] Petrosinelli Decl. Ex. R-1 (Buthusiem (Aug. 1, 2014) Dep. 291:10-292:6).

Buthusiem admitted that "[t]here isn't a bright-line rule in any of this," and a decision regarding what information to disclose, or even what language to use, is ultimately "all judgment."[143]

The "substantial defenses" language cannot support a securities fraud claim for several independent reasons.  To start, the entire sentence containing the phrase shows that this was actually a *warning* to investors, not some reassuring statement.  Specifically, Pfizer disclosed that, as to all of its legal proceedings:

> ***Although*** we believe we have substantial defenses in these matters, ***we could in the future incur judgments or enter into settlements of claims that could have a material adverse effect on our results of operations in any particular period***.[144]

Courts have rejected arguments that a warning of a risk such as this could itself somehow mislead investors about that risk.  *See, e.g.*, *Zeid v. Kimberley*, 930 F. Supp. 431, 437 (N.D. Cal. 1996) (plaintiffs' contention that risk warnings were actionable was "absurd").  Alleged misstatements must be read in context and judged for their impact on a reasonable investor.  *See Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013).  No reasonable investor could have understood Pfizer's statement—read in context—to be inconsistent with what actually happened, i.e., a substantial settlement that had "a material adverse effect on our results of operations" in a particular period (here, the fourth quarter of 2008).

Second, the "substantial defenses" statement is immunized from liability under the PSLRA's safe harbor for forward-looking statements, 15 U.S.C. § 78u-5(c)(1)(A),[145] and the

---

[143] Petrosinelli Decl. Ex. R-1 (Buthusiem (Aug. 1, 2014) Dep. 237:8-19).

[144] SUF ¶ 65.

[145] Under the safe harbor, a forward-looking statement is protected from liability if either (1) it is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," 15 U.S.C. § 78u-5(c)(1)(A)(i), or (2) plaintiffs fail to allege that it was "made with actual knowledge . . . that the statement was false or misleading," *id.* § 78u-5(c)(1)(B)(i).

bespeaks caution doctrine.  Pfizer's SEC filings in which the statement appear all clearly stated that Pfizer's forward-looking statements could be identified by the use of words such as "believe," and that they addressed, among other things, "the outcome of contingencies, such as legal proceedings."[146]  Pfizer's statement that it "believed" it had substantial defenses clearly meets this description.  That statement also was self-evidently forward-looking, as its accuracy could not be ascertained absent future developments.  *See, e.g.*, *In re Aegon N.V. Sec. Litig.*, No. 03 Civ. 0603 (RWS), 2004 WL 1415973, at *12 (S.D.N.Y. June 23, 2004).  And because the "substantial defenses" language was immediately followed, in the same sentence, by meaningful and specific cautionary language—warning investors that despite its belief in its defenses, Pfizer could incur material adverse judgments or settlements—the statement is protected from liability by the safe harbor.  Application of the bespeaks caution doctrine leads to the same result.  *See Rombach v. Chang*, 355 F.3d 164, 172-73 (2d Cir. 2004).

Finally, even if the "substantial defenses" language were not protected by the safe harbor, it was plainly a statement of opinion, which could be false only if it were both objectively false and subjectively disbelieved by the defendant at the time.  *Kaess v. Deutsche Bank AG*, 572 F. App'x 58, 59 (2d Cir. 2014); *City of Omaha v. CBS Corp.*, 679 F.3d 64, 67-68 (2d Cir. 2012) (per curiam); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011).[147]  As described above, there is not a shred of evidence that anyone at Pfizer believed that the company did not

---

[146] *See, e.g.*, SUF ¶ 66 (citing 2005 Form 10-K).  *See Gissin v. Endres*, 739 F. Supp. 2d 488, 506-07 (S.D.N.Y. 2010) ("[T]he SEC has opined, and the Second Circuit has concurred, that the use of linguistic cues like . . . 'we believe,' when combined with an explanatory description of the company's intention to thereby designate a statement as forward looking satisfie[d] [the] safe harbor.") (internal quotation marks omitted).

