UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARY K. JONES, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>    –vs–<br><br>PFIZER INC, et al.,<br><br>                  Defendants. | Civil Action No. 1:10-cv-03864-AKH<br><br>Hon. Alvin K. Hellerstein<br><br>**ECF Case**<br><br>**Electronically Filed** |

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANT ALLEN WAXMAN'S
## MOTION FOR SUMMARY JUDGMENT

Ross B. Galin
Stuart Sarnoff
Howard E. Heiss
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

*Attorneys for Defendant Allen Waxman*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................. 1

II.   UNDISPUTED FACTS ........................................................................................ 2

    A.   Mr. Waxman's roles at Pfizer. ................................................................. 2

    B.   Mr. Waxman's role in the disclosure process was to provide information
        and advice to those who made the statements. ...................................... 2

    C.   The Bextra disclosures were truthful. ..................................................... 9

    D.   The only allegedly false statement made by Mr. Waxman was true. ................ 11

    E.   Mr. Waxman was not responsible for deciding whether a reserve should be
        taken. .................................................................................................. 13

III.  ARGUMENT ...................................................................................................... 14

    A.   Mr. Waxman cannot be held liable under Rule 10b-5 because he was not
        the maker of any false or misleading statements and plaintiffs cannot
        establish he acted with scienter. ............................................................ 15

        1.   Mr. Waxman is not liable under Rule 10b-5 for any false
            statements made before he became general counsel or after he left
            Pfizer. ............................................................................................ 16

        2.   Mr. Waxman did not "make" any of the challenged statements
            regarding the government investigations. .................................... 17

            a.   Pfizer's SEC Filings were not attributed to Mr. Waxman
                and he did not have ultimate authority over them. .................. 17

            b.   Courts do not deem general counsels the "makers" of
                companies' public disclosures in these circumstances. .............. 20

        3.   There is no evidence that Mr. Waxman acted with scienter. .................. 21

            a.   The evidence shows Mr. Waxman acted in good faith. .............. 23

            b.   Mr. Waxman's good-faith reliance on expert disclosure
                counsels' advice also negates scienter. ....................................... 24

        4.   Mr. Waxman's statement in the Genotropin press release did not
            violate Rule 10b-5. ...................................................................... 26

            a.   Mr. Waxman's statement was true. .......................................... 27

            b.   There is no evidence that Mr. Waxman made the statement
                 with scienter. .......................................................................... 29

            c.   Because plaintiffs cannot establish that Mr. Waxman's lone
                 statement about an unrelated drug caused any of their
                 alleged losses, it is irrelevant to this case. ................................ 30

5.      Mr. Waxman cannot be held liable for any allegedly misleading statements regarding Pfizer's reserves. ................................... 31

        a.      Plaintiffs' allegations regarding Pfizer's reserves were outside of the scope of Mr. Waxman's duties as general counsel. ....................................................................... 31

        b.      There is no basis to conclude Mr. Waxman made any false statement regarding the FAS 5 reserves with scienter. ............... 32

    B.      Mr. Waxman is not liable as a control person under Section 20(a). .................... 33

IV.     CONCLUSION ............................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

<u>**CASES**</u>

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
   No. 03 MD 1529 (LMM), 2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007) ............................ 21

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
   No. 03 MDL 1529 (LMM), 2010 WL 3528872 (S.D.N.Y. Aug. 30, 2010) ......................... 30

*In re Alstom SA*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005) ....................................................... 34, 35, 36

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .......................................................................... 14

*Barker v. Henderson, Franklin, Starnes & Holt*,
   797 F.2d 490 (7th Cir. 1986) ................................................................ 36

*Bricklayers & Travel Trades Int'l Pension Fund v. Credit Suisse First Bos.*,
   853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014) ............................ 30

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014) ................................................................. 33

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver*,
   511 U.S. 164 (1994) .......................................................................... 20

*Chill v. Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996) ................................................................. 22

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ................................................................. 29

*DeFabio v. E. Hampton Union Free Sch. Dist.*,
   623 F.3d 71 (2d Cir. 2010) .................................................................. 15

*Derby City Capital, LLC v. Trinity HR Servs.*,
   949 F. Supp. 2d 712 (W.D. Ky. 2013) ........................................................ 20

*Dietrich v. Bauer*,
   76 F. Supp. 2d 312 (S.D.N.Y. 1999) ......................................................... 34

*Duch v. Jakubek*,
   588 F.3d 757 (2d Cir. 2009) ................................................................. 15

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005) ................................................................................................... 31

*In re DVI, Inc. Sec. Litig.,*
    919 F. Supp. 2d 498 (E.D. Pa. 2013) ....................................................................... 19

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009) ...................................................................................... 29

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976) ................................................................................................... 22

*In re FBR Inc. Sec. Litig.,*
    544 F. Supp. 2d 346 (S.D.N.Y. 2008) ...................................................................... 27

*In re Fed. Nat'l Mortg. Ass'n Sec., Deriv. & "ERISA" Litig.,*
    892 F. Supp. 2d 59 (D.D.C. 2012) ........................................................................... 33

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
    352 F. Supp. 2d 429 (S.D.N.Y. 2005) ...................................................................... 36

*Howard v. SEC,*
    376 F.3d 1136 (D.C. Cir. 2004) ............................................................................... 25

*In re ICN/Viratek Sec. Litig.,*
    No. 87-cv-4286, 1996 WL 164732 (S.D.N.Y. Apr. 9, 1996) ................................. 16

*Janus Capital Grp. v. First Derivative Traders,*
    131 S. Ct. 2296 (2011) .............................................................................. 17, 18, 19, 20

*Kalnit v. Eichler,*
    85 F. Supp. 2d 232 (S.D.N.Y. 1999) ........................................................................ 33

*Kerr v. Exobox Technologies Corp.,*
    2012 WL 201872 (S.D. Tex. Jan. 23, 2012) ........................................................... 20

*Lasker v. N.Y. State Elec. & Gas Corp.,*
    85 F.3d 55 (2d Cir. 2004) .......................................................................................... 29

*Lentell v. Merrill Lynch & Co.,*
    396 F.3d 161 (2d Cir. 2005) ...................................................................................... 30

*Merck & Co. v. Reynolds,*
    130 S. Ct. 1784 (2010) ............................................................................................... 22

*Morgan v. Prudential Grp., Inc.*,
    527 F. Supp. 957 (S.D.N.Y. 1981) ..................................................... 24

*Newton v. Uniwest Fin. Corp.*,
    802 F. Supp. 361 (D. Nev. 1990), *aff'd*, 967 F.2d 340 (9th Cir. 1992) ................. 25

*Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*,
    603 F.3d 144 (2d Cir. 2010) ........................................................ 18

*In re Philip Servs. Corp. Sec. Litig.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004) ................................................ 36

*In re Questcor Sec. Litig.*,
    No. SA CV 12–01623 DMG, 2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ......... 21

*In re Refco*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ............................................... 16

*Rolf v. Blyth, Eastman Dillon & Co.*,
    570 F.2d 38 (2d Cir. 1978) ...................................................... 22, 24

*SEC v. Boyd*, No. 95–cv–03174–MSK–MJW, 2012 WL 1060034 (D. Colo.
    Mar. 29, 2012) ..................................................................... 21

*SEC v. Carter*,
    No. 10 C 6145, 2011 WL 5980966 (N.D. Ill. Nov. 28, 2011) ....................... 20

*SEC v. Lowy*,
    396 F. Supp. 2d 225 (E.D.N.Y. 2003) .............................................. 24

*SEC v. Shanahan*,
    646 F.3d 536 (8th Cir. 2011) ...................................................... 25

*SEC v. Steadman*,
    967 F.2d 636 (D.C. Cir. 1992) ..................................................... 24

*Sgalambo v. McKenzie*,
    739 F. Supp. 2d 453 (S.D.N.Y. 2010) .............................................. 20

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
    2014 WL 3605540 (S.D.N.Y. July 21, 2014) ....................................... 34

*State Teachers Ret. Bd. v. Fluor Corp.*,
    654 F.2d 843 (2d Cir. 1981) .................................................... 15, 21

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
    148 F. App'x 66 (2d Cir. 2005) ........................................................... 24

*Stoneridge Inv. Partners LLC v. Scientific-Atlanta Inc.*,
    552 U.S. 148 (2008).................................................................... 15, 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................... 21, 22

*In re Towers Fin. Corp. Noteholders Litig.*,
    No. 93CIV 0810(WK)(AJP), 1995 WL 571888 (S.D.N.Y Sept. 20, 1995) ......................... 21

*In re UBS AG Sec. Litig.*,
    No. 07-cv-11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) .............................. 16

*United States v. DeFries*,
    129 F.3d 1293 (D.C. Cir. 1997)........................................................... 26

## OTHER AUTHORITIES

Department of Health and Human Services, Office of Inspector General's
    *Compliance Program Guidance for Pharmaceutical Manufacturers,* 68 Fed.
    Reg. 23731 (May 5, 2003) .................................................................. 28

*Oxford English Dictionary* (1933) ........................................................... 18

## RULES

Fed. R. Civ. P. 56(a) ....................................................................... 15

# I.   INTRODUCTION

Allen Waxman should be granted summary judgment because there is no evidence in the record showing that Mr. Waxman made any false or misleading statements or acted with intent to defraud investors.

Mr. Waxman, a lawyer, never signed a single SEC disclosure, and never spoke to an analyst or commented publicly about the Bextra, Geodon, Lyrica, or Zyvox investigations—the inadequate disclosure of which plaintiffs claim caused their alleged damages.  Of the dozens of public statements plaintiffs challenge, Mr. Waxman made only one.  And that statement was true, was part of a press release announcing the resolution of a government investigation that had nothing to do with this case, and could not possibly have caused any of plaintiffs' alleged losses. Plaintiffs nevertheless accuse Mr. Waxman of securities fraud under Rule 10b-5 and acting as a "control person" under Section 20(a).  These charges are baseless.

Consistent with his role as general counsel, the evidence shows that Mr. Waxman participated in Pfizer Inc's ("Pfizer's") legal disclosure process, which was led by in-house and outside legal disclosure experts.  That process was designed to ensure that Pfizer's SEC filings were accurate and complete, and that its CEO and CFO had the information they needed to make their Sarbanes-Oxley certifications.  But Mr. Waxman did not "make" any of Pfizer's public statements, which Rule 10b-5 requires.  Likewise, there is no evidence that Mr. Waxman set Pfizer's accounting reserves.  Nor, as a matter of law, did Mr. Waxman have "control" over the statements made by Pfizer's CEO or CFO, which Section 20(a) requires.

If these deficiencies were not enough to defeat plaintiffs' claims, they also have failed to produce any evidence at all that Mr. Waxman acted with scienter, which both Rule 10b-5 and Section 20(a) require.  After more than three years of discovery, over 60 depositions (including two of Mr. Waxman) and the production of 30 million pages of documents, there is not a single

piece of testimony, internal memorandum, or email that suggests—let alone provides the necessary factual basis to enable plaintiffs to meet their heavy burden of proving—that Mr. Waxman acted recklessly or with fraudulent intent. To the contrary, the evidence conclusively demonstrates the good faith basis for Mr. Waxman's conduct as Pfizer's general counsel in this case.

For these reasons—and those set forth in in his co-defendants' motions for summary judgment, which Mr. Waxman joins—the Court should grant Mr. Waxman's motion for summary judgment.[1]

## II.  UNDISPUTED FACTS

### A.  Mr. Waxman's roles at Pfizer.

Mr. Waxman began his legal career as a law clerk to the Honorable Thomas Penfield Jackson in the United States District Court for the District of Columbia before joining Williams & Connolly LLP, where he became a partner.[2]  In 2003, Pfizer hired Mr. Waxman as a senior assistant general counsel and asked him to head its litigation team.[3]  In August 2006, Mr. Waxman was promoted to general counsel.[4]  Mr. Waxman did not join Pfizer's executive leadership team until he became general counsel.[5]  He left Pfizer on March 11, 2008.[6]

### B.  Mr. Waxman's role in the disclosure process was to provide information and advice to those who made the statements.

