UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

MARY K. JONES, Individually and on Behalf :     Civil Action No. 1:10-cv-03864-AKH
of All Others Similarly Situated,           :

                                  :     CLASS ACTION

                  Plaintiff    :

                                    :     MEMORANDUM OF LAW IN SUPPORT
      vs.                           :     OF PLAINTIFFS' MOTION FOR PARTIAL
                                    :     SUMMARY JUDGMENT ON
PFIZER INC., et al.,                     :     DEFENDANTS' RELIANCE ON ADVICE
                                    :     OF COUNSEL AND GOOD FAITH
                  Defendants.    :     DEFENSES

—————————————————————— x

983842_1

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................1

II.   UNDISPUTED FACTS ........................................................................................4

    A.   Defendants Expressly Limit Their Reliance-on-Block/Fox Defense .....................4

    B.   Pfizer Falsely Represented "Substantial Defenses" and Relatedly Failed to
    Take a Reserve ........................................................................................5

    C.   The FDA Approved Bextra for Limited Usages and Dosages ...............................6

    D.   Neither Block nor Fox Were Involved in the Bextra Investigation ........................6

    E.   Neither Block Nor Fox Rendered Legal Advice to Defendants Concerning
    the Bextra Investigation ..........................................................................7

        1.   Neither Block nor Fox Advised Defendants that Pfizer Had
        Substantial Defenses to the Government's Bextra Investigation................8

        2.   Neither Block nor Fox Advised Defendants as to Whether a Loss
        from the Government's Bextra Investigation Was Probable or
        Reasonably Estimable ..........................................................................9

    F.   Defendants Did Not Rely on Block and Fox for Advice Regarding the
    Bextra Investigation ..............................................................................12

    G.   Neither Block nor Fox Pretended to Be Qualified to Offer Advice
    Regarding the Bextra Investigation .......................................................14

    H.   Defendants Did Not Share with Block or Fox the Most Significant Facts
    and Evidence in the Bextra Investigation ...............................................15

        1.   Defendants Never Told Block that Pfizer Had, in Fact, Engaged in
        Off-Label Promotion of Bextra..............................................................15

        2.   *Qui Tam* Complaint and Exhibits Corroborating Allegations .................17

        3.   Illegally Deleted and Altered Bextra-Related Documents.........................17

        4.   Sales Force Surveys ...........................................................................18

        5.   Call Notes.........................................................................................19

        6.   Employee Interviews ..........................................................................21

**Page**

7.   Pfizer's Communications with Its Investigation Counsel and Its Investigation Counsel's Files and Work-Product .....................................23

III.   ARGUMENT ...........................................................................................................23

A.   Standard Governing a Motion for Summary Judgment ...........................23

B.   No Reasonable Jury Could Render a Verdict for Defendants on Their Reliance-on-Block/Fox Defense ..............................................................24

1.   Defendants Did Not, and May Not, Rely on Block/Fox for the Accuracy of the "Substantial Defenses" Representation or for Analysis of the Strengths and Weaknesses of the Government's Case ...............................................................................................24

2.   Defendants' Omissions Relating to the "Substantial Defenses" Representation ...............................................................................28

3.   Defendants' Failure to Reserve Under FAS-5 ...........................30

C.   Defendants Have Waived Their Reliance-on-Block/Fox Defense .......................33

D.   Defendants Have Waived Any Reliance-on-KPMG Defense ..............................36

E.   Defendants Are Improperly Attempting to Use Block, Fox and KPMG for "Conduit" Testimony Outside Their Fields of Expertise ........................................38

IV.   CONCLUSION.......................................................................................................40

# TABLE OF AUTHORITIES

**Page**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..................................................................................................23

*Arista Records LLC v. Lime Grp. LLC*,
   No. 06 CV 5936 (KMW), 2011 U.S. Dist. LEXIS 42881
   (S.D.N.Y. Apr. 14, 2011)...................................................................................34, 35

*Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*,
   No. 93 Civ. 5298 (LMM) (RLE), 1998 U.S. Dist. LEXIS 13611
   (S.D.N.Y. Sept. 3, 1998), *aff'd*, 2000 U.S. Dist. LEXIS 14316
   (S.D.N.Y. 2000)......................................................................................................38

*Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*,
   210 F.R.D. 506 (S.D.N.Y. 2002) ...........................................................................33

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)................................................................................................28

*Caiola v. Citibank, N.A.*,
   295 F.3d 312 (2d Cir. 2002)....................................................................................28

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)................................................................................................23

*Dura Auto. Sys. of Indiana v. CTS Corp.*,
   285 F.3d 609 (7th Cir. 2002) ..................................................................................39

*Faulkner v. Arista Records LLC*,
   No. 07 CIV. 2318 (LAP), 2014 U.S. Dist. LEXIS 129711
   (S.D.N.Y. Sept. 15, 2014).......................................................................................39

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005).....................................................................28

*In re Par Pharm., Sec. Litig.*,
   733 F. Supp. 668 (S.D.N.Y. 1990) .........................................................................28

*In re Time Warner Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993)........................................................................................28

983842_1

**Page**

*Johns Hopkins Univ. v. CellPro*,
    978 F. Supp. 184 (D. Del. 1997),
    *aff'd sub nom., Johns Hopkins Univ. v. CellPro, Inc.*,
    152 F.3d 1342 (Fed. Cir. 1998)...................................................................................27

*L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*,
    90 F. Supp. 2d 277 (S.D.N.Y. 2000),
    *aff'd*, 4 F. App'x 81 (2d Cir. 2001)....................................................................34, 38

*Lapin v. Goldman Sachs Grp., Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006)...........................................................................28

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007)...........................................................................39

*Markowski v. SEC*,
    34 F.3d 99 (2d Cir. 1994)..............................................................................................24

*Mitchell v. Pidcock*,
    299 F.2d 281 (5th Cir. 1962) ........................................................................................28

*Moskowitz v. Lopp*,
    128 F.R.D. 624 (E.D. Pa. 1989)....................................................................................36

*S. Union Co. v. United States*,
    __ U.S. __, 132 S. Ct. 2344 (2012)...............................................................................31

*SEB, S.A. v. Montgomery Ward Co.*,
    412 F. Supp. 2d 336 (S.D.N.Y. 2006)...........................................................................33

*SEC v. Cavanagh*,
    No. 98 CIV. 1818(DLC), 2004 U.S. Dist. LEXIS 13372
    (S.D.N.Y. July 16, 2004),
    *aff'd on other grounds*, 445 F.3d 105 (2d Cir. 2006) ..............................................27

*SEC v. Forma*,
    117 F.R.D. 516 (S.D.N.Y. 1987) ..................................................................................33

*SEC v. Meltzer*,
    440 F. Supp. 2d 179 (E.D.N.Y. 2006) ...........................................................24, 26, 33

- iv -

**Page**

*SEC v. Scott*,
  565 F. Supp. 1513 (S.D.N.Y. 1983),
  *aff'd sub nom.*, *SEC v. Cayman Islands Reinsurance Corp.*,
  734 F.2d 118 (2d Cir. 1984)..................................................................................................26, 30

*SEC v. Tourre*,
  950 F. Supp. 2d 666 (S.D.N.Y. 2013)..................................................................................35

*SEC v. Wyly*,
  No. 10 CIV. 5760 (SAS), 2011 U.S. Dist. LEXIS 87660
  (S.D.N.Y. July 27, 2011) ....................................................................................33, 36, 37

*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991)........................................................................................34, 36

*United States v. Curtis*,
  769 F.3d 271, 2014 U.S. App. LEXIS 13484 (5th Cir. 2014) ................................................30

*United States v. Locascio*,
  357 F. Supp. 2d 536 (E.D.N.Y. 2004) ..................................................................................33

*Vicinanzo v. Brunschwig & Fils, Inc.*,
  739 F. Supp. 891 (S.D.N.Y. 1990) ......................................................................................34

*Westchester Teamsters Local 456 Annuity Fund v. Fleet Nat'l Bank*,
  No. 02 Civ. 6664(AKH), 2006 WL 2246232 (S.D.N.Y. Aug. 4, 2006)..................................23

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
  Rule 56(a)...........................................................................................................................23
  Rule 56(c)(1)(a) ..................................................................................................................23

Federal Rules of Evidence
  Rule 402 .............................................................................................................................35
  Rule 502(d) ..........................................................................................................................4

## I.     INTRODUCTION

Pfizer[1] had an army of outside and inside counsel (collectively, "Investigation Counsel"), led by criminal defense lawyers at Covington & Burling LLP ("Covington") and in-house former prosecutors, working on a Government[2] investigation into the Company's misbranding of certain drugs, primarily Bextra (the "Bextra Investigation").  Nevertheless, for their reliance-on-counsel defense, defendants chose two scapegoats, Dennis Block ("Block") and Lawrence Fox ("Fox"), who were not part of this army, had nothing to do with the Bextra Investigation, saw none of the incriminating evidence defendants withheld from investors, have no criminal law experience, were unfamiliar with even the elements of a misbranding violation and have testified unequivocally that they did *not* advise Pfizer regarding the Bextra Investigation (including the strengths or weaknesses of Pfizer's defenses and the Government's evidence, the probability of conviction, etc.).  Why?

The answer to this question is as obvious as it is improper.  Over plaintiffs' repeated objections, defendants used this tactic to shield from discovery all of the damning evidence uncovered by and associated with their Investigation Counsel.  But now defendants are trying to invoke Investigation Counsel's involvement and its cherry-picked work-product as a sword to defeat plaintiffs' allegations.  After having stonewalled plaintiffs for years by assuring the Court that Block and Fox are the *only* attorneys on whom defendants base their reliance defense, defendants filed summary judgment briefs that contain *99 references* to *Investigation Counsel*, including Covington, Douglas Lankler ("Lankler"), Carlton Wessel ("Wessel") and even Covington's "75-page, single-spaced legal brief discussing the numerous liability and damages defenses" (Covington's "white

---

[1]   "Pfizer" or the "Company" refers to Pfizer, Inc. and its wholly owned subsidiaries, as well as any entities that later became its wholly owned subsidiaries.

[2]   "Government" refers collectively to the DOJ and the Health and Human Services Office of Inspector General.

paper"). Dkt. No. 246 at 16. This is exactly what defendants had promised the Court they would not do when they successfully urged the Court to shield Covington and all other Investigation Counsel from discovery. *Compare* Dkt. No. 172 at 35 n.30 ("Defendants are not invoking or relying upon any advice provided by Covington regarding the Government Investigations."), *with* Dkt. No. 246 at 46 ("[T]he company's Board, senior executives, and in-house lawyers all relied on Covington's judgment to inform them that the company had meritorious defenses. . . . [T]he undisputed fact is that Pfizer and its disclosure counsel relied on investigation counsel's judgment in crafting the company's securities disclosures."). Defendants must reap what they have sown, and that means forbidding their fatally flawed reliance-on-counsel defense and precluding all references to Investigation Counsel.

