UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
MARY K. JONES, Individually and on Behalf :
of All Others Similarly Situated,          :
                                           :
                           Plaintiff       :
                                           :
            vs.                            :
                                           :
PFIZER INC., et al.,                       :
                                           :
                           Defendants.     :
———————————————————— x

Civil Action No. 1:10-cv-03864-AKH

<u>CLASS ACTION</u>

LEAD COUNSEL'S MEMORANDUM OF
LAW IN SUPPORT OF MOTION FOR
AWARD OF ATTORNEYS' FEES AND
EXPENSES AND  REIMBURSEMENT OF
THE PLAINTIFFS' EXPENSES PURSUANT
TO 15 U.S.C. §78u-4(a)(4)

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ....................................................................................................1

II.  THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND SHOULD
     BE GRANTED ......................................................................................................4

     A.  Lead Counsel Are Entitled to an Award of Attorneys' Fees from the
         Common Fund ..........................................................................................4

     B.  The Court Should Award a Reasonable Percentage of the Common Fund.............5

     C.  The Requested Attorneys' Fees Are Reasonable Under the Percentage-of-
         the-Fund Method.......................................................................................7

     D.  A Review of the *Goldberger* Factors Confirms that the Requested 23.5%
         Fee Is Fair and Reasonable ........................................................................9

         1.  The Time and Labor Expended by Plaintiffs' Counsel Support the
             Requested Fee ..................................................................................9

         2.  The Magnitude and Complexity of the Litigation Support the
             Requested Fee ................................................................................13

         3.  The Risks of the Litigation Support the Requested Fee ............................14

         4.  The Quality of Lead Counsel's Representation Supports the
             Requested Fee ................................................................................18

         5.  Second Circuit Precedent Supports the 23.5% Fee as a Reasonable
             Percentage of the Total Recovery .......................................................20

         6.  Public Policy Considerations Further Support the Requested Fee ............20

         7.  Lead Plaintiff Philips' and Class Representative Jones' Approval
             and the Class's Reaction Support the Requested Fee ..............................21

     E.  A Lodestar Cross-Check Strongly Confirms the Reasonableness of the Fee
         Request........................................................................................................22

III.  PLAINTIFFS' COUNSEL'S EXPENSES ARE REASONABLE AND SHOULD
      BE APPROVED FOR RECOVERY ....................................................................24

IV.  LEAD PLAINTIFF PHILIPS AND CLASS REPRESENTATIVE JONES
     SHOULD BE AWARDED THEIR REASONABLE TIME AND EXPENSES
     UNDER 15 U.S.C. §78u-4(a)(4)..........................................................................25

1017695_2

**Page**

V.    CONCLUSION.................................................................................................27

1017695_2

# TABLE OF AUTHORITIES

Page

## CASES

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
   472 U.S. 299 (1985) ..................................................................................5

*Blum v. Stenson*,
   465 U.S. 886 (1984) ...............................................................................6, 7

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) ..................................................................................4

*Camden I Condo. Ass'n v. Dunkle*,
   946 F.2d 768 (11th Cir. 1991) ...............................................................6, 7

*Cornwell v. Credit Suisse Grp.*,
   No. 08-cv-03758 (VM), slip op.
   (S.D.N.Y. July 18, 2011) ..........................................................................23

*Davis v. J.P. Morgan Chase & Co.*,
   827 F. Supp. 2d 172 (W.D.N.Y. 2011) .................................................6, 23

*Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974)......................................................................15

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000).............................................................. *passim*

*Gottlieb v. Barry*,
   43 F.3d 474 (10th Cir. 1994) .......................................................................6

*Harman v. Lyphomed, Inc.*,
   945 F.2d 969 (7th Cir. 1991) .......................................................................6

*Hayes v. Harmony Gold Mining Co.*,
   509 F. App'x 21 (2d Cir. 2013) ...................................................................5

*Hicks v. Morgan Stanley*,
   No. 01 Civ. 10071 (RJH), 2005 WL 2757792
   (S.D.N.Y. Oct. 24, 2005) .............................................................5, 20, 25

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
   No. 03 MDL 1529 LMM, 2006 WL 3378705
   (S.D.N.Y. Nov. 16, 2006), *aff'd*, 272 F. App'x 9 (2d Cir. 2008) ........8, 19

**Page**

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
No. 04 Civ. 8141 (DAB), 2010 WL 5060697
(S.D.N.Y. Dec. 2, 2010)..................................................................26

*In re AremisSoft Corp. Sec. Litig.*,
210 F.R.D. 109 (D.N.J. 2002)......................................................9, 23

*In re AT&T Corp. Sec. Litig.*,
455 F.3d 160 (3d Cir. 2006)...............................................................6

*In re Bisys Sec. Litig.*,
No. 04 Civ 3840 (JSR), 2007 WL 2049726
(S.D.N.Y. July 16, 2007) .............................................................4, 23

*In re Buspirone Antitrust Litig.*,
MDL No. 1413 (JGK), 2003 U.S. Dist. LEXIS 26538
(S.D.N.Y. Apr. 17, 2003).....................................................................8

*In re Cardinal Health Inc. Sec. Litigs.*,
528 F. Supp. 2d 752 (S.D. Ohio 2007) ............................................22

*In re Checking Account*,
830 F. Supp. 2d 1330 (S.D. Fla. 2011) ..............................................8

*In re China Sunergy Sec. Litig.*,
No. 07 Civ. 7895 (DAB), 2011 WL 1899715
(S.D.N.Y. May 13, 2011)...................................................................24

*In re Comverse Tech., Inc. Sec. Litig.*,
No. 06-CV-1825 (NGG) (RER), 2010 WL 2653354
(E.D.N.Y. June 24, 2010) ........................................................ *passim*

*In re Deutsche Telekom AG Sec. Litig.*,
No. 00-CV-9475 (NRB), 2005 U.S. Dist. LEXIS 45798
(S.D.N.Y. June 14, 2005).....................................................................8

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
No. 02-CV-3400 (CM) (PED), 2010 WL 4537550
(S.D.N.Y. Nov. 8, 2010) .......................................................... *passim*

*In re Global Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004)......................................................18

- iv -

Page

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009) .......................................................................8

*In re Linerboard Antitrust Litig.*,
    MDL No. 1261, 2004 WL 1221350
    (E.D. Pa. June 2, 2004) ............................................................................................9

*In re Lucent Techs., Inc. Sec. Litig.*,
    327 F. Supp. 2d 426 (D.N.J. 2004) .........................................................................21

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) .......................................................................16, 19

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    MDL No. 1222 (CLB), 2003 U.S. Dist. LEXIS 26795
    (S.D.N.Y. June 12, 2003).........................................................................................8

*In re Payment Card Interchange Fee & Merch. Disctrict Antitrust Litig.*,
    991 F. Supp. 2d 437 (E.D.N.Y. 2014) ...................................................5, 6, 22, 23

*In re Philip Servs. Corp. Sec. Litig.*,
    No. 98 Civ. 835 (AKH), 2007 WL 959299
    (S.D.N.Y. Mar. 28, 2007) ........................................................................................8

*In re Rite Aid Corp. Sec. Litig.*,
    146 F. Supp. 2d 706 (E.D. Pa. 2001) .......................................................................9

*In re Rite Aid Corp. Sec. Litig.*,
    362 F. Supp. 2d 587 (E.D. Pa. 2005) .......................................................................8

*In re Sumitomo Copper Litig.*,
    189 F.R.D. 274 (S.D.N.Y. 1999) ...........................................................................14

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008)...............................................4, 7, 14, 23

*In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*,
    56 F.3d 295 (1st Cir. 1995)......................................................................................6

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
    724 F. Supp. 160 (S.D.N.Y. 1989) .........................................................................24

- v -

**Page**

*In re Veeco Instruments Inc. Sec. Litig.*,
No. 05 MDL 01695 (CM), 2007 WL 4115808
(S.D.N.Y. Nov. 7, 2007) ............................................................................................... *passim*

*In re Vitamins Antitrust Litig.*,
No. 99-197 (TFH), 2001 WL 34312839
(D.D.C. July 16, 2001).............................................................................................................9

*In re Williams Sec. Litig.*,
No. 02-CV-72-SPF (FHM), slip op.
(N.D. Okla. Feb. 12, 2007) .....................................................................................................8