[147] Because the falsity of an opinion turns on whether the defendant "actually believed his own stated opinion," the issues of falsity and scienter "collapse into one."  *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 301 (S.D.N.Y. 2013).

have substantial defenses to 221:22-222:4, 258:11-17.the factual and legal theories advanced by the government during the course of the investigations.  In 2007, Covington & Burling presented the government with over 100 pages of single-spaced legal briefing outlining numerous defenses the company had to any charges the government indicated it was considering, and the company's Board, senior executives, and in-house lawyers all relied on Covington's judgment to inform them that the company had meritorious defenses.   That Plaintiffs apparently disagree with Covington's judgment is irrelevant:  even if Covington were incorrect, or the defenses ultimately would not have succeeded at trial, the undisputed fact is that Pfizer and its disclosure counsel relied on investigation counsel's judgment in crafting the company's securities disclosures.   In fact, as noted above, one of the liability defenses Covington raised—that the First Amendment bars criminal prosecution for truthful, even if off-label, statements about medications—is now the law of the Second Circuit.  *See United States v. Caronia*, 703 F.3d 149, 160 (2d Cir. 2012). Pfizer's statement of "belief" and opinion—an opinion that subsequent legal developments have actually, at least in part, validated—therefore cannot form the basis for a securities fraud claim. *See, e.g.*, *CBS Corp.*, 679 F.3d at 67-68; *Fait*, 655 F.3d at 110.

### D.    Pfizer's Description of the Government Investigation as Involving the "Marketing" of Bextra Was Accurate and Honestly Believed.

Plaintiffs have suggested that Pfizer committed securities fraud because its disclosures during the Class Period described the Department of Justice investigation of Bextra as involving "marketing" as opposed to "off-label marketing" (the suggestion being that using the words "off-label" would have been more concerning to investors).[148]

The Second Circuit recently explained that "we have never required a corporation to frame its public information with specific adjectives," and "[w]hile Plaintiffs may have desired

---

[148] Petrosinelli Decl. Ex. R-1 (Buthusiem (Aug. 1, 2014) Dep. 221:22-222:4, 258:11-17).

more detailed or nuanced language, that is not what the law requires." *Dalberth v. Xerox Corp.*, 766 F.3d 172, 186-87 (2d Cir. 2014).[149]   As detailed above, the government itself told Pfizer in writing, four years into the matter, that its investigation concerned the "marketing" of Bextra.[150] And the contemporaneous documents reflect that Pfizer's lawyers overseeing the investigation viewed it as involving a broad category of "marketing" conduct.[151]   Even Plaintiffs' Complaint refers to "illegal marketing" and conduct other than off-label promotion.[152]   In any event, Pfizer's inside and outside disclosure counsel advised that "marketing" was sufficient disclosure. Mr. Fox, when asked about the use of this term, stated, "I was then and am now entirely of the view that the term 'marketing' was accurate and I'm comfortable with it," and that his view was (and is) that a "reasonable investor" would understand that term to have included off-label promotion.[153]   Mr. Block similarly recalled that in conversations with the government, the investigation was discussed as one involving "marketing."[154]   A subset of marketing activity— alleged off-label promotion—certainly was a focus of the investigation, but there is no evidence

---

[149] Similarly, in *Kleinman v. Elan Corp., plc*, the Second Circuit rejected investors' claims that a press release was misleading because, among other things, the release stated only that the company had conducted a "post-hoc analysis," without specifying that the post-hoc analysis was "curvilinear."  706 F.3d 145, 154-55 (2d Cir. 2013) ("The press release simply stated that a post-hoc analysis was used without specifying the methodology; nothing about this is misleading."); *see also Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 535 (S.D.N.Y. 2008) (in order to be false or misleading under securities laws, statement must "affirmatively create an impression that was materially different from the truth").

[150] SUF ¶ 60.  In fact, in other writings the government set forth various federal statutes under which it was considering charges against the company, many of which would involve conduct beyond simply off-label promotion.  *Id*. n.95.

[151] SUF ¶ 59.

[152] *See* First Am. Compl. at 13 (describing "illegal marketing practices" by Pfizer) & ¶¶ 51 (alleging "illegal marketing" of Geodon), 55 (alleging superiority claims regarding Zyvox), 56 (alleging, *inter alia*, "unsubstantiated comparisons" and "solicitation of physicians" with regard to Lyrica).

[153] SUF ¶ 62.