As described in Pfizer's Statement of Facts, Pfizer had a detailed and comprehensive process for drafting its securities disclosures involving numerous executives, lawyers and

---

[1] Mr. Waxman seeks summary judgment also on the grounds asserted by the other defendants insofar as they are applicable to him, and incorporates by reference their memoranda of law in support of their respective motions for summary judgment.
[2] Waxman (Nov. 14, 2013) Dep. 9:8-18 (Petrosinelli Decl. Ex. R-2).
[3] *Id*. at 11:2-7.
[4] *Id*. at 20:22-24.
[5] *Id*. at 26:17-26:23.
[6] *Id*. at 22:20-22.

accountants.[7]  As part of that larger process, Pfizer's legal division followed its own extensive

procedures for counseling about the quarterly legal proceedings section.[8]  In-house disclosure

counsel Lawrence Fox[9] and outside disclosure counsel Dennis Block[10] led the legal division's

disclosure procedures, which included drafting, reviewing, and editing the disclosures and

deliberating about their content.[11]  The purpose of these procedures was to identify the nature of

the legal matters confronting the company, and to advise the CEO and CFO about whether and

how those matters should be disclosed in Pfizer's securities filings.[12]

The process began with Mr. Fox, an assistant general counsel and assistant secretary.[13]

His responsibilities were "to serve as a securities and corporate governance lawyer for the

company . . . review many of [its] public disclosure documents . . . and provide together with

outside counsel, disclosure advice."[14]  Mr. Fox would collect information from "senior practice

group attorneys" from the various functions in the legal department—including litigation,

government investigations, intellectual property, employment, compliance, etc.—regarding all of

the company's ongoing litigation and investigations.[15]  Mr. Fox would then make an initial

---

[7] *See* Pfizer's Mot. at 5-9.

[8] Pfizer Controls and Procedures (PFE-JONES 00032601-15 at PFE-JONES 00032605) (Galin Decl. Ex. A-W).

[9] Mr. Fox, Vice President and Assistant General Counsel at Pfizer, had more than 35 years of experience advising public companies on disclosure obligations.  He served as the company's securities and corporate governance lawyer.  Fox (Sep. 26, 2013) Dep. 30:25-35:2, 231:3-233:12 (Petrosinelli Decl. Ex. Y-1).

[10] Mr. Block, of Cadwalader, Wickersham & Taft, is one of the most prominent securities disclosures lawyers and has advised public companies for more than 40 years.  Block (Sep. 16, 2013) Dep. 12:5-13:24 (Petrosinelli Decl. Ex. O-1).

[11] Fox (Sep. 26, 2013) Dep. 31:21-32:2, 231:3-233:12 (Petrosinelli Decl. Ex. Y-1).

[12] Kindler (Oct. 10, 2014) Dep. 116:25-117:19 (Petrosinelli Decl. Ex. C-2) (Mr. Kindler explained it was a "very, very robust and extensive process that was designed to provide [the CFO and CEO] with substantial assurance that our disclosures were accurate and that ultimately extremely experienced and professional securities attorneys carefully reviewed what we were disclosing and the judgments that we were making and gave us their expert opinion that we were complying both with the laws and regulations and with the representations made in accordance with our Sarbanes-Oxley certification.").

[13] Mr. Fox joined Pfizer, where he has worked for more than 12 years, after five years as a corporate attorney at a major law firm, and 22 years at Champion International Corporation, where he spent 10 years as its corporate secretary.  Fox (Sep. 26, 2013) Dep. 33:18-35:2 (Petrosinelli Decl. Ex. Y-1).

[14] *Id*. 31:3-15, 31:21-32:2.

[15] *Id*. 162:4-163:2; Pfizer Controls and Procedures (Galin Decl. Ex. A-W).

determination about which of these matters needed to be disclosed and prepare an initial draft of the disclosure. At the same time, Mr. Block—one of the country's most well-regarded securities lawyers with approximately 45 years' experience advising companies on securities disclosure issues—also received documents and information about the matters being considered for disclosure, and participated in conference calls Mr. Fox had with the legal team to ask questions and make certain that he and Mr. Fox "fully understood" the information and that they had all the information "needed to make an informed judgment with respect to disclosure implications, if any."[16]

Once Mr. Fox, in consultation with Mr. Block, was comfortable with the first draft of the disclosures, he circulated them for comment to 15 to 20 lawyers, including the government investigations lawyers.[17] A revised second draft would then be prepared by Mr. Fox and reviewed again by Mr. Block and other inside counsel at Pfizer involved in commenting on the prior draft.[18] Once approved by this group, Mr. Fox would then share the next draft with Mr. Waxman for his review and comments.[19] And it was then not uncommon for Mr. Waxman to meet with Mr. Fox, Mr. Block, and others to "understand some of the details included" in the draft disclosures and "know what else was considered for inclusion, but rejected."[20]

As part of the advice about the disclosures shared with Mr. Waxman, Mr. Fox also collected sub-certifications from senior lawyers of the legal group, affirming that, to the best of

---

[16] Fox (Sep. 26, 2013) Dep.162:4-164:9; 169:2-9 (Petrosinelli Decl. Ex. Y-1).
[17] *Id.* at 165:2-166:4.
[18] *Id.* at 165:6-25 & 173:16-23.
[19] *Id.* at 171:2-15; 173:24-174:7; Oct. 17, 2006 Email from Lawrence Fox to Allen Waxman (PFE-JONES 00046686-88) (Galin Decl. Ex. B-W) (providing a draft of a 10-Q to Mr. Waxman and advising him it had "been approved by Dennis [Block] . . . and Fox and Block had discussions with those leading the investigation teams").
[20] *See* Jan. 22, 2007 Email from Lawrence Fox to Allen Waxman (PFE-JONES 00041545-46) (Galin Decl. Ex. C-W); *see also* Feb. 20, 2007 Email from Allen Waxman to Dennis Block re: 10-K Legal Proceedings (PFE-JONES 00046246-48) (Petrosinelli Decl. Ex. R-6); Feb. 21, 2007 Email from Allen Waxman to Lawrence Fox (PFE-JONES 00041249-50) (Petrosinelli Decl. Ex. K-5 (showing Mr. Waxman giving careful consideration with securities counsel to how best to describe matters accurately).

their knowledge, the draft legal proceedings section contained all necessary information, that all material information was included, and that the statements in the section were neither false nor misleading.[21] During Mr. Waxman's tenure as general counsel, sub-certifications to the adequacy of the disclosures were provided by approximately eleven senior in-house lawyers, including Mr. Fox's supervisor, Margaret Foran, Senior Vice President-Corporate Governance.[22] Douglas Lankler, a former federal prosecutor who was then Pfizer's Chief Compliance Officer and one of the in-house lawyers responsible for oversight of government investigations, was among that group.[23] In addition, Mr. Block also provided a sub-certification attesting to the accuracy and completeness of the securities disclosures.[24] And Mr. Fox sought consideration and input on the draft disclosures from Pfizer's outside auditors, KPMG.[25] Mr. Fox shared with Mr. Waxman these various sub-certifications and inputs from the senior in-house lawyers, Mr. Block, KPMG, as well as his own advice.[26]

That leadership of this disclosure process was vested in Mr. Fox and Mr. Block reflected both their expertise and experience counseling on securities disclosures. Mr. Fox and Mr. Block combined had more than seven decades of experience drafting disclosures. Mr. Waxman was

---

[21] Fox (Sep. 26, 2013) Dep. 171:8-14 (Petrosinelli Decl. Ex. Y-1); Douglas Lankler Sub-Certifications Compendium (Galin Decl. Ex. D-W); Margaret Foran Sub-Certifications Compendium (Galin Decl. Ex. E-W); Kim Dadlani Sub-Certifications Compendium (Galin Decl. Ex. F-W).

[22] Sep. 6, 2006 email from Fox to Waxman (PFE-JONES 00037387) (Galin Decl. Ex. G-W); Letters from Waxman to Senior Litigation Attorneys Compendium (collection of letters from Allen Waxman requesting sub-certifications) (Galin Decl. Ex. H-W).

[23] Lankler (Jan. 22, 2014) Dep. 10:6-23 (Petrosinelli Decl. Ex. E-2); Waxman (Nov. 14, 2013) Dep. 55:18-22, 126:20-25; 188:12-19.

[24] Fox (Sep. 26, 2013) Dep. 171:8-173:3 (Petrosinelli Decl. Ex. Y-1); Dennis Block Certifications Compendium (Petrosinelli Decl. Ex. O-7); Pfizer Disclosure Controls and Procedures (PFE-JONES 00032601-15 at PFE-JONES 00032603-05) (Galin Decl. Ex. A-W).

[25] Pfizer Disclosure Controls and Procedures (Galin Decl. Ex. A-W); Fox (Sep. 26, 2013) Dep. 174:11-176:23 (Petrosinelli Decl. Ex. Y-1).

[26] *See, e.g.*, Waxman (Nov. 14, 2013) Dep. 75:11-76:25 (Petrosinelli Decl. Ex. R-2); Feb. 15, 2006 Email from Lawrence Fox to Jeffrey Kindler regarding Legal Proceedings Disclosure (PFE-JONES 00042203) (Petrosinelli Decl. Ex. O-5); Oct. 17, 2006 Email from Lawrence Fox to Allen Waxman (PFE-JONES 00046686-88) (Galin Decl. Ex. B-W); Feb. 21, 2007 Email from Allen Waxman to Lawrence Fox (PFE-JONES 00041249-50) (Petrosinelli Decl. Ex. K-5).

not a securities disclosure attorney.  Instead, he, like the others at Pfizer, relied on Mr. Fox and Mr. Block as the "securities lawyers advising the company on disclosure obligations" to facilitate the process, advise on which legal matters should be disclosed, and craft the appropriate disclosure language.[27]  Because Mr. Waxman relied on Mr. Fox's and Mr. Block's leadership of the legal disclosure process and their securities advice, he instructed the legal division to provide Mr. Fox and Mr. Block with any information they needed to do their jobs,[28] and both Mr. Fox and Mr. Block testified that they had the authority to ask for and receive additional information.[29]

Consistent with this direction, Mr. Fox and Mr. Block had frequent discussions with Mr. Lankler and Carlton Wessel, an in-house attorney and another former federal prosecutor,[30] who, with Mr. Lankler, was in charge of handling government investigations, about these government investigations.[31]  Mr. Fox and Mr. Block constantly evaluated the disclosure language in light of what they discussed with Mr. Lankler and Mr. Wessel.[32]

Once Mr. Waxman had gained comfort from Mr. Fox, Mr. Block, KPMG, and his legal leadership team that the disclosures in the legal proceedings section were complete and accurate,

---

[27] Waxman (Nov. 14, 2013) Dep. 32:15-33:19 (Petrosinelli Decl. Ex. R-2);  Fox (Sep. 26, 2013) Dep. 84:12-13 (Petrosinelli Decl. Ex. Y-1).

[28] Waxman (Nov. 14, 2013) Dep. 137:11-21; 186:18-23 19 (Petrosinelli Decl. Ex. R-2).

[29] Block (Sep. 16, 2013) Dep. 42:5-44:14 (Petrosinelli Decl. Ex. O-1);  Fox (Sep. 26, 2013) Dep. 87:1-10; 144:1-7; 165:23-166:25; 168:19-169:9 (Petrosinelli Decl. Ex. Y-1).

[30] 2006 Annual Corporate Compliance Review (PFE DERIV A 0004054-66) at p. 5 n.1) (Galin Decl. Ex. I-W).