Not a single defendant has testified that he relied on Block or Fox for advice as to whether Pfizer had "substantial defenses" to the Bextra Investigation, or to otherwise assess the strengths and weaknesses of the Government's case, including whether a loss from the Bextra Investigation was probable or reasonably estimable. Just the opposite. Across the board, defendants, and even Pfizer's current General Counsel Lankler, have readily acknowledged that Pfizer's Investigation Counsel – not Block and Fox – were responsible for rendering advice on these subjects. Indeed, defendants' motions for summary judgment are replete with references to Pfizer's Investigation Counsel. Defendant Alan Levin ("Levin"), Pfizer's former Chief Financial Officer ("CFO"), provided the best demonstration of defendants' misguided finger pointing at Block and Fox for their defense of this case:

> Q. I'm asking you point-blank: On what counsel do you – are you claiming to have relied [for] your defense in this case?
>
> [Objection]
>
> A. Covington & Burling.

- 2 -

> Q. Any others?
>
> A. My recollection was that it was primarily Covington & Burling. I don't recall if there were any others.

Ex. 28 at 99:19-100:4.[3]

Levin and his co-defendants are entangled in the web they wove by expressly limiting their reliance-on-counsel defense to Block and Fox (the "Reliance-on-Block/Fox Defense"), and using that limitation to shield from plaintiffs all communications with – and all the work-product of – its Investigation Counsel, including Covington. Defendants never sought nor received any legal advice concerning the Bextra Investigation from Block or Fox, and that is where defendants' Reliance-on-Block/Fox Defense should end.

Consistent with not rendering advice concerning the Bextra Investigation, and not being qualified to do so, Block and Fox were unaware of the most important facts and evidence concerning it. For example, another of Pfizer's Investigation Counsel, Brien O'Connor ("O'Connor") acknowledged that,

> from February 2002 through April 2005 [Pfizer] promoted Bextra for uses that were not within Bextra's approved label, including, particularly, acute pain and pre- and postoperative surgical pain and opioid sparing in the context of surgery. And that [Pfizer] also promoted Bextra at dosages higher than the approved doses for certain indications. As a result, we agree that [Pfizer] introduced a drug into interstate commerce that lacked adequate directions for these off-label uses and dosages and was, thus, under the law, under the FDCA misbranded.

Ex. 26 at 51:13-22. Yet, throughout January 19, 2006 to January 23, 2009 (the "Class Period"), Pfizer represented the exact opposite to Block. When asked when he "first learned that Pfizer employees were, in fact, promoting Bextra off-label," Block responded, "I wouldn't know how to answer that question because I could say, in full honesty, never." Ex. 22 at 49:17-21.

---

[3]   All "Ex. __" references herein are exhibits attached to the Declaration of Jason A. Forge in Support of Plaintiffs' Motion for Partial Summary Judgment to Defendant's Reliance of Counsel and Good Faith, submitted herewith, unless otherwise noted.

Not only did Pfizer mislead Block as to its actual commission of what turned out to be the biggest corporate crime in U.S. history (as measured by the fine imposed), it also withheld from him and Fox the overwhelming evidence of its guilt. Pfizer provided the Government, *its adversary*, with more information about its misbranding (*i.e.*, off-label promotion) of Bextra than it provided to the only two men it seeks to scapegoat. For example, Pfizer provided the Government millions of "call notes" (contemporaneous summaries of its sales representatives' sales calls with physicians), which became the cornerstones of the Government's case against it. But Pfizer withheld these critical documents, as well as all analyses and summaries of them, from Block and Fox.

As must be the case with any meritorious motion for partial summary judgment, this one presents very simple questions with answers that cannot be reasonably disputed. Did Block or Fox render legal advice concerning the Bextra Investigation, including whether Pfizer had "substantial defenses" to it? No. Could Block or Fox have approved Pfizer's withholding of information from investors that it had also withheld from Block and Fox? No. Even if Block and Fox had rendered advice concerning the Bextra Investigation (which they did not), could defendants have relied on such advice in good faith in light of Block and Fox's lack of involvement in the investigation and lack of experience? No. Accordingly, defendants' FOURTEENTH DEFENSE (Dkt. No. 160 at 26) (the Reliance-on-Block/Fox Defense) fails as a matter of fact and law.

## II.    UNDISPUTED FACTS

### A.    Defendants Expressly Limit Their Reliance-on-Block/Fox Defense

Defendants have pled the following as their Reliance-on-Block/Fox Defense:

> Pursuant to Pfizer's limited subject-matter waiver of its attorney client privilege, as governed by the Rule 502(d) Order entered by the Court on January 18, 2013, Defendants acted at all times in good faith and with reasonable care, and they reasonably relied upon, among other things, advice of outside and inside counsel regarding the legal proceedings disclosures concerning (i) the government investigations that culminated in the $2.3 billion settlement announced on January

26, 2009 [(the Bextra Investigation)], and (ii) Pfizer's FAS 5 reserves to take into account any potential losses arising out of those government investigations [(the Bextra Investigation)].

*Id*. at 26 (FOURTEENTH DEFENSE).

Well over a year ago, when plaintiffs were urging the Court to end defendants' charade and permit discovery concerning Investigation Counsel, defendants adamantly insisted that their reliance-on-counsel defense was limited to *one* outside counsel – Block – and *one* inside counsel – Fox:

- "The only outside counsel that provided legal advice to Pfizer regarding the Waived Subjects was Dennis Block of Cadwalader Wickersham & Taft." Dkt. No. 172 at 25.

- "Your Honor there's one in-house lawyer, Larry Fox." July 19, 2013 Hearing Transcript at 12:1-2.

- "Defendants are not invoking or relying upon any advice provided by Covington regarding the Government Investigations." Dkt. No. 172 at 35 n.30.

Over 15 months after using these representations to convince the Court to shield from discovery all attorneys other than Block and Fox, defendants filed summary judgment briefing with *99 references* to counsel *other than* Block and Fox: Covington, Lankler, Wessel, and Covington's "white paper." SUF, ¶4.[4]

### B.   Pfizer Falsely Represented "Substantial Defenses" and Relatedly Failed to Take a Reserve

Throughout the Class Period, Pfizer represented the following to investors regarding the Bextra Investigation: "Although *we believe we have substantial defenses* in these matters, we could in the future incur judgments or enter into settlements of claims that could have a material adverse effect on our results of operations in any particular period." SUF, ¶5. Pfizer made this

---

[4]   All "SUF" references are to the Statement of Undisputed Facts in Support of Plaintiffs' Motion for Partial Summary Judgment on Defendants' Reliance on Advice of Counsel and Good Faith Defenses, submitted herewith, unless otherwise noted.  All emphasis is added and citations and footnotes are omitted, unless otherwise noted.

representation as to other matters in addition to the Bextra Investigation, but never disclosed any unique weaknesses or vulnerabilities in Pfizer's defenses to the Bextra Investigation nor any strengths in the Government's case.  *Id.*  Among the facts and evidence that defendants omitted throughout the Class Period are those described below in §II.H.  One of the symptoms of the falsely represented "substantial defenses" to the Bextra Investigation was that throughout the Class Period, Pfizer never took a reserve for the substantial *loss* that was inevitable from the year the investigation began (2004).  Of course, defendants concealed from Block and Fox the myriad facts that made this substantial loss inevitable.  SUF, ¶¶35, 43, 49-50, 55, 58, 60, 70, 72, 74.

### C.    The FDA Approved Bextra for Limited Usages and Dosages

In 2001, Pfizer submitted an application to the U.S. Food and Drug Administration ("FDA") for the drug Bextra seeking approval for the following indications: osteoarthritis ("OA"), rheumatoid arthritis ("RA"), primary dysmenorrhea ("PD"), general acute pain, pre-operative pain and opioid sparing.  Ex. 13 at BEX001360555.  Pfizer also sought approval for the following dosages: 10-20 mg for OA/RA and 40 mg for PD.  *Id.*  Late that year, the FDA denied Pfizer's application as to all but the following indications and dosages: 10 mg (once per day) for OA/RA and 20 mg (twice per day) for PD.  *Id.*  Among the concerns the FDA raised for dosing Bextra higher than 10 mg daily was that "[a]t higher total daily doses, the findings of more hypertension and edema are frequently reproduced."  Ex. 16 at BEX004849786.  Pfizer started distributing Bextra in February 2002.  Ex. 15 at BEX001800573.

### D.    Neither Block nor Fox Were Involved in the Bextra Investigation

In early 2004, the Government informed Pfizer that it was investigating the *qui tam* complaint of one of the Company's former Florida sales representatives, John Kopchinski ("Kopchinski"), who alleged that Pfizer had encouraged its sales representatives to promote Bextra

for off-label uses, including for surgical and general acute pain ("Kopchinski's Complaint").  SUF,

¶9.  Led by Covington, Pfizer's Investigation Counsel commenced an internal Bextra Investigation

that paralleled the Government's investigation.  SUF, ¶10.  Block, however, was never involved in

the Company's internal Bextra Investigation:

> Q. In other words – I guess different way of asking it: Did you actually
> participate in any sort of internal investigation –
>
> A. Oh, no.
>
> Q. – related to the government investigations?
>
> A. No, no. I had no knowledge of the actual – firsthand knowledge of the
> actual facts. I never looked at documents and things like that during this time frame.

Ex. 22 at 56:2-11; SUF, ¶11.  Fox echoed this sentiment as to all internal investigations: "I'm a

securities lawyer and do not get involved in the investigations themselves."  Ex. 23 at 11:19-20;

SUF, ¶12.

### E.     Neither Block Nor Fox Rendered Legal Advice to Defendants Concerning the Bextra Investigation

Given Block and Fox's lack of involvement in the Bextra Investigation, it is unsurprising that

neither of them rendered any legal advice concerning it.  SUF, ¶¶14-19.  Specifically, they never

advised defendants that Pfizer had substantial defenses to the Bextra Investigation.  SUF, ¶¶14-15.