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005)......................................................................................7

*In re Xcel Energy, Inc.*,
364 F. Supp. 2d 980 (D. Minn. 2005) .....................................................................................26

*J. I. Case Co. v. Borak*,
377 U.S. 426 (1964)..................................................................................................................5

*Kurzweil v. Philip Morris Cos., Inc.*,
No. 94 Civ. 2373 (MBM), 1999 WL 1076105
(S.D.N.Y. Nov. 30, 1999) ........................................................................................................8

*Maley v. Del Global Techs. Corp.*,
186 F. Supp. 2d 358 (S.D.N.Y. 2002)..........................................................................7, 20, 23

*Missouri v. Jenkins*,
491 U.S. 274 (1989)...........................................................................................................7, 24

*Ohio Pub. Emps. Ret. Sys. v. Freddie Mac*,
No. 03-CV- 4261 (JES), 2006 U.S. Dist. LEXIS 98380
(S.D.N.Y. Oct. 27, 2006) .........................................................................................................8

*Parker v. Time Warner Entm't Co., L.P.*,
631 F. Supp. 2d 242 (E.D.N.Y. 2009) ...................................................................................15

*Petrovic v. AMOCO Oil Co.*,
200 F.3d 1140 (8th Cir. 1999) .................................................................................................6

*Rawlings v. Prudential-Bache Props.*,
9 F.3d 513 (6th Cir. 1993) .......................................................................................................6

- vi -

Page

*Savoie v. Merchs. Bank*,
    166 F.3d 456 (2d Cir. 1999)...............................................................6

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011)...............................................................8

*Swedish Hosp. Corp. v. Shalala*,
    1 F.3d 1261 (D.C. Cir. 1993)............................................................6, 7

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
    No. 01-CV-11814 (MP), 2004 WL 1087261
    (S.D.N.Y. May 14, 2004)....................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...........................................................................5

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
    669 F.3d 632 (5th Cir. 2012) .............................................................6

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ...........................................................6

*Wal-Mart Stores, Inc. v. Visa U.S.A.*,
    396 F.3d 96 (2d Cir. 2005)...........................................................5, 6, 23

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §77z-1(a)(6) .......................................................................................7
    §78u-4(a)(4) ................................................................................1, 3, 25

**SECONDARY AUTHORITIES**

H.R. Conf. Rep. No. 104-369, at 32 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730......................21

- vii -

## I.      INTRODUCTION

Court-appointed Lead Counsel Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), having recovered $400 million in cash for the Class, respectfully applies for an award of attorneys' fees in the amount of 23.5% of the Settlement Amount.[1] Lead Counsel also seek $7,685,497.62 in expenses that Plaintiffs' Counsel[2] reasonably and necessarily incurred to prosecute the Litigation, as well as an award of $13,513.00 for time spent by Lead Plaintiff Philips and Class Representative Jones (collectively "Plaintiffs").

As detailed in the accompanying Lead Counsel Declaration, Lead Counsel vigorously pursued this litigation for nearly five years after filing the first complaint in May 2010, while committing the extensive resources necessary to prosecute this complex action to a successful result. Not only did the breadth of this Litigation present challenges, but from the outset Lead Counsel faced complex factual and legal questions.  They faced substantial risks establishing liability, defeating affirmative defenses, proving damages, and establishing that a class action was appropriate for litigation purposes.

For instance, Plaintiffs had to prove that Defendants' statements about Pfizer Inc.'s ("Pfizer" or the "Company") off-label promotion of certain drugs, as well as Pfizer's accounting treatment of

---

[1]      Lead Counsel respectfully refers the Court to the accompanying Declaration of Henry Rosen in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and Lead Counsel's Motion for Award of Attorneys' Fees and Expenses and Reimbursement of the Plaintiffs' Expenses Pursuant to 15 U.S.C. §78u-4(a)(4) ("Lead Counsel Decl.") for a detailed description of the case and the Settlement.  Unless otherwise noted, capitalized terms have the meanings set forth in the Stipulation of Settlement, dated as of February 8, 2015, and in the Lead Counsel Decl.

[2]      "Plaintiffs' Counsel" refers to Robbins Geller and the following additional counsel for Lead Plaintiff Stichting Philips Pensioenfonds ("Philips") and Class Representative Mary K. Jones ("Jones"): Motley Rice LLC, the Kendall Law Group, Lasky & Rifkind, Ltd., and Abraham, Fruchter & Twersky, LLP.

the U.S. Department of Justice's ("DOJ") investigation into Pfizer's off-label promotion of Bextra, Geodon, Zyvox and Lyrica ("DOJ's Off-Label Promotion Investigation"), were: (i) false and misleading; (ii) material, and (iii) made with the requisite scienter.  With respect to falsity, Defendants strenuously argued that their statements about the DOJ's Off-Label Promotion Investigation were true and complete when made.  As to materiality, Defendants argued, among other things, that, even if Pfizer was required to take a reserve related to the DOJ's Off-Label Promotion Investigation, the amount of such reserve would not have been material.  Plaintiffs also had to overcome Defendants' argument that they relied in good faith on the advice they received from Pfizer's legal counsel and its outside auditors regarding their disclosure obligations and the appropriate accounting treatment for the DOJ fine.

Moreover, even if Plaintiffs were able to overcome these liability hurdles, proving loss causation and damages was equally risky.  Indeed, loss causation was disputed at every stage of this Litigation, as Defendants took the position that Pfizer's stock price decline on January 26, 2009 was due to factors entirely unrelated to the alleged fraud, *e.g.*, Pfizer's 50% dividend cut, disappointing earnings guidance, and its proposed acquisition of Wyeth.  Each of Defendants' arguments was buttressed by expert opinion.  The results achieved are particularly impressive given that: (i) no claims of any kind were ever brought by the U.S. Securities and Exchange Commission ("SEC") on behalf of Pfizer investors; and (ii) the allegedly inaccurate financial results contained in Pfizer's financial statements have never been restated.  Lead Counsel nevertheless undertook this representation on a contingency basis and advanced millions of dollars in litigation expenses, with no guarantee of success or recovery.

Lead Counsel faced these risks head-on by devoting the necessary resources to successfully litigate this action, which was extremely hard-fought and arduous, as the parties battled up to the

- 2 -

brink of trial before reaching an appropriate resolution.  Among many other things, Lead Counsel: (i) conducted a thorough investigation; (ii) filed several detailed complaints; (iii) overcame Defendants' motions to dismiss; (iv) conducted substantial discovery, including serving 64 third party subpoenas and four Freedom of Information Act requests, filed numerous discovery-related motions, obtained and reviewed more than 23 million pages of documents, took or defended the depositions of 44 fact witnesses; (v) engaged and worked with ten experts on issues such as falsity, materiality, causation, and damages; (vi) completed expert discovery, including the production of documents and the taking or defending of 16 expert depositions; (vii) obtained class certification, (viii) opposed seven summary judgment motions; (ix) prepared for trial, including filing and responding to 23 motions *in limine* and *Daubert* motions; and (x) successfully negotiated a very favorable settlement.  *See, e.g.*, Lead Counsel Decl., ¶3.

The result of Lead Counsel's hard work and perseverance is an all cash settlement of $400 million, which as of March 26, 2015, is earning interest for the benefit of the Class.  Lead Counsel was able to achieve this result only by being fully prepared to try this case and by pushing this Litigation up to the eve of trial.

It is against this backdrop that the undersigned Court-appointed Lead Counsel – with the express endorsement of Lead Plaintiff Philips and Class Representative Jones[3] – respectfully submit this memorandum in support of their request for an award of attorneys' fees equal to 23.5% of the Settlement Amount.  Importantly, the relevant factors articulated in the Second Circuit's *Goldberger*

---

[3]  *See* Declaration of Jasper Kemme in Support of Motion for Final Approval of Class Action Settlement and Award of Attorneys' Fees and Expenses Pursuant to 15 U.S.C. §78u-4(a)(4) ("Kemme Decl.") and the Declaration of Mary K. Jones in Support of Motion for Final Approval of Class Action Settlement and Award of Attorneys' Fees and Expenses Pursuant to 15 U.S.C. §78u-4(a)(4) ("Jones Decl."), filed herewith.

decision[4] – the substantial recovery obtained for the Class, the complexity and amount of work involved, the skill and expertise required, and the significant risks that counsel undertook – strongly support the requested award. Federal courts in this District and throughout the nation have awarded comparable percentage fees in other similarly complex class litigation. *See, e.g.*, *In re Bisys Sec. Litig.*, No. 04 Civ. 3840 (JSR), 2007 WL 2049726, at *3 (S.D.N.Y. July 16, 2007) (high level of risk, extensive discovery and positive final result supported fee award of 30% of common fund with a 2.99 lodestar multiplier). Moreover, a lodestar cross-check confirms that the requested fee, which represents a modest multiplier of 1.58, is fair and reasonable.