[154] SUF ¶ 61.

in the record that the government ever told Pfizer that off-label promotion was the only subject of the investigation; indeed, all the evidence is to the contrary.  There also is no evidence that any Pfizer investor (including the Lead Plaintiff) believed that a Department of Justice "marketing" investigation of a pharmaceutical company would not include investigation of alleged off-label promotion.

Plaintiffs' after-the-fact attempt to wordsmith the language of Pfizer's disclosure is exactly what the Second Circuit has said—in *Dalberth*, *Elan Corp.*, *In re UBS* and other cases— cannot sustain a securities fraud action.

### E.   Pfizer Statements Regarding the Safety, Efficacy, and Sales Revenue for Geodon, Lyrica, and Zyvox Were Accurate.

The Complaint alleges that numerous statements in analyst conference calls and other such settings that addressed the efficacy, safety, and sales revenue of Geodon, Zyvox, and Lyrica were false and misleading.  First Am. Compl. ¶¶ 84-94 & Ex. B.  Plaintiffs spent virtually no time during depositions asking questions about these statements, and thus it is unclear whether they have abandoned these allegations.  In any event, these statements cannot support a securities fraud claim.  Geodon, Zyvox and Lyrica are each FDA-approved medications; by definition, that means the FDA found them to be safe and effective.  *See* 21 U.S.C. § 355(d) (directing the FDA to refuse to approve a new drug unless clinical tests show that the drug is safe and effective); *see also Oran v. Stafford*, 226 F.3d 275, 284-85 (3d Cir. 2000).  It is also undisputed that Pfizer achieved the sales revenues for the three products that Pfizer reported in its filings.  Such sales figures would not be rendered false even if it were true that the figures "included substantial revenues directly derived from unlawful off-label marketing."  First Am. Compl. ¶ 86.  "Absent an allegation that [defendant] reported income that it did not actually receive, the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained

is insufficient to impose Section 10(b) liability." *In re Marsh & Mclennan Cos., Sec. Litig.*, 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006).

### F.   Pfizer's Certification that It Maintained Effective Internal Control over Financial Reporting Was Accurate and Approved by KPMG.

Under the Sarbanes-Oxley Act, management of a public company is required to certify in the annual Form 10-K that the company maintains "effective internal control over financial reporting."[155]   During the Class Period, Pfizer management made those certifications, and KPMG stated that it had reviewed the controls and agreed with Pfizer's determination.[156] Plaintiffs allege that that Pfizer's statements with regard to its internal controls constituted securities fraud because between October 2006 and July 2007 Pfizer and KPMG had determined that the company had a "significant deficiency" in the area of healthcare compliance controls.

There is no requirement to disclose a significant deficiency in securities filings.[157] Plaintiffs' own accounting expert concedes that a "significant deficiency" is not required to be disclosed in a company's financial statements.[158]   Plaintiffs contend, however, that the "significant deficiency" Pfizer identified was in fact a "material weakness"—a much more serious accounting controls problem—and the failure to disclose it amounted to securities fraud.[159]   Pfizer obviously disagrees that a "material weakness" existed, but the parties' disagreement on that issue is immaterial for present purposes, because the record is undisputed

---

[155] 15 U.S.C. § 7241(a)(4); *In re SAIC, Inc. Sec. Litig.*, 2013 WL 5462289, at *11 (S.D.N.Y. Sept. 30, 2013).

[156] SUF ¶ 140.

[157] SUF ¶ 139; *see also* 17 C.F.R § 229.308 (identifying material weaknesses, but not significant disclosures, as requiring disclosure).

[158] SUF ¶ 139 & n.228.

[159] Petrosinelli Decl. Ex. O-2 (Regan (Aug. 21, 2014) Dep. 256:8-257:21, 265:1-3).

that all involved in this accounting determination—Pfizer's Controller, Pfizer's Internal Audit team, and Pfizer's independent auditor, KPMG—believed that the control deficiencies the company had identified did **not** rise to the level of a material weakness, or anything close to it. As one of the KPMG audit partners testified:

> Q.  Well, did KPMG evaluate, in the context of its review of the company's internal controls, as to whether the issues identified constituted a material weakness?
>
> A.   Yes, we did evaluate that—we evaluated the company's evaluation. ...
>
> Q.   What actually was the conclusion reached by KPMG as to whether this issue gave rise to a material weakness?
>
> A. It was not a material weakness.
>
> Q. Were you personally comfortable with that?
>
> A. Yes.[160]

Plaintiffs cannot point to any evidence in the record that anyone at Pfizer believed the company had a "material weakness" in internal control over financial reporting.  Thus, Plaintiffs' challenge to Pfizer's internal controls certifications cannot support a securities fraud claim.