[31] Fox (Sep. 26, 2013) Dep. 67:12-68:3, 144:1-7, 204:19-205:16 (Petrosinelli Decl. Ex. Y-1); Block (Sep. 16, 2013) Dep. 42:5-43:3, 46:13-47:19, 137:25-138:21 (Petrosinelli Decl. Ex. O-1); July 22, 2008 Email from Lawrence Fox to Carlton Wessel  (PFE-JONES 00044700) (Petrosinelli Decl. Ex. R-5) (describing conference call between Messrs. Fox, Block, and Wessel to discuss new government subpoenas); July 18, 2007 Email from Douglas Lankler to Carlton Wessel (PFE-JONES 00059564) (Galin Decl. Ex. J-W) (describing same); Jan. 15, 2008 Email from Lawrence Fox to Douglas Lankler (PFE-JONES 00044512) (Petrosinelli Decl. Ex. Q-5) (describing conference calls with Messrs. Block, Wessel and Gary Giampetruzzi regarding the government investigations disclosures); Oct. 17, 2007 Email from Paul Brockie to Kim Dadlani (PFE-JONES 00043522) (Petrosinelli Decl. Ex. N-6) (describing meeting with Messrs. Block, Lankler, Wessel and others to discuss potential reserve applicable to the Bextra investigation).

[32] Waxman (Nov. 14, 2013) Dep. 210:9-21 (Petrosinelli Decl. Ex. R-2); Block (Sep. 16, 2013) Dep. 165:14-166:19 (Petrosinelli Decl. Ex. O-1).

that section was sent, as part of the entire disclosure statement, to Pfizer's Disclosure Committee

for further review and comment.[33] The Disclosure Committee, which was comprised of nearly a

dozen senior executives appointed by the CEO and CFO,[34] was responsible for oversight of the

corporate disclosure process. It did so by repeatedly reviewing the controls in place to ensure

that they were adequate. It also reviewed each disclosure document, including successive drafts,

and evaluated whether Pfizer's disclosures were accurate and complete.[35]

After the Disclosure Committee reviewed the disclosures, Pfizer's CEO and CFO

reviewed them. The CEO and CFO then met with members of the Disclosure Committee and

others—including Mr. Fox and Mr. Block, and KPMG—at quarterly Certification meetings.[36]

Because the final decision about whether to issue the disclosures as drafted was made by Pfizer's

CEO and the CFO, these meetings were designed to allow them to ask any questions and seek

any clarifications they required before signing their Sarbanes-Oxley certifications for the 10-Qs,

and for the 10-Ks, both the Sarbanes-Oxley certifications and the 10-Ks themselves.[37] As

Mr. Kindler—the only CEO during Mr. Waxman's 18-month tenure as general counsel—

described these meetings,

> [w]e would ask [the attendees] questions about what matters they had considered
> disclosing and decided not to and would ask them why. We would ask them
> whether there were any disagreements among them. We would have a very
> robust discussion that usually went on for half an hour, an hour. And then finally
> we'd go around the room again and ask if anybody saw any reasons why the

---

[33] Pfizer Disclosure Controls and Procedures (Galin Decl. Ex. A-W).
[34] Disclosure Committee Charter (PFE-JONES 00036746-48) (Galin Decl. Ex. K-W). The makeup of the
Disclosure Committee changed over the course of the class period, but was chaired by the Controller and generally
composed of the CFO, VP of Internal Audit, SVP of Corporate Governance, Treasurer, SVP of Finance, General
Counsel, VP of Investor Development and Strategy, VP of Taxes, VP of Corporate Media Relations, and VP of
Pfizer Global Research and Development. *Id.*
[35] Pfizer Disclosure Controls and Procedures (Galin Decl. Ex. A-W).
[36] Fox (Sep. 26, 2013) Dep. 178:17-179:19 (Petrosinelli Decl. Ex. Y-1).
[37] *Id.* at 162:4-180:21; Block (Sep. 16, 2013) Dep. 51:18-45:13 (Petrosinelli Decl. Ex. O-1); Disclosure Committee
Minutes Compendium (Galin Decl. Ex. W-W); Certification Committee Meeting Minutes Compendium
(Petrosinelli Decl. Ex. B-4).

statements that Mr. D'Amelio and I, or Mr. Levin and I in this case, were attesting to weren't accurate. And after all that, we would sign the certifications.[38]

In addition to the Certification meetings, Pfizer's CEO and CFO along with Mr. Block also discussed the legal proceedings disclosures with one another as the need arose.[39]

At these meetings, the CEO and CFO received sub-certifications from the Chair of the Disclosure Committee that the company's disclosure controls and procedures were adequate and effective at the end of each covered period.[40] Other executives also provided sub-certifications, including Mr. Waxman; Hugh Donnelly, Vice President of Audit; Loretta Cangialosi, Controller; Sharon Kinsman, Vice President of Compensation and Benefits; Stephen Pennacchio, Vice President of Total Rewards; David Shedlarz, Vice Chairman; as well as the multiple business and financial heads of the Company's principal units—resulting in approximately fifteen sub-certifications.[41] These sub-certifications provided that, to the best of [the certifier's] knowledge, the disclosures contained all required information, did not contain any untrue statement of material fact, and did not contain any material omissions.[42] Before signing his sub-certification, and as noted above, Mr. Waxman had received substantially identical sub-certifications from approximately eleven senior in-house attorneys, including Mr. Fox's supervisor, Margaret Foran,

---

[38] Kindler (Dec. 6, 2013) Dep. 176:12-24 (Petrosinelli Decl. Ex. B-2); *see also* Levin (Sep. 23, 2014) Dep. 42:11-20 (Petrosinelli Decl. Ex. G-2) ("The disclosure counsel satisfies itself based on those conversations as part of its drafting of disclosures, and then I had fulsome conversations with Doug Lankler, I had conversations with Larry Fox, I had conversations with the disclosure committee, I had conversations in the certification committee. There were multiple venues and many people who were involved in evaluating the quality of our disclosures.").
[39] Levin (Dec. 10, 2013) Dep. 145:4-16 (Petrosinelli Decl. Ex. F-2) ("[I]n the context of my job as the CFO of the company, I would be talking with Larry, and I'd also be talking with Dennis Block, our external counsel, who are experts on disclosure to better assure myself that we got the most fulsome and appropriate disclosure for the facts and circumstances at the time."); Feb. 14, 2007 Email from Lawrence Fox to Alan Levin (PFE-JONES 00041257-58) (Galin Decl. Ex. L-W).
[40] Certification Committee Meeting Minutes Compendium (Petrosinelli Decl. Ex. B-4).
[41] *Id.*; Apr. 28, 2006 Memo Re: SEC Certciation (PFE-JONES 00045986-001) (Galin Decl. Ex. C-2-W) (Memo from Lawrence Fox requesting fifteen "senior certifiers" to execute sub-certifications before the Certification meeting).
[42] Feb. 26, 2007 Allen Waxman 2006 Form 10-K Certification (PFE-JONES 00046046) (Galin Decl. Ex. M-W).

as well as the one from Mr. Block, and the advice of Mr. Fox following the extensive legal disclosure process described above.[43]

## C.     The Bextra disclosures were truthful.

At issue in this case are disclosures made by Pfizer in its securities filings concerning government investigations of Bextra, Geodon, Lyrica, and Zyvox.  Plaintiffs contend the disclosures falsely described the investigations by:  (1) referring to them as "marketing and safety" investigations rather than as investigations of "off-label" marketing, and (2) falsely stating the company believed it had "substantial defenses" to the allegations.  The record shows, however, that the challenged statements were both accurate and believed in good faith by the company in general, and Mr. Waxman in particular.[44]  As explained by Mr. Waxman, throughout the course of the government's Bextra investigation, the DOJ had various and changing theories and concerns relating to Bextra's marketing that were not limited to "off-label" marketing.[45]  Mr. Waxman's explanation is supported by the fact that in 2006, and again in 2007, when the DOJ wanted more time for its investigation, the tolling agreement it sought was for statutes and conduct that was not limited to "off-label" promotion.[46]  And, when the DOJ made a settlement proposal in an April 4, 2008 letter to Pfizer, the DOJ itself referred to its investigation as being of the "sales and marketing" of Bextra.[47]  Consequently, Mr. Fox, Mr. Block, and KPMG all agreed

---

[43] Dennis Block Certifications Compendium (Petrosinelli Decl. Ex. O-7).

[44] *See* Pfizer's Mot. at Sec. II.C. & D.

[45] Waxman (Nov. 14, 2013) Dep. 53:19-55:4 (Petrosinelli Decl. Ex. R-2).  Likewise, the investigations of Geodon, Lyrica, and Zyvox were also broader than mere "off-label" promotion.  This is evident from the 2009 settlement agreement's "covered conduct" provisions.  2009 Settlement Agreement at 3-5 (Galin Decl. Ex. D-2-W).

[46] May 22, 2006 Letter from Michael Sullivan and Sara Bloom to Pfizer re: Tolling Agreement on Statue of Limitations (PFE-JONES 00103831-33) (Petrosinelli Ex. U-6); May 1, 2007 Letter from Michael Sullivan and Sara Bloom to Pfizer re: Tolling Agreement on Statue of Limitations  (PFE-JONES 00104621-24) (Galin Decl. Ex. N-W).

[47] Apr. 4, 2008 Letter from USAO to Pfizer (PFE DERIV 00066378-80) (Petrosinelli Decl. Ex. Y-6) (DOJ refers to its investigation as one of the "sales and marketing of Bextra").

that referring to the investigation as a "marketing and safety" investigation was appropriate.[48] There is nothing in the record that suggests Mr. Waxman thought that description was false or misleading, or that he had any intent to deceive.

The evidence also establishes that there was nothing false or misleading about Pfizer's statement that it believed it had substantial defenses.[49] Throughout the time Mr. Waxman was at Pfizer, he and the company each believed both that Pfizer had strong defenses to the Bextra allegations, and that the company was confident enough in its defenses to go to trial.[50] Mr. Waxman's belief in the merits of Pfizer's defenses was informed in part by a review of a December 2007, 75-page submission (the "White Paper") to the DOJ from Pfizer's government investigations counsel, Covington & Burling ("Covington").[51] The White Paper, which was drafted after three years of internal investigation by Covington and in response to the DOJ's August 2006 and September 2007 presentations of its concerns, addressed numerous legal and factual defenses the company believed it had.[52] It also undoubtedly supported the judgment of Mr. Fox and Mr. Block in signing off on the reference to "substantial defenses" in the Company disclosures.

---

[48] Block (Sep. 16, 2013) Dep. 126:24-127:4 (Petrosinelli Decl. Ex. O-1) ("[W]hether it was the SEC or the U.S. Attorneys, [the investigation] was always discussed as marketing and safety."); Fox (Sep. 26, 2013) Dep. 146:2-149:25, 151:20-152:3 (Petrosinelli Decl. Ex. Y-1); Jan. 25, 2008 Letter from Covington & Burling to KPMG (KPMG-PFIZ-DS 056016-21) (Petrosinelli Decl. Ex. Y-4) (audit response letter to KPMG describing investigation as "relating to the marketing and safety of drugs sold under the trade names Bextra and Celebrex"); Feb. 15, 2006 Email from Lawrence Fox to Jeffrey Kindler (PFE-JONES 00042203) (Petrosinelli Decl. Ex. O-5) (noting that KPMG suggests the investigation be described as pertaining to "marketing and safety"); Feb. 17, 2006 Email from Lawrence Fox to Eric Riso of KPMG (PFE-JONES 00032806) (Petrosinelli Decl. Ex. I-5).

[49] Plaintiffs focus only on part of the statement about substantial defenses and ignore that the discussion of substantial defenses was actually part of a warning to investors that the investigations may result in a material adverse effect on Pfizer's performance. The full quote, including the language plaintiffs omit, is "[a]lthough we believe we have substantial defenses in these matters, we could in the future incur future judgments or enter into settlements of claims that could have a material adverse effect on our results of operations in any particular period." Pfizer 2008 10 K at 18 (Petrosinelli Decl. Ex. J-1); Pfizer 2007 10 K at 17 (Petrosinelli Decl. Ex. F-1); Pfizer 2006 10 K at 17 (Petrosinelli Decl. Ex. D-1).