Likewise, neither of them advised defendants as to the strengths and weaknesses of Pfizer's

defenses, the strengths and weaknesses of the Government's case, the likelihood of a criminal

conviction or losses from the Bextra Investigation, or whether the loss from the Bextra Investigation

was reasonably estimable.  SUF, ¶¶16-17, 19.  Instead, Block and Fox deferred to, and relied upon,

Pfizer's Investigation Counsel for all of these assessments.  SUF, ¶18; *see, e.g.*, Dkt. No. 246 at 46

("[T]he company's Board, senior executives, and in-house lawyers all relied on Covington's

judgment to inform them that the company had meritorious defenses. . . .  [T]he undisputed fact is

that Pfizer and its disclosure counsel relied on investigation counsel's judgment in crafting the company's securities disclosures.").

### 1.    Neither Block nor Fox Advised Defendants that Pfizer Had Substantial Defenses to the Government's Bextra Investigation

Both Block and Fox have made it clear that they did ***not***  advise defendants that Pfizer had "substantial defenses" to the Bextra Investigation:

> [Q.] The first part talking about "we have substantial defenses in these matters," did you personally and professionally make the assessment that there were substantial defenses regarding the government investigations?
>
> A. No.
>
> Q. You relied on others for that –
>
> A. Yes.
>
> Q. – conclusion?

Ex. 22 at 104:15-23 (Block).

> Q. But with respect to the disclosure that "We believe we have substantial defenses in these matters," is that the type of information that you, Larry Fox, independently researched and determined to be accurate?
>
> [Objection]
>
> THE WITNESS: No.

Ex. 23 at 86:13-19 (Fox).

> [Q.] Did you render any legal advice regarding the accuracy of the statement "We believe we have substantial defenses in these matters"?
>
> A. I would not have said that I am – that this is my view. Nobody in the company would have ever thought to even ask me whether I have personal knowledge of the strength of our defenses in any litigation.

*Id*. at 90:12-20; *see also* SUF, ¶¶14-15.

### 2. Neither Block nor Fox Advised Defendants as to Whether a Loss from the Government's Bextra Investigation Was Probable or Reasonably Estimable

Consistent with being uninvolved with both the Bextra Investigation and any assessments of Pfizer's defenses to it, Block and Fox did not advise defendants as to whether a loss from the Bextra Investigation was probable or reasonably estimable. SUF, ¶17. Indeed, these are accounting concepts and, in the context of the Bextra Investigation, to the extent these determinations required input from a lawyer, such input would involve assessments of the probability of a conviction and U.S. Sentencing Guidelines' ("Guidelines") calculations to estimate potential fines. SUF, ¶20; Ex. 27 at 2. Block and Fox did not render advice in these areas, and to the extent the accountants sought advice from counsel regarding these issues, this advice would have come from Pfizer's Investigation Counsel. *See also* SUF, ¶¶13-19; Dkt. No. 246 at 10 (quoting KPMG LLP ("KPMG") audit citing Covington's "white paper" in support of Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("FAS-5") reserves decision). KPMG's reliance on Investigation Counsel, as opposed to "disclosure counsel," is just what defendants' own expert would expect. *See* Ex. 25 at 153:16-154:12 (typically it would be litigators, not disclosure counsel, who would provide advice for the accounting decisions regarding FAS-5 reserves relating to litigation, and the only circumstances under which accountants would receive advice from disclosure counsel concerning FAS-5 reserves would be "if the litigation was about disclosure or involved disclosure issues" – the Bextra Investigation was definitely not about disclosure issues).

Far from advising Pfizer regarding FAS-5, Block made clear that Pfizer's employees knew more than he did in this area:

> A. What I'm saying Loretta Cangialosi and the accounting people at Pfizer had much greater knowledge and experience regarding FAS 5. And when they talked to me, it wasn't me telling them anything; it was them raising issues regarding certain facts. They understood how FAS 5 applied.

Ex. 22 at 40:16-22.

> A. It could be – I – there could be a circumstance where I gave my opinion as to probability, but that would be a minority of times.  Normally it's a question of, gee, do we have to reserve.

> And I would say, well, is it probable, and I'd explain probability, and is it estimable, and I might explain what estimable means.

> But this is an accounting concept. And you typically – and *in Pfizer's case specifically*, you would talk to your accountants concerning your view of the matter, meaning *the client itself would talk to the accountants, and the accountants would say, oh, under these circumstances, we would deem it to be probable or not probable or, under these circumstances, we would deem it to be estimable or not estimable, reasonably estimable*.

*Id*. at 33:7-25.

Likewise, Block did not offer any opinions regarding the likelihood of a loss (*i.e.*, conviction) or the amount of loss (*i.e.*, fine) from the Bextra Investigation:

> Q. So in your experience, have you ever rendered an opinion to a client as to whether or not a criminal conviction was probable?

> A. Yes.

<div align="center">*       *       *</div>

> Q. So you did not render that type of opinion regarding Bextra?

> A. That's correct.

*Id*. at 34:1-22.

> Q. Do you – are you aware of the factors that are used to determine the amount of the fine for Pfizer under the sentencing guidelines?

> A. From the meeting that I described, the recollection I have is there's a penalty and a multiplier of three, is I think what they talked about.  Again, I'm giving you my best recollection.  It's probably not right.

> Q. I take it you weren't the one rendering any legal advice during that meeting?

> A. I assure you that that was the case.  I listened.

*Id*. at 71:13-25; *see also* SUF, ¶¶17-19.

<div align="center">- 10 -</div>

Just like Block, Fox did not advise defendants regarding the FAS-5 components (*i.e.*, whether a loss from the Bextra Investigation was probable and reasonably estimable):

> Q. I know you said earlier that you – as part of your job with Pfizer, you never gave assessments regarding the strengths or weaknesses of cases. ***Did you make probability determinations concerning losses in connection to cases***?
>
> A. No. ***We – I and Dennis would look to our litigators to fully inform us of their view, but we would not – no***.

Ex. 23 at 44:24-45:7.

> Q. Did you render any legal advice to Pfizer regarding whether or not the – there was a reasonable probability of loss from the government investigations?
>
> MR. FARINA: You're asking him about the FAS-5 component for the purposes of reserves?
>
> MR. FORGE: Sure.
>
> THE WITNESS: I did not – I was not involved at all in the process of determining whether reserves should be taken by Pfizer for this or any other matter.

*Id*. at 90:21-91:8

> Q. You mentioned earlier, as part of the FAS-5 analysis, a reasonably estimable component; is that right?
>
> A. Yes.
>
> Q. Were you part of any process to attempt to estimate the fine that Pfizer was facing as a result of its off-label promotion of Bextra?
>
> A. No.

*Id*. at 80:5-13.

> Q. Were you involved in any way in any analysis of potential fines that Pfizer would face from the off-label promotion of Bextra?
>
> [Objection]
>
> THE WITNESS: No. No.

*Id*. at 76:15-19; *see also* SUF, ¶¶17-19.

- 11 -

**F.      Defendants Did Not Rely on Block and Fox for Advice Regarding the Bextra Investigation**

As Block observed, "Pfizer had – close to the American Bar Association – has lawyers assisting it in connection with the criminal matters." Ex. 22 at 46:23-47:1.  Defendants, and even Pfizer's current General Counsel Lankler, were aware that Block and Fox were not among these lawyers (nor did their experience qualify them to be), and unsurprisingly did not seek legal advice from Block or Fox regarding the Bextra Investigation:

> Q. Did you ever ask Larry Fox to assess the strength of Pfizer's defenses to the Bextra investigation?

> A. I don't believe so. I don't recall ever having done that.

> Q. Did you ever ask Dennis Block to assess the strength of the government's case in the Bextra investigation?

> A. I don't believe so. As I indicated before, he became involved in resolution strategy. So an aspect of that would have been understanding, you know, some of the details of the defenses; but I don't recall ever asking him to assess them.

Ex. 24 at 107:22-108:10 (Lankler).

> Q. What attorney told you that Pfizer had substantial defenses to the government's investigation of Bextra?

> [Objection]

> A. As I've said previously, Doug Lankler.

Ex. 28 at 40:19-24 (Levin).

> Q. Because without their consultation with other lawyers, Dennis Block and Larry Fox were not qualified to provide opinions as to whether or not Pfizer had substantial defenses to the Bextra investigation; correct?

> [Objection]

> A. I am not in a position to evaluate their qualifications.  I can only speak to the way in which our disclosure process worked while I was CFO of the company. And in that instance ***it was consultation with investigation counsel that drove the views that were factored into the disclosures***.

*Id*. at 115:15-116:2 (Levin).

Q. I'm asking you point-blank: On what counsel do you – are you claiming to have relied [for] your defense in this case?

[Objection]

A. Covington & Burling.

Q. Any others?

A. My recollection was that it was primarily Covington & Burling.  I don't recall if there were any others.

*Id*. at 99:19-100:4 (Levin).

Q. In the course of that process or in any other context, did Mr. Block ever advise you regarding the strengths or weaknesses of Pfizer's defenses to the government's investigation of Bextra?

[Objection]

A. He may or may not have expressed an opinion about that, but I did not look to him for advice on that.

Q. Did you look to Larry Fox for advice on that?

A. No.

Q. You looked to other lawyers for advice on that; correct?

A. On the strength – could you repeat the predicate?

Q. Sure, the strengths or weaknesses of the government's investigation regard[ing] Bextra.

[Objection]

A. I did not look to either Mr. Block or Mr. Fox for advice on that subject.

Q. But you did look to other lawyers for advice on that subject; correct?

A. Yes.

Ex. 19 at 31:10-32:8 (Kindler).

Q. So the basis for your understanding as to substantial defenses would have been based on information that you received from Sidley, Covington & Burling, and Doug Lankler's internal team?

- 13 -

983842_1

[Objection]

     A. So the actual analysis and assessment of the investigation and the defenses would have come from some or all of those people and groups.

Ex. 21 at 16:2-14 (Waxman).

     Q. So Block and Fox would have relied on the inside and outside criminal defense government investigation team?

[Objection]

     A. I believe they would have. You certainly can talk to them. But it's my understanding, that's right.

*Id*. at 20:15-21.

     Q. And Mr. Block was not retained in connection with the Bextra investigation; is that correct?

     A. Mr. Block was not our principal government Investigation Counsel. He was retained by the company and had discussions certainly around that in his various capacities for the company, but we would not have identified him as our principal government Investigation Counsel. That would have been Covington and Sidley before that.

*Id*. at 38:13-23; *see also* SUF, ¶¶24-25.