For the reasons set forth below, Lead Counsel respectfully requests that the Court approve its application for attorneys' fees, litigation expenses and Plaintiffs' time and expenses.

## II.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND SHOULD BE GRANTED

### A.   Lead Counsel Are Entitled to an Award of Attorneys' Fees from the Common Fund

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see Goldberger*, 209 F.3d at 47. Courts recognize that awards of fair attorneys' fees from a common fund "serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons,"[5] and therefore to discourage future alleged misconduct of a similar nature. Indeed, the Supreme Court has emphasized that private securities actions, such as this one, are "an essential

---

[4]   *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).

[5]   *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 585 (S.D.N.Y. 2008*); accord In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115808, at *2 (S.D.N.Y. Nov. 7, 2007).

supplement to criminal prosecutions and civil enforcement actions"[6] brought by the SEC. Compensating plaintiffs' counsel for the risks they take in bringing these actions is essential because "[s]uch actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class." *Hicks v. Morgan Stanley*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005).

### B.    The Court Should Award a Reasonable Percentage of the Common Fund

Most courts find that the percentage-of-the-fund method, under which counsel is awarded a percentage of the fund that they created, is the preferred means to determine a fee because it "'directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation.'" *Wal-Mart Stores, Inc. v. Visa U.S.A.*, 396 F.3d 96, 122 (2d Cir. 2005)[7]; *see also Hayes v. Harmony Gold Mining Co.*, 509 F. App'x 21, 24 (2d Cir. 2013) ("[A]s the district court recognized, the prospect of a percentage fee award from a common settlement fund, as here, aligns the interests of class counsel with those of the class."). The percentage approach also recognizes that the quality of counsel's services is measured best by the results achieved and is most consistent with the system typically used in the marketplace to compensate attorneys in non-class contingency cases.[8]

---

[6]    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *accord Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (Private securities actions provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'") (quoting *J. I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964)).

[7]    Citations are omitted throughout, unless otherwise indicated.

[8]    *See, e.g., In re Payment Card Interchange Fee & Merch. Disctrict Antitrust Litig.*, 991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014) ("The percentage method better aligns the incentives of plaintiffs' counsel with those of the class members because it bases the attorneys' fees on the results they achieve for their clients, rather than on the number of motions they file, documents they review, or hours they work. The percentage method also accords with the overwhelming prevalence of

The Supreme Court has indicated that attorneys' fees in common-fund cases generally should be based on a percentage of the fund. *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("under the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class").

The Second Circuit has expressly approved the percentage method, recognizing that "the lodestar method proved vexing" and had resulted in "an inevitable waste of judicial resources." *Goldberger*, 209 F.3d at 48-50 (holding that either the percentage-of-the-fund method or lodestar method may be used to determine appropriate attorneys' fees); *Savoie v. Merchs. Bank*, 166 F.3d 456, 460 (2d Cir. 1999) (the "percentage-of-the-fund method has been deemed a solution to certain problems that may arise when the lodestar method is used in common fund cases"). The Second Circuit also has acknowledged that the "trend in this Circuit is toward the percentage method." *Wal-Mart*, 396 F.3d at 122; *accord Davis*, 827 F. Supp. 2d at 183-85; *Payment Card Interchange Fee*, 991 F. Supp. 2d at 440; *In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825 (NGG) (RER), 2010 WL 2653354, at *2 (E.D.N.Y. June 24, 2010). All federal Courts of Appeal to consider the matter have approved of the percentage method, with two circuits ***requiring*** its use in common-fund cases.[9]

---

contingency fees in the market for plaintiffs' counsel . . . ."); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 184 (W.D.N.Y. 2011) (the "advantages of the percentage method . . . are that it provides an incentive to attorneys to resolve the case efficiently and to create the largest common fund out of which payments to the class can be made, and that it is consistent with the system typically used by individual clients to compensate their attorneys").

[9]    *See In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305-07 (1st Cir. 1995); *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 164 (3d Cir. 2006); *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642-43 (5th Cir. 2012); *Rawlings v. Prudential-Bache Props.*, 9 F.3d 513, 515-17 (6th Cir. 1993); *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975 (7th Cir. 1991); *Petrovic v. AMOCO Oil Co.*, 200 F.3d 1140, 1157 (8th Cir. 1999); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *Gottlieb v. Barry*, 43 F.3d 474, 483 (10th Cir. 1994); *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1269-71 (D.C. Cir. 1993). The Eleventh and District

- 6 -

The Private Securities Litigation Reform Act of 1995 ("PSLRA") also supports use of the percentage-of-the-fund method, as it provides that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a ***reasonable percentage*** of the amount" recovered for the class.  15 U.S.C. §77z-1(a)(6) (emphasis added).  Several courts have concluded that Congress, in using this language, expressed a preference for the percentage method when determining attorneys' fees in securities class actions.  *See, e.g.*, *Telik*, 576 F. Supp. 2d at 586; *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002).

### C.   The Requested Attorneys' Fees Are Reasonable Under the Percentage-of-the-Fund Method

The Supreme Court has recognized that an appropriate court-awarded fee is intended to approximate what counsel would receive if they were bargaining for the services in the marketplace. *See Missouri v. Jenkins*, 491 U.S. 274, 285-86 (1989).  If this were a non- representative action, the customary fee arrangement would be contingent, on a percentage basis, and in the range of 30% to 33% of the recovery.  *See Blum*, 465 U.S. at 904 ("In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers.  In those cases, therefore, the fee is directly proportional to the recovery.") (Brennan, J., concurring).

The requested 23.5% is well within the range of percentage fees awarded within the Second Circuit in other comparable securities and antitrust cases:

| Case/Fee Order | Percentage of the Fund | Settlement Amount |
|---|---|---|
| *In re Converse Tech., Inc. Sec. Litig.*, No. 06-CV-1825 (NGG) (RER), 2010 WL 2653354, at *6 (E.D.N.Y. June 24, 2010) | 25% | $225 million |

of Columbia Circuits have required the use of the percentage method in common fund cases.  *See Camden*, 946 F.2d at 774; *Swedish Hosp.*, 1 F.3d at 1271.

| Case/Fee Order | Percentage of the Fund | Settlement Amount |
|---|---|---|
| *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) | 33-1/3 % | $586 million |
| *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529 LMM, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006), *aff'd*, 272 F. App'x 9 (2d Cir. 2008) | 21.4% | $455 million |
| *Ohio Pub. Emps. Ret. Sys. v. Freddie Mac*, No. 03-CV- 4261 (JES), 2006 U.S. Dist. LEXIS 98380, at *4 (S.D.N.Y. Oct. 27, 2006) | 20% | $410 million |
| *In re Deutsche Telekom AG Sec. Litig.*, No. 00-CV-9475 (NRB), 2005 U.S. Dist. LEXIS 45798, at *12-*13 (S.D.N.Y. June 14, 2005) | 28% | $120 million |
| *In re Oxford Health Plans, Inc. Sec. Litig.*, MDL No. 1222 (CLB), 2003 U.S. Dist. LEXIS 26795, at *13 (S.D.N.Y. June 12, 2003) | 28% | $300 million |
| *In re Buspirone Antitrust Litig.*, MDL No. 1413 (JGK), 2003 U.S. Dist. LEXIS 26538, at *11 (S.D.N.Y. Apr. 17, 2003) | 33-1/3% | $220 million |
| *Kurzweil v. Philip Morris Cos., Inc.*, No. 94 Civ. 2373 (MBM), 1999 WL 1076105, at *1 (S.D.N.Y. Nov. 30, 1999) | 30% | $123.8 million |

The requested percentage is also consistent with this Court's rulings in similar securities class actions, including *In re Philip Servs. Corp. Sec. Litig.*, No. 98 Civ. 835 (AKH), 2007 WL 959299 (S.D.N.Y. Mar. 28, 2007), in which a 26% fee was awarded on a $79,750,000 class recovery. *Id.* at *3.