>   **G.    Pfizer's Determination that the Requirements for a FAS 5 Reserve Were Not Met Until the Fourth Quarter of 2008, Which KPMG Advised Was Correct, Was an Accounting Judgment That Cannot Support a Securities Fraud Claim.**

As discussed above, Plaintiffs allege that Pfizer's financial statements were false and misleading because they did not reflect a FAS 5 reserve for potential losses related to the government investigations.  First Am. Compl. ¶ 79(b)-(d).  The adequacy of loss reserves "is not a matter of objective fact"; rather, reserves "reflect management's opinion or judgment" about future events and is "inherently subjective."  *Fait*, 655 F.3d at 113.  Accordingly, to establish

---

[160]  SUF ¶¶ 138 & n.226.

50

that a reserve (or lack thereof) renders a financial statement fraudulent, a plaintiff must establish "that defendant's opinions [about the potential loss] were both false and not honestly believed when they were made." *Id.* The reason for this stringent standard is to prevent a plaintiff from using hindsight to criticize complex accounting judgments that were made in good faith at the time. That is exactly what Plaintiffs seek to do here—their argument, at its core, is that Pfizer agreed in principle in January 2009 to pay a large settlement amount, so there must have been a time before then when a reserve was appropriate. Second Circuit law prohibits such a claim. *See CBS Corp.*, 679 F.3d at 68 (even if "defendants were aware of facts that *should* have led them to begin interim impairment testing" pursuant to GAAP, those facts "alone would not suffice to state a securities fraud claim after *Fait*" when they subjectively believed in their opinions).

The accounting judgment of whether to record a reserve was governed at the relevant time by FAS 5. Under FAS 5, a reserve could be booked only if *both* (i) a loss was "probable" and (ii) the loss amount could be "reasonably estimated."[161] Putting aside the parties' dispute about whether a reserve was required under FAS 5—Plaintiffs say it was, Pfizer obviously disagrees—there is no evidence that Pfizer and its employees did not honestly believe that their judgment was correct. Throughout the Class Period, Pfizer and KPMG analyzed whether the FAS 5 criteria had been satisfied, and in every quarter each concluded that whether probable or not, any potential loss associated with the investigations was not reasonably estimable. The record includes literally hundreds of internal e-mails, workpapers and other documents from the files of Pfizer, KPMG, and Mr. Block concerning the issue of reserves. *Nowhere* in this vast record—including in the thousands of pages of deposition testimony—is there even a suggestion

---

[161] Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 5, ¶ 8 (1975).

that any participant in the process believed then or believes today that a reserve should have been taken before Pfizer reached an agreement-in-principle with the government in January 2009.  To the contrary, the documents and testimony all reflect careful attention to this issue and a unanimous agreement by all parties involved in the decision that taking a reserve in a prior period would have been inconsistent with GAAP.[162]  There is no evidence that Pfizer's judgment not to record a reserve constituted fraud, as opposed to simply reflecting what is at most "the difference between two permissible judgments" in a field where accounting concepts "do not always (or perhaps ever) yield a single correct figure."  *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) (en banc); *see also In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 903 (8th Cir. 2005) (later events do not give rise to inference that earlier FAS 5 judgment was false).

## III.    PLAINTIFFS CANNOT PROVE LOSS CAUSATION OR DAMAGES.

Loss causation—"*i.e.*, a causal connection between the material misrepresentation and the loss"—and damages are essential elements of a Rule 10b-5 claim.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Here, Plaintiffs' theories of loss causation and damages founder on the undisputed facts and the governing law.