[50] Waxman (Nov. 14, 2013) Dep. 203:20-22, 229:17-20 (Petrosinelli Decl. Ex. R-2).

[51] *Id*. at 131:5-8, 234:6-235:1.

[52] *Id*.

**D.    The only allegedly false statement made by Mr. Waxman was true.**

Mr. Waxman did not make any of the statements included in the SEC filings, each of which was signed by individuals other than Mr. Waxman.[53]  The only statement made by Mr. Waxman that plaintiffs allege to be false or misleading was a quote in an April 2007 company press release announcing the resolution of the DOJ's investigation concerning Genotropin, a product that had been inherited through a prior acquisition.[54]  The plaintiffs do not allege that the resolution of the Genotropin investigation or Mr. Waxman's statement caused any of their damages.  In the press release, which like other Pfizer press releases was reviewed by others at Pfizer for accuracy,[55] Mr. Waxman said, "Pfizer's marketing and promotion practices are not involved in the settlement.  The company has internal controls to guard against these types of practices."[56]

Mr. Waxman's truthful statement that Pfizer's conduct was not involved was confirmed by the DOJ, which, in its press release announcing the resolution of the investigation, praised Pfizer for "act[ing] responsibly when it self-disclosed to various federal government agencies . . . Pharmacia's unlawful promotion of [Genotropin]" a month after the acquisition of Pharmacia.[57]

The second sentence of Mr. Waxman's statement, which said that Pfizer had controls to guard against the marketing practices involved in the Genotropin case—off-label promotion and anti-kickback violations—was also true.  At the time of the press release, Pfizer had a

---

[53] *See* Compl. ¶¶ 58-94.
[54] *Id.* ¶ 67.  The DOJ alleged that Pharmacia promoted Genotropin, a human growth hormone drug for anti-aging, cosmetic use, and athletic performance enhancement.  It alleged also that Pharmacia improperly paid a vendor for inducing prescriptions through a patient assistance program.  Apr. 2, 2007 DOJ Press Release (PFE-JONES 00028884-85) (Galin Decl. Ex. O-W A);  Excerpts from Mar. 27, 2007 Letter from U.S. Attorney Sullivan to Posner (PFE-JONES 00028845-55) (Galin Decl. Ex. P-W).  The Genotropin investigation and subsequent settlement were not related to the investigations at issue in this case.
[55] Waxman (Nov. 14, 2013) Dep. 154:7-19 (Petrosinelli Decl. Ex. R-2).
[56] Compl. ¶ 67; Apr. 2, 2007 Pfizer Press Release (Galin Decl. Ex. Q-W).
[57] Apr. 2, 2007 DOJ Press Release (Galin Decl. Ex. O-W A).

comprehensive compliance program,[58] which was overseen by Mr. Waxman's direct report, Chief Compliance Officer Doug Lankler.[59]  Mr. Waxman testified to the proactive and reactive controls Pfizer had in place to guard against off-label promotion and anti-kickback violations.[60] His testimony is supported by, among others, PricewaterhouseCoopers ("PwC"), Pfizer's Independent Review Organization responsible for evaluating its compliance with a 2004 Corporate Integrity Agreement ("CIA") which every year from 2004 to 2009 observed that Pfizer had extensive control processes and was making improvements to address previously identified shortcomings.[61]

Like all strong compliance programs, Pfizer's was constantly subjected to critical analysis, and as a result and as recognized by PwC, was continually evolving and improving. Consistent with this, in response to a November 2006 report that a "significant deficiency" existed within some of Pfizer's compliance controls, the company acted aggressively to further strengthen controls to guard against marketing and other misconduct.[62]  Mr. Waxman was aware of the strengthening of those controls and the efforts to address the issues raised by Internal

---

[58] *See, e.g.*, Summary of Pfizer Policies on Business Conduct ["Blue Book"] (PFE DERIV 00013223-68) (Petrosinelli Decl. Ex. F-7); Pfizer, The Field Guide ["Orange Guide"] (LYR00044363-560) (Petrosinelli Decl. Ex. M-7); *see also* Fleischmann (Apr. 26, 2013) Dep. 254:4- 256:21 (identifying the Blue Book and Orange Guide as "documents that dealt with Pfizer's compliance policies" and noting "each member of the Pfizer field force was expected to review [the Blue Book] and sign an affidavit attesting that they had reviewed and would comply with the policies and procedures laid out here on an annual basis").

[59] Waxman (Nov. 14, 2013) Dep. 23:20-22 (Mr. Lankler was chief compliance officer); 82:7-9 (Mr. Lankler was the chief compliance officer when Mr. Waxman was general counsel); 88:14-23 (Messrs. Lankler and Waxman frequently discussed compliance-related matters) (Petrosinelli Decl. Ex. R-2).

[60] Waxman (Oct. 16, 2014) Dep. 75:14-17 ("I would have been aware of various controls we had in place at Pfizer that were evolving and developing and being reinforced and implemented throughout this period of time."); 92:5-16 (Petrosinelli Decl. Ex. S-2) (Mr. Waxman had general recollection that the compliance program consisted of both proactive and reactive initiatives; an understanding he gained from working with the compliance program and with Mr. Lankler).

[61] *See, e.g.*, Sep. 30, 2005 PwC Independent Review Org. Report (PFE DERIV 00064326-395) (Galin Decl. Ex. T-W) (reporting period August 11, 2004 to May 10, 2005); Sep. 26, 2007 PwC Independent Review Org. Report (PFE-DERIV 00064987-064) (Galin Decl. Ex. U-W) (reporting period May 11, 2006 to May 10, 2007); Sep. 28, 2009 PwC Independent Review Org. Report (PFE DERIV 00065804-833) (Galin Decl. Ex. V-W) (reporting period May 11, 2008 to May 10, 2009).

[62] *See* Nov. 11, 2006 Email from Heidi Chen to Hugh Donnelly (PFE-JONES 00005987-97) (Galin Decl. Ex. S-W).

Audit.[63]  In addition to receiving reports on the remediation efforts, Mr. Waxman had

discussions with Pfizer's head of Internal Audit, Hugh Donnelly, "about the improvements that

were being made."[64]  Even with these improvements ongoing, it remained true throughout that

Pfizer maintained controls designed to guard against improper marketing practices, such as off-

label promotion and anti-kickback violations.  In fact, just five weeks before Mr. Waxman's

statement in the press release, Pfizer's outside auditor—who also was aware of the Company's

efforts at improvement in response to its and internal audit's significant deficiency finding[65]—

concluded that "Pfizer [had] robust controls in place to identify and respond to potential illegal

acts and other related compliance matters."[66]

> **E.      Mr. Waxman was not responsible for deciding whether a reserve should be taken.**

Pfizer's reserve decisions were made by Loretta Cangialosi, Pfizer's controller, in

consultation with the company's outside auditors.[67]  Because the reserve decisions were

necessarily tied to litigations, Mr. Waxman was consulted by the Finance team and KPMG about

the status of Pfizer's litigation and investigations, but Mr. Waxman was not principally

responsible for determining if a reserve was appropriate.[68]  Pfizer had a comprehensive process

for evaluating whether an accounting reserve was required, including quarterly reserve reviews

with the Controller's group, KPMG, and the in-house attorneys responsible for the Bextra

---

[63] Mr. Waxman attended Audit Committee meetings and received reports to the Committee, which described the substantial progress.  *See* Feb. 21, 2007 Audit Committee Minutes (KPMG-PFIZ-DS 057317-22) (Petrosinelli Decl. Ex. X-4); Jan. 19, 2007 Disclosure Committee Meeting Minutes (PFE-JONES 00036609-10) (Galin Decl. Ex. E-2-W);  Mar. 16, 2007 Memo from Ian Read to Pfizer Audit Committee (PFE DERIV A 00003833) (Galin Decl. Ex. X-Y).
[64] Waxman (Nov. 14, 2013) Dep. 151:5-8 (Petrosinelli Decl. Ex. R-2).
[65] Chapman (Sep. 5, 2013) Dep. 94:8-13; 96:8-12 (Petrosinelli Decl. Ex. T-1).
[66] KPMG 2006 Compliance Overview Memo at 3, 11 (KPMG-PFIZ-DS 0005889-99) (Petrosinelli Decl. Ex. W-4).
[67] Cangialosi (June 21, 2013) Dep. 367:23-368:14 (Petrosinelli Decl. Ex. S-1).
[68] Oct. 17, 2007 Email from Paul Brockie to Kim Dadlani (PFE-JONES 00043522) (Petrosinelli Decl. Ex. N-6) (listing those involved in determining whether a reserve was appropriate for Bextra in the third quarter of 2007, and notably not referencing Mr. Waxman).

investigation.[69]  Mr. Block was consulted regarding reserving decisions, and concluded that the

Bextra investigation did not require a reserve.[70]

Furthermore, the undeniable fact is that at or before the time Mr. Waxman left Pfizer, the

Company's experts had concluded that a reserve was not warranted.  Pfizer's disclosure counsel,

outside auditors, and Legal Review Committee ("LRC") regularly analyzed the status of the

government investigations to determine whether a loss was both probable and reasonably

estimable, as required by the accounting standards for a reserve to be taken.[71]  It was consistently

Mr. Block's, KPMG's, and the LRC's opinion that a reserve was not appropriate during the time

Mr. Waxman was Pfizer's general counsel.[72]  Indeed, even as of January 2009—nearly a year

after Mr. Waxman had left the Company—these individuals continued to believe that no reserve

was appropriate.[73]

## III.  <u>ARGUMENT</u>

A defendant is entitled to summary judgment when there is no dispute regarding any

material fact, and the facts, interpreted in the light most favorable to the plaintiff, would not

support a jury verdict against him.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48

(1986).  A plaintiff cannot defeat a defendant's summary judgment motion by relying on

conclusory allegations or unsubstantiated speculation, but rather must set forth actual facts to

establish a genuine dispute for trial.  *Id.* at 248; *DeFabio v. E. Hampton Union Free Sch. Dist.*,

---

[69] *See* Pfizer's Mot. at 9-12.
[70] *See* Oct. 16, 2007 Email from Douglas Lankler to Carlton Wessel (PFE-JONES 00047115) (Galin Decl. Ex. Y-W) (stating that Mr. Block was consulted and advised a reserve was not appropriate).
[71] June 20, 2007 Reserving and Settlement Procedures Memo (PFE-JONES 00038023) (Galin Decl. Ex. Z-W).
[72] *See* Pfizer's Mot. at Sec. II.G;  Oct. 22, 2007 Financial Exec. Litigation Meeting Minutes (PFE-JONES 00032448) (Galin Decl. Ex. A-2-W);  Jan. 22, 2008 KPMG 2007 Earnings Release Memo (PFE-JONES 00039437-42) (Galin Decl. Ex. B-2-W);  Feb. 28, 2008 KPMG Memo, Bextra: Consideration of SFAS No. 5 (FAS 5) Loss Contingencies (KPMG-PFIZ-DS 0004281) (Petrosinelli Decl. Ex. U-4).
[73] Jan. 12, 2009 email from Dennis Block to Gary Giampetruzzi (PFE-JONES 00059201 at 00059201) (Petrosinelli Decl. Ex. G-5); Jan. 2009 draft memorandum to KPMG (PFE-JONES 00059201 at 00059202) (Petrosinelli Decl. Ex. G-5).

623 F.3d 71, 81 (2d Cir. 2010) (plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts" and "may not rely on conclusory allegations or unsubstantiated speculation." (internal citation and quotation marks omitted)); *Duch v. Jakubek*, 588 F.3d 757, 764 n.2 (2d Cir. 2009) (plaintiff must come forward with specific facts showing there is a genuine issue for trial); *see also* Fed. R. Civ. P. 56(a).