### G.    Neither Block nor Fox Pretended to Be Qualified to Offer Advice Regarding the Bextra Investigation

Neither Block nor Fox has ever worked as a prosecutor or a criminal defense attorney. SUF, ¶26. Neither of them was familiar with the elements of a misbranding offense or of *respondeat superior* criminal liability. SUF, ¶¶27-28. Nor did either of them have any experience performing the calculations under the Guidelines that are essential in determining criminal fines for corporations. Ex. 22 at 16:6-8; Ex. 23 at 18:24-19:2; SUF, ¶26. They were also completely unfamiliar with the significant distinction between a grand jury "subject" and a grand jury "target." In fact, Fox understood these terms to be interchangeable. Ex. 23 at 106:3-23. In addition, while Pfizer's Investigation Counsel was aware that the possibility of automatic debarment from federal

- 14 -

health benefits programs gave the Government "enormous leverage" in negotiations with Pfizer, Fox was under the mistaken impression that debarment was not automatic for a felony conviction and that even if there was a debarment, it would apply only to the specific product that triggered debarment as opposed to the Company as a whole – including *all* of its products.  Ex. 29 at 118:12-19; Ex. 23 at 130:7-15, 218:21-219:5.

### H.   Defendants Did Not Share with Block or Fox the Most Significant Facts and Evidence in the Bextra Investigation

#### 1.   Defendants Never Told Block that Pfizer Had, in Fact, Engaged in Off-Label Promotion of Bextra

Several defendants have admitted their pre-Class Period awareness that Pfizer sales representatives had, in fact, promoted Bextra off-label.  SUF, ¶34.  This off-label promotion was extensive, as one of Pfizer's Investigation Counsel, O'Connor, later acknowledged to the court:

- From February 2002 through April 2005, Pfizer promoted Bextra for uses that were not within its approved label, including (a) for acute pain, (b) for pre-operative and post-operative surgical pain, and (c) as opioid sparing in the context of surgery.  Ex. 26 at 51:10-17.

- Pfizer promoted Bextra at dosages higher than the approved doses for certain indications.  *Id*. at 51:17-18.

- Pfizer introduced a drug into interstate commerce that lacked adequate directions for such off-label uses and dosages.  *Id*. at 51:19-21.

- Pfizer promoted Bextra with an intent to defraud or mislead.  *Id*. at 51:22-23.

- Certain members of Pfizer's sales force promoted Bextra with false and misleading claims, including that it had no dose proportional increase in hypertension and edema.  *Id*. at 52:1-4

- Certain members of Pfizer's sales force submitted to their supervisors false, fake requests indicating that physicians had requested off-label information when, in fact, they had not, and then there was follow-through in providing medical information letters to those physicians.  *Id*. at 52:5-9.

Pfizer withheld from Block all of the foregoing information:

- 15 -

Q. No, I want to know what I asked, which is [when] you first learned that Pfizer employees were, in fact, promoting Bextra off-label.

A. I wouldn't know how to answer that question because I could say, in full honesty, never.

Ex. 22 at 49:16-21.

Q. Mr. Block, at any point during your representation of Pfizer, did any Pfizer employee or any Pfizer outside counsel inform you that members of Pfizer's sales force had promoted Bextra false and misleading claims?

[Objection]

THE WITNESS: No.

*Id*. at 56:21-57:2.

Q. Had – at any time during representation of Pfizer, did any of Pfizer's outside counsel or any other Pfizer employee inform you that certain members of Pfizer's sales force submitted to the supervisors false requests indicating that doctors had requested off-label information for Bextra when, in fact, they had not?

[Objection]

THE WITNESS: No.  There was a time, I believe it was very late, I can't tell you when, when there was an indictment of a female supervisor, I believe in Ohio, for doing something that was characterized as misbranding.  And I knew about that when it happened.  I think I read it in the newspaper, actually.

*Id*. at 57:4-22.[5]

Q. Through the class period, did any of Pfizer's outside counsel or any Pfizer employee inform you that through February of 2002 through April of 2005, Pfizer promoted Bextra for uses that were not within Bextra's approved label?

A. No.

Ex. 22 at 57:24-58:4; *see also* SUF, ¶43.

The contrast between what defendants knew and what they did ***not*** share with Block is

glaring:

---

[5]    Regional Manager Mary Holloway, the "female supervisor" to whom Block was referring, was not charged and did not plead guilty until after the Class Period had ended.  *See* Ex. 60.

| Defendant Jeffrey Kindler | Dennis Block |
|---|---|
| A. As I said earlier, I did not form conclusions in 2004 regarding what categories of people or Pfizer as a whole concluded. I was made aware that there was wrongdoing, that people in our field force, including managers in our field force, and people at junior levels of our marketing organization, had engaged in conduct that resulted in off-label promotion.<br><br>Ex. 34 at PFE-JONES 00000894 (Kindler testimony). | Q. Did Jeffrey Kindler at Pfizer ever inform you that he had concluded in 2004 that Pfizer had engaged in the off-label promotion of Bextra?<br><br>A. Absolutely not.<br><br>Ex. 22 at 63:25-64:4. |

## 2.   *Qui Tam* Complaint and Exhibits Corroborating Allegations

Kopchinski's Complaint described and attached as exhibits, *inter alia*, internal Company documents, including an email from a Pfizer District Manager to dozens of Pfizer employees, congratulating and rewarding a Pfizer sales representative for obtaining a surgical protocol – in accordance with the Company's strategy – that called for the off-label pre-operative use of Bextra. Ex. 37.  All of the exhibits to Kopchinski's Complaint were internal Pfizer documents (mostly emails), or publicly available, so defendants had access to them from the time the Government informed Pfizer of the Kopchinski's Complaint in 2004.  SUF, ¶47.  By April 2008, defendants had Kopchinski's Complaint itself, including its specific descriptions of corroborative exhibits.  SUF, ¶48.  Yet, no one ever shared with Block or Fox a copy of Kopchinski's Complaint or any of the internal Pfizer documents that were exhibits to it.  SUF, ¶¶49-50.

## 3.   Illegally Deleted and Altered Bextra-Related Documents

Soon after learning of Kopchinski's Complaint, in March 2004, Pfizer issued a Company-wide document hold for all Bextra-related documents.  SUF, ¶51.  In late 2004, Pfizer and its Investigation Counsel learned that one of Pfizer's District Managers in its Northeast region, Thomas Farina ("Farina"), had instructed his subordinate sales representatives to delete or alter certain internal Bextra-related documents.  SUF, ¶52.  Pfizer and its Investigation Counsel further learned

- 17 -

that the internal documents that Farina had instructed his subordinates to delete or alter included surgical protocols and briefing sheets as well as a Plan of Action ("POA") guide that included the following off-label goals: "[g]et Bextra added to hospital formularies . . . for use in the acute, peri-operative setting with the overall goal of getting the patient to remain on Bextra long term" and "[g]et Bextra added to pre-op briefing sheets in other surgical subspecialties – podiatry, general surgery, plastic surgery, ENT, etc."   Ex. 33 at PFE-JONES 00103717-18; Ex. 42 at BKLYN 000000063-64.

Pfizer's Investigation Counsel interviewed the Company's employees who were involved in the deletion and alteration of Bextra-related documents.  SUF, ¶56.  On September 27, 2005, Pfizer provided the Government with copies of the documents that its employees had deleted and altered along with a letter setting forth detailed descriptions of the documents and the "employees' confessions" (*e.g.*, "Mr. Bermudez's admission that he altered pre-operative surgery instructions sheets by deleting references to Bextra" and District Manager Farina's "admi[ssion that] he made similar modifications to pre-operative surgery instructions sheets on his own laptop and likewise altered his laptop time setting to backdate the modifications").  Ex. 33 at PFE-JONES 00103714, 718, 720.  Later, Pfizer provided the Government with redacted versions of its Investigation Counsel's interview memoranda concerning the attempted deletion and alteration of Bextra-related documents.  SUF, ¶57.  No one shared with Block or Fox any of the deleted or altered documents or the related interview memoranda that Pfizer shared with the Government.  SUF, ¶58.

### 4. Sales Force Surveys

As part of the internal Bextra Investigation, Pfizer and its Investigation Counsel reviewed Bextra-related surveys of its sales force, which revealed the following, *inter alia*:

- Pfizer's District Managers "find specific reference to OA, RA, and PD needlessly restrictive" (Ex. 32 at PFE DERIV 00066528); and

- 18 -

- "Several respondents from both Pfizer and Pharmacia mention their discomfort in delivering the desired positioning.  They note that it is Celebrex that has the acute pain data vs. narcotics that they can show to physicians, yet they are being asked to position Bextra for the acute patient."  *Id.* at PFE DERIV 00066599.

Although Pfizer shared with the Government the findings from its surveys, it did not share them with Block or Fox.  SUF, ¶¶59-60.

### 5.    Call Notes

Pfizer and its Investigation Counsel provided to the Government millions of contemporaneous "call notes" in which the Company's sales representatives summarized their Bextra-related sales calls with physicians.  SUF, ¶61.  These call notes were a major focus of the Government's investigation, as demonstrated during lengthy presentations made by the Assistant U.S. Attorney running the Government's Bextra Investigation, Sara Bloom ("Bloom"), to Pfizer and its Investigation Counsel.  SUF, ¶¶62-65, 69.  AUSA Bloom's August 17, 2006 and September 19, 2006 presentations contained dozens of slides quoting call notes by Pfizer's sales representatives throughout the country.  *Id.*  Consistent with the *qui tam* complaint allegations and exhibits, as well as the deleted and altered documents, these call notes reflected the repeated promotion of Bextra for usages and dosages that the FDA had explicitly rejected: for general acute and pre/post/peri-operative pain.  SUF, ¶¶62-63.  Indeed, AUSA Bloom presented statistics gathered from Pfizer's call notes that demonstrated that the Company's sales representatives referred to off-label indications during sales calls with physicians at least as often as they referred to on-label indications.  SUF, ¶69.

AUSA Bloom also presented an analysis of call-note data that indicated that Pfizer's sales representatives had given out 20 mg Bextra samples in over 1.3 million sales calls to physicians who would not typically prescribe medication for patients suffering from PD (*e.g.*, surgeons, cardiovascular specialists and dentists) as evidence that Pfizer had promoted 20 mg Bextra for unapproved indications.  SUF, ¶64.