A review of fee awards in other securities cases and other complex class actions from other jurisdictions further confirms the reasonableness of the requested 23.5% award. *See, e.g.*, *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 332-33 (3d Cir. 2011) (en banc) (affirming award of 25% of a $295 million settlement fund in an antitrust case); *In re Checking Account*, 830 F. Supp. 2d 1330, 1359-60 (S.D. Fla. 2011) (awarding 30% of $410 million settlement fund, net of expenses); *In re Williams Sec. Litig.*, No. 02-CV-72-SPF (FHM), slip op. at 2 (N.D. Okla. Feb. 12, 2007) (awarding 25% of $311 million settlement fund, net of expenses); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp.

2d 587, 590-91 (E.D. Pa. 2005) and *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 736 (E.D. Pa. 2001) (awarding 25% of $319.6 million in combined settlement funds); *In re Vitamins Antitrust Litig.*, No. 99-197 (TFH), 2001 WL 34312839, at *9-*10 (D.D.C. July 16, 2001) (awarding 33.7% of $365 million common fund); *see also, e.g.*, *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 WL 1221350, at *5, *19 (E.D. Pa. June 2, 2004) (awarding 30% of $202.5 million settlement fund); *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 130-35 (D.N.J. 2002) (awarding 28% of $194 million settlement fund).

**D.    A Review of the *Goldberger* Factors Confirms that the Requested 23.5% Fee Is Fair and Reasonable**

The Second Circuit recently reiterated that the appropriate criteria to consider when reviewing a request for attorneys' fees in a common-fund case include the "*Goldberger*" factors:

> "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . .; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."

*Goldberger*, 209 F.3d at 50.

Consideration of these factors demonstrates that the fee requested by Lead Counsel is reasonable.

**1.    The Time and Labor Expended by Plaintiffs' Counsel Support the Requested Fee**

Over the past five years, Lead Counsel dedicated an enormous amount of time and money to successfully litigate this case.   Lead Counsel's efforts included the extensive and thorough investigation necessary to prepare four class action complaints or amended complaints.   Lead Counsel Decl., ¶21.   The investigations included, among other things, analyzing pleadings in nine *qui tam* actions which led to the $2.3 billion agreement in principle with the DOJ.   *Id.*   Lead Counsel also thoroughly reviewed all Pfizer and Wyeth related news, financial and pharmaceutical industry

- 9 -

media regarding the $2.3 billion fine and Pfizer's announcement of the Wyeth merger.  As part of

this investigation, Lead Counsel scoured every news story and analyst report for information about

the market's reaction to the $2.3 billion fine and the merger.  Lead Counsel's investigation also

included a thorough review of Pfizer's prior off-label marketing offenses, including the 2004

Neurontin settlement in which Pfizer admitted to promoting Neurontin off-label and paid a

$430 million fine.  Lead Counsel also opposed two motions to dismiss, which required extensive

briefing and supplemental submissions.  *Id.*, ¶¶21-31.

Lead Counsel next devoted considerable resources to developing a compelling evidentiary

record to prove Plaintiffs' claims.  This included serving Defendants with comprehensive discovery

requests.  Lead Counsel also subpoenaed 64 third parties with relevant documents and information,

including the Company's former employees, auditors, outside counsel and securities analysts.  *Id.*,

¶¶52-54.  Lead Counsel also directed Freedom of Information Act requests to four governmental

agencies.  *Id.*, ¶¶3, 52-53.  In addition, in order to obtain key documents and deposition testimony

over Defendants' and third parties' many objections, Lead Counsel met and conferred on many

occasions with Defendants' counsel and the various third parties.  *Id.*, ¶¶39-51, 56-61.  As a result,

Lead Counsel was forced to file numerous discovery-related motions against Defendants and certain

third parties concerning, for example, the following issues: (i) the production of documents Pfizer

provided to the DOJ; (ii) Defendants' redactions of responsive documents; (iii) Defendants'

objections based on reliance on counsel and reliance on auditor defenses; (iv) Defendants' privilege

objections; and (v) Defendants' objections to the number of witnesses Plaintiffs sought to depose.

*Id.*, ¶¶40, 56.

Lead Counsel's tireless efforts resulted in the massive production of documents and

testimony.  In total, Lead Counsel obtained over 23 million pages of documents from Defendants

and third parties.  *Id.*, ¶50, 52.  Plaintiffs' Counsel carefully reviewed and analyzed these documents for use in depositions and at trial, including developing a sophisticated system to categorize the documents by issue, custodian, and relevance; identifying the key witnesses; preparing witness files for prospective deponents; and identifying the "hot" documents that supported Plaintiffs' claims. This effort was massive and ongoing throughout the litigation.  In addition to thousands of hours of attorney review, Lead Counsel used forensic accountants to review documents relating to the accounting and internal controls claims and retained consultants to assist the attorneys in analyzing documents that related to medical, scientific, regulatory and marketing issues.  *Id.*, ¶¶67, 70, 72, 84, 92-94.  Lead Counsel used these documents to depose 33 current and former Pfizer employees and six third-party fact witnesses, who were located throughout the United States.  *Id.*, ¶¶62, 64.

Lead Counsel also worked with Plaintiffs in responding to discovery propounded by Defendants, coordinating the collection and production of responsive documents, and prepared for the five depositions taken of Plaintiffs or their advisors by Defendants.  *Id.*, ¶¶3(vii), 63.

In addition, in January 2012, Lead Counsel moved for class certification.  *Id.*, ¶32.  In support, Plaintiffs submitted extensive briefing, deposition testimony, documentary evidence, and the expert declaration of Professor Steven P. Feinstein.[10]  Dr. Feinstein concluded that Pfizer common stock traded in an efficient market during the Class Period (*id.*, ¶¶33, 68), thus supporting the presumption of reliance and hence, predominance.  Following the completion of briefing and oral argument, the Court granted Plaintiffs' motion on March 29, 2012.

Lead Counsel also engaged in extensive expert discovery.  *Id.*, ¶¶86-87.  Although Lead Counsel consulted with many experts throughout the Litigation, they ultimately retained, designated,

---

[10]   Dr. Feinstein, an Associate Professor of Finance at Babson College, has published extensively regarding corporate valuation, derivatives and investments.  *Id.*, ¶68.

and prepared detailed expert reports for ten experts: Dr. Feinstein (loss causation and damages expert), D. Paul Regan (accounting expert), Meredith B. Rosenthal, Ph.D. (economic expert), Christopher F. Baum, Ph.D. (econometric expert), Jerry L. Avorn, M.D. (pharmaco epidemiology and pharmaco economic expert), Nicholas P. Jewell, Ph.D. (biostatistics and statistics expert), Kevin L. O'Brien (healthcare compliance expert), Robert A. Rosenheck, M.D. (psychiatrist with Geodon expertise), Sara Sun Beale (law professor with expertise in corporate criminal liability), and Edward J. Buthusiem (pharmaceutical industry disclosure process expert). *Id.*, ¶¶69, 71, 73-75, 77, 79, 81-83.

After exchanging expert reports, subpoenaing Defendants' experts and responding to Defendants' subpoenas of Plaintiffs' experts, the parties engaged in expert witness depositions. In all, Lead Counsel took or defended a total of 16 expert witness depositions throughout the United States. *Id.*, ¶¶86-87.

Following the completion of expert discovery, on October 30, 2014, Defendants filed seven separate summary judgment motions which included memoranda of law totaling 242 pages and nearly 300 exhibits. *Id.*, ¶102. Defendants also filed a motion *in limine* to exclude Plaintiffs' expert Professor Feinstein. *Id.* Plaintiffs filed a motion for partial summary judgment on Defendants' reliance-on-counsel and good faith defenses. *Id.*, ¶104. By mid-December 2014, the parties' summary judgment motions were fully briefed. *Id.*

In addition, Lead Counsel spent considerable time and resources preparing for trial. This included filing and responding to 23 motions *in limine* and *Daubert* motions, sorting trial exhibits, finalizing witness lists, and consulting with experts. *Id.*, ¶¶105-117. Lead Counsel also prepared proposed jury instructions, a statement of claims and defenses, deposition designations, stipulated facts and law, and a joint pretrial order. *Id.*, ¶110, 112-113, 115, 117. Lead Counsel's trial

- 12 -

preparation also included the extensive review of documents and testimony associated with potential trial witnesses.  *Id.*, ¶¶111-113.  Lead Counsel also drafted proposed jury instructions, negotiated with defense counsel regarding the preliminary jury instructions and the proposed jury background questionnaire, and was in the process of researching and drafting the joint statement of the case to be read to the jury and *voir dire* questions, when the case settled.  All of this was in addition to numerous in-depth internal meetings to discuss trial strategy.  *Id.*, ¶116.