Courts routinely grant summary judgment where the record shows that plaintiffs are unable to prove loss causation or damages.  *See, e.g.*, *Dalberth*, 766 F.3d at 188 (affirming summary judgment on loss-causation grounds); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512-13 (2d Cir. 2010) (same).  In a recent case also involving Pfizer, for example, Judge Swain granted summary judgment on loss-causation and damages grounds after excluding the

---

[162] SUF ¶ 35.

plaintiffs' expert economic witness. *In re Pfizer Inc. Sec. Litig.*, No. 4-CV-9866-LTS-HBP, 2014 WL 3291230 (S.D.N.Y. July 8, 2014). The same result is called for here.

Although Plaintiffs offer an expert economist in an attempt to prevent summary judgment, his opinions are unreliable and inadmissible, as explained below and more fully in Pfizer's motion to exclude his testimony (filed simultaneously with this motion). Even if Plaintiffs' expert were not formally excluded, however, his opinions are simply "'unsustainable on th[e] record,'" so they cannot forestall summary judgment. *Dalberth*, 766 F.3d at 189 (quoting *In re Omnicom*, 597 F.3d at 513). "An expert may be entitled to his opinion, but he is not entitled to a conclusion that his view of the facts necessarily precludes summary judgment." *Id.* (affirming grant of summary judgment on loss causation despite denial of *Daubert* motion). Thus, "'an expert's report is not a talisman against summary judgment.'" *Id.* (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)).

### A.    On the Undisputed Facts, Plaintiffs Cannot Prove Loss Causation.

To establish loss causation, Plaintiffs must prove that "the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) (citation and internal quotation marks omitted). For two independent reasons, Plaintiffs cannot make that showing here.

### 1.    The Alleged "Corrective Disclosure" Did Not Reveal that Any Prior Statement Was False or Misleading.

"[W]here a disclosure does not reveal the falsity of the alleged misstatements, it does not qualify as 'corrective'" and cannot establish loss causation. *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501. *See also, e.g., Janbay v.*

*Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL 1080306, at *14-16 (S.D.N.Y. Mar. 30, 2012); *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 493 (D. Conn. 2013); *Joffee v. Lehman Bros.*, 410 F. Supp. 2d 187, 191 (S.D.N.Y. 2006); *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007).

The sole "corrective disclosure" that Plaintiffs allege is a single sentence that appeared in Pfizer's earnings release for the fourth quarter of 2008:

> Fourth quarter 2008 results were impacted by a $2.3 billion pre-tax and after-tax charge resulting from an agreement in principle … to resolve previously disclosed investigations regarding allegations of past off-label promotional practices concerning Bextra, as well as other open investigations.[163]

This one-sentence announcement that Pfizer would be settling investigations involving Bextra and other unnamed products did not reveal that any of the company's earlier statements were false or misleading, as is required to establish loss causation.  *See Lentell*, 396 F.3d at 173.

For years, Pfizer had disclosed the pendency of the Department of Justice investigation. It had also told investors that the company was "considering various ways to resolve" the investigation, which "could result in the payment of a substantial fine and/or civil penalty."[164] The so-called "corrective disclosure" simply announced that the very thing Pfizer repeatedly warned might happen, had happened.  Thus, Plaintiffs cannot establish that this announcement corrected any misstatement concerning the Bextra investigation.

In addition, although Exhibit B to the Complaint sets forth 42 alleged misrepresentations concerning Geodon, Lyrica and Zyvox, the disclosure on January 26, 2009 did not even mention those products by name.  Therefore, the announcement clearly did not correct any prior alleged

---

[163] SUF ¶ 123.

[164] SUF ¶ 104.

misrepresentation concerning those other products.  *See, e.g.*, *In re Omnicom*, 597 F.3d at 511

(affirming summary judgment where "none of [the statements in the allegedly corrective

disclosure] even purported to reveal some then-undisclosed fact with regard to the specific

misrepresentations alleged in the complaint"); *In re Odyssey Healthcare, Inc. Sec. Litig.*, 424 F.

Supp. 2d 880, 888 (N.D. Tex. 2005) (dismissing claim that disclosure of CEO's resignation

corrected earlier statements concerning company operations; a corrective disclosure "must at

minimum be of a nature that would cause recipients to identify which representations were the

false prior representations").