> **A.** **Mr. Waxman cannot be held liable under Rule 10b-5 because he was not the maker of any false or misleading statements and plaintiffs cannot establish he acted with scienter.**

To establish Rule 10b-5 liability against Mr. Waxman, plaintiffs must prove each of the following: (1) a material misrepresentation or omission by Mr. Waxman; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation.[74] Plaintiffs cannot meet this burden.

Pfizer's brief demonstrates that there is no evidence the statements alleged by plaintiffs were false or misleading, were connected to the purchase or sale of a security, or caused plaintiffs to suffer economic loss.[75] Plaintiffs also cannot prove that Mr. Waxman made false statements or that he did so recklessly or with fraudulent intent. Mere allegations of scienter are insufficient; plaintiff must—but cannot on this record—produce actual facts that Mr. Waxman acted with scienter. *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 850-51 (2d Cir. 1981) (affirming grant of summary judgment where there were insufficient facts adduced to support scienter). As a result, the Court should grant Mr. Waxman summary judgment.

---

[74] *Stoneridge Inv. Partners LLC v. Scientific-Atlanta Inc.*, 552 U.S. 148, 157 (2008).
[75] Pfizer's Mot. at Secs. I & III.

## 1. Mr. Waxman is not liable under Rule 10b-5 for any false statements made before he became general counsel or after he left Pfizer.

Plaintiffs' allegations against Mr. Waxman appear to relate exclusively to the period when he served as Pfizer's general counsel.[76]  While the Class Period spans more than three years, Mr. Waxman was Pfizer's general counsel only from August 2006 through March 11, 2008, when he left the company,[77] a period of eighteen months.  As a matter of law, Mr. Waxman cannot be liable for any statements made before August 2006 or after March 11, 2008, and plaintiffs do not allege otherwise.  *See In re UBS AG Sec. Litig.*, No. 07-cv-11225 (RJS), 2012 WL 4471265, at *22 n.20 (S.D.N.Y. Sept. 28, 2012) (not reported) (dismissing all claims against individual defendants to the extent they relied on any part of the alleged frauds that occurred before they assumed their roles or after they left the company); *In re ICN/Viratek Sec. Litig.*, No. 87-cv-4286, 1996 WL 164732, at *12 n.4 (S.D.N.Y. Apr. 9, 1996) (president of the company cannot be held liable for statements made by any defendant prior to the date he assumed that role); *In re Refco*, 503 F. Supp. 2d 611, 643-44 (S.D.N.Y. 2007) (former CFO not liable under Section 10(b) for alleged public statements filed after he left the company).

On this basis alone, Mr. Waxman is entitled to summary judgment on the Rule 10b-5 claim for the periods January 19, 2006 through July 31, 2006 and March 12, 2008 through January 23, 2009.

---

[76] *See* Compl. n.1 & ¶ 35.
[77] Waxman (Nov. 14, 2013) Dep. 20:22-24, 26:17-25 (Petrosinelli Decl. Ex. R-2).

2. **Mr. Waxman did not "make" any of the challenged statements regarding the government investigations.**

a. **Pfizer's SEC Filings were not attributed to Mr. Waxman and he did not have ultimate authority over them.**

As Pfizer's general counsel from August 2006 to March 11, 2008, Mr. Waxman acted as a lawyer trying to ensure the above-described disclosure process provided Pfizer's CEO and CFO relevant information and advice regarding Pfizer's public statements. What Mr. Waxman did not do was make any public statements about the government's investigations of Bextra, Geodon, Lyrica, or Zyvox. In *Janus Capital Group v. First Derivative Traders*, the Supreme Court ruled that where "none of the statements . . . [can be] attributed, explicitly or implicitly, to [a defendant]," there is no basis to conclude the defendant made an actionable misrepresentation or omission.[78] The record in this case is unambiguous that Mr. Waxman did not sign any of Pfizer's SEC filings.

Other than the unrelated Genotropin press release addressed below in Section III.A.4, none of the allegedly actionable public disclosures was attributed—directly or indirectly—to Mr. Waxman. Under *Janus*, Mr. Waxman cannot be deemed the maker of the statements attributed to others because "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed."[79] "This rule might be best exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes the credit—or blame—for what ultimately is said."[80]

---

[78] 131 S. Ct. 2296, 2305 n.11 (2011).
[79] *Id.* at 2302.
[80] *Id.*

Because each of the challenged statements was attributed to someone other than Mr. Waxman, he can only be a maker of those statements if he had "ultimate authority" over the challenged statements.[81]  As the Supreme Court explained, "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker."[82]  In fact, the Court expressly rejected the government's argument in its amicus brief that "make" should be defined as "create."[83]  Citing the *Oxford English Dictionary*, the Court explained that "[o]ne 'makes' a statement by stating it. . . . The phrase at issue in Rule 10b-5, '[t]o make any . . . statement,' is thus the approximate equivalent of 'to state.'"[84]

After three years of extensive discovery, there is absolutely no evidence that Mr. Waxman had ultimate authority over the challenged statements.  The record is clear that Mr. Waxman was part of an extensive disclosure process in which he and the others relied on the expert legal advice of Mr. Fox and Mr. Block—a process that concluded each quarter with Pfizer's CEO and CFO signing the Sarbanes-Oxley certifications for the 10-Qs, and each year signing both the 10-Ks and the Sarbanes-Oxley certifications.  Consistent with the *Oxford English Dictionary*'s definition of "ultimate" as "coming at the end of a process, course of action,"[85] "ultimate authority" over the public statements was unquestionably vested in Pfizer's

---

[81] *Id*.
[82] *Id*.
[83] *Id*. at 2303.
[84] *Id*. at 2302.  Even prior to *Janus*, the Second Circuit had long rejected the argument that participation in the drafting of statements attributable to others may be a basis for imposing Section 10(b) liability.  *See, e.g.*, *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 155 (2d Cir. 2010) (rejecting the "creator" and "substantial participation" standards for imposing Section 10(b) liability and reasserting the Second Circuit's "bright line" rule).
[85] *Oxford English Dictionary*, at 11-12 (1933) (Galin Decl. Ex. F-2-W).

CEOs and CFOs who signed them and to whom they are attributed—and there is no record evidence that there was any dispute about that authority. Rather, each of the other individual defendants—Pfizer's past and present CEOs and CFOs—testified they evaluated and approved the statements in reliance on the comprehensive disclosure process and the company's expert in-house and outside disclosure counsel (Mr. Fox and Mr. Block), as well as KPMG.[86] Nothing in the testimony of Mr. Kindler or the Company's other CEOs or CFOs suggests, let alone raises a factual question, that Mr. Waxman had ultimate authority over their public statements.

That Mr. Waxman, like numerous other Pfizer employees and outside counsel, provided disclosure sub-certifications does not change this conclusion. Preparing unpublished documents reviewed by those who signed the SEC filings and/or incorporated Sarbanes-Oxley certifications is conduct far removed from that required to establish the sub-certifier as a "maker." *See Janus*, 131 S. Ct. at 2303-04 (rejecting a definition that "would permit private plaintiffs to sue a person who 'provides the false or misleading information that another person then puts into the statement'" because it is "merely an undisclosed act preceding the decision . . . to make a public statement" (internal citation omitted)); *In re DVI, Inc. Sec. Litig.*, 919 F. Supp. 2d 498, 509-10 (E.D. Pa. 2013) (senior vice president was not the maker of the company's financial statements despite signing an unpublished certification for the company's subsidiary on which the published financial statement relied).

---

[86] Kindler Dep. (Dec. 6, 2013) 116:25-117:19 (reliance on Messrs. Fox and Block for legal disclosure), 218:12-14 (reliance on outside and inside accountants, together with Mr. Block, for reserves issue) (Petrosinelli Decl. Ex. B-2); McKinnell Dep. (Sept. 19, 2014) 51:23-65:5, 88:19-91:16 (reliance on Messrs. Fox and Block for legal disclosure), 232:16-236:12 (reliance on KPMG for reserves) (Petrosinelli Decl. Ex. I-2); D'Amelio Dep. (Dec. 4, 2013) 26:21-27:12, 205:14-206:7 (reliance on Messrs. Fox and Block for legal disclosure; 276:4-15 (reliance on KPMG for reserves) (Petrosinelli Decl. Ex. U-1); Levin Dep. (Dec. 10, 2013) 299:17-23 (reliance on Messrs. Fox and Block for legal disclosure); 301:17-302:6 (reliance on KPMG for reserves) (Petrosinelli Decl. Ex. F-2). Mr. Read did not become Pfizer's CEO until well after Mr. Waxman had left Pfizer. Thus, it is not surprising that none of the summary judgment motions submitted by Pfizer and the other individual defendants identify Mr. Waxman as the key figure with respect to the public disclosures in issue.

Moreover, neither the fact nor content of the sub-certifications was ever communicated to the public, and plaintiffs had no knowledge of them during the Class Period. As the Supreme Court made clear in *Stoneridge*, plaintiffs cannot claim to have relied to their detriment on such undisclosed acts. 552 U.S. 148, 159-60 (2008) (holding that plaintiffs cannot show reliance on undisclosed deceptive acts never communicated to or otherwise known by the public).[87]

### b. Courts do not deem general counsels the "makers" of companies' public disclosures in these circumstances.

Notably, since *Janus* clarified that Rule 10b-5 liability requires that a defendant possess "ultimate authority" over an alleged misstatement and that "one who prepares or publishes a statement on behalf of another is not the maker," no federal court has ruled that a general counsel could be liable as a maker by virtue of having provided information or drafting assistance for SEC filings ultimately signed by and attributed to the company's CEO and CFO.[88] *See, e.g.*, *Derby City Capital, LLC v. Trinity HR Servs.*, 949 F. Supp. 2d 712, 744 (W.D. Ky. 2013) (counsel who drafted SEC statements was not "maker" under *Janus*); *Kerr v. Exobox Technologies Corp.*, 2012 WL 201872, at *11 (S.D. Tex. Jan. 23, 2012) (not reported) (general counsel and majority shareholder who prepared SEC filings signed by CEO and CFO not "maker" under *Janus*). For instance, in *SEC v. Carter*, the court concluded that the CEO who was quoted in a press release and who signed an attached SEC statement was the "maker" of the release, while the corporate attorney who drafted the release was "in contrast, 'the

---

[87] *See also Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164, 178, 180 (1994) (the central premise of Section 10b liability is that "[a] plaintiff must show reliance on the defendant's misstatement or omission to recover . . . [and] [t]he proscription does not include giving aid to a person who commits a manipulative or deceptive act."); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 475-76 (S.D.N.Y. 2010) (dismissing Rule 10b-5 claims against senior executive officers where the public statements were not attributed to them, and plaintiff provided no facts showing that any investor relied on their role in issuing them).

[88] *Janus*, 131 S. Ct. at 2303.

speechwriter[],' who wrote the release[] . . . but would not be blamed for [its] contents."[89]  That

conclusion is also consistent with pre-*Janus* cases in this District—"[i]n no sense can an attorney

giving legal advice to a person or corporation making a statement, or assisting in its drafting, be

understood to 'cause' the statement to be made."[90]  In the few instances where courts have

allowed claims against a general counsel to proceed, the allegations involved statements

expressly attributed to the general counsel or the general counsel's active participation in

obviously fraudulent schemes, conduct clearly absent here.[91]

     Because Mr. Waxman did not make any of the allegedly false or misleading statements,

he is entitled to summary judgment on the Rule 10b-5 claim.

### 3.    There is no evidence that Mr. Waxman acted with scienter.

     Even if plaintiffs could offer evidence raising a factual dispute as to whether

Mr. Waxman was a "maker" of the relevant statement—which they cannot—plaintiffs must also

establish that Mr. Waxman acted with scienter, a showing they also cannot make.  "To establish

liability under [Section] 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant

acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'"

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted).