Perhaps most seriously, AUSA Bloom quoted call notes from different Pfizer sales representatives in different states across the country, which reflected the promotion of Bextra with the false claim that Bextra had no dose-related increases in hypertension and edema.  SUF, ¶65.  This false representation was a "Core Message" in Pfizer's Northeast Region.  SUF, ¶67.  Yet, any such representation directly contradicted the FDA's documented concerns and observations that Bextra users did experience dose-related increases in hypertension and edema.  *See* SUF, ¶8.  In fact, defendants' own criminal law expert admitted that he was unaware of **any** defenses, let alone "substantial defenses," for such conduct.  Ex. 30 at 62:23-63:11.

Despite the significance of the call note evidence to the Bextra Investigation, no one ever disclosed or discussed them with Block or Fox:

> [Q.] Does that phrase ["call notes"] mean anything to you?
>
> A. No.
>
> Q. I take it then you never reviewed any call notes from Pfizer?
>
> A. That is correct.
>
> Q. And you never reviewed any sort of analysis of call notes?
>
> A. During the class period we're talking about?
>
> Q. Or before the class period. Calls related to the government investigation.
>
> A. I'm trying to get the Klein case out of the discussion.
>
> Q. Understood. So the class period and earlier.
>
> A. No, not to my knowledge.

Ex. 22 at 76:5-23 (Block).

> Q. Did you ever review any of the call notes?
>
> A. No.
>
> Q. Did you ever receive any summaries or analyses of the call notes?

- 20 -

A. Well, as I indicated earlier, the answer is no.  But the net result of the call notes is the type of information that, to the extent of any moment, would have been provided to Dennis Block and me by our GI attorneys.

Q. Did you ever make any sort of assessment as to the strength of the evidence in the government's case based on the call notes?

A. No. That's the sort of thing that I would rely on our GI attorneys to do, who are expert in the field.

Ex. 23 at 60:7-22 (Fox); *see also* SUF, ¶70.

## 6.    Employee Interviews

In addition to interviewing the Pfizer employees involved in the deletion and alteration of Bextra-related documents, the Company's Investigation Counsel interviewed over 100 other Pfizer employees in connection with the Bextra Investigation and generated interview memoranda for most if not all of these interviews.  SUF, ¶71.  No one shared with Block or Fox any of these interview memoranda:

Q. Mr. Block, did anyone at Pfizer or any Pfizer representative ever tell you during the class period or before the class period approximately how many witnesses were interviewed in connection with the internal investigation concerning Bextra off-label marketing?

\*       \*       \*

MR. FORGE: Interviewed by the company or the company representatives.

THE WITNESS: The answer's no.

Ex. 22 at 105:3-13 (Block).

Q. Did you participate in any of the – any employee interviews concerning Bextra off-label promotion?

A. No.

Q. Were you ever informed how many company interviews had, in fact, occurred, how many employee interviews had occurred?

A. No.

Q. Were you given the names of anyone interviewed?

- 21 -

A. I don't recall being given the names.

Q. Did you receive any memoranda or notes of such interviews?

A. Of the interviews themselves?

Q. Yes.

A. No.

Q. Did you receive any summaries of the interviews?

A. Written summaries?

Q. Or verbal.

A. The short answer is that I do not recall. To the extent the – that such interviews were a matter of any consequence in the view of our GI attorneys, that is the sort of information that would have been conveyed to me and Dennis Block in our updates from our GI attorneys.

Q. But you have no recollection of that actually being conveyed to you?

A. That is correct.

Ex. 23 at 53:23-55:3 (Fox); *see also* SUF, ¶76.

Just as defendants withheld from Block and Fox all of the employee interviews in the Bextra Investigation, defendants withheld them from plaintiffs. Dkt. No. 197. Defendants even withheld from Block and Fox, as well as plaintiffs, several employee interviews that Pfizer and its Investigation Counsel produced to the Government. *See* SUF, ¶58. After the close of fact discovery, plaintiffs managed to track down these interview memoranda and this Court has already held that defendants had improperly withheld them in violation of the Court's first discovery order in this action. Dkt. No. 197. Still, defendants never produced over 100 additional witness interview memoranda from the Bextra Investigation – since defendants never disclosed them to Block and Fox, they withheld them from plaintiffs. *Id.*

- 22 -

7.    **Pfizer's Communications with Its Investigation Counsel and
Its Investigation Counsel's Files and Work-Product**

Neither Block nor Fox received any of Pfizer's confidential communications with its Investigation Counsel.  SUF, ¶73.  Likewise, Block and Fox had no access whatsoever to the files and work-product of any of Pfizer's Investigation Counsel concerning the Bextra Investigation.  *Id.* As a result, and over plaintiffs' repeated objections, defendants withheld in discovery all of their confidential communications with Investigation Counsel and all of Investigation Counsel's work-product.  Dkt. No. 197.

## III.   ARGUMENT

### A.    Standard Governing a Motion for Summary Judgment

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" based on "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(a), (c)(1)(a).  A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  As the Court has observed, "'[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.'"  *Westchester*

- 23 -

*Teamsters Local 456 Annuity Fund v. Fleet Nat'l Bank*, No. 02 Civ. 6664(AKH), 2006 WL 2246232, at *4 (S.D.N.Y. Aug. 4, 2006).

### B.     No Reasonable Jury Could Render a Verdict for Defendants on Their Reliance-on-Block/Fox Defense

In order to sustain their Reliance-on-Block/Fox Defense, defendants would have to prove that: (i) they made complete disclosure to Block and Fox regarding the Bextra Investigation; (ii) they sought Block and Fox's advice regarding the accuracy and completeness of their statements, and the propriety of their FAS-5 reserve decisions, regarding the Bextra Investigation (*i.e.*, advice regarding "the legality of [their] conduct"); (iii) Block and Fox advised them that the statements at issue here were accurate and complete in all material respects and their reserve decision was proper (*i.e.*, advice that "[their] conduct was legal"); and (iv) they relied on Block and Fox's advice in good faith. *See Markowski v. SEC*, 34 F.3d 99, 104-05 (2d Cir. 1994); *see also SEC v. Meltzer*, 440 F. Supp. 2d 179, 189 (E.D.N.Y. 2006) ("To establish the defense, the defendant should show that he/she/it made a complete disclosure, sought the advice as to the appropriateness of the challenged conduct, received advice that the conduct was appropriate, and relied on that advice in good faith.'").   As the undisputed facts detailed above make clear, defendants cannot possibly satisfy any one of these elements, let alone all of them.

### 1.     Defendants Did Not, and May Not, Rely on Block/Fox for the Accuracy of the "Substantial Defenses" Representation or for Analysis of the Strengths and Weaknesses of the Government's Case

Although this is primarily an omissions case, defendants' representation throughout the Class Period that Pfizer had "substantial defenses" to the Bextra Investigation was false.   In order for defendants' Reliance-on-Block/Fox Defense to survive summary judgment as to this representation, there would have to be triable question of fact as to *all* of the following elements: (i) that defendants

- 24 -

sought Block and/or Fox's advice as to whether the "substantial defenses" representation was accurate; (ii) that defendants made a complete disclosure to Block and/or Fox of all facts relevant to determining the accuracy of the "substantial defenses" representation; (iii) that Block and/or Fox advised defendants that the "substantial defenses" representation was accurate; and (iv) that defendants relied on Block and/or Fox's advice in good faith.  In light of the undisputed facts here, there is no triable issue of fact as to defendants' non-reliance on Block/Fox for their "substantial defenses" representation or to assess the strengths and weaknesses of the Government's case.  No reasonable jury could find in defendants' favor.

First, as set forth above, the witnesses' testimony is unanimous that defendants did ***not*** seek Block or Fox's advice about whether Pfizer had substantial defenses to the Bextra Investigation or their assessment of the strengths and weaknesses of the Government's case.  *Supra* §II.F.; SUF, ¶¶24-25. This alone defeats defendants' Reliance-on-Block/Fox Defense as to the "substantial defenses" representation.

Second, as defendants' own criminal law expert has recognized, whether a defense in any given case is "substantial" is relative to a number of factors, including the evidence of guilt.  Ex. 30 at 5:16-7:9.  Yet, it is undisputed that defendants failed to disclose to Block or Fox much of the most important evidence in the Bextra Investigation, which demonstrated that Pfizer's sales force had promoted Bextra off-label – including documents that corroborated a *qui tam* relator's claims, Bextra-related documents that Pfizer employees had attempted to delete or alter, call notes, sales force survey results and employee interview memoranda.  *Supra* §II.H.; SUF, ¶¶43, 49-50, 55, 58, 60, 70, 72, 74.  Likewise, defendants did not disclose to Block that Pfizer's sales force had promoted Bextra with false and misleading claims even though defendants' own expert declared that he was not aware of any defenses whatsoever that Pfizer had regarding this admitted fact.  *Supra* §II.H.1.

- 25 -

and 5.; SUF, ¶¶35, 68, 70.  It is therefore obvious that defendants failed to disclose to Block or Fox all facts relevant to determining the accuracy of Pfizer's "substantial defenses" representation.  This alone defeats defendants' Reliance-on-Block/Fox Defense as to this representation.  *See, e.g.*, *SEC v. Scott*, 565 F. Supp. 1513, 1534 (S.D.N.Y. 1983) ("by not informing his counsel about the purchases until after the closing, Dirks failed to apprise his counsel of all the material facts and therefore cannot rely on his counsel's advice to shield him from culpability [for failing to amend prospectus to reflect material use of proceeds from offering]"), *aff'd sub nom.*, *SEC v. Cayman Islands Reinsurance Corp.*, 734 F.2d 118 (2d Cir. 1984); *Meltzer*, 440 F. Supp. 2d at 189 (Court rejected reliance-on-counsel defense at summary judgment stage because "Meltzer did seek the advice of counsel, but there is nothing in the record to demonstrate that he made a complete disclosure, nor is there any indication that counsel advised Meltzer that the conduct was appropriate.  (*See* Meltzer Dep. at 110-115 (indicating that Meltzer did not discuss the actual content of the e-mails or websites with counsel).)  In fact, Meltzer's testimony demonstrates that he did not make a full disclosure.  (*See id.* at 112 (Q: 'Did [your attorney] review each profile you sent out?' Meltzer: 'No, he did not.').)").