In sum, Lead Counsel devoted an enormous amount of time and resources to prosecuting this Litigation, all the way up to trial.  Indeed, the case settled just days from trial.  *See id.*, ¶135.

In total, as set forth in their respective declarations, Plaintiffs' Counsel expended 146,733.27 hours prosecuting this Litigation.  *See* Declaration of Henry Rosen, Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Geller Decl."), Ex. A; Declaration of William H. Narwold, Filed on Behalf Motley Rice LLC in Support of Application for Award of Attorneys' Fees and Expenses ("Motley Rice Decl."), Ex. A; Declaration of Mitchell M.Z. Twersky, Filed on Behalf of Abraham, Fruchter & Twersky, LLP, in Support of Application for Award of Attorneys' Fees and Expenses ("Abraham Decl."), Ex. A; Declaration of Jamie McKey, Filed on Behalf of Kendall Law Group in Support of Application for Award of Attorneys' Fees and Expenses ("Kendall Decl."), Ex. A; Declaration of Leigh Lasky, Filed on Behalf of Lasky & Rifkind, Ltd. in Support of Application for Award of Attorneys' Fees and Expenses ("Lasky Decl."), ¶4, filed herewith.  The significant amount of time and effort devoted to this case by Plaintiffs' Counsel confirms that the fee requested here is reasonable.

**2.    The Magnitude and Complexity of the Litigation Support the Requested Fee**

Courts have long recognized that securities class actions are """notably difficult and notoriously uncertain.""" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM)

- 13 -

(PED), 2010 WL 4537550, at *15 (S.D.N.Y. Nov. 8, 2010) (quoting *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999)). This Litigation was no exception. It raised many novel and complex issues, including, for example, the specialized areas of the off-label marketing and sales of pharmaceutical products, Pfizer's disclosure obligations regarding the DOJ's Off-Label Promotion Investigation, relevant accounting standards, and market efficiency.

In addition, Defendants raised compelling arguments in connection with the elements of falsity, materiality, scienter, loss causation and damages. Defendants consistently and forcefully argued that their statements were accurate and truthful and that even if false, they were not material or made with the requisite scienter. Lead Counsel Decl., ¶¶119, 124. With respect to loss causation and cognizable damages, at every stage of the Litigation, Defendants challenged the impact their statements and omissions had on Pfizer's common stock price. Defendants also raised reliance-on-counsel and reliance-on-auditor defenses in response to Plaintiffs' claims. These and other issues required substantial efforts by Lead Counsel, often through analysis of the factual record and consultation with experts.

Accordingly, the magnitude and complexity of this Litigation support the conclusion that the requested fee is fair and reasonable.

### 3. The Risks of the Litigation Support the Requested Fee

The risk undertaken in the litigation is often considered the most important *Goldberger* factor. *Goldberger*, 209 F.3d at 54; *Comverse*, 2010 WL 2653354, at *5; *Telik*, 576 F. Supp. 2d at 592. The Second Circuit has recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award:

> "No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated

- 14 -

cases producing large recoveries, is it just to make a fee depend solely on the
reasonable amount of time expended."

*Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974), *abrogated on other grounds by*
*Goldberger*, 209 F.3d 43.  When considering the reasonableness of attorneys' fees in a contingency
action, the Court should consider the risks of the litigation at the time the suit was brought.  *See*
*Goldberger*, 209 F.3d at 55; *Parker v. Time Warner Entm't Co., L.P.*, 631 F. Supp. 2d 242, 276
(E.D.N.Y. 2009) (the court should consider "'the contingent nature of the expected compensation'"
and the "'risk of non-payment viewed as of the time of the filing of the suit'").

The "risk of non-payment viewed as of the time of the filing of the suit" was extreme in this
case.  The commencement of this Litigation was the exception to the rule that shortly after the stock
price dropped the inevitable lawsuits followed.  It bears emphasis that until Class Representative
Jones stepped forward with Lead Counsel to file the initial complaint on May 11, 2010, almost 16
months after January 26, 2009, no other plaintiff and no other law firm filed this case.  The reason
for the delay in commencing the action comes down to a single issue: loss causation.  In a carefully
orchestrated fashion, Pfizer chose to announce the Wyeth merger and disappointing 2009 earnings
guidance on the same day the Company announced the $2.3 billion fine, the then largest in U.S.
history.  On January 26, 2009 – the day of the twin announcements – *The AmLaw Daily* published an
article detailing the timing of this maneuver stating:

> Dennis Block, an M&A partner at Cadwalader, Wickersham & Taft, first got
> the call in June: his longtime client, Pfizer, was interested in buying rival Wyeth in
> what would likely be the largest deal in the history of the pharmaceutical industry.
> ***The deal sputtered off and on for more than six months until Thursday [1/22/09],***
> ***when Block says Pfizer indicated it was ready to get the deal done – and fast***.

> Block left his office for only a couple of hours a night over the next four days
> as he and Wyeth's attorneys at Simpson Thacher & Bartlett ***rushed to complete the***
> ***$68 billion takeover before the markets opened today***.

- 15 -

Dkt No. 71, ¶139.  The timing of the twin announcements was further complicated by Pfizer's decision to accelerate its 2008 earnings announcement by moving it up two days and simultaneously issuing earnings guidance for 2009 below market expectations.

In total, the twin merger/fine announcement combined with the disappointing 2009 earnings guidance created at best, an extreme loss causation challenge and indicated at worst, a deliberate attempt by Defendants to insulate their alleged fraud.  Defendants' timing maneuver almost worked as no cases were filed for almost 16 months, until Lead Counsel, with the Kendall Law Group, on behalf of Plaintiff Jones filed a complaint.  As noted, throughout the Litigation and especially as the parties prepared for trial, loss causation was the keystone defense asserted by Defendants.  If the jury accepted Defendants' arguments that the other events they chose to announce on January 26, 2009 – and not the revelation of the $2.3 billion fine – caused Pfizer stock price to decline that day, Plaintiffs would have been able to establish neither loss causation nor damages at trial.

In the face of these uncertainties, Lead Counsel undertook this case on a wholly contingent basis, knowing that the Litigation could last for years and would require them to devote substantial attorney time and significant expenses with no guarantee of compensation.  Lead Counsel Decl., ¶11.  Although the case was brought to a successful conclusion, this was far from guaranteed at the outset – or indeed, through much of the Litigation.  "There are numerous class actions in which counsel expended thousands of hours and yet received no remuneration whatsoever despite their diligence and expertise." *Veeco*, 2007 WL 4115808, at *6.  Plaintiffs' Counsel's assumption of this contingency-fee risk strongly supports the reasonableness of the requested fee.  *See Flag Telecom*, 2010 WL 4537550, at *27 ("the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award"); *In re Marsh ERISA Litig.*, 265 F.R.D.

- 16 -

128, 148 (S.D.N.Y. 2010) ("There was significant risk of non-payment in this case, and Plaintiffs' Counsel should be rewarded for having borne and successfully overcome that risk.").

And, in addition to Defendants' attempt to thwart a finding of loss causation, this case presented other substantial risks and uncertainties from the outset, which made it far from certain that any recovery, let alone a substantial recovery of $400 million in cash, would ultimately be obtained for the Class. As discussed in the Lead Counsel Declaration (¶¶118-131) and in Plaintiffs' Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement and Plan of Allocation (at 10-15), there were also substantial risks here with respect to the ability to prove at trial that Defendants had made material misstatements or omissions with scienter which caused Plaintiffs' losses.