Similarly, the law forecloses any argument that the January 26, 2009 announcement

revealed that Pfizer's prior statements about its internal controls and compliance programs were

fraudulent.  *See, e.g.*, *Gusinsky v. Barclays plc*, 944 F. Supp. 2d 279, 292 (S.D.N.Y. 2013)

(Barclays entering into $450 million settlement of government civil and criminal investigations

into LIBOR conduct was not corrective disclosure as to bank's earlier LIBOR statements);

*Kuriakose v. Fed. Home Loan Mortg. Corp.*, No. 08 Civ. 7281 (JFK), 2011 WL 1158028, at *13-

14 (S.D.N.Y. Mar. 30, 2011) (government placing Freddie Mac into conservatorship was not a

corrective disclosure as to its internal controls).[165]

> **2.   Plaintiffs Cannot Disaggregate the Alleged Effect of the Announcement of the Agreement in Principle from the Acknowledged Effects of the Other News Announced on January 26.**

On January 26, 2009, Pfizer announced a $68 billion acquisition of Wyeth, a substantial

dividend cut, and a lower-than-expected 2009 earnings guidance.  Even Plaintiffs agree that the

latter two were not good news.  On the same day, in connection with its fourth quarter results,

---

[165] The announcement also did not reveal anything about the safety or efficacy of the medications in question.  Thus, the announcement could not have been a corrective disclosure concerning those topics. The January 26 release did contain information about the sales revenues of Geodon, Zyvox and Lyrica—Bextra was no longer being marketed at the time—but none of that information revealed any falsity in Pfizer's earlier statements.

Pfizer also announced the $2.3 billion tentative settlement with the government.   Because Plaintiffs have failed to show that any part of the stock price drop on that day was caused by the announcement of the settlement, as opposed to the other major events, they cannot prove loss causation.

Where, as here, multiple events coincide with the stock drop in question, the Supreme Court's decision in *Dura* "requires plaintiffs to disaggregate those losses caused by . . . other events" from those proximately caused by the misrepresentation in question.  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (internal quotation marks omitted). This "disaggregation requires that a cause be assigned to each piece of a [security] price decline and precludes assigning two different causes to the same quantum of loss."  *Id*. (quotation omitted).  Plaintiffs "b[ear] the burden of disaggregating" the effects of the alleged fraud from "other, non-fraud-related 'confounding' events."  *See Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 518 & n.29 (S.D.N.Y. 2013).

Consequently, when a plaintiff fails to disentangle without speculation the various possible causes of a loss, summary judgment must be granted for the defendant.  *See In re Williams Sec. Litig.—WCG Subclass*, 558 F.3d 1130, 1139 (10th Cir. 2009); *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014); *In re Scientific Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1379 (N.D. Ga. 2010); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d at 554; *Gordon Partners v. Blumenthal*, No. 02 Civ. 7377 (LAK), 2007 WL 1438753, at *2 (S.D.N.Y. May 16, 2007), *aff'd* 293 F. App'x 815 (2d Cir. 2008); *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014-16 (C.D. Cal. 2003); *In re Pfizer Inc. Sec. Litig.*, 4-CV-9866-LTS-HBP, 2014 WL 3291230, at *1-2 (S.D.N.Y. July 8, 2014).

As an empirical matter, any one of the important events, other than the settlement, announced on January 26, 2009—the merger, the dividend cut, and the disappointing earnings guidance—alone would have caused a drop in Pfizer's stock price.  As discussed above, the undisputed facts concerning the market's reaction to the January 26 announcements confirms that the stock drop was caused by the other news, not by the announcement of the tentative settlement.  Indeed, the record is overwhelming:  ***over 200 financial analyst reports*** concerning Pfizer were issued from January 26, 2009 through September 1, 2009, and ***not a single one*** discussed the settlement, suggested that Pfizer had suffered any reputational harm based on the settlement, or stated that the settlement had any effect on their long-term evaluation of the company.  Instead, they all discussed, evaluated, and raised questions about the Wyeth-related news.[166]  The same is true of Lead Plaintiff's own investment advisor, BlackRock, which spoke with Pfizer the day after the announcements and, like everyone else in the market, asked only about Wyeth.  Plaintiffs cannot prove that the announcement of the agreement in principle caused any loss, much less disaggregate it from other events, when no one even mentioned it at the time.