Mr. Waxman is entitled to summary judgment if the plaintiffs cannot produce actual facts—as

opposed to unproven allegations in a complaint—to support their claims that he made knowingly

false statements with the intent to defraud.  *See State Teachers*, 654 F.2d at 850-51 (affirming

---

[89] No. 10 C 6145, 2011 WL 5980966, at *1-2 (N.D. Ill. Nov. 28, 2011).

[90] *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MD 1529 (LMM), 2007 WL 2615928, at *12 (S.D.N.Y. Sept. 10, 2007) (not reported); *see also In re Towers Fin. Corp. Noteholders Litig.*, No. 93CIV 0810(WK)(AJP), 1995 WL 571888, at *14 (S.D.N.Y Sept. 20, 1995) (not reported) (citing cases rejecting liability for attorneys providing legal advice even under the more lenient aiding and abetting theory).

[91] *See, e.g.*, *In re Questcor Sec. Litig.*, No. SA CV 12–01623 DMG, 2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) (not reported) (denying motion to dismiss where general counsel was also CFO and signed SEC filings); *SEC v. Boyd*, No. 95–cv–03174–MSK–MJW, 2012 WL 1060034 (D. Colo. Mar. 29, 2012) (not reported) (denying motion to amend judgment where general counsel issued statements and diverted funds into personal account).

grant of summary judgment where there were insufficient facts adduced to support scienter). Plaintiffs cannot point indiscriminately to disconnected statements and alleged conduct, but must connect the specific alleged misstatement made by the defendant to facts showing that he personally intended to defraud investors with that statement. *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 271 (2d Cir. 1996).

Despite exhaustive discovery, including all privileged correspondence reflecting disclosure advice regarding Pfizer's disclosures about the government investigations, plaintiffs cannot point to a single piece of evidence—no testimony, internal memorandum, or email—that could possibly enable them to meet their burden of proving that Mr. Waxman acted with "intent to deceive, manipulate, or defraud."[92] *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1796 (2010) ("A plaintiff cannot recover without proving that a defendant made a material misstatement *with an intent to deceive*—not merely innocently or negligently." (emphasis in original) (citation omitted)).

There is also no evidence that Mr. Waxman acted recklessly. "Reckless conduct is, at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"[93] There is a "significant burden on the plaintiff in stating a fraud claim based on recklessness,"[94] and plaintiffs cannot satisfy that burden here.

After years of discovery and Pfizer's voluntary waiver of the attorney-client privilege regarding advice it received about its disclosures and reserves, there is no evidence that

---

[92] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976) (plaintiffs bear the burden of proving scienter). *See also Tellabs*, 551 U.S. at 319.

[93] *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978) (internal citation omitted).

[94] *Chill*, 101 F.3d at 269.

Mr. Waxman believed or was recklessly unaware that Pfizer's disclosures were false or misleading. Nor is there any evidence that Mr. Waxman did not believe that the disclosures were complete and accurate. To the contrary, the record is replete with evidence that Mr. Waxman acted in good faith and as part of a legal process designed to ensure that Pfizer's disclosures were truthful and accurate, and complied with the federal securities laws. Additionally, the evidence is uncontroverted that Mr. Waxman justifiably relied on Pfizer's in-house and outside disclosure counsels' advice and expert opinions, further preventing plaintiffs from establishing scienter.

### a. The evidence shows Mr. Waxman acted in good faith.

The record establishes Mr. Waxman's good faith. Pfizer's extensive legal disclosure review process itself, more fully described *supra* at pages 2-8 and in Pfizer's motion and Rule 56.1 Statement, should preclude a finding of scienter.[95] Pfizer's legal proceedings disclosures were initially drafted by experienced disclosure counsel and then passed through a detailed, multi-stage vetting process involving numerous internal and external lawyers and accountants.[96] Mr. Waxman, with others, participated in the review process, asked the right questions, and acted conscientiously to help ensure that the disclosures were truthful and accurate.[97] Highly competent and experienced disclosure counsel were involved throughout this

---

[95] *See* Pfizer's Mot. at 5-9; I.B.

[96] Fox (Sep. 26, 2013) Dep. 165:2-166:25, 174:11-175:8, 177:17-178:5 (Petrosinelli Decl. Ex. Y-1); Certifications by Messrs. Kindler and Levin Filed With 2006 Form 10-K (Galin Decl. Ex. G-2-W) (PFE-JONES 00036636-37); Certifications by Messrs. Kindler and Levin Filed With the First Quarter 2007 Form 10-Q (Galin Decl. Ex. H-2-W) (PFE-JONES 00036902-03); Certifications by Messrs. Kindler and Levin Filed With the Second Quarter 2007 Form 10-Q (Galin Decl. Ex. I-2-W) (PFE-JONES 00036974-75); Certifications by Messrs. Kindler and D'Amelio Filed With the Third Quarter 2007 Form 10-Q (Galin Decl. Ex. J-2-W) (PFE-JONES 00034611-12); Certifications by Messrs. Kindler and D'Amelio Filed With 2007 Form 10-K (Galin Decl. Ex. K-2-W) (PFE-JONES 00036996-97); Feb. 12, 2007 Email from Allen Waxman to Lawrence Fox and Douglas Lankler re Cox-2 Investigations - Legal Proceedings Disclosure ((Petrosinelli Decl. Ex. P-6) (PFE-JONES 00044564-66).

[97] *See supra* at 3-4; Jan. 22, 2007 Email from Lawrence Fox to Allen Waxman (PFE-JONES 00041545-46) (Galin Decl. Ex. C-W); Feb. 20, 2007 Email from Allen Waxman to Dennis Block re: 10-K Legal Proceedings (PFE-JONES 00046246-48) (Petrosinelli Decl. Ex. R-6); Feb. 21, 2007 Email from Allen Waxman to Lawrence Fox (PFE-JONES 00041249-50) (Petrosinelli Decl. Ex. K-5) (showing Mr. Waxman giving careful consideration with securities counsel to how best to describe matters accurately); Feb. 21, 2007 Email from Lawrence Fox to Allen

process, provided Mr. Waxman with expert advice,[98] and approved the final language in each of the filings.[99] This rigorous process to produce accurate and lawful disclosures cannot possibly be considered "an extreme departure from the standards of ordinary care,"[100] and defeats any suggestion that Mr. Waxman acted with scienter.

> **b.    Mr. Waxman's good-faith reliance on expert disclosure counsels' advice also negates scienter.**

As described above, Mr. Waxman was not a securities disclosure lawyer and did not have Mr. Fox's or Mr. Block's specialized knowledge or their decades of disclosure experience. Mr. Waxman, therefore, reasonably and in good faith relied on the "securities lawyers advising the company on disclosure obligations."[101] *See Morgan v. Prudential Grp., Inc.*, 527 F. Supp. 957, 960 (S.D.N.Y. 1981) (no scienter where the general counsel lacked substantive expertise and relied instead on the participation of tax counsel); *SEC v. Lowy*, 396 F. Supp. 2d 225, 246-47 (E.D.N.Y. 2003) (not reckless for attorney to rely on legal opinion from other reputable lawyers); *SEC v. Steadman*, 967 F.2d 636, 642-43 (D.C. Cir. 1992) (defendant's law degree and extensive securities experience did not preclude good-faith reliance on outside counsel's opinion). Mr. Waxman's undisputed reliance on Mr. Block's and Mr. Fox's advice that Pfizer's securities disclosures complied with the law negates any inference of scienter. *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 148 F. App'x 66, 69 (2d Cir. 2005) (affirming summary judgment due to

---

Waxman, Dennis Block and various recipients re: Legal Proceedings Disclosure (Galin Decl. Ex. L-2-W) (PFE-JONES 00041470-87);
Feb. 26, 2007 Email from Lawrence Fox to Suzanne Lee regarding Financial Report - Legal Proceedings Disclosure (Petrosinelli Decl. Ex. A-6) (PFE-JONES 00059156); Feb. 21, 2007 Email from Kim Dadlani to Lawrence Fox re: 10K comment (Petrosinelli Decl. Ex. H-6) ((PFE-JONES 00032727-28).

[98] *See supra* at 2-8.
[99] As detailed in Pfizer's brief, Mr. Waxman, like his colleagues, honestly believed that describing the government's Bextra investigation as a "marketing" investigation was the best way to characterize a constantly evolving government investigation, and that the company had substantial defenses to any potential claims the government might assert. *See* Waxman (Nov. 14, 2013) Dep. 53:14-54:6 (Petrosinelli Decl. Ex. R-2); Pfizer's Mot. at Sec. II.C-D.
[100] *Rolf*, 570 F.3d at 47.
[101] Fox (Sep. 26, 2013) Dep. 84:12-13 (Petrosinelli Decl. Ex. Y-1).

plaintiff's failure to proffer sufficient evidence of scienter where the record showed that defendant relied on the expertise of outside counsel).[102]

Mr. Fox and Mr. Block had full access to all information necessary to provide competent disclosure advice, and they had the freedom and opportunity to ask any questions they deemed appropriate. In fact, Mr. Waxman instructed the legal division to provide disclosure counsel with any information they requested.[103] As more fully described by Pfizer in its motion papers, disclosure counsel were fully integrated and engaged in the disclosure process, and were provided whatever information they requested regarding the government investigations at issue.[104] Mr. Fox and Mr. Block were informed on a regular basis of developments in the government investigations. Mr. Fox and Mr. Block, like Mr. Waxman, received updates, information and legal analyses from the criminal law experts handling the government investigations[105] about the allegations and defenses in those investigations.[106] In addition, Mr. Block was part of Pfizer's core team overseeing all of the company's COX-2 litigation, including the Bextra government investigation.[107] And both Mr. Fox and Mr. Block knew they

---

[102] *See also Howard v. SEC*, 376 F.3d 1136, 1147-49 (D.C. Cir. 2004) (holding that approval of a transaction by inside and outside counsel is a "green" flag that "constitute[s] powerful evidence" of no scienter); *SEC v. Shanahan*, 646 F.3d 536, 544 (8th Cir. 2011) (SEC failed to prove scienter where defendants relied on inside and outside lawyers and accountants to ensure the accuracy of disclosures); *Newton v. Uniwest Fin. Corp.*, 802 F. Supp. 361, 368 (D. Nev. 1990), *aff'd*, 967 F.2d 340 (9th Cir. 1992) (granting summary judgment for defendant because, *inter alia*, "Plaintiff has produced no evidence to counter Defendant's contention, based upon the evidence, that he acted in good faith reliance on [the company's] lawyers and certified public accountants and without the requisite scienter."). *See* Pfizer Mot. at Sec. I.B.

[103] Fox (Sep. 26, 2013) Dep. 144:1-4, 168:19-22 (Petrosinelli Decl. Ex. Y-1); Waxman (Nov. 14, 2013) Dep. 56:2-8, 127:18-130:9, 137:11-21, 186:18-23 (Petrosinelli Decl. Ex. R-2).

[104] *See* Pfizer's Mot. at 5-9; I.B.1.

[105] Fox (Sep. 26, 2013) Dep. 68-74, 156:14-18 (Petrosinelli Decl. Ex. Y-1); Block (Sep. 16, 2013) Dep. 46:8-48:11, 244-45 (Petrosinelli Decl. Ex. O-1).

[106] Among those analyses was a comprehensive 75-page "White Paper," a submission by Pfizer's government investigations counsel to the DOJ regarding defenses to the DOJ's allegations. The White Paper is more fully described in Pfizer's Motion. Pfizer's Mot. at 17.