Third, Block and Fox's testimony could not have been clearer that they did ***not*** advise defendants that Pfizer had "substantial defenses" to the Bextra Investigation.  *Supra* §II.E.I.; SUF, ¶¶14-15.  Nor did they provide defendants with any assessment of the strengths and weaknesses of the Government's case or the likelihood of conviction (Ex. 22 at 34:1-22 (Block); Ex. 23 at 32:16-33:5 (Fox)) – both of which would be necessary to determining the ***relative*** strengths of Pfizer's defenses.  The actual rendering of advice is the most fundamental element of defendants' Reliance-on-Block/Fox Defense, but they cannot prove it.  This is another independent, yet wholly complete, basis for rejecting defendants' Reliance-on-Block/Fox Defense as to Pfizer's "substantial defenses"

representation. *See, e.g.*, *SEC v. Cavanagh*, No. 98 CIV. 1818(DLC), 2004 U.S. Dist. LEXIS 13372, at *87-*88 (S.D.N.Y. July 16, 2004) (rejecting on summary judgment reliance-on-counsel defense where "[t]he passages in [deceased attorney's] Hearing testimony on which the defendants rely do not reflect that Cavanagh or Nicolois asked [attorney] for legal advice or that he gave them any on the many issues related to the SEC's evidence of a market manipulation"), *aff'd on other grounds*, 445 F.3d 105 (2d Cir. 2006).

And fourth, the reason defendants did not seek Block or Fox's advice, and neither Block nor Fox rendered advice, regarding the accuracy of defendants' "substantial defenses" representation is because Block and Fox were neither involved in the Bextra Investigation nor qualified to render such advice. *Supra* §§II.D., G.; SUF, ¶¶11, 15, 18. Pfizer's current General Counsel Lankler identified the individuals most knowledgeable about, and most qualified to assess, the facts that had developed during the course of Pfizer's internal Bextra Investigation. Ex. 24 at 92:23-97:21. He did not include Block and Fox on this list. *Id.* Even if Block and Fox had advised defendants on the accuracy of Pfizer's "substantial defenses" representation (which they clearly did not), there is no way defendants could have relied in good faith on such advice in light of the many informed and qualified attorneys whom their Reliance-on-Block/Fox Defense spurns, and defendants' tremendous level of sophistication. Pfizer is unquestionably one of the most sophisticated company's in the world and all of the defendants have advanced degrees, including two who are lawyers themselves (Jeffery Kindler and Allen Waxman). No reasonable jury could find that defendants relied in good faith on the advice of two lawyers regarding an investigation with which they were not involved, about which they were poorly informed, and that concerned areas of the law with which they had no experience (criminal law generally and off-label promotion (misbranding) specifically). *See, e.g.*, *Johns Hopkins Univ. v. CellPro*, 978 F. Supp. 184, 190 (D. Del. 1997) (instructing jury that

- 27 -

"[w]hether it was reasonable to rely upon an opinion of counsel may depend on whether the client is itself knowledgeable and sophisticated about patent matters or instead is ignorant and unsophisticated in patent matters"), *aff'd sub nom., Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342 (Fed. Cir. 1998); *Mitchell v. Pidcock*, 299 F.2d 281, 287 (5th Cir. 1962) ("We find it incredible that in 1958 an informed, knowledgeable, experienced tobacco warehouseman would have accepted the opinion of July 18 and continued to rely on it.").

### 2. Defendants' Omissions Relating to the "Substantial Defenses" Representation

In addition to being inaccurate, defendants' "substantial defenses" representation, as well as other public representations regarding the lawfulness of Pfizer's sales practices, unquestionably triggered a duty to provide investors with a complete picture of the Bextra Investigation. "[O]nce corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading." *In re Par Pharm., Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990) (citing multiple cases, including *Basic Inc. v. Levinson*, 485 U.S. 224, 241 n.18 (1988) ("the ever-present duty not to mislead")); *In re Time Warner Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) (holding that "[a] duty to disclose arises whenever secret information renders prior public statements materially misleading"); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) (holding that "upon choosing to speak one 'has a duty to be both accurate and complete'") (quoting *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) ("[O]mission is actionable when the failure to disclose renders a statement misleading."). In other words, as this Court has repeatedly recognized, this case is largely about information defendants omitted, or failed to disclose, but should have disclosed. *See, e.g.*, August 9, 2011 Hearing

Transcript at 4:17-20, 6:20-24, 20:22-21:7, 23:1-11; March 8, 2013 Hearing Transcript at 6:1-6; July

19, 2013 Hearing Transcript at 5:4-12; July 7, 2014 Hearing Transcript at 3:4-9.

Regarding defendants' omissions, the question of whether their Reliance-on-Block/Fox

Defense fails as a matter of fact and law is rhetorical: could a reasonable jury find that defendants

sought and received advice from Block/Fox, made a full disclosure to Block/Fox and relied in good

faith on such advice when it related to the propriety of defendants' failure to disclose to investors the

very information they failed to disclose to Block/Fox?  It is undisputed that defendants failed to

disclose to Block/Fox and investors alike much of the most important evidence in the Bextra

Investigation, which demonstrated the nationwide, Company-wide off-label promotion of Bextra:

internal documents supporting a *qui tam* relator's claims; illegally deleted and altered documents

evidencing off-label promotion of Bextra; call notes demonstrating nationwide off-label promotion

in the form of promoting for unapproved uses, unapproved doses and with false and misleading

statements regarding dose-related increases in hypertension and edema (again, this last form of off-

label promotion is one for which defendants' own criminal law expert said there were no known

defenses – even with ten years of hindsight); sales force survey results that were completely aligned

with the *qui tam* relator's allegations; and employee interview memoranda, which, if consistent with

Pfizer's sales force survey results, would contain numerous admissions of off-label promotion

activities (collectively, the "Concealed Information").  *Supra* §II.H.; SUF, ¶¶43, 49-50, 55, 58, 60,

70, 72, 74.

The incompleteness of defendants' disclosure to Block and Fox is exacerbated by the fact

that, despite withholding all of the Concealed Information from Block and Fox, defendants did

disclose it to the Government.  Even with regard to employee interview memoranda, defendants

provided the Government with only about a half-dozen of the more than 100 Bextra-related

interview memoranda drafted by Investigation Counsel, but that is still a half-dozen more than they shared with Block or Fox.  Defendants provided to their adversary a far fuller disclosure than to the two lawyers on whom they claim to have relied.  Defendants cannot possibly establish that they sought Block or Fox's advice about the propriety of omitting the Concealed Information from their statements to investors regarding the Bextra Investigation when they also withheld the Concealed Information from Block and Fox.  Likewise, Block and Fox could not have possibly advised defendants on the propriety of omitting information of which Block and Fox were unaware.  There was no disclosure whatsoever, let alone full disclosure, of the Concealed Information to investors during the Class Period.  And defendants could not have relied in good faith on advice that was ***never*** given, much less from uninvolved and unqualified counsel.  *See, e.g.*, *United States v. Curtis*, 769 F.3d 271, 2014 U.S. App. LEXIS 13484, at *14 (5th Cir. 2014) (confirming unavailability of reliance-on-counsel defense concerning defendants' fraudulent concealment of contracts from bankruptcy schedule, where reliance counsel also "'had no information regarding the contracts that [defendant] fraudulently concealed'"); *Scott*, 565 F. Supp. at 1535 ("reliance-on-counsel defense requires more than such a complacent attitude . . . defendant must establish that he actively sought and relied on the advice of counsel").

### 3.    Defendants' Failure to Reserve Under FAS-5

The second subject of defendants' Reliance-on-Block/Fox Defense is Pfizer's "legal proceedings disclosures concerning . . . (ii) Pfizer's FAS 5 reserves to take into account any potential losses arising out of [the Bextra Investigation]."  Dkt. No. 160 at 26.  Under FAS-5 a reserve must be taken for a legal contingency if (i) a loss is probable and (ii) the amount of loss is reasonably estimable.  *See* FAS-5, ¶8.  First, the determination as to the probability of a loss from the Bextra Investigation involved an assessment of the strength of Pfizer's defenses, of the Government's

evidence, and thus the likelihood of a conviction.  As set forth above, these are subjects on which defendants neither sought nor received advice from Block and Fox.  *Supra* §II.E.2.; SUF, ¶¶24-25. Moreover, defendants could not have relied on any advice from Block and Fox in good faith because: (i) defendants withheld from Block and Fox critical evidence concerning these subjects; (ii) Block and Fox had no criminal law experience and no familiarity with the misbranding statutes; and (iii) defendants had retained other more knowledgeable and more qualified counsel to participate in, and assess, the Bextra Investigation.  *Supra* §§II.F.-H.; SUF, ¶¶13, 22-25, 43, 49-50, 55, 58, 60, 70, 72, 74.

> Q. I know you said earlier that you – as part of your job with Pfizer, you never gave assessments regarding the strengths or weaknesses of cases.  Did you make probability determinations concerning losses in connection to cases?
>
> A. No.  We – I and Dennis would look to our litigators to fully inform us of their view, but we would not – no.

Ex. 23 at 44:24-45:7.

The same also holds true for the determination of whether a loss from the Bextra Investigation was reasonably estimable.  Estimating the losses from the Bextra Investigation necessarily involved calculations based on the Guidelines and estimates regarding Pfizer's gain from its off-label promotion of Bextra.  *See, e.g.*, *S. Union Co. v. United States*, __ U.S. __, 132 S. Ct. 2344, 2350-51 (2012) (holding that *Apprendi* applies to monetary fines that "are frequently imposed today, especially upon organizational defendants who cannot be imprisoned" and are "often calculated by reference to particular facts" such as "the amount of the defendant's gain").  Indeed, the primary driver for the ultimate fine in the Bextra Investigation was Pfizer's gain from its off-label promotion of Bextra: $664 million – a figure Pfizer's attorney, O'Connor, assured the presiding Judge (the Honorable Douglas P. Woodlock) was reached with the "assist[ance of] a very good expert firm called The Analysis Group, and we had a lot of good heads on it, not just Ropes & Gray,

- 31 -

not just Pfizer and Pharmacia, but also others as well.  So it was very much arm's length negotiated and I think everyone was doing the best they could."  Ex. 26 at 7:19-20, 12:13-17; Ex. 27 at 2 (proposed Guidelines' calculations for Bextra Investigation).  While Block is undoubtedly sharp, he was not one of the "good heads" who helped determine the amount of Pfizer's gain from its off-label promotion of Bextra:

> [Q.] Did you ever consult – during the class period, did you ever consult any experts to – regarding the amount of gain Pfizer had from the off-label promotion of Bextra?
>
> A. No.
>
> Q. Were you aware as to whether or not Pfizer had consulted experts to come up with that figure?
>
> A. Pfizer didn't believe there was any off-label sales of any significance, but I know the criminal lawyers talked about the issue. I can't say what they said because I don't recall.
>
> Q. Do you recall – was there any expert ever identified for you or expert entity?
>
> A. I wouldn't have paid attention to that.  The answer is I don't know.
>
> Q. Fair to say you certainly weren't involved in that process of determining –
>
> A. Absolutely –
>
> Q. – the amount of gain?
>
> A. – yes.