Indeed, Plaintiffs had the burden of proving that Defendants made false and misleading statements about Pfizer's off-label promotion of Geodon, Zyvox and Lyrica and the DOJ's Off-Label Promotion Investigation and Pfizer's history of compliance with applicable statues and rules. In addition, Plaintiffs had to prove that Defendants violated Generally Accepted Accounting Principles ("GAAP") in failing to reserve for the fine associated with the DOJ's Off-Label Promotion Investigation. Defendants argued, among other things, that they had no duty to disclose any off-label marketing activities or the DOJ's Off-Label Promotion Investigation, that the accounting and disclosure rules applicable to the contingent losses associated with the DOJ's Off-Label Promotion Investigation were subject to multiple interpretations and that they had no duty to disclose that Pfizer was not in compliance with the law. Lead Counsel Decl., ¶119. As a result, Defendants contended that Pfizer's disclosure of, and accounting for, the DOJ's Off-Label Promotion Investigation was correct and did not violate GAAP and that Defendants' other challenged statements were not actionable. *Id.*, ¶¶119-123. Plaintiffs faced the risk that the jury would side with Defendants on these

- 17 -

issues, including whether Pfizer was required to reserve for any DOJ fines and whether any required reserve was material in any event.

Establishing scienter is always challenging, but here it was particularly so as Defendants contended that scienter was lacking based on their reliance on Pfizer's counsel and outside auditors. For instance, with respect to statements concerning the DOJ's Off-Label Promotion Investigation, Defendants purported to rely on Pfizer's disclosure process which included inside and outside government investigation counsel.  Similarly, in defense of Plaintiffs' claim that Pfizer was required to reserve for the DOJ fine, Defendants contended that scienter was lacking due to their reliance on the advice of Pfizer's counsel and outside auditor.

Lead Counsel firmly believe that Plaintiffs' claims were meritorious and that Pfizer committed securities fraud.  However, the Company was very sophisticated and, at every stage, took great pains to position itself as relying on lawyers and auditors.  And, ultimately, in Lead Counsel's view, the Company went to extreme lengths to game the loss causation issue.  Against this backdrop, the risk was enormous and the willingness of Lead Counsel to assume that risk with a massive commitment of time and money demonstrates that this *Goldberger* factor weighs heavily in favor of the requested fee.

### 4.    The Quality of Lead Counsel's Representation Supports the Requested Fee

The quality of the representation is another important factor that supports the reasonableness of the requested fee.  The quality of the representation here is best evidenced by the quality of the result achieved. *See Goldberger*, 209 F.3d at 55; *Veeco*, 2007 WL 4115808, at *7; *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 467 (S.D.N.Y. 2004).  As a result of its massive discovery efforts (*see* Lead Counsel Decl., ¶¶36-65), Lead Counsel developed a strong factual record over the course of almost five years of litigation.  That record was critical to its efforts in obtaining

- 18 -

class certification, opposing summary judgment and preparing for trial.  The quality of Lead Counsel's efforts in the Litigation to date, together with their substantial trial and securities class action experience, their ability to marshal the necessary resources, and their commitment to the Litigation, enabled Lead Counsel to negotiate the significant and meaningful $400 million Settlement.

The skill and substantial experience of counsel in the specialized field of shareholder securities litigation also support the reasonableness of the requested fee.  *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01-CV-11814 (MP), 2004 WL 1087261, at *6 (S.D.N.Y. May 14, 2004).  Lead Counsel specialize in complex securities litigation and are highly experienced in such litigation, with a successful track record in securities cases throughout the country.  *See* Lead Counsel's firm resume, attached to the Robbins Geller Decl. as Ex. G.

Finally, courts repeatedly recognize that the quality of the opposition faced by plaintiffs' counsel should also be taken into consideration in assessing the quality of counsel's performance.  *See, e.g.*, *Marsh*, 265 F.R.D. at 148 ("The high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement."); *Veeco*, 2007 WL 4115808, at *7 (among the factors supporting a 30% award of attorneys' fees was that defendants were represented by "one of the country's largest law firms"); *Adelphia*, 2006 WL 3378705, at *3 ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work.").  Here, Defendants are represented by an array of the highest quality defense firms: Cadwalader, Wickersham & Taft LLP; Cahill Gordon & Reindel LLP; Williams & Connolly LLP; O'Melveny & Meyers LLP; Davis Polk & Wardwell LLP; Quinn Emanuel Urquhart & Sullivan LLP; Goodwin Procter LLP; and Skadden, Arps, Slate, Meagher & Flom LLP.  These are

- 19 -

highly respected law firms whose individual attorneys presented a very skilled defense and spared no

effort in representing their clients.  *See generally* Lead Counsel Decl., ¶¶22-35, 40-51, 102-109, 118-

131.  Notwithstanding this formidable opposition, Lead Counsel's ability to present a strong case and

to demonstrate their willingness to continue to vigorously prosecute the Litigation through trial and the

inevitable appeals enabled Lead Counsel to achieve a very favorable Settlement for the benefit of the

Class.

> **5.      Second Circuit Precedent Supports the 23.5% Fee as a
>             Reasonable Percentage of the Total Recovery**

Courts have interpreted the next factor – the requested fee in relation to the settlement – as

requiring the review of the fee requested in terms of the percentage it represents of the total

recovery.  "When determining whether a fee request is reasonable in relation to a settlement amount,

'the court compares the fee application to fees awarded in similar securities class-action settlements

of comparable value.'"  *Comverse*, 2010 WL 2653354, at *3.  As discussed above, the requested

23.5% fee is well within the range of percentage fees that courts in the Second Circuit and around

the country have awarded in comparable complex cases.  *Supra* at 7-9.  Accordingly, the 23.5% fee

requested is reasonable in relation to the size of the Settlement.

> **6.      Public Policy Considerations Further Support the Requested
>             Fee**

Public policy strongly favors rewarding firms for bringing successful securities actions like

this one.  *See Flag Telecom*, 2010 WL 4537550, at *29 (if the "important public policy [of enforcing

the securities laws] is to be carried out, the courts should award fees which will adequately

compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they

undertook"); *Maley*, 186 F. Supp. 2d at 373 ("In considering an award of attorney's fees, the public

policy of vigorously enforcing the federal securities laws must be considered."); *Hicks*, 2005 WL

2757792, at *9 ("'To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding.'"). Accordingly, public policy favors granting Lead Counsel's fee and expense application here.

### 7. Lead Plaintiff Philips' and Class Representative Jones' Approval and the Class's Reaction Support the Requested Fee

Lead Plaintiff Philips and Class Representative Jones were actively involved in the prosecution and settlement of this Litigation and have approved the requested fee. *See* Kemme Decl., ¶¶5, 6; Jones Decl., ¶¶4, 6.

Moreover, Lead Plaintiff Philips is precisely the type of sophisticated and financially interested investor that Congress envisioned serving as a fiduciary for the class when it enacted the PSLRA. The PSLRA was intended to encourage institutional investors to assume control of securities class actions in order to "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." H.R. Conf. Rep. No. 104-369, at 32 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 731. Congress believed that these institutions would be in the best position to monitor the prosecution and to assess the reasonableness of counsel's fee requests. In this Litigation, representatives of Lead Plaintiff Philips played an active role in the litigation and closely supervised the work of Lead Counsel. *See* Kemme Decl., ¶¶4-5. Accordingly, Lead Plaintiff's endorsement of the fee request supports its approval as fair and reasonable. *See, e.g.*, *Veeco*, 2007 WL 4115808, at *8 ("public policy considerations support the award in this case because the Lead Plaintiff . . . – a large public pension fund – conscientiously supervised the work of lead counsel and has approved the fee request"); *In re Lucent Techs., Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 442 (D.N.J. 2004) ("[s]ignificantly, the Lead Plaintiffs, both of whom are institutional investors with great financial stakes in the outcome of the litigation,

- 21 -

1017695_2

have reviewed and approved Lead Counsel's fees and expenses request") (approving fee of 17% of $517 million recovery).

The reaction of the Class also supports the requested fee. As of April 7, 2015, the Claims Administrator has sent the Notice to over 2.7 million potential Class Members and their nominees (Sylvester Decl., ¶3), informing them that, among other things, Lead Counsel intended to apply to the Court for an award of attorneys' fees in an amount not to exceed 23.5% of the Settlement Amount. Sylvester Decl., Ex. A at 2 (Part IV). While the time to object to the fee-and-expense application does not expire until May 21, 2015, to date, not a single objection has been received. Should any objections be received, Lead Counsel will address them in their reply papers.