Plaintiffs' purported loss causation expert, Steven Feinstein, offers no justification for ignoring the unanimous response of market analysts to the settlement.  In his deposition, he acknowledged that reviewing analyst reports is the standard method that economists, himself included, use to determine the market's reaction to specific events, but he asserted that the hundreds of reports that failed to mention the settlement were somehow "anomalous."[167]  An

---

[166] Considering the history of pharmaceutical industry mergers, it is understandable that analysts would do so.  When Pfizer acquired Pharmacia for $60 billion in 2002, for instance, it experienced a 10.6% stock drop on the day of the announcement.  SUF ¶ 130.

[167] Petrosinelli Decl. Ex. W-1 (Feinstein (Oct. 14, 2014) Dep. 303:19-21).

anomaly, however, is something that is out of place—an outlier; here, **every one** of the hundreds

of analyst reports was consistent—the settlement was not significant.   Feinstein's opinion

amounts to nothing more than his own uncorroborated and subjective *ipse dixit* that the

settlement must have been important despite the fact that the analysts (whose job it is to

determine what matters to investors) failed to notice.   That opinion is simply "unsustainable on

th[e] record," and therefore cannot forestall summary judgment.   *Dalberth*, 766 F. 3d at 189

(internal quotation marks omitted); *see also, e.g*, *Bricklayers & Trowel Trades Int'l Pension

Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d at 190-91 (granting summary where

plaintiffs' expert made "subjective judgments about which news impacted the stock price").

Plainly, what mattered to the analysts, and what mattered to investors, were the other

announcements on January 26, 2009.[168]   As a result, Plaintiffs cannot establish that the

announcement of the agreement in principle caused any portion of the alleged losses, and

certainly cannot disaggregate it from the effect of the other announcements.   As such, Plaintiffs

cannot survive summary judgment.   *See, e.g.*, *In re Williams Sec. Litig.*, 558 F.3d at 1139; *In re

Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d at 554.

## B.      On the Undisputed Facts, Plaintiffs Cannot Prove Damages.

Damages is an essential element of a claim under Rule 10b-5, and expert testimony is

required to establish that element.   *See, e.g.*, *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp.

735, 744 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986); *Freeland v. Iridium World

Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 81 (D.D.C. 2008); *Behrens v. Wometco Enters., Inc.*, 118

F.R.D. 534, 542 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990).   In her recent decision in

---

[168] This lack of commentary by the analysts also strongly suggests that none of them were caught off-guard by the announcement of the resolution—a further testament to the adequacy of Pfizer's Class Period disclosures.

*In re Pfizer Inc. Securities Litigation*, Judge Swain held that "[w]ithout a loss causation expert, Plaintiffs cannot prove either" loss causation or damages, and she granted summary judgment after she excluded the plaintiffs' expert in that case. 2014 WL 3291230, at *3. The same result obtains here, whether or not Feinstein is formally excluded.

Feinstein asserts, with minimal discussion, that Pfizer's stock price included the same amount of inflation on the first and last days of the Class Period and on every day in between—a so-called "constant inflation ribbon."[169] Under the undisputed facts of this case, however, that opinion is unfounded and unreliable. Indeed, it is inconsistent with the facts, the law, Plaintiffs' other expert opinions, and the Complaint.

The facts of the government investigations changed significantly between January 19, 2006, the first day of the Class Period, and January 23, 2009, the last day of the Class Period. On January 19, 2006, there was no $2.3 billion settlement to disclose. As of that date, the Department of Justice had initiated an investigation into the marketing of only one of the four products that were involved in the settlement three years later. The single investigation that had commenced, into the marketing of Bextra, was still in its preliminary stages, and the government had not even presented its view of the evidence, let alone made any settlement demand. Even Plaintiffs' accounting expert, Paul Regan, has taken account of these changing circumstances, opining that the reserve he believes Pfizer should have taken changed over the Class Period, as multiple events occurred and "the information . . . matured."[170] And, of course, as of January 19, 2006, Pfizer had made only one of the dozens of supposedly false and misleading statements that the Complaint alleges were made throughout the Class Period.

---

[169] Petrosinelli Decl. Ex. A-4 (June 10, 2014 Feinstein Report 90-91).

[170] Petrosinelli Decl. Ex. O-2 (Regan (Aug. 21, 2014) Dep. 193:12).