[107] Fox (Sep. 26, 2013) Dep. 46:13-23, 64:9-13, 87:1-88:14 (Petrosinelli Decl. Ex. O-1); Waxman (Nov. 14, 2013) Dep. 134:4-15, 178:10-182:23 (Petrosinelli Decl. Ex. R-2); Jan. 11, 2006 Email from Douglas Lankler to Lawrence Fox re: Legal Proceedings Disclosure for 2005 Financial Report (Galin Decl. Ex. M-2-W) (PFE-JONES 00046906-08).

were free to ask for any additional information they wanted.[108] Mr. Fox and Mr. Block had access to all of the relevant facts necessary to make a fully informed judgment about the contents of the disclosures and to advise Mr. Waxman and the company that the disclosures complied with the law. Had Mr. Fox or Mr. Block not believed it appropriate for Pfizer's disclosures to notify investors that, "[a]lthough we believe we have substantial defenses in these matters, we could in the future incur future judgments or enter into settlements of claims that could have a material adverse effect on our results of operations in any particular period,"[109] Mr. Fox or Mr. Block could and would have removed that language. As with all aspects of the disclosures, Mr. Waxman relied on their counsel. Significantly, both Mr. Fox and Mr. Block continue to this day to believe Pfizer's disclosures were accurate and complete.[110]

Mr. Waxman's reasonable reliance on the opinions of experienced disclosure counsel is not fraud or recklessness. Plaintiffs therefore cannot establish that Mr. Waxman acted with scienter.[111]

### 4. Mr. Waxman's statement in the Genotropin press release did not violate Rule 10b-5.

The single alleged statement actually attributed to and made by Mr. Waxman is from an April 2, 2007 press release announcing the settlement of a government investigation relating to Genotropin, a product Pfizer had acquired as a result of a 2003 acquisition. Specifically, the

---

[108] Fox (Sep. 26, 2013) Dep. 87:1-10 (Petrosinelli Decl. Ex. O-1); Block (Sep. 16, 2013) Dep. 42:19-43:9 (Petrosinelli Decl. Ex. O-1).

[109] Pfizer 2008 10-K at 18 (Petrosinelli Decl. Ex. J-1); Pfizer 2007 10-K at 17 (Petrosinelli Decl. Ex. F-1); Pfizer 2006 10-K at 17 (Petrosinelli Decl. Ex. D-1).

[110] Fox (Sep. 26, 2013) Dep. 168:19-169:9, 181:10-182:17 (Petrosinelli Decl. Ex. Y-1); Block (Sep. 16, 2013) Dep. 269:7-18 (Petrosinelli Decl. Ex. Y-1). *See United States v. DeFries*, 129 F.3d 1293, 1308-09 (D.C. Cir. 1997) ("So long as the primary facts which a lawyer would think pertinent are disclosed, or the client knows the lawyer is aware of them, the predicate for an advice-of-counsel defense is laid.")..

[111] The White paper reflected the company's bona fide view that it had substantial defenses. Waxman (Nov. 14, 2013) Dep. 234:6-235:1; 203:12-22. The uncontested evidence is that Mr. Waxman believed that the company had numerous factual and legal defenses to any criminal or civil charges. *Id.* 130:13-131:8; 203:12-22; Waxman (10/16/2014) Dep. 11:3-12:15 (Petrosinelli Decl. Ex. R-2).

press release quoted Mr. Waxman as saying, "Pfizer's marketing and promotion practices are not involved in the settlement. The company has internal controls to guard against these types of practices."[112] There cannot be any material dispute on this record that Mr. Waxman's statement was both true and made in good faith.

### a.     Mr. Waxman's statement was true.

A fundamental flaw in plaintiffs' assertions is that Mr. Waxman's Genotropin press release statement was true. The Genotropin settlement covered activities at Pharmacia before Pfizer acquired that company in 2003. The DOJ itself praised Pfizer for "act[ing] responsibly when it self-disclosed to various federal government agencies . . . *Pharmacia*'s unlawful promotion of [Genotropin]" a month after the acquisition.[113] In addition, and consistent with what Mr. Waxman said, the record is replete with evidence that Pfizer had internal controls designed to prevent the conduct that was the subject of the Genotropin investigation. There simply is no evidence in the record that raises a factual question as to whether Pfizer had such internal controls.

Confronted with this indisputable fact that Mr. Waxman's Genotropin press release statement was true, plaintiffs may attempt to distort it as a guarantee that Pfizer's compliance controls would invariably succeed. But, the law is clear that statements regarding the existence of policies or procedures to prevent certain outcomes are not guarantees that those outcomes will not occur, and no reasonable investor could rely upon them as such. *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359 (S.D.N.Y. 2008) (rejecting plaintiffs' claim that company's

---

[112] Compl. ¶ 67; Press Release, *Pfizer, Inc, Pharmacia Subsidiaries Reach $34.7 Million Settlement with DOJ; Resolve Allegations of Improper Activities Prior to Acquisition by Pfizer* (Apr. 2, 2007) (Galin Decl. Ex. Q-W).
[113] Press Release, U.S. Attorney's Office District of Massachusetts, *Pfizer Subsidiary Agrees to Plead Guilty for Offering Kickback and Pay $19.68 Million Criminal Fine* (Apr. 2, 2007) ( (Galin Decl. Ex. O-W) (PFE-JONES 00028884-85).

statement that it had a "corporate wide risk management program approved by our Board of Directors," without more, "misled investors into believing that [the company] had an effective compliance program that would root out any impropriety . . . . Such an allegation fails to state a claim of securities fraud.").  In fact, plaintiffs' own proffered disclosure expert, Edward Buthesium, conceded this precise point:

> Q.  So the fact that you have policies and practices in place to ensure compliance is not a representation that, in every instance, those standards will be achieved?
>
> A.  Right.
>
> Q.  You agree with that?
>
> A.  Yes.
>
> Q.  So there's nothing wrong with a public company disclosing its policy that it complies with—or at least attempts to comply with ethical behavior?
>
> A.  Yes, nothing wrong.
>
> Q.  There's nothing actionable about those statements if it turns out that there are employees within the company that are not following the company policy?
> ***
>
> A.  No. . . . It's not a guarantee.[114]

---

[114] Buthusiem (Aug. 1, 2013) Dep. 354:6-355:3 (Petrosinelli Decl. Ex. R-1); *see also id.* 351:7-352:14 (conceding that a similar disclosure made by his former employer GSK while he was disclosure counsel there—that GSK "is committed to ethical . . . marketing" and that the pharmaceutical marketing and promotional activity policy requires that "all marketing and promotional activities . . . comply with applicable laws and regulations"—is a statement as to the company's policy, and not a representation that there were no employees within the company who were engaging in conduct that violated the companies' policies or an assurance that everyone's following the policy); 352:16-353:5 (GSK statement that "the company is committed to ethical values" is "a statement as to [the company's] policy" and not a guarantee that every employee of the company is always going to follow it); *see also* Department of Health and Human Services, Office of Inspector General's *Compliance Program Guidance for Pharmaceutical Manufacturers,* 68 Fed. Reg. 23731, 23732 (May 5, 2003) (stating, "The OIG recognizes that the implementation of a compliance program may not entirely eliminate improper conduct from the operations of a pharmaceutical manufacturer.") (Galin Decl. Ex. N-2-W); Chapman (Sept. 5, 2013) Dep. 54:15-22 (Petrosinelli Decl. Ex. T-1) ("[A]s we well know, no control environment, no matter how good it is, can detect a hundred percent. People - people do bad things.  And so - but at the end of the day, this was a very strong set of controls that were put in place to enhance that - their control environment in this very difficult area for the industry").

It is also well established under Second Circuit precedent that—to the extent plaintiffs try to distort Mr. Waxman's statement into a guarantee of effectiveness —such statements constitute non-actionable "puffery." *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (statement that the company "set the standard for best practices in risk management" was puffery and did not constitute a "guarantee" against adverse events); *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 58-59 (2d Cir. 2004) (statement that company "would not compromise its financial integrity" could not be a material misstatement to a reasonable investor). No reasonable investor would rely on Mr. Waxman's Genotropin statement as a guarantee that all Pfizer employees, at all times, would fully comply with all of Pfizer's internal policies and all laws.[115] In short, "general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014). Accordingly, Mr. Waxman's Genotropin press release statement was not materially misleading as a matter of law.

### b. There is no evidence that Mr. Waxman made the statement with scienter.

Even if Mr. Waxman's sole statement in the Genotropin press release could be deemed false or misleading, plaintiffs are nevertheless unable to point to any evidence in the record that it was made with scienter. Rather, as described above, the evidence shows that Mr. Waxman had a good faith basis to—and did in fact—believe the statement to be true when made.[116] And Mr.

---

[115] *See* Pfizer's Mot. at Sec.II.B.

[116] Waxman (Nov. 14, 2013) Dep. 154:7-156:3 (Petrosinelli Decl. Ex. R-2) (at the time he made the statement in the press release, Mr. Waxman believed it to be true, explaining that the statement would have been reviewed by others as well to ensure its accuracy).

Waxman testified also that he relied upon the review by others of the accuracy of the statement before he issued it,[117] which reliance was reasonable and warranted. Specifically, Chief Compliance Officer Lankler, upon whom Waxman relied with respect to the compliance function, testified that, during the year before the statement, Pfizer had continued to improve its controls, and as of April 2007, the company had enhanced its policies and procedures, training, monitoring and other compliance programs designed to guard against improper marketing.[118] All of this evidence negates any attempt to raise a factual question that Mr. Waxman was attempting to deceive by making the statement in the Genotropin press release.

> **c.** **Because plaintiffs cannot establish that Mr. Waxman's lone statement about an unrelated drug caused any of their alleged losses, it is irrelevant to this case.**

Finally, and fundamentally, plaintiffs have made no effort to connect Mr. Waxman's statement in the Genotropin press release to any of their losses. It is axiomatic that, to be liable for a Rule 10b-5 violation, plaintiffs must demonstrate that a defendant's specific statement caused them loss. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529 (LMM), 2010 WL 3528872, at *4 (S.D.N.Y. Aug. 30, 2010). "[B]lam[ing] it on all defendants" is insufficient. *Bricklayers & Travel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 191 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014). Here, plaintiffs do not even attempt to satisfy this burden, and their loss causation and damages expert, Stephen P. Feinstein, conceded as much. Specifically, Mr. Feinstein admitted that he did not and could not determine whether

---

[117] *Id.* 154:12-19, 158:21-25.
[118] *Id.*; Lankler (Aug. 17, 2010) Dep. 246:14-247:6 (Petrosinelli Decl. Ex. D-2) (the significant deficiency found by KPMG had been addressed and corrected).

any particular statement caused any of plaintiffs' alleged losses.[119]  Discovery is now closed, and there is no record evidence that Mr. Waxman's statement in April 2007 caused any portion of plaintiffs' purported losses.  Indeed, plaintiffs must not only show a "causal connection between the material misrepresentation and the loss," but the loss must further be disaggregated from losses caused by other events.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005).  Plaintiffs have not done so because they cannot.  Any connection between Pfizer's stock prices and Mr. Waxman's lone statements is purely speculative.  Because there is no evidence that Mr. Waxman's Genotropin press release statement caused any of plaintiffs' claimed loss, the Court should grant Mr. Waxman summary judgment on the Rule 10b-5 claim.