Ex. 22 at 73:21-74:16.

Again, the undisputed facts show that defendants neither sought nor received advice from Block or Fox as to whether the fine (*i.e.*, loss) from the Bextra Investigation was reasonably estimable.  Such advice concerned tasks – making Guidelines' calculations and estimating gains from off-label promotion – with which they had no experience and that required information they did not receive (*e.g.*, Bextra sales figures). *Supra* §§II.E.2., G.; SUF, ¶¶13-19, 26, 74.  Thus, this is yet

- 32 -

another aspect of defendants' Reliance-on-Block/Fox Defense that no reasonable jury could sustain. *Meltzer*, 440 F. Supp. 2d at 189 ("'To establish the defense, the defendant should show that he/she/it made a complete disclosure, sought the advice as to the appropriateness of the challenged conduct, received advice that the conduct was appropriate, and relied on that advice in good faith.'").

### C. Defendants Have Waived Their Reliance-on-Block/Fox Defense

Defendants' refusal to permit discovery related to Pfizer's Investigation Counsel provides an additional basis for the Court to reject defendants' Reliance-on-Block/Fox Defense. As defendants intended, Block and Fox relied on Pfizer's Investigation Counsel for all assessments and conclusions regarding the Bextra Investigation. Accordingly, in order for defendants to properly raise their Reliance-on-Block/Fox Defense, they were obligated to allow plaintiffs full discovery regarding Pfizer's Investigation Counsel. *See, e.g.*, *SEB, S.A. v. Montgomery Ward Co.*, 412 F. Supp. 2d 336, 348-49 (S.D.N.Y. 2006) (ordering defendant to turn over advice rendered by third attorney where it had asserted reliance-on-counsel in good faith defense but had previously waived privilege only as to two prior counsel); *Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 210 F.R.D. 506, 510 (S.D.N.Y. 2002) (ordering production of privileged documents where defendant had put communications with any counsel during the relevant time at issue by asserting a reliance on counsel defense because such documents relate to its "reasonable reliance"); *see also United States v. Locascio*, 357 F. Supp. 2d 536, 551 (E.D.N.Y. 2004) (finding advice received by defendant from any attorney relating to the subject matter of the advice on which he asserted a good faith defense discoverable). "If the rule were otherwise, a 'claim of reliance on counsel would be immune from a showing that, in fact, the defendant had received overwhelming advice to the contrary.'" *SEC v. Wyly*, No. 10 CIV. 5760 (SAS), 2011 U.S. Dist. LEXIS 87660, at *5-*6 (S.D.N.Y. July 27, 2011) (quoting *SEC v. Forma*, 117 F.R.D. 516, 523 n.5 (S.D.N.Y. 1987)).

As the Court is well aware, the parties engaged in extensive litigation over defendants' refusal to allow any discovery concerning Pfizer's Investigation Counsel.  Defendants justified their refusal by adamantly maintaining that their reliance defense was limited to Block and Fox.  *See, e.g.*, Dkt. No. 172 at 24-5, 35 n.30; July 19, 2013 Hearing Transcript at 12:1-2.  And defendants prevailed – they were able to shield from discovery all depositions, questions and documents concerning Pfizer's Investigation Counsel.  Having shielded Pfizer's Investigation Counsel from discovery, defendants may not use their involvement and advice as a sword in this case.  *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (cautioning that a party may not use the attorney-client privilege "as a shield and a sword").

In other words, because defendants failed to fulfill their discovery obligations regarding the Investigation Counsel on whom Block and Fox relied, defendants have waived their Reliance-on-Block/Fox Defense.  "'A party who intends to rely at trial on the advice of counsel must make a full disclosure during discovery; *failure to do so constitutes a waiver of the advice-of-counsel defense*.'"  *Arista Records LLC v. Lime Grp. LLC*, No. 06 CV 5936 (KMW), 2011 U.S. Dist. LEXIS 42881, at *8 (S.D.N.Y. Apr. 14, 2011) (quoting *Vicinanzo v. Brunschwig & Fils, Inc.*, 739 F. Supp. 891, 894 (S.D.N.Y. 1990)).  In *Arista Records*, defendants asserted a good-faith belief in the lawfulness of their LimeWire filing sharing service, but repeatedly blocked plaintiffs from conducting discovery into their communications with counsel.  Accordingly, the Court held that "[d]efendants cannot now, at trial, assert their alleged good faith belief in the lawfulness of their conduct."  *Id.*; *see also E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 296 n.133 (S.D.N.Y. 2000) ("Having blocked his adversary from conducting discovery on this issue, he will not now be heard to advance reliance on counsel."), *aff'd*, 4 F. App'x 81 (2d Cir. 2001).

Defendants' purported Reliance-on-Block/Fox Defense is merely a mask for a reliance-on-Investigation Counsel defense that defendants have plainly waived.  No advice or assessments from Block or Fox served as the basis for Pfizer's "substantial defenses" representation, defendants' omission of the Concealed Information from investors or the probability or reasonably estimable determinations under FAS-5.  *Supra* §§II.B., E.2., H.  Block and Fox, like defendants themselves, have pointed to Pfizer's Investigation Counsel as the source of these assessments, and rightly so because KPMG expressly referenced Investigation Counsel's "white paper" in support of its audit as defendants invoked in their summary judgment briefs.  *Id.*; Dkt. No. 246 at 10, 46 ("[T]he company's Board, senior executives, and in-house lawyers all relied on Covington's judgment to inform them that the company had meritorious defenses. . . . [T]he undisputed fact is that Pfizer and its disclosure counsel relied on investigation counsel's judgment in crafting the company's securities disclosures.").  It is hard to imagine a clearer example of a defendant attempting to use as a sword the very attorneys it successfully shielded from discovery.

The involvement of Pfizer's Investigation Counsel is either relevant to defendants' defense of this case or it is not.  If it is relevant to any of defendants' defenses, such as their Reliance-on-Block/Fox Defense, then they waived the defense by failing to make a complete disclosure regarding Investigation Counsel during discovery.  *See Arista Records*, 2011 U.S. Dist. LEXIS 42881, at *8-*9; *see also SEC v. Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013) ("It would be confusing and unduly prejudicial for Tourre to present extensive evidence on the presence and involvement of lawyers – who are presumably paid to ensure that any disclosures comply with the relevant legal requirements – while at the same time professing not to have relied on their advice in preparing or disseminating those disclosures.").  If Investigation Counsel's involvement is irrelevant, it is inadmissible on that basis alone.  *See* Fed. R. Evid. 402.  Either way, the Court should preclude

defendants from pursuing any defense based on, or otherwise referring to, Pfizer's Investigation Counsel's involvement in the Bextra Investigation. In addition to granting plaintiffs' motion for partial summary judgment as to defendants' Reliance-on-Block/Fox Defense, the Court should disregard, and order stricken, all references to Investigation Counsel in defendants' summary judgment briefs. This is the only way to prevent defendants from violating the bedrock prohibition against using the attorney-client privilege "as a shield and a sword." *Bilzerian*, 926 F.2d at 1292; *see also Wyly*, 2011 U.S. Dist. LEXIS 87660, at *5 ("the adversary 'cannot be stonewalled by the simultaneous assertion of the [advice of counsel] defense and the privilege'") (quoting *Moskowitz v. Lopp*, 128 F.R.D. 624, 638 (E.D. Pa. 1989)).

### D. Defendants Have Waived Any Reliance-on-KPMG Defense

Defendants have not pled a reliance-on-auditors/accountants defense, yet dozens of times throughout their summary judgment briefs, defendants assert that they relied on advice from outside auditor KPMG on issues germane to this action, including the FAS-5 reserve decisions. Dkt. No. 246 at 1-2, 5-6, 9-16, 19-21, 30-31, 35-37, 49-51; Dkt. No. 274 at 3, 5, 9, 14-16; Dkt. No. 253 at 2, 9, 12-16, 26-27; Dkt. No. 258 at 5-7, 9-10, 13-14, 19, 30-33; Dkt. No. 269 at 7-9, 12-13; Dkt. No. 263 at 2, 6-11, 16-18, 23-26, 28-31, 34. As was the case for Block and Fox, however, KPMG's "advice" was based upon input from *Investigation Counsel*, including Covington, Lankler and Wessel. *See, e.g.*, Dkt. No. 246 at 9 (citing KPMG's consultation with Pfizer's Controller, Loretta Cangialosi, who "participated in quarterly reserve reviews attended by KPMG and Pfizer's in-house government *Investigation Counsel* responsible for the Bextra investigation [*i.e.*, counsel *other than* Block and Fox]"); *id.* at 10 (citing KPMG's audit, which expressly referred to Covington's white paper as support for Pfizer's decision not to reserve for the Bextra Investigation); *id.* at 16 ("*Covington* also provided audit response letters to KPMG and Pfizer which stated that *Covington*

- 36 -

had 'not concluded that the prospect of an unfavorable outcome' in the Bextra investigation was 'probable'"); Dkt. No. 274 at 5 ("***Mr. Lankler and his team*** provided updates to Mr. Kindler, Mr. Fox and other Pfizer executives (such as Pfizer's Controller, Loretta Cangialosi), as well as to Mr. Block and KPMG, on the status of the government investigations into the marketing of Bextra and other drugs."); *id.* at 24 ("the undisputed evidence demonstrates that Mr. Kindler relied on Pfizer's accountants, led by Ms. Cangialosi, Pfizer's Controller, in consultation with ***Mr. Lankler***, as well as KPMG and Mr. Block, to determine whether Pfizer was required to accrue a reserve in connection with the Bextra investigation"); Dkt. No. 253 at 13 ("Those executive litigation review meetings were also attended by Ms. Cangialosi, 'several members of her staff, and members of the legal division ***who were handling various litigation matters*** [*i.e.*, neither Block nor Fox],' as well as KPMG."); Dkt. No. 258 at 10 n.48 (citing "Jan. 25, 2008 Letter from ***Covington & Burling*** to KPMG").

KPMG's reliance on Investigation Counsel is entirely consistent with defendants' testimony, testimony from Block, Fox and even defendant's own expert (*see* E-F *supra*, SUF, ¶¶18-20), who testified that typically it would be litigators, not disclosure counsel, who would provide advice for the accounting decisions relating to FAS-5 reserves for litigation. Ex. 25 at 153:16-154:12. In fact, the only circumstance under which defendants' own expert could imagine accountants receiving advice from disclosure counsel concerning FAS-5 reserves would be "if the litigation was about disclosure or involved disclosure issues." *Id.* at 154:11-12. The Bextra Investigation was definitely not about disclosure issues. Defendants' purported reliance on KPMG is therefore just another way in which they are seeking to use Investigation Counsel as a sword after having shielded them from discovery. This KPMG-plated sword is no less prohibited.