### E.  A Lodestar Cross-Check Strongly Confirms the Reasonableness of the Fee Request

To ensure the reasonableness of a fee awarded under the percentage-of-the-fund method, the Second Circuit encourages district courts to cross-check the proposed award against counsel's lodestar. *See Goldberger*, 209 F.3d at 50; *Payment Card Interchange Fee*, 991 F. Supp. 2d at 447-48. In cases like this, fees representing multiples of the lodestar are regularly awarded to reflect the contingency-fee risk and other relevant factors. *See, e.g.*, *Flag Telecom*, 2010 WL 4537550, at *26 ("'Under the lodestar method, a positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors.'"); *Comverse*, 2010 WL 2653354, at *5 ("Where . . . counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar."); *In re Cardinal Health Inc. Sec. Litigs.*, 528 F. Supp. 2d 752, 761 (S.D. Ohio 2007) ("the Court rewards . . . lead counsel that takes on more risk, demonstrates superior quality, or achieves a greater settlement with a larger lodestar multiplier").

- 22 -

Accordingly, in complex contingent litigation, lodestar multipliers between 2 and 5 are commonly awarded. *See Wal-Mart*, 396 F.3d at 123 (upholding multiplier of 3.5 as reasonable on appeal); *Payment Card Interchange Fee*, 991 F. Supp. 2d at 447-48 (awarding fee representing a multiplier of 3.41, which was "comparable to multipliers in other large, complex cases"); *Davis*, 827 F. Supp. 2d at 185 (awarding fee representing a multiplier of 5.3, which was "not atypical" in similar cases); *Cornwell v. Credit Suisse Grp.*, No. 08-cv-03758 (VM), slip op. at 4 (S.D.N.Y. July 18, 2011) (awarding fee representing a multiplier of 4.7); *Comverse*, 2010 WL 2653354, at *5 (awarding fee representing a 2.78 multiplier); *Telik*, 576 F. Supp. 2d at 590 ("In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court."); *Bisys*, 2007 WL 2049726, at *3 (awarding 30% fee representing a 2.99 multiplier and finding that the multiplier "falls well within the parameters set in this district and elsewhere"); *AremisSoft*, 210 F.R.D. at 135 (a 4.3 multiplier was appropriate in light of the contingency risk and the quality of the result achieved); *Maley*, 186 F. Supp. 2d at 369 (awarding fee equal to a 4.65 multiplier, which was "well within the range awarded by courts in this Circuit and courts throughout the country").

Here, a lodestar cross-check fully supports the requested percentage fee. In this entirely contingent action that raised myriad complex legal and factual issues and was litigated for almost five years up to the brink of trial, Lead Counsel and additional Plaintiffs' Counsel collectively devoted over 146,000 hours of attorney and other professional support time in the prosecution and investigation of the Litigation. Plaintiffs' Counsel's total lodestar, derived by multiplying the hours spent by each attorney and paraprofessional by their current hourly rates, is $59,314,844.40.[11] The

---

[11]    *See* Robbins Geller Decl., Ex. A; Motley Rice Decl., Ex. A; Abraham Decl., Ex. A; Kendall Decl., Ex. A; Lasky Decl., ¶4, filed herewith. Both the Supreme Court and courts in this Circuit have long approved the use of current hourly rates to calculate the base lodestar figure as a means of compensating for the delay in receiving payment that is inherent in class actions, inflationary losses, and the loss of access to legal and monetary capital that could otherwise have been employed had

requested fee of 23.5% of the Settlement Amount represents a multiplier of 1.58 on Plaintiffs' Counsel's lodestar amount.  Thus, the 23.5% fee requested is well within the range awarded in cases of this type.

In sum, Lead Counsel's requested 23.5% fee award is well within the range of what courts in this Circuit and throughout the country commonly award in complex class actions such as this one, including in other securities class actions, when calculated as a percentage of the fund, and pursuant to a lodestar cross-check.

## III.   PLAINTIFFS' COUNSEL'S EXPENSES ARE REASONABLE AND SHOULD BE APPROVED FOR RECOVERY

Lead Counsel's application includes a request for charges and expenses that were reasonably incurred in furtherance of the claims on behalf of the Class.  Both Lead Counsel's out-of-pocket expenses and certain in-house charges are properly recovered by counsel.  *See, e.g.*, *In re China Sunergy Sec. Litig.*, No. 07 Civ. 7895 (DAB), 2011 WL 1899715, at *6 (S.D.N.Y. May 13, 2011) (in a class action, attorneys should be compensated "'for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were "incidental and necessary to the representation"'"); *Flag Telecom*, 2010 WL 4537550, at *30 ("It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class.").

As set forth in detail in Plaintiff's Counsel's fee and expense declarations[12], Lead Counsel requests $7,685,497.62 in expenses for prosecuting this Litigation for the benefit of the Class.  The expenses are the type that are necessarily incurred in litigation and routinely charged to clients billed

---

class counsel been paid on a current basis during the pendency of the litigation.  *See In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F. Supp. 160, 163 (S.D.N.Y. 1989); *Veeco*, 2007 WL 4115808, at *9; *Missouri*, 491 U.S. at 284.

[12]   *See* Robbins Geller Decl., Ex. B; Motley Rice Decl., Ex. B; Abraham Decl., Ex. B; Kendall Decl., Ex. B; Lasky Decl., ¶¶5-6, filed herewith.

- 24 -

by the hour. These expenses and other charges include expert fees, document-management/litigation support, computerized research, mediation costs, travel expenses, photocopying, long distance telephone and facsimile charges, postage, delivery expenses, and filing fees. *See* Robbins Geller Decl., Ex. B; Motley Rice Decl., Ex. B; Kendall Decl., Ex. B; Lasky Decl., ¶¶5-6.[13]

The Notice informed Class Members that Lead Counsel would apply for expenses in an amount not to exceed $8,260,000 from the Settlement Fund.  Sylvester Decl., Ex. A at 2 (Part IV). The expenses actually requested, $7,685,497.62, are well below that amount.  To date, no one has objected to Lead Counsel's request for expenses.

## IV. LEAD PLAINTIFF PHILIPS AND CLASS REPRESENTATIVE JONES SHOULD BE AWARDED THEIR REASONABLE TIME AND EXPENSES UNDER 15 U.S.C. §78u-4(a)(4)

Lead Counsel also seek approval for an award of $13,213 and $300 to compensate Lead Plaintiff Philips and Class Representative Jones, respectively, for the time they spent directly relating to their representation of the Class.  The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class."  15 U.S.C. §78u-4(a)(4).  Numerous courts have approved such awards under the PSLRA to compensate class representatives for the time and effort they spent on behalf of the class.  *See Veeco*, 2007 WL 4115808, at *12 (award to Steelworkers based on "over eighty hours valued at a total of $15,964.20"); *see also Hicks*, 2005 WL 2757792, at *10 ("Courts in this Circuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages,

---

[13]   Because a large component of these expenses was devoted to Plaintiffs' experts and consultants, the Lead Counsel Declaration explains how each expert and consultant contributed to Lead Counsel's prosecution of the Litigation.  Lead Counsel Decl., ¶¶66-85.

as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place.").

As set forth in the Kemme and Jones Declarations (filed herewith), Lead Plaintiff Philips and Class Representative Jones took an active role in the prosecution of the Litigation, including communicating with Lead Counsel regarding issues and developments in the Litigation, reviewing pleadings, motions and other documents filed in the case, supervising the production of discovery, providing deposition testimony, and consulting with Lead Counsel concerning the settlement negotiations.  Kemme Decl., ¶5; Jones Decl., ¶¶4, 5.  Pursuant to the PSLRA, Lead Plaintiff Philips and Class Representative Jones request $13,213 and $300, respectively, based on the value of their hours expended participating in and managing this litigation on behalf of the Class.  Kemme Decl., ¶7 (181 hours); Jones Decl., ¶7 (20 hours).  These are precisely the types of activities that courts have found to support awards to class representatives.  *See, e.g.*, *In re Am. Int'l Grp., Inc. Sec. Litig.*, No. 04 Civ. 8141 (DAB), 2010 WL 5060697, at *3 (S.D.N.Y. Dec. 2, 2010) (granting PSLRA award of $30,000 to institutional lead plaintiffs "to compensate them for the time and effort they devoted on behalf of a class"); *Flag Telecom*, 2010 WL 4537550, at *31 (approving award of $100,000 to Lead Plaintiff for time spent on the litigation); *Veeco*, 2007 WL 4115808, at *12 (characterizing such awards as "'routine[]'" in this Circuit); *see also In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (awarding $100,000 collectively to lead plaintiffs who "fully discharged their PSLRA obligations and have been actively involved throughout the litigation [including] communicat[ing] with counsel [and] review[ing] counsels' submissions").