Feinstein, however, insists that despite all this, the amount of inflation in Pfizer's stock price was precisely the same—$1.26—on each and every day of the Class Period. Feinstein attempted to defend this facially irrational opinion at his deposition by claiming that Pfizer's legal obligation was not to disclose the existing facts about the investigations, which undeniably changed over time, but rather to announce to the world that the company was somehow "guilty," even before the government had threatened any claims or, indeed, had even begun investigating some of the products.[171] As discussed above, *see supra* II.B, that rationale is flatly foreclosed by Second Circuit law, which does not require companies to accuse themselves of unadjudicated wrongdoing or confess to uncharged crimes. *See UBS*, 752 F.3d at 182.

Feinstein's opinion also is out of step with the Complaint's allegations of dozens of false and misleading statements on multiple topics. Feinstein expresses no opinion as to what introduced the inflation in Pfizer's stock price, when it occurred, or who was responsible for it—but he is willing to opine that the inflation was present on each and every day of the Class Period, in exactly the same amount.[172] In his view, Plaintiffs would be entitled to recover $1.26 per share in inflation even if the Court or the jury were to find some—or even all but one—of the alleged false statements not actionable.[173] The court in *In re BP p.l.c. Securities Litigation*, No. 4:10-md-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013), rejected this type of constant-inflation damages theory precisely because, under that approach, "the amount of damages to be

---

[171] Petrosinelli Decl. Ex. W-1 (Feinstein (Oct. 14, 2014) Dep. 53:2-10, 57:22-58:12, 65:15-23, 137:1-12 ("So the disclosure that could have been made at the beginning was the off-label marketing, and the condition of the company, and the falsehood of the reassurances, and the falsehood of the representations that they weren't doing anything wrong, and that they were abiding by the CIA. . . . [W]hat was concealed from the marketplace is not just the investigations. It's what the investigations were looking into—that Pfizer was engaged in off-label marketing."), 199:15-23).

[172] Petrosinelli Decl. Ex. W-1 (Feinstein (Oct. 14, 2014) Dep. 27:1-7, 28:15-21, 125:17-127:2).

[173] Petrosinelli Decl. Ex. W-1 (Feinstein (Oct. 14, 2014) Dep. 182:11-21, 186:20-187:5.

awarded will be . . . unresponsive to the jury's specific findings of liability."  *Id*. at *17.  The same conclusion applies here.

In *In re Pfizer Inc. Securities Litigation*, Judge Swain granted summary judgment based on a similar failing by the plaintiffs' expert to properly account for the amount of alleged inflation included in the stock price on each day of the class period.  4-CV-9866-LTS-HBP, 2014 WL 2136053, at *1-2 (S.D.N.Y. May 21, 2014).  In particular, the court found that the expert's failure to account for the portion of the price inflation that was due to a subset of the allegedly false statements was improper.  *Id*. at *1.  The expert there cited "no research reference or peer review information" in support of his problematic analysis, just as in this case.  *Id*.  The court ruled that the flawed opinion was "unhelpful to the jury in making calculations of damages proximately caused by Defendants' alleged misrepresentations and omissions" and therefore inadmissible.  *Id*. at *1.  The same conclusion obtains here, where Feinstein has failed to offer any reliable explanation for his facially flawed constant-ribbon approach.

## CONCLUSION

For the reasons stated above, the Court should grant summary judgment dismissing the

Complaint in its entirety.


Date:   October 30, 2014

Respectfully submitted,

WILLIAMS & CONNOLLY LLP


By: _____

Joseph G. Petrosinelli (admitted *pro hac vice*)
Steven M. Farina (admitted *pro hac vice*)
George A. Borden
Amanda M. MacDonald (admitted *pro hac vice*)

725 Twelfth Street, N.W.
Washington, D.C.  20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
sfarina@wc.com
jpetrosinelli@wc.com
gborden@wc.com
amacdonald@wc.com

*Counsel for Defendant Pfizer Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 30th day of October, 2014, Defendant Pfizer Inc.'s

Memorandum In Support of Its Motion for Summary Judgment was filed with the Court through

the CM/ECF system and thereby served on all counsel of record.

Amanda M. MacDonald
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
amacdonald@wc.com