   **5.    Mr. Waxman cannot be held liable for any allegedly misleading
          statements regarding Pfizer's reserves.**

      **a.    Plaintiffs' allegations regarding Pfizer's reserves were outside
             of the scope of Mr. Waxman's duties as general counsel.**

   Nor is there any basis under *Janus* or otherwise to hold Mr. Waxman liable in connection with plaintiffs' allegations regarding the sufficiency of Pfizer's FAS 5 reserves.  Mr. Waxman did not determine whether or not a FAS 5 loss contingency reserve was required, did not sign any disclosures about reserves, and did not have ultimate authority over such disclosures.  Rather, Pfizer's controller, Loretta Cangialosi, in consultation with Pfizer's CFO and the company's outside auditors at KPMG, had principal responsibility for determining the FAS 5 reserves.[120]  During Mr. Waxman's tenure as general counsel, the company's Finance Group, led by Ms. Cangialosi, and KPMG, regularly conferred with Pfizer's inside and outside

---

[119] Feinstein (Oct. 14, 2014) Dep. 127:8-17 ("Q. So there's not a single statement that's identified in the complaint that caused the inflation to increase during the class period…[W]e looked at 41 that are in [Exhibit B].  There are more in the Complaint.  There's not a single statement that was made by Pfizer or a Pfizer employee during the class period that … added inflation to the stock? A. Correct.") (Petrosinelli Ex. W-1).
[120] Cangialosi (June 21, 2013) Dep. 367:23-368:14 (Petrosinelli Ex. S-1).

investigations counsel to evaluate the FAS 5 reserve judgment.[121]  All agreed that taking a reserve earlier than January 2009, when Pfizer and the government reached their agreement in principle, was not warranted and actually would have violated GAAP.[122]  Mr. Waxman, who was not an accountant and did not have any specialized accounting training, had no reason or basis to doubt their decision.[123]

> **b.      There is no basis to conclude Mr. Waxman made any false statement regarding the FAS 5 reserves with scienter.**

As detailed in Pfizer's brief, the relevant members of Pfizer's management team received and relied on guidance from Pfizer's Finance department and KPMG with respect to the FAS 5 reserve determination, and any disclosure relating thereto.[124]  KPMG opined each and every reporting period that the disclosures were appropriate, and that KPMG continues to stand by its unqualified opinion.[125]  Mr. Block, based in part on his conversations with the government investigations lawyers, also advised that no contingency reserve should be taken in connection with the Bextra investigation.[126]  Mr. Waxman was entitled to rely on the advice of inside and outside accounting professionals that no loss contingency reserve was appropriate under the

---

[121] *Id*. 276:13-17; 380:19-382:15.

[122] *Id*. 370; 373-74; Block (Sept. 16, 2013) Dep. 149:6-150:23 (Petrosinelli Ex. O-1); Bradley (Aug. 8, 2013) 53:12-54:12 (Petrosinelli Ex. P-1); KPMG Q4 Legal Update Discussion (KPMG-PFIZ-DS 0001776) (Petrosinelli Ex. F-4); Oct. 18, 2007 Email from Denise Townsend re: disclosure (Petrosinelli Ex. S-6) (PFE-JONES 00046662); 2007 Audit Results and SAS 114 Report (Petrosinelli Ex. J-4) (KPMG-PFIZ-DS 018642 at 018648) .

[123] *See* Pfizer's Mot. at II.G; Waxman (Nov. 14, 2013) Dep. 16:12-17:2; 34:15-22 (Petrosinelli R-2).

[124] *See* Pfizer's Mot. at II.G.

[125] 2006 Compliance Overview Mem. at 11 (Petrosinelli Decl. W-4) (KPMG-PFIZ-DS 0005889-99);  Q2 2008 Interim Completion Document at 11 (Petrosinelli Decl. R-4) (KPMG-PFIZ-DS 0019725); KPMG Memorandum to 2007 Audit Files (Petrosinelli U-4) (KPMG-PFIZ-DS 0004281); Chapman (Sept. 5, 2013)  Dep. 193:1-195:19 (Petrosinelli Ex. T-1); Bradley (Aug. 8, 2013) Dep. 334:15-337:1 (Petrosinelli Ex. P-1).

[126] Oct. 16, 2007 Email from Douglas Lankler to Carlton Wessel (Galin Decl. Y-W) (PFE-JONES 00047115); Oct. 17, 2007 Email and attachment from Carlton Wessel to various recipients regarding Disclosure (Petrosinelli Decl. Ex. P-5) (PFE-JONES 00043523-24); Oct. 18, 2007 Email and attachment from Dennis Block to various recipients regarding Disclosure (Petrosinelli Decl. Ex. C-6) (PFE-JONES 00060496-97); Jan. 25, 2008 Audit Response Letter (Petrosinelli Decl. Ex. Y-4) (KPMG-PFIZ-DS 056016-21); Email from Kim Dadlani to Paul Brockie re: Bextra DOJ (Petrosinelli Decl. N-6) (PFE-JONES 00043522).

circumstances.[127] Mr. Waxman's reasonable, good-faith reliance on accounting professionals negates scienter with respect to the issue of FAS 5 reserves. *See In re Fed. Nat'l Mortg. Ass'n Sec., Deriv. & "ERISA" Litig.*, 892 F. Supp. 2d 59, 72 (D.D.C. 2012) (summary judgment warranted where defendant relied in good faith on the professional judgment of the company's internal and external accounting and auditing personnel). Finally, it is important to note that, even after Mr. Waxman left Pfizer and the prospects of settlement with the DOJ ripened, Mr. Block and KPMG continued to believe and to advise that no FAS 5 reserve was required because any amount of potential loss still was not reasonably estimable.[128] There is no genuine dispute of material fact, therefore, that Mr. Waxman did not act with scienter respecting the FAS 5 reserve issue at any time prior to his March 11, 2008 departure from Pfizer.

### B.    Mr. Waxman is not liable as a control person under Section 20(a).

To impose liability under Section 20(a), plaintiffs must establish three elements: (1) a primary violation; (2) Mr. Waxman's control over the primary violator; and (3) that Mr. Waxman was a "culpable participant" in the primary violation.[129] The requirement that there be a primary violation means that control person liability necessitates a finding of a violation by another party; a defendant's own conduct cannot give rise to it. *Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999). Thus, Mr. Waxman's own conduct, including his Genotropin press release statement, cannot be the basis of Section 20(a) liability against Mr. Waxman. Rather, only violations by others over whom Mr. Waxman had control could

---

[127] Waxman (Nov. 14, 2013) Dep. 17:9-18:25 (explaining that Mr. Block advised him as to the FAS 5 rule of thumb); 222:17-224:4 ("So I would say at the time that I left the company I do not recall a conclusion using that sort of rule of thumb guidepost . . . that we had come to the conclusion that a finding of liability was 75 percent probable") (Petrosinelli Decl. Ex. R-2).
[128] *See* Block (Oct. 1, 2014) Dep. 148:17-149:1; 203:18-204:6 (Petrosinelli Decl. Ex. O-1); Riso (Aug. 1, 2013) Dep. 126:17-130:11 (Petrosinelli Decl. Ex. P-2); June 23, 2008 KPMG Memorandum to 2008 Audit Files (Petrosinelli Decl. Ex. V-4) KPMG-PFIZ-DS 0005507; Excerpts of the Pfizer Interim Completion Document, Q2, 2008 (Petrosinelli Decl. Ex. R-4) (KPMG-PFIZ-DS 00019725).
[129] *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).

result in Section 20(a) liability. Yet plaintiffs' failure of proof on essential elements of their Rule 10b-5 claims against the other individual defendants—as well as plaintiffs' inability to prove that Mr. Waxman controlled them—also dooms their Section 20(a) claim.[130]

First, it cannot be disputed that Mr. Waxman could not have been a control person until August 2006, when he became general counsel and a member of Pfizer's executive leadership group. *See, e.g.*, *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 333-34 (S.D.N.Y. 1999) (dismissing Section 20(a) claim against attorney absent allegations of control status or facts showing that he had actual power over primary violators). It is also inarguable that Mr. Waxman could not have been a control person after he left Pfizer on March 11, 2008. *In re Alstom SA*, 406 F. Supp. 2d 433, 497 (S.D.N.Y. 2005) (defendant cannot be liable as a control person after he stepped down as the company's CFO). As was true of the Rule 10b-5 claim, Mr. Waxman on this basis alone is entitled to summary judgment on the Section 20(a) claim with respect to any statements from the beginning of the Class Period (January 19, 2006) through July 31, 2006, and for the period from March 12, 2008, to the end of the Class Period (January 23, 2009).

Second, culpable participation requires the same showing of scienter as the underlying Section 10(b) violation, and this element cannot be satisfied with respect to Mr. Waxman. *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd*., 2014 WL 3605540, *26 (S.D.N.Y. July 21, 2014). Plaintiffs must show that Mr. Waxman, at minimum, acted with recklessness because he "knew or should have known that the primary violator was engaging in fraudulent conduct, or that [Mr. Waxman] failed to review or check information that he . . . had a duty to monitor, or that [Mr. Waxman] ignored obvious signs of fraud." *Alstom SA*, 406 F. Supp. 2d at 491-92 ("To qualify as reckless conduct, the [alleged conduct] must have been highly

---

[130] Pfizer's Mot. at 41-72.

unreasonable, representing an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. . . . [F]raud by hindsight, positive public statements consistent with reasonably available data, failure to adequately monitor the behavior of others, and accounting violations standing alone, do not rise to the level of recklessness." (internal citation and quotation marks omitted).

Plaintiffs have failed to produce any evidence that Mr. Waxman's conduct in relation to the publication of the alleged misstatements of others was "highly unreasonable or extreme misconduct."[131] There is no evidence in the communications between Mr. Waxman and disclosure counsel or otherwise to support a "strong inference" that Mr. Waxman, through fulfilling his role as general counsel, acted recklessly in any respect. To the contrary, as shown above, Mr. Waxman attempted in good faith to assist Pfizer in fulfilling its disclosure obligations, reasonably relied in good faith on the advice of highly experienced disclosure counsel, and honestly believed that Pfizer's disclosures and reserves were accurate, complete, and complied with the law. Because there is no evidence of scienter, plaintiffs cannot possibly establish the necessary elements of their Section 20(a) claim.

Equally fatal to their Section 20(a) claim, plaintiffs have not produced any evidence that Mr. Waxman not only "possessed 'the power to direct or cause the direction of the management and policies of a person," but that he "ha[d] 'actual control over the *transaction* in question.'" *Alstom SA*, 406 F. Supp. 2d at 87 (internal citations omitted) (emphasis in original). To make this showing, the "exercise of influence" alone is insufficient,[132] and plaintiffs must establish that Mr. Waxman had more than "the mere ability to persuade" a primary violator in the specific

---

[131] *Alstom SA*, 406 F. Supp. 2d at 491 (internal citation and quotation marks omitted).
[132] *Id.* at 487.

misstatements alleged here. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005). Underscoring plaintiffs' failure of proof on this point is that the Section 20(a) claim against Mr. Waxman is premised on alleged misstatements by individuals who were the company's actual decision-makers, its highest-ranking corporate officers, and the actual makers of the statements in issue. As courts have recognized, signers of financial statements exercise control not only over the contents of those statements, but also "over those who write the[m]."[133] *See Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 494 (7th Cir. 1986) (affirming summary judgment against plaintiff on Section 20(a) claim against outside law firm, noting that the attorneys' "ability to persuade and give counsel is not the same thing as 'control,' which almost always means the practical ability to *direct . . .* actions" (emphasis in original)).[134] Mr. Waxman did not sign a single published document containing alleged misstatements, and plaintiffs have no evidence to support a finding that Mr. Waxman, the general counsel—through providing information or drafting or reviewing any disclosure documents—had actual control over Pfizer's CEO or CFO with respect to their public statements.

## IV.    CONCLUSION

For the foregoing reasons, and those set forth in the motions of Mr. Waxman's co-defendants, Mr. Waxman respectfully requests that the Court grant him summary judgment.

---

[133] *Id.* at 468.
[134] *See also In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004); *Alstom SA*, 406 F. Supp. 2d at 488.

Dated:  October 30,                        O'MELVENY & MYERS LLP
         New York, New York

By: /s/ Ross Galin
                _____

                Ross B. Galin
                Stuart Sarnoff
                Howard E. Heiss
                7 Times Square
                New York, New York 10036
                Telephone: (212) 326-2000
                Facsimile: (212) 326-2061
                rgalin@omm.com
                ssarnoff@omm.com
                hheiss@omm.com

                *Attorneys for Defendant Allen Waxman*