The bottom line here is that because defendants successfully shielded from plaintiffs all discovery related to any attorney not named Block or Fox, defendants and their witnesses should be precluded from invoking any other attorneys, including any Investigation Counsel, to explain or justify anything they did or did not do. *See, e.g.*, *Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, No. 93 Civ. 5298 (LMM) (RLE), 1998 U.S. Dist. LEXIS 13611, at *9 (S.D.N.Y. Sept. 3, 1998) (rejecting defendant's attempt to limit reliance and waiver to "transactional" counsel because the defendant's pleading was "replete with detailed references to conversations between [defendant] and its litigation counsel"), *aff'd*, 2000 U.S. Dist. LEXIS 14316 (S.D.N.Y. 2000); *see also E.G.L. Gem Lab*, 90 F. Supp. 2d at 296 n.133 ("Having blocked his adversary from conducting discovery on this issue, he will not now be heard to advance reliance on counsel."). Not only should defendants be precluded from asserting their reliance on Investigation Counsel, they should also be precluded from relying on anyone else who relied on Investigation Counsel. Otherwise, the "straw-man" exception that defendants implicitly urge would swallow the rule prohibiting use of the attorney-client privilege as both a shield and a sword.

### E. Defendants Are Improperly Attempting to Use Block, Fox and KPMG for "Conduit" Testimony Outside Their Fields of Expertise

As the Court has observed, Block is a first-rate securities lawyer. Thankfully, he is also blunt, and Block readily acknowledged that he does not rate as a criminal defense lawyer or prosecutor or investigator. Nor does Fox. The same is true for KPMG. None of them have any experience whatsoever assessing government investigations or cases concerning the misbranding statutes that were at the heart of the Bextra Investigation. None of them were actually involved in the Bextra Investigation. That is why, as detailed above, Block, Fox, KPMG and defendants themselves have all made clear that they relied on Pfizer's Investigation Counsel for all purported assessments of, and opinions concerning, the Bextra Investigation, including the strengths and

- 38 -

weaknesses of Pfizer's defenses and the government's case, as well as the probability of loss and whether the loss was reasonably estimable. *See, e.g.*, Dkt. Nos. 10, 46. Block, Fox and KPMG simply accepted the judgment of Investigation Counsel regarding these purported assessments, without which Block, Fox and KPMG could not have rendered their so-called advice. Whatever testimony they have to offer, therefore, is crystal clear conduit testimony, which is plainly prohibited:

> Mr. Coleman admittedly relied on another's expertise to produce his opinion on this subject. Accordingly, his testimony is excludable as "conduit testimony from an expert on a matter outside his field of expertise." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007) (financial consultant not allowed to testify regarding statistical analysis of sales data); *see also Dura Auto. Sys. of Indiana v. CTS Corp.*, 285 F.3d 609, 612-14 (7th Cir. 2002) (excluding relied-upon expert because he "exercise[d] professional judgment that is beyond [his] ken" and "the soundness of the underlying expert judgment is in issue.").

*Faulkner v. Arista Records LLC*, No. 07 CIV. 2318 (LAP), 2014 U.S. Dist. LEXIS 129711, at *48 (S.D.N.Y. Sept. 15, 2014). The application of the prohibition on conduit testimony is yet another way in which defendants' Reliance-on-Block/Fox Defense, as well any reliance-on-KPMG defense, fail as a matter of fact and law.

## IV.     CONCLUSION

For all of the foregoing reasons, plaintiffs respectfully request that the Court grant summary judgment as to defendants' Fourteenth Defense, and preclude defendants from offering any testimony, documents or argument that refers to or is based upon any input from counsel, including any statements or conduct of KPMG that was based on input from counsel.

DATED:  November 14, 2014                    Respectfully submitted,

                                             ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                             MICHAEL J. DOWD
                                             HENRY ROSEN
                                             TRIG R. SMITH
                                             JASON A. FORGE
                                             RYAN A. LLORENS
                                             IVY T. NGO


                                                    s/ JASON A. FORGE
                                             _____
                                                  JASON A. FORGE

                                             655 West Broadway, Suite 1900
                                             San Diego, CA  92101
                                             Telephone:  619/231-1058
                                             619/231-7423 (fax)
                                             miked@rgrdlaw.com
                                             henryr@rgrdlaw.com
                                             trigs@rgrdlaw.com
                                             jforge@rgrdlaw.com
                                             ryanl@rgrdlaw.com
                                             ingo@rgrdlaw.com

                                             ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                             SAMUEL H. RUDMAN
                                             58 South Service Road, Suite 200
                                             Melville, NY  11747
                                             Telephone:  631/367-7100
                                             631/367-1173 (fax)
                                             srudman@rgrdlaw.com

- 40 -

983842_1

ROBBINS GELLER RUDMAN
  & DOWD LLP
WILLOW E. RADCLIFFE
DANIEL J. PFEFFERBAUM
MATTHEW S. MELAMED
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
willowr@rgrdlaw.com
dpfefferbaum@rgrdlaw.com
mmelamed@rgrdlaw.com

Lead Counsel for Plaintiffs

- 41 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 14, 2014, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 14, 2014.

<div style="margin-left:40%;">

s/ JASON A. FORGE
JASON A. FORGE

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  JForge@rgrdlaw.com

</div>

983842_1

# Mailing Information for a Case 1:10-cv-03864-AKH

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Scott Bailey**
  michael.bailey@skadden.com

- **Sidney Bashago**
  sidney.bashago@dpw.com

- **Sheila L. Birnbaum**
  sheilabirnbaum@quinnemanuel.com

- **George Anthony Borden**
  gborden@wc.com

- **Kevin Anthony Burke**
  kaburke@sidley.com,nyefiling@sidley.com,efilingnotice@sidley.com

- **Michael Barry Carlinsky**
  michaelcarlinsky@quinnemanuel.com,brantkuehn@quinnemanuel.com,jomairecrawford@quinnemanuel.com

- **Lauren Kristina Collogan**
  lcollogan@wc.com

- **Keir Nicholas Dougall**
  kdougall@dougallpc.com

- **Michael Joseph Dowd**
  miked@rgrdlaw.com,e_file_sd@rgrdlaw.com,tome@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Alexander C Drylewski**
  alexander.drylewski@skadden.com

- **Charles S. Duggan**
  charles.duggan@dpw.com,ecf.ct.papers@davispolk.com

- **Steven M.. Farina**
  sfarina@wc.com

- **Jason A. Forge**
  jforge@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_SD@rgrdlaw.com

- **Ross Bradley Galin**
  rgalin@omm.com,neverhart@omm.com

- **Gary John Hacker**
  ghacker@skadden.com

- **James R. Harper**
  coljamesrharper@me.com

- **Howard E. Heiss**
  hheiss@omm.com,#nymanagingattorney@omm.com

- **Paul T. Hourihan**
  phourihan@wc.com

- **James M. Hughes**
  jhughes@motleyrice.com,kweil@pacernotice.com,erichards@motleyrice.com,kweil@motleyrice.com

- **Jay B. Kasner**
  jkasner@skadden.com

- **Joe Kendall**
  administrator@kendalllawgroup.com,jkendall@kendalllawgroup.com,hlindley@kendalllawgroup.com

- **Brant Duncan Kuehn**
  brantkuehn@quinnemanuel.com

- **Leigh R. Lasky**
  lasky@laskyrifkind.com

- **Hamilton Philip Lindley**
  hlindley@deanslyons.com,mgoens@deanslyons.com

- **Ryan A. Llorens**
  ryanl@rgrdlaw.com,nbear@rgrdlaw.com,kirstenb@rgrdlaw.com

- **Amanda M. MacDonald**
  amacdonald@wc.com

- **Lori McGill**
  lorialvinomcgill@quinnemanuel.com

- **Matthew Melamed**
  mmelamed@rgrdlaw.com

- **Donald Alan Migliori**
  dmigliori@motleyrice.com

- **Eugene Mikolajczyk**
  genem@rgrdlaw.com

- **Seema Mittal**
  smittal@wc.com

- **Cynthia Margaret Monaco**
  cmonaco@cynthiamonacolaw.com,cmmonaco@gmail.com

- **Juliana Newcomb Murray**
  juliana.murray@davispolk.com,ecf.ct.papers@davispolk.com

- **Scott D. Musoff**
  smusoff@skadden.com,david.carney@skadden.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com

- **William H. Narwold**
  bnarwold@motleyrice.com,vlepine@motleyrice.com,ajanelle@motleyrice.com

- **Ivy T. Ngo**
  ingo@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Joseph G. Petrosinelli**
  jpetrosinelli@wc.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,ptiffith@rgrdlaw.com

- **Joseph F. Rice**
  jrice@motleyrice.com

- **Darren J. Robbins**
  e_file_sd@rgrdlaw.com

- **Daniel Prugh Roeser**
  droeser@goodwinprocter.com

- **Henry Rosen**
  henryr@rgrdlaw.com,dianah@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James P. Rouhandeh**
  james.rouhandeh@dpw.com,ecf.ct.papers@davispolk.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Stuart Michael Sarnoff**
  ssarnoff@omm.com

- **William E. Schurmann**
  wschurmann@wc.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,e_file_sd@rgrdlaw.com,nhorstman@rgrdlaw.com

- **Jennifer Lynn Spaziano**
  jen.spaziano@skadden.com

- **Richard Mark Strassberg**
  rstrassberg@goodwinprocter.com,nymanagingclerk@goodwinprocter.com

- **Mitchell M.Z. Twersky**
  mtwersky@aftlaw.com

- **John K. Villa**
  jvilla@wc.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Daniel          E. Hill**
Kendall Law Group, LLP
3232 McKinney Avenue
Suite 700
Dallas, TX 75204

**Catherine       J. Kowalewski**
Robbins Geller Rudman & Dowd LLP (San Diego)
655 West Broadway
Suite 1900
San Diego, CA 92101

**Jamie          J. McKey**
Kendall Law Group, LLP
3232 McKinney Avenue
Suite 700
Dallas, TX 75204

**David          C. Walton**
Robbins Geller Rudman & Dowd LLP (SANDIEGO)
655 West  Broadway
Suite  1900
San Diego, CA 92101