The Notice sufficiently informed potential Class Members that such expenses would be sought.  Sylvester Decl., Ex. A at 1 (Part IV).  The modest requests by Lead Plaintiff Philips and Class Representative Jones are supported by declarations, including a description of the hours

- 26 -

dedicated to the Litigation.  Lead Plaintiff Philips' and Class Representative Jones' requests are

reasonable and fully justified under the PSLRA and should be granted.

## V.    CONCLUSION

For all of these reasons, Lead Counsel respectfully requests that the Court award it attorneys'

fees of 23.5% of the Settlement Amount, $7,685,497.62 in Plaintiffs' Counsel's expenses, and

$13,213 to Lead Plaintiff Philips and $300 to Class Representative Jones for the time they spent

representing the Class.

DATED:  May 6, 2015                                Respectfully submitted,

                                                   ROBBINS GELLER RUDMAN
                                                     & DOWD LLP
                                                   MICHAEL J. DOWD
                                                   HENRY ROSEN
                                                   TRIG R. SMITH
                                                   JASON A. FORGE
                                                   RYAN A. LLORENS
                                                   IVY T. NGO


                                                            s/ HENRY ROSEN
                                                   ───────────────────────────
                                                          HENRY ROSEN

                                                   655 West Broadway, Suite 1900
                                                   San Diego, CA  92101
                                                   Telephone:  619/231-1058
                                                   619/231-7423 (fax)
                                                   miked@rgrdlaw.com
                                                   henryr@rgrdlaw.com
                                                   trigs@rgrdlaw.com
                                                   jforge@rgrdlaw.com
                                                   ryanl@rgrdlaw.com
                                                   ingo@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
WILLOW E. RADCLIFFE
DANIEL J. PFEFFERBAUM
MATTHEW S. MELAMED
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
willowr@rgrdlaw.com
dpfefferbaum@rgrdlaw.com
mmelamed@rgrdlaw.com

Lead Counsel for Plaintiffs

- 28 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 6, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 6, 2015.

s/ HENRY ROSEN
HENRY ROSEN

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:HenryR@rgrdlaw.com

# Mailing Information for a Case 1:10-cv-03864-AKH

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Scott Bailey**
  michael.bailey@skadden.com

- **Sidney Bashago**
  sidney.bashago@dpw.com,jennifer.kan@davispolk.com,ecf.ct.papers@davispolk.com

- **Sheila L. Birnbaum**
  sheilabirnbaum@quinnemanuel.com

- **George Anthony Borden**
  gborden@wc.com

- **Kevin Anthony Burke**
  kaburke@sidley.com,nyefiling@sidley.com,efilingnotice@sidley.com

- **Michael Barry Carlinsky**
  michaelcarlinsky@quinnemanuel.com,brantkuehn@quinnemanuel.com,jomairecrawford@quinnemanuel.com

- **Lauren Kristina Collogan**
  lcollogan@wc.com

- **Patrick Daniel Curran**
  patrickcurran@quinnemanuel.com,justinemanzano@quinnemanuel.com

- **Keir Nicholas Dougall**
  kdougall@dougallpc.com

- **Michael Joseph Dowd**
  miked@rgrdlaw.com,debg@rgrdlaw.com,e_file_sd@rgrdlaw.com,tome@rgrdlaw.com

- **Alexander C Drylewski**
  alexander.drylewski@skadden.com

- **Charles S. Duggan**
  charles.duggan@dpw.com,ecf.ct.papers@davispolk.com

- **Steven M.. Farina**
  sfarina@wc.com

- **Jason A. Forge**
  jforge@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_SD@rgrdlaw.com

- **Ross Bradley Galin**
  rgalin@omm.com,mochoa@omm.com,neverhart@omm.com,lisachen@omm.com

- **Gary John Hacker**
  ghacker@skadden.com

- **James R. Harper**
  coljamesrharper@me.com

- **Howard E. Heiss**
  hheiss@omm.com,#nymanagingattorney@omm.com

- **Paul T. Hourihan**
  phourihan@wc.com

- **James M. Hughes**
  jhughes@motleyrice.com,kweil@pacernotice.com,mgruetzmacher@motleyrice.com,erichards@motleyrice.com,kweil@motleyrice.com

- **Jay B. Kasner**
  jkasner@skadden.com

- **Joe Kendall**
  administrator@kendalllawgroup.com,jkendall@kendalllawgroup.com,hlindley@kendalllawgroup.com

- **Brant Duncan Kuehn**
  brantkuehn@quinnemanuel.com

- **Leigh R. Lasky**
  lasky@laskyrifkind.com

- **Hamilton Philip Lindley**
  hlindley@deanslyons.com

- **Ryan A. Llorens**
  ryanl@rgrdlaw.com,nbear@rgrdlaw.com,kirstenb@rgrdlaw.com

- **Amanda M. MacDonald**
  amacdonald@wc.com

- **Lori McGill**
  lorialvinomcgill@quinnemanuel.com

- **Matthew Melamed**
  mmelamed@rgrdlaw.com

- **Donald Alan Migliori**
  dmigliori@motleyrice.com

- **Eugene Mikolajczyk**
  genem@rgrdlaw.com

- **Seema Mittal**
  smittal@wc.com

- **Cynthia Margaret Monaco**
  cmonaco@cynthiamonacolaw.com,cmmonaco@gmail.com

- **Juliana Newcomb Murray**
  juliana.murray@davispolk.com,lisa.hirakawa@davispolk.com,ecf.ct.papers@davispolk.com

- **Scott D. Musoff**
  smusoff@skadden.com,aviva.nusbaum@skadden.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com

- **William H. Narwold**
  bnarwold@motleyrice.com,vlepine@motleyrice.com,ajanelle@motleyrice.com

- **Ivy T. Ngo**
  ingo@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Joseph G. Petrosinelli**
  jpetrosinelli@wc.com

- **Theodore J. Pintar**
  tedp@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,ptiffith@rgrdlaw.com

- **Joseph F. Rice**
  jrice@motleyrice.com

- **Darren J. Robbins**
  e_file_sd@rgrdlaw.com

- **Daniel Prugh Roeser**
  droeser@goodwinprocter.com

- **Henry Rosen**
  henryr@rgrdlaw.com,dianah@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James P. Rouhandeh**
  james.rouhandeh@dpw.com,ecf.ct.papers@davispolk.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Stuart Michael Sarnoff**
  ssarnoff@omm.com

- **William E. Schurmann**
  wschurmann@wc.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,e_file_sd@rgrdlaw.com,nhorstman@rgrdlaw.com

- **Jennifer Lynn Spaziano**
  jen.spaziano@skadden.com

- **Meghan K. Spillane**
  mspillane@goodwinprocter.com,sewald@goodwinprocter.com,ttam@goodwinprocter.com

- **Richard Mark Strassberg**
  rstrassberg@goodwinprocter.com,nymanagingclerk@goodwinprocter.com

- **Mitchell M.Z. Twersky**
  mtwersky@aftlaw.com

- **John K. Villa**
  jvilla@wc.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Daniel          E. Hill
Kendall Law Group, LLP
3232 McKinney Avenue
Suite 700
Dallas, TX 75204

Catherine       J. Kowalewski
Robbins Geller Rudman & Dowd LLP (San Diego)
655 West Broadway
Suite 1900
San Diego, CA 92101

Jamie           J. McKey
Kendall Law Group, LLP
3232 McKinney Avenue
Suite 700
Dallas, TX 75204

David           C. Walton
Robbins Geller Rudman & Dowd LLP (SANDIEGO)
655 West  Broadway
Suite  1900
San Diego, CA 92101
```