UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| MARY K. JONES, Individually and on Behalf of All Others Similarly Situated, | x<br>:<br>: | Civil Action No. 1:10-cv-03864-AKH |
|  | : | <u>CLASS ACTION</u> |
| Plaintiff | : |  |
|  | : | DECLARATION OF HENRY ROSEN IN |
| vs. | : | SUPPORT OF PLAINTIFFS' MOTION |
|  | : | FOR FINAL APPROVAL OF CLASS |
| PFIZER INC., et al., | : | ACTION SETTLEMENT AND PLAN OF |
|  | : | ALLOCATION AND LEAD COUNSEL'S |
| Defendants. | : | MOTION FOR AWARD OF ATTORNEYS' |
|  | x | FEES AND EXPENSES AND |
|  |  | REIMBURSEMENT OF THE PLAINTIFFS' |
|  |  | EXPENSES PURSUANT TO 15 U.S.C. |
|  |  | §78u-4(a)(4) |

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ............................................................................1

II.  THE LITIGATION ...........................................................................................7

    A.   The Commencement of the Action ............................................................7

    B.   Defendants' Motion to Dismiss the Consolidated Complaint .................9

    C.   Defendants' Motion to Dismiss the FAC...............................................11

    D.   Plaintiffs' Motion for Class Certification .............................................13

    E.   Fact Discovery .......................................................................................14

        1.   Document Discovery Directed to Defendants ...........................14

        2.   Discovery Disputes with Defendants.........................................14

        3.   Third Party Discovery................................................................22

        4.   Discovery Disputes with Third Parties .....................................25

        5.   Depositions ................................................................................29

    F.   Expert Witnesses and Consultants .........................................................40

        1.   Crowninshield Financial Research ...........................................41

        2.   Stephen P. Feinstein..................................................................41

        3.   Hemming Morse, LLP ...............................................................42

        4.   D. Paul Regan ...........................................................................43

        5.   Greylock McKinnon Associates ...............................................44

        6.   Meredith B. Rosenthal, Ph.D. ...................................................45

        7.   Christopher F. Baum, Ph.D........................................................45

        8.   Jerry L. Avorn...........................................................................46

        9.   Nicholas P. Jewell, Ph.D...........................................................48

        10.  Robert A. Rosenheck, M.D........................................................49

|  | 11. | Berkeley Research Group, LLC | 50 |
|  | 12. | Kevin L. O'Brien | 51 |
|  | 13. | Edward J. Buthusiem | 52 |
|  | 14. | Sara Sun Beale | 53 |
|  | 15. | Consultants | 54 |
|  | 16. | Expert – Related Discovery | 55 |
| G. | | In-House Forensic Accounting Experts | 55 |
| H. | | The Fruits of Plaintiffs' Discovery Efforts | 60 |
| I. | | Class Notice | 60 |
| J. | | Summary Judgment Motions | 61 |
| K. | | Pretrial Motions | 62 |
| L. | | Additional Trial Preparation | 64 |
| III. | | RISKS OF LITIGATION | 67 |
| A. | | Falsity | 67 |
| B. | | Scienter | 69 |
| C. | | Loss Causation and Damages | 70 |
| IV. | | SETTLEMENT NEGOTIATIONS AND TERMS | 73 |
| A. | | The Settlement Is in the Best Interests of the Class and Warrants Approval | 75 |
| B. | | The Plan of Allocation | 76 |

1.      I, HENRY ROSEN, am an attorney duly licensed to practice before all of the courts of the State of California, and I have been admitted in this case *pro hac vice*.  I am a member of the firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), and counsel for Stichting Philips Pensioenfonds ("Philips" or "Lead Plaintiff") and additional Class Representative Mary K. Jones ("Jones") (collectively, "Plaintiffs") and the Class.  I have been actively involved in the prosecution and resolution of this action, am familiar with its proceedings and have personal knowledge of the matters set forth herein based on my active supervision and participation in all material aspects of the Litigation.

2.      I submit this Declaration in support of Plaintiffs' application, pursuant to Rule 23 of the Federal Rules of Civil Procedure , for approval of:  (a) the Stipulation of Settlement dated as of February 8, 2015 (the "Stipulation"),[1] which provides for a cash settlement of $400,000,000 (the "Settlement Amount"); (b) the proposed Plan of Allocation; (c) Lead Counsel's application for attorneys' fees and expenses; and (d) reimbursement of Plaintiffs' time and expenses incurred in prosecuting the Litigation.

## I.      PRELIMINARY STATEMENT

3.      This case has been zealously litigated from its commencement in May 2010 through settlement, the basic terms of which were not finalized until after the last of a series of mediation sessions held on January 11 and 18, 2015, shortly before trial was scheduled to commence.  At every stage of the Litigation, Plaintiffs aggressively litigated the matter in the face of Defendants'[2]

---

[1]  Capitalized terms not otherwise defined in this Declaration have the same meaning set forth in the Stipulation.

[2]  Defendants include Pfizer Inc. ("Pfizer" or "the Company"), Henry A. McKinnell ("McKinnell"), Jeffrey B. Kindler ("Kindler"), Frank D'Amelio ("D'Amelio"), Alan G. Levin ("Levin"), Ian C. Read ("Read") and Allen Waxman ("Waxman") ("Individual Defendants"), as well as Joseph Feczko ("Feczko"), Karen Katen ("Katen"), J. Patrick Kelly ("Kelly") and David L.

assertions that they had comprehensive defenses.  The settlement was achieved only after Lead

Counsel, *inter alia*: (i) successfully opposed Defendants' two comprehensive motions to dismiss;

(ii) obtained class certification over Defendants' aggressive opposition; (iii) conducted extensive

discovery, including the review and analysis of over 23.3 million pages of documents produced by

Defendants and third parties; (iv) conducted or oversaw detailed investigative interviews of many

witnesses, including former Pfizer employees; (v) obtained key documents through requests made

pursuant to the Freedom of Information Act ("FOIA"); (vi) took or defended the depositions of 44

fact witnesses; (vii) responded to discovery propounded by Defendants, including document

requests and deposition notices; (viii) filed numerious complex discovery-related motions, most of

which were decided by this Court after being fully briefed and argued; (ix) completed expert

discovery involving 18 testifying experts in the areas of off-label promotion strategies and

practices, sales driven by off-label promotion, compliance with federal healthcare laws, bio-

statistics, financial reporting, disclosures, disclosure processes, accounting, internal controls over

financial reporting, loss causation and damages, which included working with Plaintiffs' ten experts

as they drafted and finalized their reports and taking or defending the depositions of the parties' 16

experts; (x) fully briefed 23 *Daubert* and motions *in limine* in anticipation of trial, some of which

were decided by this Court after oral argument, including the denial of Defendants' *Daubert* motion

to exclude Plaintiffs' loss causation and damages expert; (xi) fully briefed seven motions for

summary judgment filed by Defendants and one filed by Plaintiffs; and (xii) comprehensively

prepared for trial, including selecting the exhibits to be used and the witnesses to be called at trial,

designating deposition testimony, building trial witness files, creating trial demonstratives, drafting

---

Shedlarz ("Shedlarz"), who were named as defendants in the First Amended Consolidated Class
Action Complaint for Violations of the Federal Securities Laws (Dkt. No. 71) (the "FAC") but were
voluntarily dismissed on February 19, 2013 (Dkt. No. 151) (collectively, "Defendants").

*voir dir*e questions, jury instructions and the joint pretrial order.  Moreover, Lead Counsel achieved this result against a who's who of the securities defense bar, as Lead Counsel battled: (1) Cadwalader, Wickerham & Taft LLP; (2) Cahill Gordon & Reindel LLP; (3) Williams & Connolly LLP; (4) Goodwin Procter LLP; (5) Davis Polk & Wardwell LLP; (6) Skadden, Arps, Slate, Meagher & Flom LLP; (7) Quinn Emanuel Urquhart & Sullivan LLP; and (8) O'Melveny & Myers LLP during the Litigation.

4.     This settlement is the product of hard-fought litigation and takes into consideration the significant risks specific to the case.  The settlement is the result of extensive arm's-length negotiations between the parties, including multiple mediation sessions facilitated by the Honorable Layn R. Phillips (Ret.), a nationally recognized mediator.  These negotiations were conducted by experienced counsel with a firm and full understanding of their respective cases.  The substantial discovery, motion practice and trial preparation outlined herein informed Plaintiffs that, while their case had strengths, it also had weaknesses and risks, which had to be, and were, conscientiously evaluated in determining what course of action was in the best interest of the Class.  The settlement for $400,000,000 is an extraordinary recovery given that there was no Company financial restatement or any other admission that the Company's financial statements were false.

5.     The gravamen of Plaintiffs' FAC is that, in violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated by the Securities and Exchange Commission ("SEC"), Defendants participated in a fraudulent scheme to hide from investors Pfizer's widespread off-label promotion of Bextra, Geodon, Zyvox and Lyrica (the "Drugs") in violation of the U.S. Food, Drug and Cosmetic Act.  The FAC further alleged that Defendants' scheme also hid the risks that off-label promotion posed to Pfizer's business and financial results, including that the Company would be subject to massive fines and potential

- 3 -

exclusion from government-funded programs as a result of the U.S. Department of Justice's ("DOJ") investigation into Pfizer's off-label promotion of the Drugs ("DOJ's Off-Label Promotion Investigation").  Plaintiffs alleged that during the Class Period (January 19, 2006 through January 23, 2009, inclusive), Defendants falsely assured investors that, inter alia, Pfizer was compliant with all relevant statutes and had internal controls to guard against off-label promotion through a series of misrepresentations and omissions which artificially inflated the price of Pfizer's common stock.

6.      Plaintiffs asserted that Defendants' allegedly false and misleading statements caused the Company's stock price to be artificially inflated, reaching a high of $28.47 per share during the Class Period.  The truth about Pfizer's off-label promotional practices and the risks such practices had on its business and financial results finally reached the market on January 26, 2009.  That day, the Company announced its $2.3 billion agreement in principle with the government to resolve the DOJ's Off-Label Promotion Investigation and as a result, the price of Pfizer's common stock dropped from $17.45 per share to $15.65 per share.  A more detailed description of Plaintiffs' allegations is set forth in the FAC.  Dkt. No. 71.

7.      In opting to settle the Litigation, Plaintiffs and their counsel considered the significant risks associated with proving the claims alleged in the Complaint.  For instance, the accounting and disclosure rules applicable to the contingent losses associated with the DOJ's Off-Label Promotion Investigation during the Class Period were subject to varying interpretations. Defendants contended that their disclosure of, and accounting for, the DOJ's Off-Label Promotion Investigation were not materially misleading, did not violate Generally Accepted Accounting Principles ("GAAP") and, in any case, were not made with scienter.  In addition, they argued that their statements regarding off-label promotion were not material or misleading.  They further claimed "good faith" reliance on the accounting and disclosure processes at Pfizer, particularly on

- 4 -

1008659_1

in-house and outside disclosure counsel and auditors.  Although Plaintiffs disputed Defendants' assertions and received favorable rulings on what evidence and legal arguments Defendants could present at trial, there was substantial risk that Defendants would still attempt – and be permitted – to offer compelling evidence and legal arguments to bolster their defenses at trial.

8.      The issue of loss causation was hotly contested throughout this case from the motions to dismiss through the final pretrial conference.  The issue would have also been the keystone defense for Defendants at trial.  Defendants would have taken the position, supported by expert testimony, that none of the drop in Pfizer's stock price could be attributed to the $2.3 billion settlement announcement, and therefore Class Members had suffered no legal damages. Defendants would have pointed to other information disclosed on January 26, 2009, that caused the share price to decline – none of which supported a claim for damages – including a 50% cut in Pfizer's dividend, disappointing earnings guidance by the Company, and the announcement of the proposed acquisition of Wyeth by Pfizer.  While Plaintiffs disputed these contentions, there was a substantial risk of recovering limited or no damages if the jury agreed with Defendants' loss causation arguments.  Compounding these factors was a risk that the Court would reopen and grant, in whole or in part, Defendants' motion to exclude the opinion and testimony of Plaintiffs' loss causation and damages expert during trial.  Although, this motion was denied during the final pretrial conference on January 6, 2015, the Court denied the motion without prejudice leaving Defendants free to reassert it during trial.

9.      The parties also disagreed on the importance and meaning of witness testimony and many of the trial exhibits produced in the Litigation.  There was no way to predict which interpretations and inferences a jury would accept.  In deciding to settle the Litigation, Plaintiffs weighed the witness testimony and documents they believed supported the allegations against the

- 5 -

testimony of other witnesses and documents that Defendants believed undercut those allegations. All of these issues, and the risks attendant to them, were considered by Plaintiffs and their counsel in deciding to settle this Litigation on the agreed terms.

10.     On balance, considering all the circumstances and risks both sides faced at trial, both Plaintiffs (for themselves and the Class) and Defendants concluded that settlement on the terms agreed upon was in their respective best interests.

11.     Lead Counsel has prosecuted the Litigation on a wholly contingent basis and has advanced or incurred all litigation expenses.  By doing so, Lead Counsel shouldered the substantial risk of an unfavorable result.  Lead Counsel has not yet received any compensation for their effort.

12.     The fee application for 23.5% of the Settlement Amount is fair both to the Class and Lead Counsel, and warrants the Court's approval.  This fee request is within the range of fee percentages frequently awarded in this type of action and, under the particular facts of this case, is fully justified in light of the substantial benefits conferred on the Class, the risks undertaken, the quality of representation, the nature and extent of legal services performed and the fact that the $400 million settlement was not likely at the outset of the case.  Both the settlement and the fee request have been independently approved by the Plaintiffs, Philips and Jones.  This is the kind of result envisioned by Congress in enacting the Private Securities Litigation Reform Act of 1995 ("PSLRA") and is entitled to significant weight by the Court in awarding fees to counsel.

13.     Lead Counsel also seek an award of $7,685,497.62 in expenses reasonably and necessarily committed to the prosecution of the Litigation over the last five years.  These expenses include:  (i) the substantial fees and expenses of consultants and experts whose services Lead Counsel required in the successful prosecution and resolution of this case; (ii) the cost associated with conducting or defending fact and expert witness depositions, which included court reporter and

- 6 -

videographer fees and travel expenses; (iii) photocopying, imaging, shipping and managing a database of more than 23.3 million pages of documents; and (iv) online factual and legal research. As will be seen from the discussion of the efforts required by Lead Counsel to achieve this settlement, these expenses were reasonable and necessary to obtain the successful result.

14.     Also, as allowed under the PSLRA, Lead Plaintiff Philips and Class Representative Jones seek reimbursement for their time and expenses in the amounts of $13,213 and $300, respectively.  Their investment of time, effort and expense greatly contributed to the successful result of the Litigation.

15.     The following is a summary of the principal events which occurred during the course of the Litigation and the legal services provided by Lead Counsel.

## II.     THE LITIGATION

### A.     The Commencement of the Action

16.     Although the revelation of the alleged fraud occurred on January 23, 2009, not a single class member stepped forward to file a complaint against Pfizer for 16 months.  Finally, on May 11, 2010.  Lead Counsel, on behalf of Jones, filed a class action complaint against Pfizer and several of its executives: Kindler, McKinnell, D'Amelio, Shedlarz, Levin and Read (collectively, the "Original Defendants").  Dkt. No. 1.  On May 25, 2010, Lead Counsel filed an amended class action complaint against the Original Defendants.  Dkt. No. 2.  No other action was filed involving similar claims.

17.     On July 12, 2010, Philips moved to be appointed Lead Plaintiff and for approval of its selection of Robbins Geller as lead counsel.  Dkt. Nos. 15-17.  On the same day, Martin Meister, Paul Meister and Carol Meister (the "Meister Group") also moved to be appointed lead plaintiff and for approval of their selection of Kendall Law Group, LLP ("Kendall Law") as lead counsel and

- 7 -

Lasky & Rifkind, Ltd. ("Lasky Rifkind") as local counsel for the class.  Dkt. Nos. 8-10.  In addition, Oklahoma Firefighters Pension and Retirement System and Union Asset Management Holding AG ("Oklahoma Firefighters & Union") moved to be appointed lead plaintiff and for approval of their selection of Abraham, Fruchter & Twersky, LLP ("Abraham Fruchter") and Motley Rice LLC ("Motley Rice") as co-lead counsel for the class.  Dkt. Nos. 11-14.

18.     The Meister Group withdrew their lead plaintiff motion on November 1, 2010.  Dkt. No. 36.

19.     Philips and Oklahoma Firefighters & Union filed oppositions to all competing lead plaintiff motions on July 29, 2010, and replies on August 9, 2010.  Dkt. Nos. 18-21, 23-26.  After hearing oral argument, the Court granted Philip's motion for lead plaintiff and approved its selection of Robbins Geller as lead counsel on November 4, 2010, denying Oklahoma Firefighters & Union's competing motion.  Dkt. No. 37.

20.     On November 8, 2010, Oklahoma Firefighters & Union moved for reconsideration of their lead plaintiff motion.  Dkt. Nos. 40-41.  After Philips opposed the motion on November 29, 2010, and Oklahoma Firefighters & Union replied on December 1, 2010, the Court denied the motion for reconsideration on December 9, 2010, and affirmed its decision to appoint Philips as the sole lead plaintiff in the case.  Dkt. Nos. 47-49, 52.  The Court suggested that Robbins Geller incorporate into their litigation group the attorneys who represented Oklahoma Firefighters & Union to the extent that such cooperation would enhance the efficiency of this Litigation without duplicating efforts or causing undue expense.  *Id*.  Accordingly, in order to increase the efficiency of this Litigation, Lead Counsel incorporated into their litigation group Lasky Rifkind, Abraham Fruchter, Motley Rice and Kendall Law.

21.     After being appointed Lead Counsel, attorneys from Robbins Geller under my supervision undertook an extensive investigation to prepare an amended complaint. This investigation included analyzing pleadings in the nine *qui tam* actions which led to the $2.3 billion agreement in principle with the DOJ. Lead Counsel also had to thoroughly review all Pfizer and Wyeth related news, financial and pharmaceutical industry media regarding the $2.3 billion fine and Pfizer's announcement of the Wyeth merger. As part of this investigation, Lead Counsel scoured every news story and analyst report for information about the market's reaction to the $2.3 billion fine and the merger. Lead Counsel's investigation also required a thorough review of Pfizer's prior off-label marketing offenses including the 2004 Neurontin settlement in which Pfizer admitted to promoting Neurontin off-label and paid a $430 million fine. Lead Counsel evaluated the Corporate Integrity Agreement ("CIA") Pfizer agreed to as part of the Neurontin settlement. Lead Counsel also reviewed Pfizer's claims that it enhanced its Blue Book on Business Conduct as a result of the 2004 CIA to determine whether the Company's claims that it enhanced its internal controls designed to prevent off-label promotion were accurate. On December 6, 2010, Plaintiffs filed their 75-page Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Consolidated Complaint") against the Company, the Original Defendants and defendants Feczko, Katen, Kelly and Waxman. Dkt. No. 51. The Consolidated Complaint detailed violations of §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. *Id.*

### B.     Defendants' Motion to Dismiss the Consolidated Complaint

22.     On January 19, 2011, Pfizer, McKinnell, Kindler, D'Amelio, Shedlarz, Levin, Read and Feczko moved to dismiss the Consolidated Complaint. Dkt. Nos. 54-56. Their complex motion to dismiss raised multiple legal issues. Dkt. No. 55. In sum, they argued that Plaintiffs: (i) failed to adequately allege any misleading statements or omissions; (ii) failed to adequately

allege materiality; (iii) failed to adequately allege scienter, including any allegations of motive or opportunity to commit fraud, or strong circumstantial evidence of conscious misbehavior or recklessness; (iv) failed to adequately allege transaction causation; (v) failed to adequately allege loss causation; and (vi) failed to meet the pleading requirements required for a §20(a) control person claim. *Id*. They also argued that Plaintiffs' claims were time-barred by the statute of limitations. *Id*.

23.    On February 2, 2011, Katen, Kelly and Waxman joined in the motion to dismiss the Consolidated Complaint.  Dkt. No. 61.

24.    On March 9, 2011, Plaintiffs filed their opposition to Defendants' motion to dismiss, discussing how each reason cited by Defendants to dismiss the Consolidated Complaint failed.  Dkt. No. 64.  Specifically, Plaintiffs argued, *inter alia*, that: (i) the Consolidated Complaint adequately alleged that Defendants' statements and omissions regarding the DOJ Off-Label Promotion Investigation and Pfizer's off-label marketing of the Drugs were materially false and misleading when made; (ii) Defendants' statements that Pfizer complied with the law, maintained adequate compliance mechanisms, had sufficient internal controls and maintained adequate reserves were materially false and misleading or omitted material information; (iii) Defendants had actual knowledge or recklessly disregarded their false statements and omissions;  (iv) Plaintiffs had adequately alleged the elements of causation; and (v) the Consolidated Complaint was timely filed. Dkt. No. 64.  In opposition to Defendants' motion to dismiss, Lead Counsel spent significant time and resources performing the legal research necessary to demonstrate that the Consolidated Complaint satisfied the strict pleading burden imposed by the PSLRA.  *Id*.  In conjunction with their opposition, Plaintiffs filed a motion to strike certain exhibits referenced in Defendants' motion

to dismiss which impermissibly introduced into the record disputed facts not referenced in the Consolidated Complaint.  Dkt. Nos. 62-63.

      25.     On March 25, 2011, Defendants filed a reply in support of their motion to dismiss and an opposition to Plaintiffs' motion to strike.  Dkt. Nos. 67-68.  On April 1, 2011, Plaintiffs filed a reply in support of their motion to strike.  Dkt. No. 69.  Plaintiffs argued that their motion to strike was procedurally proper and should be granted because (i) Defendants erred in seeking to rely on irrelevant excerpts of analyst reports as documentary evidence to support their truth-on-the-market defense at the pleading stage and (ii) statements made 18 months after the Class Period by an Assistant U.S. Attorney General were irrelevant to the Consolidated Complaint.  *Id*.

      26.     On April 5, 2011, the Court granted Plaintiffs' motion to strike and ordered Plaintiffs to file an amended complaint which would only reference essential exhibits and denied Defendants' motion to dismiss without prejudice subject to renewal after Plaintiffs filed an amended complaint. Dkt. No. 70.

      27.     On April 15, 2011, Plaintiffs filed the FAC against Pfizer and the Individual Defendants, after amending it to more clearly and concisely detail the violations of §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Dkt. No. 71.

      **C.**     **Defendants' Motion to Dismiss the FAC**

      28.     On May 24, 2011, Defendants moved to dismiss the FAC.  Dkt. No. 77-80. Defendants argued that Plaintiffs:  (i) failed to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA; (ii) inadequately alleged any materially misleading statements or omissions; (iii) failed to allege scienter; (iv) failed to allege materiality; (v) failed to allege loss causation; and (vi) failed to state a claim for control person liability.  Dkt. No. 78.  Defendants also argued that Plaintiffs' claims were both in violation of Rule 8 and time-barred by the statute of limitations.  *Id*.

- 11 -

29.     On June 24, 2011, Plaintiffs filed their opposition to Defendants' motion to dismiss and argued that each reason cited by Defendants to dismiss the FAC failed.  Dkt. No. 81.  Specifically, Plaintiffs argued, *inter alia*, that:  (i) the FAC complied with Rule 8 and adequately alleged fraud with particularity against all Defendants; (ii) Defendants falsely reassured investors that Pfizer complied with marketing laws and maintained adequate controls, without disclosing the known Company-wide illegal marketing campaigns; (iii) Pfizer's purported disclosures were misleading and inadequate; (iv) Defendants made statements regarding drug sales while omitting that Pfizer was engaged in illegal off-label marketing; (v) Pfizer's reported financials were materially false and misleading; (vi) Defendants' false statements and omissions were material; (vii) Plaintiffs had adequately alleged scienter; (viii) Plaintiffs had adequately pled loss causation; and (ix) the FAC was timely filed.  *Id*.  Lead Counsel spent significant time and resources performing the legal research and analysis necessary to draft an effective opposition and to demonstrate that the FAC satisfied the strict pleading burden imposed by the PSLRA.  *Id*.

30.     After hearing oral argument, the Court denied Defendants' motion to dismiss the FAC on August 10, 2011.  Dkt. No. 84.

31.     Although formal discovery was stayed pending the Court's ruling on Defendants' motion to dismiss, Plaintiffs continued their factual investigation of the allegations in preparation for discovery.  Immediately following the August 10, 2011 Order, the parties began to meet and confer regarding discovery and a pretrial schedule.  The parties conducted their Rule 26(f) conference on August 31, 2011.  After engaging in substantial negotiations, the parties filed a Joint Rule 26(f) Report and Case Management Plan on September 16, 2011.  Dkt. No. 90.

### D.      Plaintiffs' Motion for Class Certification

32.      On January 13, 2012, Plaintiffs sought the Court's certification of a class comprised of all persons who purchased the publicly-traded securities of Pfizer during the Class Period.  Dkt. Nos. 104-107.  Further, Plaintiffs requested that the Court appoint them as class representatives based on their combined purchases of 2,144,269 shares of Pfizer stock during the Class Period.

33.      In support of their motion, Plaintiffs retained Dr. Steven P. Feinstein to conduct an event study of all publicly available information about Pfizer and to opine on the efficiency of the market for Pfizer's stock.  Dkt. No. 106.  Based on his findings, Dr. Feinstein concluded that Pfizer common stock traded in an efficient market during the Class Period.  Lead Counsel spent substantial time consulting with Dr. Feinstein on his declaration and the class certification briefing. In addition, Lead Counsel spent substantial time preparing Dr. Feinstein for his deposition and defended that deposition on January 24, 2012 in Boston, Massachusetts.

34.      On February 1, 2012, Defendants opposed Plaintiffs' motion, claiming that Plaintiffs had not satisfied their burden under Rule 23 because: (i) the proposed class representatives were not adequate or typical; (ii) the proposed class was indefensibly overbroad; and (iii) Dr. Feinstein's declaration was insufficient to satisfy predominance.  Dkt. No. 123.

35.      On February 15, 2012, Plaintiffs filed their reply memorandum in support of their motion for class certification and argued that they had met their burden under Rule 23 by satisfying the typicality and adequacy requirements of Rule 23(a) and the predominance requirement of Rule 23(b)(3).  Dkt. Nos. 117, 129.  After hearing oral argument, the Court granted Plaintiffs' motion for class certification on March 29, 2012, and certified a class of all purchasers of Pfizer common stock during the Class Period.  Dkt. No. 132.

E.    **Fact Discovery**

1.    **Document Discovery Directed to Defendants**

36.    Plaintiffs served document requests on all Defendants on September 1, 2011, November 14, 2011 and November 16, 2011.  In addition, Plaintiffs propounded their first set of requests for admission on all Defendants on October 17, 2013.  Plaintiffs served their initial disclosures on Defendants on September 21, 2011, and ultimately supplemented them on February 8, 2013.

37.    Lead Counsel engaged in numerous meet-and-confer discussions with Defendants' counsel to discuss their objections to the document requests, requests for admission and initial disclosures, to negotiate the scope of the discovery and to arrange for the production of documents.  Given the scope of discovery sought and disputes about relevancy, burden and privilege, these efforts were extensive and required the expenditure of substantial time by Lead Counsel.  After the discovery disputes with Defendants were partially resolved as set forth below, Lead Counsel were required to establish an extremely large and complex database to manage the millions of pages produced by Defendants.  Lead Counsel had to advance certain costs and expended considerable effort to establish and manage this database.

38.    Prior to producing responsive documents, Defendants insisted that Plaintiffs stipulate to a confidentiality agreement.  The parties engaged in substantial negotiations over the terms of a protective order setting forth the confidential treatment of documents and other information.  Ultimately the protective order was entered by the Court on October 18, 2011.  Dkt. No. 93.

2.    **Discovery Disputes with Defendants**

39.    The parties litigated numerous complex discovery disputes during the Litigation.  Prior to filing or responding to motions to compel and other motions, the details of which are

outlined below, Lead Counsel spent thousands of hours analyzing the documents in an effort to narrow the scope of discovery disputes while still aggressively pursuing the discovery rights of the Class. Lead Counsel also spent many hours preparing for meet-and-confer conferences with counsel for Defendants and third parties, conducting those conferences and preparing correspondence memorializing those conversations.

40. Due to the high number and the complexity of the disputes regarding documents and depositions, the parties filed numerous motions related to discovery, the vast majority of which were fully briefed, argued and then decided by the Court.

| Discovery Disputes with Defendants | |
|---|---|
| November 2011 | Plaintiffs' motion to compel Defendants to produce all documents Pfizer produced in the Pfizer Derivative Litigation and documents produced to the government in the DOJ's Off-Label Promotion Investigation. |
| May 2012 | Plaintiffs' motion to compel Defendants to produce documents in unredacted form. |
| January 2013 | The parties successfully negotiated a Rule 502(d) Order because Defendants agreed to a partial waiver of their attorney-client privilege because they asserted a reliance-on-counsel defense. |
| March 2013 | Plaintiffs' motion to compel to allow Plaintiffs more than five depositions and to compel Defendants to produce documents related to their reliance-on-counsel and reliance-on-auditor defenses. |
| July 2013 | Plaintiffs' motion to compel Defendants to produce: (1) documents related to their reliance-on-counsel defense; (2) documents withheld on privilege transmitted to third parties; (3) documents from current Pfizer employees' files; and (4) documents missing from earlier productions. |
| August 2013 | Plaintiffs' motion to compel depositions of eight witnesses with knowledge of the off-label promotion of the Drugs. |
| October 2013 | Plaintiffs' motion to compel the depositions of former defendants Shedlarz, Kelly and Feczko and verify interrogatory responses. |
| May 2014 | Plaintiffs' motion to compel to allow Plaintiffs ten two-hour depositions to be taken because Defendants withheld documents related to the DOJ's Off-Label Promotion Investigation. |

These disputes are discussed below.

- 15 -

41.     On November 21, 2011, the parties filed a joint letter seeking the Court's assistance regarding Defendants' objections to Plaintiffs' document requests.  Dkt. No. 98.  In order to streamline the discovery in the case, Lead Counsel proposed during the Rule 26(f) conference that Defendants produce all the documents produced by Pfizer in *In re Pfizer Inc. Shareholder Derivative Litigation*, No. 09-cv-7822 (S.D.N.Y.) (the "Pfizer Derivative Case").  In the interest of efficiency, Plaintiffs also included in their document requests that Defendants produce all documents Pfizer produced to the federal government in *United States v. Pharmacia & Upjohn Co., Inc.*, No. 09 CR 10258-DPW (D. Mass.) (the "Bextra Criminal Case").  Defendants claimed that only a subset of the documents produced in the Pfizer Derivative and Bextra Criminal Case were relevant and accordingly, only produced 7,756 pages of documents in this case during the week of October 17, 2011.  Ultimately, Lead Counsel was forced to present this issue to the Court after meet-and-confer conferences with Defendants failed.  During discussions with Defendants, in the joint letter to the Court and at the November 29, 2011 hearing, Plaintiffs demonstrated the high relevance and extreme efficiency of producing all the documents from the Pfizer Derivative and the Bextra Criminal Cases.  During the November 29, 2011 hearing, where the Court heard oral argument on Plaintiffs' motion to compel, the Court ordered Defendants to produce all documents produced by Pfizer in the Pfizer Derivative and Bextra Criminal Cases.  In addition, the Court ordered Defendants to produce their collection of analyst reports from the securities analysts who covered Pfizer during the Class Period.

42.     After reviewing millions of pages of documents produced by Defendants, Plaintiffs met and conferred with Defendants regarding certain categories of documents that were redacted for responsiveness.  Defendants refused to even consider reviewing such redactions.  Thus, Lead Counsel was forced to prepare a joint letter filed with the Court on May 9, 2012.  Dkt. No. 136.

- 16 -

Plaintiffs were able to provide Defendants and the Court with a detailed explanation regarding why certain categories of highly relevant documents needed to be produced in unredacted form. Defendants' objections were primarily based on the burden of revisiting the document productions in the Pfizer Derivative and Bextra Criminal Cases. *Id*. On May 11, 2012, the Court required Defendants to produce in unredacted form certain documents which related to the off-label marketing of the Drugs at issue in the case. *Id*.

43. As set forth above, Defendants asserted a reliance-on-counsel defense in this case. After a series of meet-and-confer conferences, Lead Counsel and Defendants' counsel successfully negotiated a Rule 502(d) Order regarding the production of documents as to which Defendants agreed they had waived the attorney-client privilege concerning the Company's disclosures relating to the DOJ's Off-Label Promotion Investigation. The Court entered that order on January 18, 2013. Dkt. No. 150. Lead Counsel continued to meet-and-confer with Defendants about various aspects of their purported reliance-on-counsel defense until the case settled. In response to the parties' meet-and-confers, Defendants filed an Amended Answer to Plaintiffs' First Amended Consolidated Class Action Complaint on March 22, 2013, to add, *inter alia*, a Fourteenth Defense relating to the reliance-on-counsel defense. Dkt. No. 160.

44. After expending substantial time and effort analyzing the documents related to defendants Katen, Shedlarz, Kelly and Feczko, Lead Counsel stipulated to dismissing them in order to streamline the case but obtained their consent for the service of document and deposition subpoenas. Dkt. No. 151. The Court entered the order on February 19, 2013. *Id*.

45. On March 5, 2013, the parties presented another series of discovery disputes to the Court. The disputes arose out of Defendants' refusal to agree to allow Plaintiffs to take more than five depositions and Defendants' decision to withhold relevant documents related to Plaintiffs'

- 17 -

financial allegations and Defendants' reliance-on-counsel defense.  In addition, Defendants objected to Plaintiffs' requests for documents related to Defendants' reliance on the advice of KPMG LLP ("KPMG") defense.  Ultimately, Plaintiffs were able to demonstrate to the Court in the March 5, 2013 joint letter, and during the March 8, 2013 hearing, that the depositions and document requests were highly probative in this case.  Consequently, the Court ordered the production of additional documents related to the reliance-on-counsel and auditor defenses.  The Court also allowed Plaintiffs to depose all witnesses on Defendants' trial witness list, eight to ten witnesses related to the off-label promotion of the Drugs and two witnesses who conducted internal audits at Pfizer.  Dkt. No. 157.  From these documents and depositions, Lead Counsel was able to uncover essential evidence and obtain crucial testimony which supported Plaintiffs' claims and undercut Defendants' reliance-on-counsel and auditor defenses.

46.     On July 8, 2013, the parties presented, via another joint letter to the Court, additional discovery disputes.  These disagreements included:  (1) the documents Defendants were required to produce related to their reliance-on-counsel defense; (2) Defendants' withholding of purportedly privileged documents that were transmitted to third parties; (3) Defendants' failure to adequately respond to Plaintiffs' subpoenas for depositions and documents from current Pfizer employees; and (4) Defendants' objections to producing documents which appeared to be missing from their document production.  Dkt. No. 172.  Defendants refused to produce the requested documents on the basis of burden and their narrow interpretation of what the parties had previously agreed to regarding the scope of the document production.  *Id*.  Based on the discovery that had already taken place, Plaintiffs were able to convince the Court during the July 19, 2013 hearing, that the discovery they sought was highly relevant.  As a result, the Court required Defendants to produce documents that their outside counsel used or considered in providing legal advice to Defendants.  Further, the

- 18 -

Court warned Defendants that they would be precluded from using at trial any document withheld from Plaintiffs during discovery and that any witness who handled the withheld documents would not be allowed to testify.  The Court also ordered counsel for Defendants to not prevent witnesses from answering questions relating to their knowledge of Pfizer's reserves taken for the DOJ's Off-Label Promotion Investigation, to allow Plaintiffs to take additional depositions and to produce relevant documents before depositions of Pfizer employees.

47.     Despite the Court's directives on March 8, 2013 and July 19, 2013, Defendants persisted in making burden objections to the number of witnesses Plaintiffs sought to depose.  The parties thus had to submit another joint letter to the Court on August 29, 2013.  Dkt. No. 181.  Based on their review of the millions of pages of documents, Plaintiffs were able to demonstrate how eight witnesses they sought to depose had critical knowledge relating to the off-label promotion of the Drugs, another witness had knowledge related to the reserves for the DOJ's Off-Label Promotion Investigation and seven witnesses had knowledge related to the disclosures concerning the DOJ's Off-Label Promotion Investigation.  *Id.*  On August 30, 2013, the Court ordered the depositions of eight witnesses related to the off-label promotion of the Drugs.  *Id*.  Lead Counsel was subsequently able to elicit key testimony relating to the off-label promotion of the Drugs from Maria Connie Abelardo, Richard Burch, Robert Clark, Christopher Dowd, Lisa Levy, Antony Loebel and Mark Westlock.

48.     Even though the parties had previously stipulated to the service of subpoenas to former defendants Shedlarz, Kelly and Feczko when Plaintiffs agreed to dismiss them from the case, Defendants continued to make burden objections to these additional depositions sought by Plaintiffs.  Consequently, the parties had to submit another joint letter to the Court on October 18, 2013, regarding the depositions of former defendants Shedlarz, Kelly and Feczko, and a new

- 19 -

dispute arising from Defendants' refusal to verify interrogatory responses in the Pfizer Derivative Case which related to the DOJ's Off-Label Promotion Investigation. Dkt. No. 183. Plaintiffs were able to provide ample detail in the joint letter to the Court regarding how the requested depositions would be vital to proving their allegations and how verifying the highly relevant interrogatory responses would promote efficiency. *Id.* Accordingly, on October 31, 2013, the Court authorized the requested depositions and ordered Defendants to verify the interrogatory responses. *Id.* Lead Counsel was able to obtain additional testimony from the former defendants in support of Plaintiffs' claims relating to the off-label promotion of the Drugs and the reserves for the DOJ's Off-Label Promotion Investigation.

49. On May 15, 2014, the parties submitted a joint letter to the Court regarding a dispute arising after the close of fact discovery which related to documents Defendants withheld from Plaintiffs, in this case, but which they produced to the government during the DOJ's Off-Label Promotion Investigation. Dkt. No. 196. Such documents were extremely probative of Plaintiffs' claims, but Plaintiffs only became aware of them after Lead Counsel expended substantial time and effort to obtain them via FOIA requests to the DOJ. The documents – memoranda detailing interviews with Pfizer employees who were engaged in blatant off-label promotion of Bextra and who attempted to destroy incriminating evidence – demonstrated stunning evidence of the illegal promotion of Bextra. Because Defendants gave these documents to the government during the DOJ's Off-Label Promotion Investigation, they should have been produced in late 2011 or early 2012 before Plaintiffs commenced depositions. This dispute arose because Defendants refused to allow Plaintiffs to take up to ten additional two-hour depositions in order to question the witnesses about these previously withheld documents. *Id.* Defendants objected to the production of additional documents and additional depositions even though they were asserting reliance on these

- 20 -

witnesses as part of their reliance-on-counsel and auditor defenses.  Defendants asserted Plaintiffs already received 23 million pages and completed 36 depositions.  *Id*.  On May 30, 2014, the Court found that the withheld documents were responsive to Plaintiffs' document requests and should have been previously produced and allowed the additional depositions sought by Plaintiffs.  Dkt. No. 197.  As a result, Lead Counsel was able to depose defendants McKinnell, Kindler, Levin and Waxman a second time and elicited critical testimony undermining their reliance-on-counsel defenses.  Lead Counsel was further able to depose witnesses with unique knowledge of the off-label promotion of Bextra and the destruction of documents related to that off-label promotion, including Alejandro (Alex) Alvarez.

50.     The result of the discovery requests and the resolution of the discovery disputes with Defendants culminated in the production of over 23.3 million pages of documents by Defendants to Lead Counsel.  Careful examination and analysis of these documents required a massive effort by teams of attorneys which analyzed and organized the documents, selected the documents that proved or could undermine Plaintiffs' allegations, identified relevant witnesses and established procedures to identify additional documents and information that had not been produced.  It must be stressed here that virtually all of the documents produced by Defendants as well as most of those by third parties, were very complex, highly technical documents regarding what symptoms and indications the Drugs could be used for, how to market and sell the Drugs to physicians and how to account for and disclose the DOJ's Off-Label Promotion Investigation.  Lead Counsel, as suggested by the Court, enlisted the assistance of the firms Lasky Rifkind, Abraham Fruchter and Motley Rice to assist with the massive document review and to help evaluate the merits of Plaintiffs' allegations and Defendants' defenses thereto.

51.     Lead Counsel thus directed projects to these outside firms, as well as members of Lead Counsel's internal litigation team, to analyze the millions of documents produced.  Lead Counsel and these other firms spent significant time deciphering dense communications and lengthy, complicated presentations and other materials authored by and directed to sales, marketing and medical personnel both inside and outside Pfizer.  Throughout the document review process, the entire Plaintiffs' litigation team had to understand what information the documents conveyed, determine how they were relevant to the alleged fraud and then apply that understanding to other documents that had been produced.  Compounding the difficulty of the document review process was the lack of metadata for the majority of the documents Defendants produced.  This required Plaintiffs' litigation team to manually search for attachments to emails such as presentations and spreadsheets.  Due to sheer size of the production and the fact that Defendants produced documents on a rolling basis throughout the Litigation, the document review and accompanying analysis was a time-consuming and ongoing project.

### 3.     Third Party Discovery

52.     Commencing on April 6, 2011, Lead Counsel began making requests pursuant to FOIA to relevant government agencies and subsequently received vital information supporting Plaintiffs' claims.  In addition, starting on September 6, 2011, Plaintiffs began issuing subpoenas for documents to dozens of other relevant third parties, including the Company's former employees, auditors, outside counsel and securities analysts.  As with Defendants' production, Lead Counsel expended significant resources obtaining, reviewing and analyzing these documents.  The document requests, discussions and motion practice (set forth in ¶¶54-55, 57-62, *infra*) resulted in the production of over 336,000 pages of documents.

53.     The government agencies to whom Lead Counsel directed FOIA requests are set

forth below:

| GOVERNMENT AGENCY | DATE | SUBJECT MATTER(S) |
|---|---|---|
| Office of Inspector General ("OIG"), U.S. Department of Health & Human Services | 4/6/11 | Reports and correspondence related to Pfizer's promotion or sales of the Drugs. |
| Office of Attorney General for the State of Florida ("FL AG") | 8/20/12 | Documents relating to Pfizer's promotion or branding of the Drugs, Pfizer's profits related to the Drugs, Pfizer's payment of kickbacks to healthcare professionals, all civil investigative demands or subpoenas served on Pfizer, and the September 9, 2009 settlement, reached between the FL AG and Pfizer. |
| DOJ | 3/1/13 | Correspondence and presentation materials related to the DOJ's Off-Label Promotion Investigation. |
| Medicines and Healthcare Products Regulatory Agency ("MHRA") of the United Kingdom | 4/7/14 | Communications related to MHRA's advertising complaint regarding Pfizer's promotion of Zyvox. |

54.     The third parties to whom Lead Counsel directed document subpoenas are set forth

below:

| PERSON/ENTITY | DATE | RELATIONSHIP |
|---|---|---|
| Abelardo, Maria C. | 9/10/13 | Pfizer Medical Director & Review Committee Medical Point Person |
| Alliance Capital Management Corporation | 11/4/11 | Investment Banker/Securities Analyst |
| Bank of America Merrill Lynch | 11/17/11 | Investment Banker/Securities Analyst |
| Barclays Capital Service Inc. | 11/8/11 | Advisor for Wyeth Acquisition |
| BlackRock, Inc. | 8/9/13 | Asset Manager for Lead Plaintiff Philips |
| Block, Dennis | 9/4/13 | Outside Counsel for Pfizer |
| BMO Capital Markets Corp. | 11/4/11 | Investment Banker/Securities Analyst |
| Bradley, Larry | 4/16/13 | KPMG, Lead Audit Engagement Partner |
| Brockie, Paul | 8/21/13 | Pfizer Legal Finance |
| Burch, Richard A. | 8/21/13 | Pfizer Senior VP, Sales |
| Cadwalader, Wickersham & Taft LLP | 7/24/13 | Outside Counsel for Pfizer |
| Cangialosi, Loretta | 4/9/13 | Pfizer VP, Controller |
| Cawkwell, Gail | 4/3/13 | Pfizer Executive Medical Director |
| Chapman, John | 4/16/13 | KPMG, Lead Audit Engagement Partner |

- 23 -

| PERSON/ENTITY | DATE | RELATIONSHIP |
|---|---|---|
| Citigroup Global Markets, Inc. | 11/17/11 | Investment Banker/Securities Analyst |
| Clark, Robert B. | 9/10/13 | Pfizer VP, US Regulatory Affairs |
| Columbia Management Investment Advisors, LLC | 11/4/11 | Investment Banker/Securities Analyst |
| Cowen and Company, LLC | 11/4/11 | Investment Banker/Securities Analyst |
| Credit Suisse Securities (USA) LLC | 11/4/11 | Investment Banker/Securities Analyst |
| Deutsche Bank Securities, Inc. | 11/4/11 | Investment Banker/Securities Analyst |
| Donnelly, Hugh | 4/9/13 | Pfizer VP, Corporate Audit |
| Dowd, Christopher | 10/3/13 | Pfizer VP, Sales |
| Dowd, Kathleen | 4/10/13 | Pfizer Director, Lyrica Team Leader |
| Evercore Group LLC | 9/13/11 | Advisor for Wyeth Acquisition |
| Feczko, Joseph | 8/23/13 | Pfizer Chief Medical Officer |
| Fleischmann, Bruce | 3/28/13 | Pfizer, Regional Manager |
| Fox, Lawrence | 4/12/13 | Pfizer VP, Assistant General Counsel |
| Friedman, Billings, Ramsey Group, Inc. | 11/4/11 | Investment Banker/Securities Analyst |
| Friedman, Jake | 3/28/13 | Pfizer SVP, Sales |
| Gavigan, Michael | 4/11/13 | Pfizer Director U.S. Team Leader, Cox 2 Franchise; Director, Zyvox Team Leader |
| Goldman Sachs Group, Inc. | 11/17/11 | Investment Banker/Securities Analyst |
| Greensmith, Alan | 3/27/13 | Pfizer Director of Division Operations |
| Hedley, Timothy | 4/16/13 | KPMG, Lead Forensic Partner |
| Highside Capital Management L.P. | 11/16/11 | Investment Banker/Securities Analyst |
| Holloway, Mary | 6/5/13 | Pfizer Regional Sales Manager |
| HSBC Securities (USA) Inc. | 11/4/11 | Investment Banker/Securities Analyst |
| Jennison Associates LLC | 11/4/11 | Investment Banker/Securities Analyst |
| JP Morgan Chase & Co. | 11/17/11 | Investment Banker/Securities Analyst |
| Kelly, J. Patrick | 8/23/13 | Pfizer President, US Pharmaceuticals |
| KPMG LLP | 9/6/11, 6/27/14 | Pfizer External Auditor |
| Lankler, Douglas | 8/23/13 | Pfizer SVP and Chief Compliance & Risk Officer |
| Leerink Swann | 11/4/11 | Investment Banker/Securities Analyst |
| Levy, Lisa A. | 8/21/13 | Pfizer Director & Senior Marketing Manager, Bextra |
| Loebel, Antony D. | 8/21/13 | Pfizer Senior Medical Director & Team Leader, Geodon |
| Mahoney, Dee | 4/12/13 | Pfizer SVP & GM, Specialty Markets |
| Maximus Capital Management, LLC | 11/18/11 | Investment Banker/Securities Analyst |
| Merrill Lynch & Co., Inc. | 11/4/11 | Investment Banker/Securities Analyst |
| Mooney, Chuck | 4/9/13 | Pfizer Senior Audit Director; Director of Corporate Internal Audit |
| Morgan Stanley & Co. LLC | 9/13/11 | Advisor for Wyeth Acquisition |

| PERSON/ENTITY | DATE | RELATIONSHIP |
|---|---|---|
| O'Connor, Brien | 7/2/13 | Ropes & Gray LLP, Partner |
| Parini, Michael | 8/21/13 | Pfizer Senior Corporate Counsel |
| PricewaterhouseCoopers LLP | 9/6/11 | Pfizer Compliance Monitor |
| Prudential Equity Group, LLC | 11/4/11 | Investment Banker/Securities Analyst |
| Putnam Investments | 11/4/11 | Investment Banker/Securities Analyst |
| Raymond James Financial Services, Inc. | 11/4/11 | Investment Banker/Securities Analyst |
| Riso, Eric | 4/16/13 | KPMG, Audit Partner |
| Sanford C. Bernstein & Co., LLC | 11/4/11 | Investment Banker/Securities Analyst |
| Shedlarz, David L. | 8/23/13 | Pfizer Vice Chairman |
| Summer Street Research Partners | 11/4/11 | Investment Banker/Securities Analyst |
| SunTrust Robinson Humphrey, Inc. | 11/4/11 | Investment Banker/Securities Analyst |
| Thompson Siegel and Walmsley LLC | 11/4/11 | Investment Banker/Securities Analyst |
| UBS AG | 11/4/11 | Investment Banker/Securities Analyst |
| Wells Fargo Advisors, LLC | 11/4/11 | Investment Banker/Securities Analyst |
| Westlock, Mark | 8/21/13 | Pfizer Sales Representative |

55. Lead Counsel engaged in numerous meet-and-confers with all the government agencies and most of the subpoenaed third parties to discuss their objections to the FOIA requests or subpoenas, to negotiate the scope of the document requests and to arrange for the production of responsive documents. This required extensive coordinated efforts and expenditures of time and resources by Lead Counsel.

### 4.    Discovery Disputes with Third Parties

56. In addition to disputes with Defendants, Lead Counsel also devoted substantial time to negotiating subpoenas served on third parties who objected to producing documents. With most of the third parties, Plaintiffs were able to successfully resolve discovery issues without the Court's intervention. With some third parties, however, the Court's assistance was required.

| Discovery Disputes with Third Parties | |
|---|---|
| February 2013 | Plaintiffs' motion to compel KPMG to produce documents from the files of Timothy Hedley ("Hedley"), the lead audit partner on Pfizer's 2006 and 2007 audits. |

- 25 -

| Discovery Disputes with Third Parties | |
|---|---|
| May 2013 | Plaintiffs' discovery dispute with KPMG regarding: (1) the depositions of Hedley, Larry Bradley ("Bradley"), John Chapman ("Chapman") and Eric Riso ("Riso") who worked on Pfizer's Class Period audits; (2) KPMG's production of additional documents; and (3) KPMG's objection to a Rule 30(b)(6) deposition. |
| June 2013 | Plaintiffs' motion to compel Hedley from KPMG to produce documents. |
| October 2014 | Plaintiffs' motion to compel Mary Holloway ("Holloway") to answer deposition questions she refused to answer on the basis of her Fifth Amendment right against self-incrimination. |
| February-July 2014 | Plaintiff Jones' complaint against the DOJ to enforce a FOIA request for documents related to the DOJ Off-Label Promotion Investigation. |

These disputes are discussed below.

57.     On February 22, 2013, Plaintiffs submitted a letter to the Court outlining a discovery dispute with KPMG.  KPMG steadfastly refused to produce documents from Hedley, a forensic audit partner at KPMG.  Plaintiffs sought the Court's intervention because they believed Hedley, the lead audit partner on the Pfizer 2006 and 2007 audits, possessed responsive documents Plaintiffs needed to complete certain depositions.  Accordingly, on March 5, 2013, KPMG moved for a protective order to prohibit Plaintiffs from obtaining the production of additional documents from Hedley's files, primarily on the basis of burden. Dkt. Nos. 153-155.  After reviewing the briefing and hearing oral argument, the Court issued an order on March 8, 2013, denying KPMG's motion to the extent KPMG sought to prevent Plaintiffs from accessing the records of Hedley.  Dkt. No. 158. The Court also held that KPMG was entitled to reimbursement for some of its costs in responding to Plaintiffs' subpoena.  *Id*.

58.     Despite the Court's March 8, 2013 Order, KPMG continued to object to the discovery sought by Plaintiffs, including discovery directed to Hedley.  Therefore Plaintiffs again sought the Court's intervention.  On May 3, 2013, KPMG and Plaintiffs submitted a joint letter to the Court regarding: (1) KPMG's request to quash Plaintiffs' subpoenas to Hedley, Bradley,

Chapman and Riso who were responsible for the various Pfizer Class Period audits; (2) KPMG's objections to producing additional documents; and (3) KPMG's objections to Plaintiffs' request for a 30(b)(6) deposition regarding Hedley's custodial documents. Dkt. No. 167. KPMG's arguments again focused on burden and downplayed the relevance of the requested depositions and documents, despite the showing of relevance made by Lead Counsel in the joint letter to the Court. *Id*. On May 6, 2013, the Court overruled the majority of KPMG's objections and ordered the depositions of all four KPMG partners as well as the production of all KPMG workpapers for the Pfizer Class Period audits. *Id*. Lead Counsel was able to elicit crucial testimony from Hedley, Bradley, Chapman and Riso and uncover important information based on the documents produced by KPMG to support Plaintiffs' claims and to address Defendants' defenses thereto. The majority of this testimony and information was not available from other witnesses or document productions.

59.     Despite the Court's March 8, 2013 and May 6, 2013 Orders, Plaintiffs' discovery dispute with KPMG relating to Hedley's custodial documents persisted, forcing them to request the Court's assistance again on June 19, 2013. Dkt. No. 169. After Lead Counsel reviewed KPMG's workpapers, and in light of KPMG not producing a single document or email authored by Hedley, Plaintiffs renewed their request for a Fed. R. Civ. P. 30(b)(6) deposition relating to the preservation, collection and potential deletion or destruction of Hedley's documents. *Id*. Defendants objected primarily based on burden. On June 25, 2013, the Court denied Plaintiffs' request for a Rule 30(b)(6) deposition but noted they were free to make arguments at trial based on the absence of documents. *Id*.

60.     On October 15, 2014, Plaintiffs and Holloway, a former Pfizer Regional Sales Manager who had responsibility for selling Bextra, submitted a joint letter to the Court regarding a discovery dispute arising from her assertion of the Fifth Amendment privilege against self-

- 27 -

incrimination in response to nearly every question posed by Lead Counsel and Defendants' counsel during her deposition.  Dkt. No. 223.  Plaintiffs sought to depose Holloway a second time, as permitted by the Court in its May 30, 2014 Order, and to compel her to testify regarding the off-label promotion of Bextra based in large part on the documents which had previously been withheld from Plaintiffs.  *Id*.  Holloway objected on the basis of relevance as well as burden and persisted in claiming that she could assert the Fifth Amendment and refuse to answer.  On October 28, 2014, Defendants submitted a letter in support of Holloway's relevance objections, but attached questions they would pose to Holloway if she was compelled to testify.  Dkt. No. 238.  On October 29, 2014, Plaintiffs submitted a supplemental memorandum in support of their motion to compel and to respond to Defendants' and Holloway's objections.  Dkt. No. 241.  Following full briefing and a hearing on October 30, 2014, the Court found that Holloway could validly invoke her Fifth Amendment privilege to not answer questions.  Dkt. No. 280.  However, the Court also noted that Lead Counsel could seek an adverse inference instruction at trial in light of Holloway's assertion of the privilege.  Ultimately the parties briefed the propriety of such an instruction during subsequently filed motions *in limine*.

61.     In 2013, Plaintiffs served the DOJ with document requests pursuant to FOIA.  After corresponding with the DOJ for over a year without success regarding Plaintiffs' FOIA request, Plaintiff Jones filed a complaint for injunctive relief against the DOJ on February 18, 2014, in the District of Columbia before the Honorable Beryl A. Howell, seeking the expedited processing and release of records responsive to Plaintiffs' FOIA request.  Plaintiff Jones requested that a default judgment be entered against the DOJ because the deadline for responding to the complaint had expired and the DOJ had not requested an extension of time.  On May 19, 2014, with Plaintiff Jones' consent, the DOJ moved for a 14-day extension to respond to the complaint, which was

- 28 -

granted by Judge Howell.  On May 30, 2014, the DOJ moved for another extension, this time for 45 days, to respond to Plaintiffs' FOIA request.  On June 2, 2014, Plaintiff Jones opposed the request, disputing that the DOJ had shown good cause for the extension, but Judge Howell granted the DOJ's motion.  On July 10, 2014, the DOJ began producing responsive documents.  As a result of the FOIA request to the DOJ, Plaintiffs obtained documents relating to Pfizer's negotiations with the DOJ during the course of the DOJ Off-Label Promotion Investigation.  Plaintiffs did not receive these documents from any other source, including Defendants who were ordered in November 2011 to produce all documents Pfizer produced to the government in the DOJ Off-Label Promotion Investigation.  These documents were highly probative of Defendants' false and misleading statements and knowledge thereof regarding the status of the government investigation.  Only through their tenacity and perseverance and in continuously following up for 18 months did Lead Counsel obtain these compelling documents from the DOJ.

## 5.    Depositions

62.    In preparation for trial, Plaintiffs took the deposition of 33 current and former Pfizer employees throughout the United States.  Those depositions took place on the dates and at the locations listed below:

| DEPONENT | DATE | LOCATION | POSITION/RESPONSIBILITIES |
|---|---|---|---|
| Fleischmann, Leonard Bruce | 4/26/13 | Indianapolis, IN | At Pfizer from 1974 to 2009.  From 2003 to 2009 he was the Vice President of Sales who had 1,000 employees reporting to him in the sales division responsible for selling the Drugs. Plaintiffs intended to use his deposition testimony at trial. |

- 29 -

| DEPONENT | DATE | LOCATION | POSITION/RESPONSIBILITIES |
|---|---|---|---|
| Cawkwell, Gail | 5/2/13 | New York, NY | At Pfizer from 2000 to the present. From February 2001 to June 2003, she was the Medical Director for Bextra and became the Medical Director for a related drug, Celebrex, thereafter.  She participated in the launch of Bextra as a presenter to the sales force and was responsible for the development of the publications program, the advisory boards, specialty conferences, CME conferences and other programs to discuss Bextra.   She also participated in the DOJ Off-Label Promotion Investigation.   Plaintiffs intended to call her as a witness at trial. |
| Friedman, Jake | 5/9/13 | San Diego, CA | At Pfizer from 1979 to 2009.  From 2000 to 2009, he was Vice President of Sales, responsible for several different teams with hundreds of employees reporting to him.  Had responsibility for the sales of Geodon and Lyrica.  Plaintiffs intended to use his deposition testimony at trial. |
| Gavigan, Michael | 5/10/13 | New York, NY | At Pfizer from 1989 to the present.  From 2000 to April 2005 when the drug was withdrawn from the market, he was the director of the Bextra marketing team. From June 2006 to December 2008, he was director of the Zyvox marketing team.  Plaintiffs intended to call him as a witness at trial. |
| Dowd, Kathleen | 5/17/13 | Southbury, CT | At Pfizer from 1991 to 2007.  She was the Director and Team Leader for Lyrica and coordinated the launch of Lyrica in 2005 and mobilized the 4,500 sales force. Plaintiffs intended to call her as a witness at trial. |

| DEPONENT | DATE | LOCATION | POSITION/RESPONSIBILITIES |
|---|---|---|---|
| Mooney, Charles | 5/31/13 | New York, NY | Throughout the Class Period, he held the position of Senior Director Commercial Activities and was responsible for Pfizer's internal audit department and was responsible for managing the activities of the healthcare compliance audit function within Pfizer. Therefore, he was involved first hand in the Company's assessment of its internal controls over healthcare compliance and financial reporting. Plaintiffs intended to call him as a witness at trial. |
| Brown, J. Mark | 6/19/13 | Atlanta, GA | At Pfizer from 1991 to 2008. From the fall 2005 to August 2008, he was Vice President of sales responsible for Zyvox. He had first-hand knowledge of the Zyvox superiority message. Plaintiffs intended to use his deposition testimony at trial. |
| Cangialosi, Loretta V. | 6/21/13 | New York, NY | At Pfizer from 1993 to the present. From 1999 to the present, has held the position of Senior Vice President and Controller of the Company. Throughout the Class Period, she served as the Company's chief accounting officer and was in charge of the process to disclose Statement of Financial Accounting Standards No. 5 ("FAS 5") legal contingencies and, if necessary, establish and periodically evaluate legal contingency reserves. She was also responsible for interacting Pfizer's outside auditors, KPMG, regarding the Company's periodic financial statements, including footnotes to the financial statements and other disclosures required by GAAP. Plaintiffs intended to call her as a witness at trial. |

| DEPONENT | DATE | LOCATION | POSITION/RESPONSIBILITIES |
|---|---|---|---|
| Greensmith, Alan | 6/25/13 | Atlanta, GA | At Pfizer from 1988 to 2008. He was a Regional Manager in Pfizer's South East Region and based in Atlanta. He was responsible for instructing District Managers and the sales force how to market Zyvox. He was familiar with instructions received from Pfizer's headquarters to market Zyvox as superior to vancomycin. Plaintiffs intended to call him as a witness at trial. |
| Mahoney, Dee L. | 7/19/13 | New York, NY | At Pfizer from 1998 to 2008. From 2000 to 2005, she was Vice President of Sales in Pfizer's Roerig division. In that position she was responsible for Bextra sales. From 2001 to 2005, she was responsible for Geodon sales. In 2005, she became Senior Vice President of Sales for Specialty Products and became responsible for Zyvox sales. Plaintiffs intended to use her deposition testimony at trial. |
| Holloway, Mary | 7/23/13 | New York, NY | At Pfizer from 1988 to 2009. While Bextra was on the market from March 2002 to April 2005, she was a Regional Manager in Pfizer's Powers Division in the North East. She was prosecuted by the DOJ for her conduct related to Bextra. Ultimately, she pleaded guilty to a misdemeanor for the misbranding of Bextra. Plaintiffs intended to use her deposition testimony at trial. |

- 32 -

| DEPONENT | DATE | LOCATION | POSITION/RESPONSIBILITIES |
|---|---|---|---|
| Donnelly, Hugh M. | 8/14/13 | New York, NY | From 2004 to the end of the Class Period, he was the head of Internal Audit at Pfizer. In that position, he was responsible for directing the investigations of Pfizer internal controls including the controls over healthcare compliance used to check whether the Company had procedures in place to ensure it was marketing its drugs in accordance with healthcare laws and maintained processes and procedures to ensure that the Company's financial statements were stated in accordance with GAAP. As Director of Internal Audit, he was also responsible to ensure the Company had adequate Sarbanes-Oxley controls. Plaintiffs intended to use his deposition testimony at trial. |
| Abelardo, Maria C. | 9/20/13 | San Francisco, CA | At Pfizer from 1996 to 2008. From 2003 to 2008, she was a member of Pfizer's Review Committee as the lead medical representative. The Review Committee was responsible for approving marketing pieces and other materials the sales force used to detail physicians on medical uses of Pfizer's drugs. Plaintiffs intended to call her as a witness at trial. |
| Burch, Richard | 9/20/13 | Tuscaloosa, AL | Was employed at Pfizer for almost 31 years, leaving in 2009. He held several positions at Pfizer, including Senior Vice President with responsibilities related to the sales of Bextra, Geodon and Zyvox. With respect to Bextra, he supervised approximately 6,000 people. He was involved in the Bextra launch and familiar with Pfizer's use of speakers, the sales force use of call notes and how the sales force marketed Bextra for acute pain. Plaintiffs intended to use his deposition testimony at trial. |

- 33 -

| DEPONENT | DATE | LOCATION | POSITION/RESPONSIBILITIES |
|---|---|---|---|
| Fox, Lawrence | 9/26/13 | New York, NY | Throughout the Class Period, he served as Pfizer's Assistant Secretary and Assistant General Counsel. He served as Pfizer's lead in-house securities and corporate governance counsel. He was one of the six individuals that Defendants originally identified as trial witnesses, and he was one of the two lawyers Defendants identified in connection with their reliance-on-counsel defense. Plaintiffs intended to call him as a witness at trial. |
| Westlock, Mark | 9/27/13 | St. Louis, MO | At Pfizer from 2001 to 2008 during which time he was a sales representative and did a one-year stint as a District Manager responsible for marketing Geodon. He filed a *Qui Tam* lawsuit accusing Pfizer of illegally promoting Geodon after he was constructively discharged in the fall of 2008. Plaintiffs intended to call him as a witness at trial. |
| Clark, Robert | 10/11/13 | Southport, CT | At Pfizer from 1992 to 2012. From June 2003 to February 2007 he was Vice President of US Regulatory Affairs and had responsibility for Geodon, Zyvox and Lyrica. Each Review Committee – there was a committee for each drug – reported to him. From 2007 to 2009, he was Vice President, Worldwide Regulatory Strategy. Plaintiffs intended to use his deposition testimony at trial. |
| Loebel, Antony | 10/31/13 | New York, NY | From 2001 to 2007, he was the Medical Director for Geodon and ultimately became the Senior Medical Director. Plaintiffs intended to call him as a witness at trial. |
| Levy, Lisa | 11/6/13, 11/7/13 | New York, NY | At Pfizer from 1998 to 2007. In 2000, she became a Marketing Manager for Bextra and subsequently held the position of Senior Marketing Manager until Bextra was removed from the market. Plaintiffs intended to call her as a witness at trial. |

- 34 -

| DEPONENT | DATE | LOCATION | POSITION/RESPONSIBILITIES |
|---|---|---|---|
| McKinnell, Henry | 11/11/13, 9/19/14 | New York, NY | Defendant in this Litigation who was at Pfizer from 1971 to January 2007. Among numerous positions held, he was CFO for three to four years in the late 1990s and he was CEO from 2001 until September 2006.  He was deposed twice in this Litigation.  Plaintiffs intended to call him as a witness at trial. |
| Waxman, Allen | 11/14/13, 10/16/14 | New York, NY | Defendant in this Litigation who held various in-house legal positions at the Company including General Counsel from the fall of 2006 until his departure from Pfizer in 2007.  He was deposed twice in this action.  Plaintiffs intended to call him as a witness at trial. |
| Read, Ian | 11/20/13 | New York, NY | Defendant in this Litigation, who started at Pfizer in 1978, was promoted to President of Worldwide Pharmaceutical Operations in the fall of 2006 and held that position throughout the Class Period. In that position he had the responsibility for approving the drug Operating Plans which contained the core marketing messages.  He is currently Pfizer's CEO. Plaintiffs intended to call him as a witness at trial. |
| D'Amelio, Frank | 12/4/13 | New York, NY | Defendant in this Litigation who became Pfizer's CFO in September 2007 during the Class Period when he was hired to replace defendant Levin.    Plaintiffs intended to call him as a witness at trial. |
| Kindler, Jeffrey | 12/6/13, 10/10/14 | New York, NY | Defendant in this Litigation who was Pfizer's General Counsel until August 2006 at which time he became the Company's CEO.  He remained CEO until the end of the Class Period.  He was deposed twice in this case.   Plaintiffs intended to call him as a witness at trial. |
| Levin, Alan | 12/10/13, 9/23/14 | New York, NY | Defendant in this Litigation who started at Pfizer in 1987 and eventually served as Pfizer's CFO from March 2005 to September 2007 when he left the Company.  He was deposed twice in this case.  Plaintiffs intended to call him as a witness at trial. |

| DEPONENT | DATE | LOCATION | POSITION/RESPONSIBILITIES |
|---|---|---|---|
| Dowd, Christopher P. | 12/12/13 | New York, NY | At Pfizer from 1986 to 2005. In November 2002, he became Vice President of Sales for a division at Pfizer responsible for marketing Bextra to physicians. He held that position until after Bextra was withdrawn from the market in April 2005. Plaintiffs intended to call him as a witness at trial. |
| Kelly, J. Patrick | 1/14/14, 1/15/14 | San Francisco, CA | Originally a defendant in this Litigation who Plaintiffs agreed to dismiss from the case. He was President of U.S. Pharmaceutical Operations at Pfizer during the period when the Company marketed Bextra from March 2002 to April 2005. Plaintiffs intended to call him as a witness at trial. |
| Feczko, Joseph | 1/15/14 | New York, NY | Originally a defendant in this Litigation who Plaintiffs agreed to dismiss from the case. He became Chief Medical Officer and a member of Pfizer's Executive Leadership Team in August 2006 when defendant Kindler became CEO. He was familiar with the development and launch of the Drugs. |
| Lankler, Douglas | 1/22/14 | New York, NY | Throughout most of the Class Period, he served as Pfizer's Chief Compliance Officer. He was integrally involved in Pfizer's internal investigation concerning off-label promotion allegations related to the Drugs. He was one of the six individuals originally identified by Defendants as trial witnesses. Plaintiffs intended to call him as a witness at trial. |
| Shedlarz, David | 2/14/14 | New York, NY | Originally a defendant in this Litigation who Plaintiffs agreed to dismiss from the case. He became Senior Vice President and a member of Pfizer's Executive Leadership Team in August 2006 when defendant Kindler became CEO. |

- 36 -

| DEPONENT | DATE | LOCATION | POSITION/RESPONSIBILITIES |
|---|---|---|---|
| Bailey-Hardy, Angela | 9/25/14 | Melville, NY | She was a Pfizer sales representative throughout the time that Pfizer was promoting Bextra. She promoted Bextra as a member of Pfizer's Brooklyn-Powers Division, where her District Manager was Thomas Farina ("Farina"). Farina was charged and convicted at trial for destroying, altering or falsifying documents related to the government's investigation of Pfizer's off-label promotion of Bextra. She was one of the individuals Defendants identified on their final trial witness list. |
| Alvarez, Alejandro (Alex) | 9/25/14 | Melville, NY | He was a Pfizer sales representative throughout the time that Pfizer was promoting Bextra. He promoted Bextra as a member of Pfizer's Brooklyn-Powers Division, where his District Manager was Farina.  He was a government witness in Farina's criminal trial, which ended with Farina being convicted for destroying, altering or falsifying documents related to the government's investigation of Pfizer's off-label promotion of Bextra. He was one of the individuals Plaintiffs identified on their final trial witness list. |
| Kopchinski, John | 10/23/14 | San Antonio, TX | He was a Pfizer sales representative throughout the time that Pfizer was promoting Bextra. He promoted Bextra as a Senior Specialty Representative in Pfizer's Southeast Region.  He filed a *Qui Tam* complaint against Pfizer, alleging that Pfizer had engaged in the off-label promotion of Bextra. He was one of the individuals Plaintiffs identified on their final trial witness list. |

These depositions were critical in developing evidence concerning the marketing and sales of the

Drugs, the DOJ's Off-Label Promotion Investigation, Pfizer's shoddy internal controls over

healthcare compliance to prevent off-label promotion and to establish Defendants' knowledge of

material, non-public facts.  The depositions were also critical in establishing the admissibility of

- 37 -

documentary evidence.  All told, in the Pfizer and third party depositions, Plaintiffs marked nearly

1,000 exhibits and took over 241 hours of deposition testimony.  Based on this deposition testimony,

Lead Counsel continually assessed the sufficiency of Defendants' document productions in order to

request additional documents to prove Plaintiffs' case.

63.     In addition to taking depositions, Lead Counsel were required to defend the

depositions of five individuals, including Plaintiff Jones, Lead Plaintiff Philips' representatives,

Theo Kamps and Roger Otten, and two witnesses from Philips' Investment advisor BlackRock.

These depositions included:

| DEPONENT | DATE | LOCATION |
|---|---|---|
| Jones, Mary K. | 12/15/11 | Fayetteville, KS |
| Kamps, Theo (Philips) | 1/11/12 | New York, NY |
| Hanson, Daniel (BlackRock) | 5/16/12 | New York, NY |
| Otten, Roger (Philips) | 7/18/13 | New York, NY |
| Bristow, James (BlackRock) | 1/7/14 | London, UK |

64.     Plaintiffs also conducted the depositions of six third party fact witnesses, including

current and former employees of Pfizer's external auditor and outside counsel during the Class

Period.  Those depositions took place on the dates and at the locations listed below:

| DEPONENT | DATE | LOCATION | POSITION/RESPONSIBILITIES |
|---|---|---|---|
| Riso, Eric A. | 8/1/13 | New York, NY | At KPMG from 2002 to the present.  From 2002 through early 2010, he worked on the Pfizer audit engagement team, starting as a lead senior manager and ultimately took on the responsibilities of second partner in support of the lead engagement partner.  During the Class Period, he was responsible for running the operational side of the Pfizer audits, including the supervision of the day-to-day tasks of KPMG audit personnel. |

| DEPONENT | DATE | LOCATION | POSITION/RESPONSIBILITIES |
|---|---|---|---|
| Hedley, Timothy | 8/7/13 | New York, NY | At KPMG from 2000 to the present. Beginning in 2000, he worked as a director in KPMG's forensic and litigation services practice and in 2003 he obtained the position of partner in KPMG's forensic practice where he served as global lead for KPMG's fraud risk management service offerings. During the Class Period, he assisted KPMG audit personnel in implementing SAS 99, the auditing standard KPMG used in determining if Pfizer's financial statements were free of material misstatement, whether caused by error or fraud.  Further, he was responsible for assuring that Pfizer's potential illegal acts were brought to the attention of the KPMG audit engagement team. |
| Bradley, Larry P. | 8/8/13, 8/9/13 | New York, NY | At KPMG from 1983 to the present. Beginning in 2008, he took on the responsibilities of the lead partner on the Pfizer audit engagement.  His responsibilities included ensuring that the Pfizer engagement was appropriately planned, staffed and executed for the purposes of his ultimate responsibility for signing the annual audit opinion.  He was further responsible for the planning, staffing and execution of the quarterly reviews of Pfizer's interim financial statements during 2008. |
| Chapman, John | 9/5/13 | New York, NY | At KPMG from 1976 to the present. Between 2003 and 2007, he was the lead partner on the Pfizer audit engagement.  His responsibilities included creating the KPMG audit plan, scoping the annual audits, overseeing the execution of the audit and ultimately signing the annual audit opinion. He was also responsible for the planning, staffing and execution of the quarterly review of Pfizer's interim financial statements from the beginning of the Class Period through the fourth quarter of fiscal year 2007. |

- 39 -

| DEPONENT | DATE | LOCATION | POSITION/RESPONSIBILITIES |
|----------|------|----------|---------------------------|
| Block, Dennis | 9/16/13 | New York, NY | Throughout the Class Period, he served as Pfizer's outside SEC disclosure counsel, which meant that he reviewed all of Pfizer's significant SEC filings.  He was one of the six individuals originally identified by Defendants as trial witnesses, and he was one of the two lawyers Defendants identified in connection with their reliance-on-counsel defense. |
| O'Connor, Brien | 10/2/13 | Boston, MA | He served as Pfizer's lead outside counsel for the criminal and civil resolutions of the government's investigations concerning the off-label promotion of the Drugs, which were the subject of the alleged misstatements and omissions in this case.  He signed the plea agreement concerning the off-label promotion of Bextra and he appeared in court for the plea and sentencing hearings. He was one of the six individuals originally identified by Defendants as trial witnesses, but later he was withdrawn from their witness list. |

65.     As with the Pfizer depositions, these depositions were critical in developing evidence regarding Defendants' alleged fraud.  This was particularly important because Pfizer's former outside counsel for the DOJ's Off-Label Promotion Investigation, Brien O'Connor, resided outside this District and there was a serious question as to whether he could be compelled to appear at trial.  In sum, Lead Counsel took more than 41 hours of third party deposition testimony.

**F.     Expert Witnesses and Consultants**

66.     To assist Lead Counsel in investigating and proving Plaintiffs' claims and navigating the complex issues involved in this matter, the services of certain experts and consultants were required.

- 40 -

### 1. Crowninshield Financial Research

67.     Plaintiffs utilized the services of the well-known economic consulting firm, Crowninshield Financial Research ("CFR"), to examine and explain how Pfizer's stock trades in an efficient market, to conduct a thorough event study examining all industry, market and Company specific news during the Class Period, to review and analyze documents related to events surrounding Pfizer's announcement on January 26, 2009 and to provide analyses in connection with determining and proving loss causation and damages.  CFR's economic analysis was integral to demonstrating that Pfizer traded in an efficient market, eliminating non-fraud related factors from the decline in Pfizer's stock price, allowing Plaintiffs to demonstrate loss causation and quantifying damages suffered by Plaintiffs and the Class of all investors who purchased Pfizer stock during the Class Period.

### 2. Stephen P. Feinstein

68.     Dr. Feinstein, founder and President of CFR, is an Associate Professor of Finance at Babson College, has published extensively regarding corporate valuation, derivatives and investments.  Prior to entering academia, Dr. Feinstein was an economist at the Federal Reserve Bank of Atlanta.  Dr. Feinstein has provided analysis and testimony in numerous class action securities lawsuits, ERISA cases, the *qui tam* yield burning cases, derivatives valuations and complex business litigation.  Initially, Dr. Feinstein provided a declaration in support of Plaintiffs' motion for class certification.  Dr. Feinstein was deposed by Defendants while the parties were briefing Plaintiffs' motion for class certification.  At his first deposition, Dr. Feinstein explained the conclusions set forth in his declaration that Pfizer's stock traded in an efficient market.  Dr. Feinstein provided evidence that was instrumental to the Court's order granting the motion for class certification.

- 41 -

69.      Later, during expert discovery, Plaintiffs offered Dr. Feinstein as a loss causation and damages expert to opine that Plaintiffs' allegations of fraud were the proximate cause of Plaintiffs' losses.  Dr. Feinstein provided a detailed, 94-page report opining on the percentage of the $1.90 per share drop on January 26, 2009 that aggrieved investors were entitled to by disentangling and economically quantifying the per share impact of the following non-fraud related factors: (i) the Wyeth acquisition; (ii) the dividend cut; and (iii) Pfizer's 2009 revenue and earnings guidance and the explanations given by Defendants for that guidance, including the adverse impact that repatriating cash from overseas would have on Pfizer's tax obligations.  Dr. Feinstein and his staff at CFR spent many hours preparing his class certification declaration and expert report, as well as several days preparing for and providing deposition testimony on two occasions.  Further, Dr. Feinstein and his staff spent significant time assisting Lead Counsel in analyzing Defendants' experts' reports, preparing counsel to depose Defendants' experts and providing assistance with the *Daubert* motion Defendants filed in advance of trial.  Dr. Feinstein and his staff also assisted Lead Counsel in opposing Defendants' loss causation arguments on summary judgment and helped Lead Counsel prepare for the mediation and settlement discussions in November 2013, November and December 2014 and January 2015.  Dr. Feinstein also spent time with Lead Counsel preparing for his testimony at trial.

### 3.      Hemming Morse, LLP

70.      Plaintiffs utilized the services of Hemming Morse, LLP, a highly respected firm of Certified Public Accountants ("CPA") and forensic accountants providing financial, economic and accounting expertise in complex business disputes, litigation and financial fraud litigation in the United States and internationally.  Hemming Morse, LLP examined Pfizer's public disclosures regarding the DOJ's Off-Label Promotion Investigation, the Company's financial disclosures

- 42 -

regarding reserves for legal contingencies and whether Pfizer's financial statements complied with GAAP. Hemming Morse, LLP provided invaluable assistance when Lead Counsel was preparing the Consolidated Complaint and the FAC regarding how to treat the revenue and earnings Pfizer derived from off-label marketing of the Drugs. Hemming Morse, LLP also helped Plaintiffs review documents and provided analyses in connection with disclosures, contingency reserves, GAAP and Pfizer's internal controls.

### 4.    D. Paul Regan

71.    Plaintiffs offered D. Paul Regan ("Regan") of Hemming Morse, LLP as an accounting expert concerning Pfizer's business and financial reporting during the Class Period. Regan, CPA/CFF, CFE has been a CPA for more than 40 years and was a member of the American Institute of CPA governing Council from 2003-2011. As an auditor, Regan served as engagement partner and supervised and participated in more than 100 audits of public and private companies. As an expert, Regan has testified in more than 100 trials and arbitrations and more than 200 depositions where his opinions related to compliance with GAAP, Public Company Accounting Oversight Board ("PCAOB") Auditing Standards, SEC accounting requirements, financial statement fraud and the adequacy of disclosures of financial information to investors. Regan provided a detailed, 90-page report and a supplemental report opining that Pfizer's Class Period SEC filings failed to disclose: (i) the nature and circumstances of the DOJ's Off-Label Promotion Investigation; (ii) the probable loss or range of possible loss Pfizer would incur as a result of the DOJ's Off-Label Promotion Investigation; (iii) whether Pfizer's earnings conformed with GAAP in light of the status and circumstances of the DOJ's Off-Label Promotion Investigation; and (iv) whether the Company's internal controls over healthcare compliance suffered a material weakness. Regan and his staff at Hemming Morse, LLP spent many hours preparing his reports, as well as

- 43 -

numerous days preparing for and providing deposition testimony.  Further, Regan and his staff spent significant time assisting Lead Counsel in analyzing Defendants' experts' reports, preparing counsel to depose Defendants' experts and providing input with respect to the *Daubert* motion Defendants filed in advance of trial.

### 5.  Greylock McKinnon Associates

72.  Plaintiffs utilized the services of Greylock McKinnon Associates ("GMA") to analyze and consult with Lead Counsel regarding what impact Pfizer's off-label promotion had on the Drugs' sales and profits.  GMA provides expert economic analysis and litigation support to a diverse group of domestic and international clients in the legal profession, the business community and government agencies.  GMA economists are nationally recognized experts from major universities and have considerable experience at deposition, trial and regulatory hearings.  GMA conducts economic, statistical, econometric and financial analyses and employs methodologies that range from simple supply and demand analyses to extremely sophisticated econometric techniques.  GMA has extensive experience employing econometric techniques recognized in the industry and by courts around the country, which are used to calculate the impact off-label promotion has on revenue and profits from drug sales.  GMA consulted with Lead Counsel throughout the Litigation.  During the massive document review Plaintiffs conducted to analyze the more than 23.3 million pages produced, GMA provided invaluable assistance searching for documents related to the marketing, sales and profit and loss derived from the Drugs.  Based on their expertise in the industry, GMA was able to direct Lead Counsel to search for and recover specific documents related to the Drugs.  In addition, GMA helped coordinate obtaining information regarding the marketing of and sales achieved for the Drugs from industry third parties that monitor drug sales and track information on how those sales were derived.  This information was crucial for GMA to

- 44 -

employ while completing its econometric modeling of the Drugs' sales.  GMA's work was essential for Plaintiffs to establish how Pfizer's sales and earnings were impacted by off-label promotion.

### 6.    Meredith B. Rosenthal, Ph.D.

73.    Plaintiffs designated Meredith B. Rosenthal, Ph.D., of GMA as an economic expert to explain the theory of how and why promotion is used by pharmaceutical companies to increase sales.  Dr. Rosenthal opined that Pfizer's off-label promotion of the Drugs increased the sales and profits achieved and quantified the impact of off-label promotion.  Dr. Rosenthal is a Professor of Health Economics and Policy at the Harvard School of Public Health and an Academic Affiliate of GMA.  Dr. Rosenthal's detailed, 73-page report set forth her opinions that the alleged unlawful promotional practices by Pfizer of the Drugs resulted in increased revenue and profits to Pfizer.  Dr. Rosenthal also quantified the financial impact of these practices.  With respect to Bextra, Geodon and Lyrica, Dr. Rosenthal relied on econometric modeling by Dr. Christopher F. Baum for the quantification of the impact the challenged promotion had on sales of those three drugs.  As to Zyvox, Dr. Rosenthal examined how Pfizer itself calculated the increase in Zyvox sales and profits from the Company's unlawful promotion of Zyvox.  Dr. Rosenthal and her staff at GMA spent many hours preparing her report, as well as numerous days preparing for and providing deposition testimony.  Further, Dr. Rosenthal and her staff at GMA spent significant time assisting Lead Counsel in analyzing Defendants' experts' reports, preparing counsel to depose Defendants' experts and providing input with respect to the *Daubert* motions Defendants filed in advance of trial.

### 7.    Christopher F. Baum, Ph.D.

74.    Plaintiffs also designated Christopher F. Baum, Ph.D., also of GMA, as an econometric expert.  Dr. Baum implemented econometric techniques used by Dr. Rosenthal to quantify how the alleged off-label promotion actually increased Pfizer's sales of Bextra, Geodon

- 45 -

and Lyrica.  Dr. Baum is a Professor of Economics and Social Work at Boston College and an Academic Affiliate of GMA.  Dr. Baum provided a 13-page report setting forth his conclusions that a strong statistically significant relationship existed between Pfizer's promotion and its sales of Bextra, Geodon and Lyrica and his estimate of the impact Pfizer's off-label promotion had on sales. Dr. Baum and his staff at GMA spent many hours preparing his report, as well as numerous days preparing for and providing deposition testimony.  Further, Dr. Baum and his staff spent significant time assisting Lead Counsel in analyzing Dr. Rosenthal's expert report and understanding complex econometric analysis including econometric techniques.  Dr. Baum and his staff also spent substantial time assisting Lead Counsel in analyzing Defendants' experts' reports, preparing counsel to depose Defendants' experts and providing input with respect to the *Daubert* motions Defendants filed in advance of trial.

### 8.   Jerry L. Avorn

75.   Plaintiffs designated Jerry L. Avorn, M.D., as a pharmacoepidemiology and pharmacoeconomics expert on the impact pharmaceutical manufacturers marketing has on physicians.  Dr. Avorn opined that Pfizer engaged in a pervasive and consistent campaign of illegal off-label promotional activities as to the Drugs.  Dr. Avorn is a Professor of Medicine at Harvard Medical School and Chief of the Division of Pharmacoepidemiology and Pharmacoeconomics in the Department of Medicine at the Brigham and Women's Hospital, one of Harvard's main teaching hospitals.  The division he founded includes a staff of over 50 people including Harvard Medical School professors, associate professors, assistant professors, junior faculty, research assistants, staff scientists, programmers and other staff.  For over 35 years, a core component of his research has been the study of how physicians make drug prescribing choices.  His work involved the assessment of pharmaceutical companies' marketing practices, their influence on continuing

- 46 -

medical education courses and contact with physicians in training to influence their knowledge about medication benefits and risks.  He is also an expert in the study of medication safety and side effect outcomes, pharmaceutical cost-effectiveness and drug policy as it relates to U.S. Food and Drug Administration's ("FDA") decisions concerning the approval of medications.  His book, "Powerful Medicines:  The Benefits, Risks, and Costs of Prescription Drugs," first published in 2004 is now in its eleventh printing.  Dr. Avorn provided a detailed, 53-page report describing Defendants' illegal promotion of the Drugs at issue, including promoting the Drugs for unapproved indications and dosages, directing promotional activities at unapproved patient populations and asserting unapproved superiority claims for the Drugs above others in their class.  Dr. Avorn analyzed Pfizer's use of:  (i) advisory boards; (ii) specialty conferences; (iii) publications programs; (iv) continuing medical education conferences; (v) standing orders and protocols; and (vi) other speaker programs to provide examples of impermissible off-label promotion during the Class Period, and opined on whether impermissible off-label core promotional messages were handed down by Pfizer headquarters to its Regional and District Managers to provide guidance to the sales force on how to promote the Drugs to physicians.  Dr. Avorn spent significant time preparing his report, as well as numerous days preparing for and providing deposition testimony.  Further, Dr. Avorn analyzed Defendants' experts' reports to prepare counsel to depose Defendants' experts and provided assistance with the *Daubert* motions Defendants filed in advance of trial.  In preparation for trial, Lead Counsel sent Dr. Avorn a set of documents that were to be used as exhibits during his testimony.  Dr. Avorn and Lead Counsel had a telephonic session to prepare for his trial testimony in mid-January 2015 and were scheduled to meet for another preparation session in Boston on January 20, 2015.  Dr. Avorn's assistance in this case was invaluable because of his unique qualifications to explain to a jury how marketing affects physicians' prescribing behavior.

- 47 -

9.     **Nicholas P. Jewell, Ph.D.**

76.      During discovery as Plaintiffs began examining documents related to Zyvox and specifically Pfizer's marketing message that Zyvox was superior to a 50-year old inexpensive antibiotic called "vancomycin," Plaintiffs employed the consulting services of Nicholas P. Jewell, Ph.D. to examine Pfizer's superiority claim.  Dr. Jewell is a Professor of Biostatistics and Statistics at the University of California, Berkeley, and a Fellow of the American Statistical Association, the Institute of Mathematical Statistics and the American Association for the Advancement of Science. In 1976, he earned his Ph.D. in Mathematics from the University of Edinburgh and between 1977 and 1978 was a Harkness Fellow at Stanford University, Division of Statistics and Biostatistics.  In the last four years, Dr. Jewell has provided opinions in 12 cases regarding biostatistics, including in several large and complex securities class actions.  His expertise includes statistical methods related to infectious diseases, biostatistical techniques in epidemiological data analysis, survival analysis and stochastic processes, and genomics.  Dr. Jewell also examined the FDA's response to Pfizer's marketing claim that Zyvox was superior to vancomycin and how Pfizer continued to use the superiority claim even though the FDA instructed it to cease and desist.  During the document review in this case, Dr. Jewell analyzed documents relating to the clinical studies Pfizer sponsored to establish superiority.

77.      Thereafter, Plaintiffs offered Dr. Jewell as a medical and biostatistical expert.  He opined that Pfizer did not have sufficient scientific evidence or clinical experience to make any promotional claim that Zyvox was superior to vancomycin.  Dr. Jewell provided a detailed, 40-page report describing: (i) what it means to conduct a "well-designed" and "well-controlled" clinical trial; (ii) statistical inference; (iii) statistical significance; (iv) how clinical trials must be "powered" in order to make reasonable conclusions from trial data using commonly accepted statistical

- 48 -

techniques; and (v) the statistical inferences which can, or cannot, be made given the design and limitations of certain clinical trials related to Zyvox.  Dr. Jewell spent many hours preparing his report, as well as numerous days preparing for and providing deposition testimony.  Dr. Jewell's participation in the case was critical in Plaintiffs' efforts to prove that Pfizer did not have a statistically sound basis to claim Zyvox was superior to vancomycin.  This issue was a key part of Plaintiffs' claim that Pfizer failed to disclose that it was profiting by illegally promoting Zyvox.

### 10.    Robert A. Rosenheck, M.D.

78.    Plaintiffs utilized the services of Robert A. Rosenheck, M.D. to evaluate Pfizer's statements about Geodon.  Specifically, Plaintiffs retained Dr. Rosenheck to evaluate Pfizer's claims that the Clinical Antipsychotic Trials of Intervention Effectiveness ("CATIE") demonstrated that Geodon was more effective than traditional antipsychotic medications.  Dr. Rosenheck, Professor of Psychiatry, Epidemiology and Public Health, and the Child Study Center, Yale Medical School, has published extensively regarding antipsychotic medications and was a co-author of the CATIE study.  Dr. Rosenheck is a nationally prominent clinically trained psychiatrist who lectures worldwide and has published extensively including several major studies on the efficacy, cost-effectiveness and clinical trials of atypical antipsychotic medications.  For 22 years he served as the Director of the Department of Veterans Affairs ("VA") Northeast Program Evaluation Center ("NEPEC"), a national arm of the VA Central Office in Washington and is now a Senior Investigator at the VA New England Mental Illness Research Education and Clinical Center.  In these capacities, he has been responsible for monitoring and evaluating the effectiveness and cost of mental health initiatives nationally in the U.S. Veterans Health Administration which provides health services to over five million veterans annually.  He has published over 650 papers in the peer-reviewed scientific literature and authored over 100 VA program evaluation reports, including

- 49 -

seven annual reports on the pharmacotherapy of schizophrenia in the VA nationally.  He has published several major studies on the cost-effectiveness of atypical antipsychotic medications for several psychiatric conditions.  He is currently on the Editorial Board of the Journal of Mental Health Policy and Economics, the American Journal of Psychiatric Rehabilitation and Health Services Research.

79.     Dr. Rosenheck opined that Pfizer's claims for Geodon based on the results of the CATIE study were false and misleading in the following areas: (i) the effectiveness of Geodon as an antipsychotic; (ii) the relative efficacy of Geodon as compared to other antipsychotics; (iii) the association of Geodon with metabolic side effects; and (iv) assertions that dosing of Geodon was inadequate.  Dr. Rosenheck provided a detailed 67-page report describing complex concepts regarding the class of drugs to which Geodon belongs (second generation antipsychotics) and evaluating whether the CATIE study supported statements regarding Geodon made by Pfizer's senior executives, marketing personnel and sales representatives when communicating the core promotional messages for Geodon.  Dr. Rosenheck devoted considerable time to interacting with Lead Counsel and preparing his report.

### 11.     Berkeley Research Group, LLC

80.     Berkeley Research Group, LLC ("Berkeley") is an international consulting firm that offers expertise in a multitude of areas.  Plaintiffs retained Berkeley to examine Pfizer's disclosure process regarding the DOJ Off-Label Promotion Investigation and the Company's internal heathcare compliance controls.  Because this Litigation involved, among other allegations, the adequacy of Pfizer's disclosures, Berkeley's expertise in these areas was very useful to Plaintiffs.

### 12.    Kevin L. O'Brien

81.    Plaintiffs designated Kevin L. O'Brien ("O'Brien"), from Berkeley, as a healthcare compliance expert to examine the risks faced by pharmaceutical companies that do not comply with the healthcare laws, rules and regulations, including CIAs.  O'Brien opined that the deficiencies in Pfizer's healthcare compliance controls contributed to Pfizer's off-label promotional activities. O'Brien is co-founder and a Director with Berkeley and a member of its Healthcare Practice group. O'Brien has over 25 years of experience providing accounting, financial, economic, regulatory and operational consulting services to organizations and individuals operating in the healthcare, health insurance and pharmaceutical industries.  O'Brien holds a Master's degree in Health Services Administration, a Master of Science degree in Systems Management and a Bachelor of Arts degree in Accounting.  He is a Certified Fraud Examiner, Certified Internal Control Auditor, Certified Valuation Analyst and a Master Analyst in Financial Forensics.  O'Brien has substantial experience in healthcare compliance and regulatory matters, including development, implementation and testing of corporate compliance programs.  O'Brien has tested and reviewed the internal controls for health service organizations, including entities in the pharmaceutical industry.  O'Brien provided a detailed 37-page report describing the actual state of Pfizer's healthcare compliance controls during the Class Period and the likelihood that deficiencies in those controls contributed to Pfizer's off-label promotional activities.  O'Brien and his staff at Berkeley spent many hours preparing his report, as well as several days preparing for and providing deposition testimony.  Further, he and his staff spent significant time assisting Lead Counsel in analyzing Defendants' experts' reports and preparing counsel to depose Defendants' experts.

### 13.    Edward J. Buthusiem

82.    In addition to O'Brien, Plaintiffs also designated Edward J. Buthusiem ("Buthusiem"), from Berkeley, as an expert in the disclosure process in the pharmaceutical industry.  Buthusiem opined that the processes and procedures Pfizer used to draft the legal proceedings disclosures in the Company's public filings to describe the DOJ Off-Label Promotion Investigation was flawed.  Buthusiem is also a Director at Berkeley and is in the Corporate Compliance and Risk Management practice where he advises clients on a variety of business, regulatory, operational, intellectual property, litigation, transactional and compliance matters, with particular emphasis in legal operations, compliance and corporate governance.  Prior to joining Berkeley, Buthusiem spent 20 years with GlaxoSmithKline plc ("GSK") in various senior positions in GSK's global legal department, and most recently held the title of Senior Vice President and Special Counsel and was in charge of GSK's legal proceeding disclosures.  While in charge of GSK's legal proceeding disclosures, Buthusiem was involved in the disclosure of the DOJ's investigation of certain GSK off-label promotional practices.  Buthusiem's experience with legal proceeding disclosures and familiarity with pharmaceutical industry government investigations, and in particular, off-label promotion investigations similar to those Pfizer faced during the Class Period, was extremely useful to Plaintiffs.  Plaintiffs, therefore, designated Buthusiem as a healthcare compliance expert to opine on the deficiencies in Pfizer's legal proceedings disclosure process.  Buthusiem provided a detailed 25-page report setting forth his conclusions that Pfizer's legal proceedings disclosures process was flawed.  Buthusiem and his staff at Berkeley spent many hours preparing his reports, as well as several days preparing for and providing deposition testimony.  Further, he spent significant time assisting Lead Counsel in analyzing Defendants' experts' reports and preparing counsel to depose Defendants' experts.

- 52 -

### 14.   Sara Sun Beale

83.     Because Defendants asserted their reliance-on-counsel defense and specifically named Dennis Block ("Block") and Lawrence Fox ("Fox") as counsel relied upon, Plaintiffs designated Professor Sara Sun Beale as a corporate criminal liability expert to opine on the doctrine of corporate criminal liability based on the *respondeat superior* doctrine.  Professor Beale is the Charles L.B. Lowndes Professor of Law at the Duke University School of Law.  Professor Beale has been on the faculty at the Duke University School of Law since 1979, and has held the Charles L.B. Lowndes Chair since 2001. One of her fields of specialization is federal criminal law, including corporate criminal liability.  She is the author of numerous books and scores of articles, and the co-author of "Federal Criminal Law and Related Actions: Crimes, Forfeiture, the False Claims Act and RICO" (1998), "Grand Jury Law and Practice" (1986 & 2d ed. 1997) and "Federal Criminal Law and Its Enforcement" (2d ed. 1993, 3d ed. 2000, 4th ed. 2006) (with Norman Abrams). Her work has been cited on many occasions by the Supreme Court and other  federal courts.  Professor Beale was retained to testify regarding the fundamental nature of corporate criminal liability under the *respondeat superior* doctrine and how a corporation is criminally liable for crimes committed by employees.  Professor Beale provided a 19-page report opining on the misleading nature of Defendants' claims of "substantial defenses" to the DOJ's Off-Label Promotion Investigation in light of the *respondeat superior* doctrine.  Professor Beale's opinions were very helpful and would have assisted the trier of fact in evaluating Plaintiffs' scienter allegations.  Professor Beale spent considerable time preparing her report and conferring with Lead Counsel.

### 15.    Consultants

84.    In addition to testifying experts, Plaintiffs retained various consultants who had extensive experience with pharmaceutical company's marketing practices or who had first-hand knowledge of Pfizer's promotional practices.  For example, Plaintiffs' retained John Abramson, M.D. and Palko Goldman, M.D. regarding Pfizer's promotion of Bextra, Geodon and Lyrica for non-FDA approved indications, dosages and patient populations.  Drs. Abramson and Goldman have extensive experience evaluating pharmaceutical company's marketing practices and as consultants assisting attorneys with large-scale and complicated document reviews.  Drs. Abramson and Goldman spent substantial time reviewing documents and analyzing the strategies and techniques that Pfizer employed to promote Bextra, Geodon and Lyrica off-label, including presentations made during advisory boards, symposia, medical conferences and continuing medical education programs and made by physicians hired by Pfizer as key opinion leaders ("KOLs"), Company-employed medical specialists and sales representatives.

85.    In addition, Plaintiffs retained Stefan Kruszewski, M.D. and Steven G. Klotz, M.D., clinically trained psychiatrists, who had extensive first-hand knowledge regarding Pfizer's efforts to promote Geodon off-label.  Drs. Kruszewski and Klotz were able to direct Plaintiffs in their investigation regarding the off-label promotion of Geodon.  This included giving Lead Counsel details about Pfizer's practice of marketing Geodon to physicians who primarily treated children, adolescents or the elderly despite the FDA never approving Geodon for pediatric or geriatric indications.  Drs. Kruszewski and Klotz also explained Pfizer's practice of marketing Geodon for non-FDA approved symptoms and conditions such as depression, insomnia, anxiety, attention deficit disorder, lack of concentration and other mood, behavioral and conduct disorders.

### 16.    Expert – Related Discovery

86.    Beginning on July 22, 2014, Plaintiffs began serving subpoenas on all of Defendants' experts, seeking information and materials related to their proposed testimony. Plaintiffs expended substantial time negotiating the scope of each expert's production and reviewing the information produced.  Defendants similarly served subpoenas to Dr. Feinstein, Regan, Dr. Rosenthal, Dr. Baum, Dr. Avorn, Dr. Jewell, O'Brien and Buthusium.  Plaintiffs filed objections and produced documents on behalf of their designated experts.

87.    Subsequently, the parties completed expert witness depositions, which were taken or defended by Lead Counsel on the dates and at the locations listed below:

| DEPONENT | DATE | LOCATION |
| --- | --- | --- |
| Jewell, Nicholas P. (Plaintiffs' Expert) | 7/22/14 | San Francisco, CA |
| O'Brien, Kevin L. (Plaintiffs' Expert) | 7/25/14 | Chicago, IL |
| Buthusiem, Edward J. (Plaintiffs' Expert) | 8/1/14 | New York, NY |
| Avorn, Jerome L. (Plaintiffs' Expert) | 8/7/14 | Boston, MA |
| Regan, D. Paul (Plaintiffs' Expert) | 8/12/14 | San Francisco, CA |
| Panchal, Sunil (Defendants' Expert) | 8/22/14 | New York, NY |
| Tanselle, Jack (Defendants' Expert) | 8/28/14 | New York, NY |
| Rosenthal, Meredith B. (Plaintiffs' Expert) | 9/11/14 | Boston, MA |
| Theodorou, Nicholas (Defendants' Expert) | 9/16/14 | New York, NY |
| Baum, Christopher F. (Plaintiffs' Expert) | 9/23/14 | Boston, MA |
| Coates, John C. (Defendants' Expert) | 10/3/14 | New York, NY |
| Nicholson, Sean (Defendants' Expert) | 10/10/14 | Ithaca, NY |
| Feinstein, Steven (Plaintiffs' Expert) | 1/24/12, 10/14/14 | Boston, MA |
| Holder, William (Defendants' Expert) | 10/17/14 | Los Angeles, CA |
| Feigal, David (Defendants' Expert) | 10/21/14 | New York, NY |
| Lehn, Kenneth (Defendants' Expert) | 10/24/14 | New York, NY |

### G.    In-House Forensic Accounting Experts

88.    In order to conduct effective discovery and prepare for trial, Lead Counsel employed highly specialized in-house forensic accounting professionals to provide investigative accounting, auditing and financial expertise to Lead Counsel throughout the pendency of this case.  Andrew J. Rudolph, CPA ("Rudolph"), Christopher Yurcek, CPA ("Yurcek"), and Heather Jennette, CPA

- 55 -

("Jennette") (collectively, the "Forensic Accountants"), provided the majority of forensic accounting services in this case. They worked side-by-side with Lead Counsel in case investigation and evaluation, developing and drafting complaint allegations, responding to motions and assisting with document discovery, depositions, summary judgment, case mediation and trial preparation.

89. Rudolph is the National Director of the firm's forensic accounting department. He is a CPA licensed to practice in California and has been designated by the American Institute of Certified Public Accountants ("AICPA") as Certified in Financial Forensics (CFF). He is also a Certified Fraud Examiner. Rudolph has 30 years of public accounting and consulting experience, including extensive experience in forensic accounting and fraud investigations of national and foreign companies, and began as an auditor for the public accounting firm of Price Waterhouse LLP. Rudolph is an active member of the AICPA, the California Society of Certified Public Accountants ("CalCPA") and the Association of Certified Fraud Examiners.

90. Yurcek is the Assistant Director of the firm's forensic accounting department. He is a CPA licensed to practice in California and has been designated by the AICPA as Certified in Financial Forensics (CFF). Yurcek has over 30 years of public accounting and consulting experience, including extensive experience in forensic accounting and fraud investigations, auditing at both national and local CPA firms, complex business litigation and bankruptcy fraud consulting. Yurcek is an active member of the AICPA, the CalCPA and the Association of Certified Fraud Examiners.

91. Jennette is a forensic accountant in the firm's forensic accounting department. She is a CPA licensed to practice in the states of California and New Jersey. She has been designated by the AICPA as Certified in Financial Forensics (CFF). Jennette has over 20 years of public accounting, auditing and forensic accounting experience, including 17 years of experience directly

- 56 -

related to the investigation of securities fraud.  Prior to joining the firm, she was an auditor for the public accounting firm of Deloitte & Touche LLP where she primarily audited large international public companies.  She is an active member of the AICPA, the CalCPA and the Association of Certified Fraud Examiners.  Jennette was part of the Robbins Geller trial team that moved to New York in early January 2015.

92.     The Forensic Accountants, *inter alia*, reviewed Pfizer's publicly available SEC filings and analyst reports, analyzing and cataloguing the Company's disclosures regarding Legal Proceedings and Contingencies, particularly relating to government investigations, dating back several years prior to the Class Period.  They also performed extensive research of authoritative literature and industry trends and practices relating to the accounting and disclosure of litigation contingencies.  This information was used in developing the allegations appearing in the Consolidated Complaint and in the FAC.

93.     The Forensic Accountants assisted in identifying accounting issues and developing and drafting document discovery necessary to successfully prosecute the case's accounting and financial allegations, and assisted in discovery negotiations and motion practice to that end.  The Forensic Accountants also assisted in determining the sufficiency of the Company's and KPMG's document productions.  They provided evidence that key missing documents existed and assisted Lead Counsel throughout extensive motion practice to obtain these missing documents, successfully defeating Defendants' and KPMG's relevance and privilege claims regarding certain categories of documents.

94.     The Forensic Accountants reviewed and analyzed the voluminous productions of accounting and finance-related documents obtained from Pfizer, KPMG and other third parties including PricewaterhouseCoopers LLP and the DOJ.  The results of this analysis and review were

- 57 -

critical to developing evidence for the accounting issues in the case.  After a detailed analysis of the working papers produced by the auditor and the related documents produced by the Company, the Forensic Accountants determined that Pfizer may have withheld from its auditors important information concerning the DOJ's Off-Label Promotion Investigation.  This information was used in the depositions of KPMG auditors to successfully attack Pfizer's assertion that its auditors knew of and approved the Company's allegedly improper accounting and disclosure of the loss contingency attributable to the DOJ's Off-Label Promotion Investigation.  This information was also used by Plaintiffs' accounting expert who was prepared to testify at trial that Defendants failed to properly account for and disclose the DOJ's Off-Label Promotion Investigation under the applicable accounting and disclosure rules.

95.     A significant portion of the Forensic Accountants' time was spent assisting and preparing Lead Counsel and Plaintiffs' testifying experts on key accounting issues for expert reports, depositions and trial.  Specifically, the Forensic Accountants worked extensively with Plaintiffs' accounting expert, Regan, in order to assist with the preparation of his reports and his deposition and provided key assistance in opposing Defendants' motion to limit Regan's testimony at trial.  Lead Counsel also deposed numerous accounting, auditing and finance professionals employed by Pfizer and KPMG.  The Forensic Accountants played a critical role in this deposition process.  They assisted in identifying key deponents, clarifying deposition objectives, explaining complex audit and accounting principles, selecting deposition exhibits, developing extensive deposition outlines and attending many depositions in order to evaluate testimony and confer with Lead Counsel in real-time.  As a result, Lead Counsel was more effective during depositions, eliciting significant testimony helpful to Plaintiffs' case.

96.     The Forensic Accountants also analyzed Defendants' accounting and compliance experts' reports, evaluating the assertions and theories advanced and identifying the portions of their opinions that should be challenged at deposition, or by motion *in limine*.  They assisted the attorneys in preparing for these experts' depositions, including reviewing prior case testimony and publications, selecting deposition exhibits, attending the deposition and assisted in preparing the motions *in limine*.  As a result, Plaintiffs believe they had a solid basis to significantly narrow the opinions that Defendants' accounting and compliance experts could have credibly advanced at trial, mitigating potentially damaging testimony.

97.     In addition, the Forensic Accountants assisted with summary judgment and trial preparation.  They provided valuable assistance with the selection of potential trial exhibits and deposition testimony excerpts for both summary judgment and trial purposes.  The Forensic Accountants also aided in the design and development of demonstrative and summary exhibits to be used at trial to assist the jury.

98.     The Forensic Accountants' substantial efforts in this case were instrumental in achieving the settlement of the Litigation.  Furthermore, by using in-house forensic accountants, Lead Counsel saved the Class millions of dollars in expenses that would have been incurred if outside experts had been engaged.  Moreover, the Forensic Accountants have been involved in the successful prosecution of cases arising out of some of the largest public company frauds in American corporate history, including Enron, WorldCom, United Health, Household International and many other cases.  The Forensic Accountants were critical to the prosecution of this case.  Again, their time is not billed here as an expense – rather it is included in Robbins Geller's time, thereby reducing expenses that would have been sought from any recovery if any outside accounting firm had been engaged to perform these same tasks.

- 59 -

### H.   The Fruits of Plaintiffs' Discovery Efforts

99.   The evidence developed by Lead Counsel in discovery supported Plaintiffs' allegations that Pfizer failed to inform investors that it was engaged in the widespread off-label promotion of the Drugs and that its conduct created risks to its business and financial results, including that it would be subject to massive fines and exclusion from government-funded programs. Further, the evidence uncovered by Lead Counsel beyond what Defendants produced in discovery – including key documents and witnesses who had not been a part of the Pfizer Derivative or Bextra Criminal Cases – strengthened the case Plaintiffs would have put on at trial in support of their allegations and in undermining Defendants' reliance-on-counsel and reliance-on-auditor defenses.

100.   As demonstrated in Plaintiffs' opposition to Defendants' motions for summary judgment, the documentary and testimonial evidence developed was critical to proving Defendants' public statements were materially false and misleading when made. *See, e.g.*, Dkt. No. 304 at 29-69. The evidence developed by Lead Counsel was also critical in proving Defendants' scienter and establishing that the damages suffered by investors were the result of the alleged fraud. *Id.* at 69-112.

### I.   Class Notice

101.   On October 15, 2014, Plaintiffs moved the Court for approval of class notice and directing class notice procedures because the parties could not reach an agreement on these issues. Dkt. Nos. 221-222. Due to the importance of the issue, the Court accelerated the hearing of the motion, ordering opposition briefing to be filed on October 24, 2014, and the parties to appear on October 28, 2014, for oral argument. Dkt. No. 229. Subsequently, the parties were able to reach an agreement regarding class notice and so informed the Court on October 24, 2014. Dkt. No. 234.

On November 17, 2014, the Court entered the Stipulation and Order Directing Class Notice Procedures.  Dkt. No. 291.

### J.     Summary Judgment Motions

102.    On October 30, 2014, Defendants filed seven separate summary judgment motions with supporting documents that included memoranda of law totaling 242 pages and nearly 300 exhibits.  Dkt. Nos. 244-248, 252-279.  Defendants also jointly filed a 25-page motion *in limine* to exclude Plaintiffs' expert Dr. Feinstein.  Dkt. Nos. 249-251.

103.    On November 26, 2014, Plaintiffs filed their opposition to Defendants' seven complex summary judgment motions, filing upwards of 120 pages of briefing citing to over 500 exhibits and the testimony of 29 witnesses.  Dkt. Nos. 303-305, 307-309.  Plaintiffs also filed objections to certain exhibits Defendants referenced in support of their motions for summary judgment and responses to Defendants' seven lengthy Rule 56.1 statements.  Dkt. Nos. 295, 310-316.  Plaintiffs concurrently filed their 30-page opposition to Defendants' motion to exclude Plaintiffs' expert Dr. Feinstein.  Dkt. Nos. 293-294.  On December 8, 2014, Defendants' filed their replies to Plaintiffs' oppositions and responses to Plaintiffs' objections to Defendants' exhibits and statement of material facts.  Dkt. Nos. 321, 324-327, 329-335.

104.    On November 14, 2014, Plaintiffs filed a motion for partial summary judgment on Defendants' reliance-on-counsel and good faith defenses.  Dkt. No. 287.  On December 18, 2014, Plaintiffs filed their reply in support of the motion for partial summary judgment on Defendants' reliance-on-counsel and good faith defenses.  Dkt. No. 391.  In total, Plaintiffs filed upwards of 87 pages of briefing and 72 exhibits in support of that motion.  Dkt. Nos. 288-290, 318.

### K.      Pretrial Motions

105.     After the July 9, 2014 status conference, during which the Court set the dates for the final pretrial conference and jury trial, Lead Counsel spent the next several months completing the expert discovery outlined above, fully briefing summary judgment, selecting trial exhibits, finalizing witness lists, meeting with experts and dozens of other tasks to prepare for trial.

106.     First, after spending substantial time reviewing the reports and testimony of Defendants' designated experts for trial, Plaintiffs moved to exclude the opinions which would not be of assistance to a jury and which did not meet the standards set forth in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993), and Fed. R. Evid. 702 and 403.  Specifically, Plaintiffs moved to exclude certain opinions of Defendants' proposed experts Dr. Sunil Panchal, William W. Holder ("Holder"), Jack T. Tanselle ("Tanselle") and John C. Coates ("Coates") on December 10, 2014. Dkt. Nos. 385-387. These motions were largely predicated on the extensive deposition testimony Lead Counsel took from each expert, and involved unique and novel issues of law and fact. Further, Plaintiffs moved to exclude cumulative expert testimony from Coates, Tanselle and Nicholas C. Theodorou, Esq. regarding Pfizer's disclosures and Pfizer's off-label promotion from Dr. Panchal, Sean Nicholson and David Feigal regarding Pfizer's off-label promotion.  Dkt. Nos. 372, 374, 377.  After Defendants opposed these motions, Plaintiffs filed replies in support of their motions to exclude expert testimony.  Dkt. Nos. 415, 417.

107.     After careful consideration of the issues Plaintiffs expected to arise during trial, Plaintiffs also filed the following motions *in limine* on December 10, 2014:  (i) relating to trial procedure and the manner in which evidence will be presented at trial; (ii) to preclude Defendants from presenting evidence or making statements concerning the absence of an SEC investigation/ enforcement action or a restatement of Pfizer's Class Period financial statements; (iii) to exclude

reliance evidence and argument; (iv) to admit the deposition testimony of Holloway and for an adverse-inference instruction; (v) to preclude Defendants from disputing the off-label promotion of Bextra and Zyvox; and (vi) to preclude opinion testimony by fact witnesses.  Dkt. Nos. 337-340, 343, 346, 348, 350, 352, 362, 365-366, 369, 381-383.  After Defendants opposed these motions, Plaintiffs filed replies in support of each motion.  Dkt. Nos. 419, 421, 423-426.

108.   On December 10, 2014, Defendants moved to exclude the testimony of Plaintiffs' proposed experts Dr. Avorn, Dr. Rosenthal, Dr. Baum, Dr. Jewell and Regan.  Dkt. Nos. 341-342, 344-345, 347, 349, 376, 378, 384.  Defendants further filed the following motions *in limine* to exclude:  (i) argument and evidence related to the deletion of electronic documents by Pfizer's former employees; (ii) evidence related to the marketing and alleged off-label promotion of the Drugs; (iii) argument and evidence regarding nondisclosures unrelated to Plaintiffs' losses; (iv) evidence regarding the August 2009 criminal information and plea documents from the Bextra Criminal Case; (v) evidence or argument related to the promotion of, and settlement agreements regarding, Neurontin and Genotropin; (vi) evidence of Holloway's invocation of the Fifth Amendment at her deposition and documents relating to her criminal conviction; (vii) physician surveys and sales representatives' call notes; (viii) evidence or testimony in connection with certain statements that are not actionable as a matter of law; (ix) argument at trial that the abandoned statements and omissions support any finding of liability against any of the Defendants; and (x) evidence and argument regarding Defendants' finances.  Dkt. Nos. 351, 353-361, 363-364, 367-368, 370-371, 373, 375, 379-380.  As a result, Plaintiffs spent substantial time and effort reviewing and researching each of Defendants' 14 motions, including the associated memoranda and exhibits, to adequately respond to them on December 22, 2014.  *See* Dkt. Nos. 403-414.

109.    At the time the parties agreed upon a settlement, most of these motions were pending.  However, on January 12, 2015, the Court denied Defendants' *Daubert* motions to exclude Dr. Feinstein and Dr. Avorn, except that Dr. Avorn would not be permitted to testify to someone else's intent, and sustained Plaintiffs' objections to Defendants' trial witnesses Ethan Posner, Gary Giampetruzzi and Carl Wessel.  Dkt. No. 447.  The Court denied Plaintiffs' motion to exclude reliance evidence and argument, but held that Defendants would only be permitted to introduce such evidence and argument at trial to the extent they had allowed Plaintiffs to question Block and Fox about the information and the individuals upon whom they relied.  *Id*.  Further, the Court granted Defendants' motion to exclude evidence related to the marketing and alleged off-label promotion of the Drugs, but indicated that if Defendants disputed that they engaged in off-label promotion and the extent of that off-label promotion, Plaintiffs would be permitted to adduce such evidence at trial.  *Id*.

**L.    Additional Trial Preparation**

110.    In October 2014, Lead Counsel began negotiating with Defendants' counsel concerning motions *in limine*, proposed jury instructions, a statement of claims and defenses, marked pleadings, exhibit and witness lists, deposition designations, stipulated facts and law and the joint pretrial order.  By November 7, 2014, the parties had reached an agreement on the pretrial schedule.  Lead Counsel spent substantial time researching and drafting each of those materials before they were exchanged with Defendants' counsel in December 2014.  These negotiations continued until the parties filed the proposed joint pretrial order with the Court on January 2, 2015.  Dkt. No. 430.

111.    To prepare many of the items attached to the joint pretrial order, Lead Counsel was compelled to re-review thousands of exhibits and dozens of deposition transcripts.  The process to

- 64 -

select trial exhibits alone was on-going for several months.  Lead Counsel created lengthy, detailed exhibit lists, narrowing the number of exhibits to be used to support Plaintiffs' allegations to just under 700.  The lists summarized each exhibit and identified the foundation that would permit each document to be received into evidence.  In addition to trial exhibits, Lead Counsel also began creating demonstrative exhibits to be used at trial.

112.   Lead Counsel also designated deposition testimony for every individual who was deposed in the Litigation but who resided outside this District and thus could not be compelled to appear at trial.  In doing so, Lead Counsel reviewed and analyzed more than 16,000 pages of deposition testimony elicited from percipient witnesses in this case, and carefully evaluated their testimony in light of Plaintiffs' claims and Defendants' asserted defenses.

113.   Lead Counsel's trial preparation also involved an extensive review of the documents and testimony associated with potential trial witnesses.  Lead Counsel reviewed the witness's deposition testimony, the testimony of other witnesses relevant to that witness's testimony, the deposition exhibits presented to that witness and exhibits listed on Plaintiffs' trial exhibit list that were not shown to the witness at deposition but might otherwise be relevant to his or her trial testimony.  Lead Counsel then prepared Plaintiffs' witness list and assembled witness files for the more than 44 witnesses whose testimony would be relied upon at trial.

114.   At the time the case settled, Plaintiffs had already subpoenaed the following witnesses for trial:

| WITNESS | SUBPOENA DATE |
| --- | --- |
| Abelardo, Maria C. | 12/01/14 |
| Alvarez, Alex | 12/02/14 |
| Block, Dennis | 12/02/14 |
| Bradley, Larry | 12/30/14 |
| Cangialosi, Loretta V. | 12/01/14 |
| Cawkwell, Gail | 12/01/14 |
| Chapman, John | 12/30/14 |

- 65 -

| WITNESS | SUBPOENA DATE |
|---|---|
| Dowd, Christopher | 12/29/14 |
|  | 12/31/14 |
| Dowd, Kathleen | 11/12/14 |
| Fox, Lawrence | 12/03/14 |
| Gavigan, Michael | 12/01/14 |
| Gibney, James | 12/30/14 |
| Greensmith, Alan | 11/10/14 |
| Holloway, Mary | 12/30/14 |
| Kelly, J. Patrick | 12/03/14 |
| Kindler, Jeffrey B. | 12/29/14 |
| Lankler, Douglas | 12/01/14 |
| Levin, Alan G. | 12/29/14 |
| Levy, Lisa | 12/01/14 |
| Mahoney, Dee | 12/30/14 |
| McKinnell, Henry A. | 12/29/14 |
| Mooney, Charles | 12/01/14 |
| O'Connor, Brien | 12/30/14 |
| Read, Ian C. | 12/29/14 |
| Waxman, Allen | 12/29/14 |
| Westlock, Mark | 11/11/14 |

115.    The parties were also still negotiating the proposed jury background questionnaire and proposed preliminary jury instructions, when the case settled.  Further, Lead Counsel was in the process of drafting the joint statement of the case to be read to the jury and proposed *voir dire* questions.

116.    Lead Counsel spent substantial time preparing for trial, holding numerous in-depth internal meetings to discuss trial logistics and strategy and coordinating with experts.  As part of this process, Lead Counsel's information technology department began preparing a trial database that included the videotaped depositions and all exhibits anticipated to be used at trial.

117.    After the parties completed and submitted the proposed joint pretrial order on January 2, 2015, Lead Counsel relocated 18 members of the trial team to lower Manhattan in proximity to the Southern District of New York courthouse.  This relocation effort included moving

- 66 -

hundreds of boxes of exhibits, computer stations and personal effects for attorneys and staff who were on the trial team.  In addition, Lead Counsel acquired lodging for the trial team nearby.

## III.    RISKS OF LITIGATION

118.    Although Plaintiffs believe that their case is meritorious and that the Class would ultimately prevail in establishing both liability and damages, they also understand that a number of factors made the outcome of the trial uncertain.  For instance, while Plaintiffs firmly believe that the documentary and testimonial evidence they intended to offer at trial fully supports their claims, there is no way of predicting which interpretations, inferences or testimony a jury would accept. Further, Defendants have adamantly denied any culpability throughout the litigation and were prepared to mount aggressive defenses that could potentially bar a Class recovery.  If the jury sided with Defendants on even one of their defenses, the Class would recover nothing.  Defendants were prepared to aggressively challenge each and every element of Plaintiffs' case alleging violations of the federal securities laws.

### A.    Falsity

119.    As to falsity, Plaintiffs alleged that certain statements by defendants such as "'[c]ompliance with all relevant statutes and rules is both the legacy of our 150-year history and one of our most important advantages in global business'" and that Pfizer "'observes all requirements of the U.S. Food and Drug Administration'" were false and misleading when made.  FAC, ¶61. Defendants on the other hand, asserted that these statements were not actionable and in any event, they were not obligated to disclose that Pfizer was selling its Drugs off-label or that it was not in compliance with the law.  Defendants further asserted that these statements were not material to the reasonable investor.  If the Court or the jury found Defendants' arguments compelling, Plaintiffs would have been hard-pressed to prevail at trial on these statements.

- 67 -

120.     Plaintiffs also asserted that Defendants issued false and misleading statements regarding Geodon, Zyvox and Lyrica sold during the Class Period which failed to reveal that Pfizer was only able to achieve the reported sales by engaging in off-label promotion.  Again, Defendants contested that they actually engaged in the off-label marketing and even if they did, they were under no obligation to disclose that promotional activity.  Defendants asserted that the January 26, 2009 announcement, that Pfizer had agreed to pay the $2.3 billion fine did not even mention Geodon, Zyvox and Lyrica.  Further, even though the $2.3 billion fine related, in part, to the off-label promotion of Geodon, Zyvox and Lyrica during the Class Period, Plaintiffs faced real risk of not being able to demonstrate falsity in the face of Defendants' arguments.

121.     Plaintiffs further asserted that Defendants issued false and misleading statements regarding the status of the DOJ Off-Label Promotion Investigation because Defendants failed to disclose that the investigation focused on off-label promotion and that Pfizer would be required to pay an enormous fine or risk being barred from federal drug reimbursement programs.  Defendants asserted that Pfizer's description of the DOJ Off-Label Promotion Investigation as mere requests for information regarding the promotion of Bextra were sufficient.  Defendants further asserted that they were under no obligation to make further disclosures regarding the government's investigation.  At trial, Plaintiffs faced the very real risk of having their claims dismissed if the Court or the jury agreed with Defendants' assertions that Pfizer's descriptions of the DOJ Off-Label Promotion Investigation were adequate.

122.     In addition to asserting the description of the DOJ Off-Label Promotion Investigation was false and misleading, Plaintiffs also asserted that Defendants caused Pfizer to issue false and misleading financial statements not in accordance with GAAP because Defendants failed to take adequate reserves for the inevitable fine Pfizer paid to resolve the government's

- 68 -

investigation. Defendants strongly opposed Plaintiffs' allegations of false financial statements and inadequate reserves by pointing to disclosures made by other companies in the pharmaceutical industry that were also facing off-label marketing investigations. Defendants also asserted, supported by their expert's testimony that Pfizer's financial statements complied with GAAP.

123.    In addition, Defendants intended to present aggressive arguments with respect to materiality, asserting, for instance, that even if Pfizer should have taken a reserve related to the DOJ's Off-Label Promotion Investigation during the Class Period, the reserve would not have been material to investors because it would have had an immaterial impact on the Company's financial results for that year. Plaintiffs' ability to demonstrate materiality relied in part on the testimony of their accounting expert, Regan. Defendants had moved to exclude Regan's testimony and that motion was still pending at the time the case settled. And, in any event, it is hard to predict the outcome of a "battle of the experts" in a jury trial.

**B.    Scienter**

124.    In addition to the very real risks Plaintiffs faced establishing falsity, Defendants were also prepared to mount a strong defense asserting that Plaintiffs could not establish that Defendants made any false or misleading statements with the requisite intent. At minimum, Plaintiffs were required to establish that Defendants were reckless in issuing the alleged false and misleading statements and omissions. Defendants were prepared to argue at trial that Plaintiffs could not establish that Defendants' statements regarding the DOJ Off-Label Promotion Investigation were reckless because Pfizer had a robust disclosure process in place that included review by inside and outside securities disclosure counsel. Defendants were prepared to argue at trial that Plaintiffs could not demonstrate scienter because Defendants were asserting their reliance-on-counsel defense. In fact, several competing motions *in limine* were fully briefed by the parties and argued

- 69 -

during the final pretrial conference on January 6, 2015.  Although the Court did not rule on these motions during the final pretrial conference, the Court made clear that the parties could continue to raise various issues related to Defendants' reliance-on-counsel defense during the trial.  Therefore, Plaintiffs faced the very real risk that the Court or the jury could have accepted Defendants' reliance defense and concluded that Plaintiffs could not establish the element of scienter.

125.    Defendants were also prepared to argue that the misrepresentations and omissions concerning a reserve for the DOJ's Off-Label Promotion Investigation were not false and misleading because, under GAAP and the SEC rules, the accounting and disclosure requirements were subject to varying interpretations and thus Defendants could not have been reckless in failing to adhere to these rules.  Defendants further claimed good faith reliance on Pfizer's auditors, KPMG, in addition to the disclosure processes at Pfizer, which a jury could rely upon in finding in Defendants' favor.  Under their reliance-on-auditors defense, Defendants contended that Plaintiffs could not meet their burden to demonstrate that Defendants knew or were reckless in not knowing that Pfizer's accounting for the risk posed by the DOJ Off-Label Promotion Investigation was false or misleading.  Although Plaintiffs disagreed with Defendants' assertions, Defendants offered both persuasive evidence and expert testimony to bolster their reliance-on-auditor defense.  As with their reliance-on-counsel defense, Defendants' reliance on their auditor posed a substantial risk to Plaintiffs' ability to recover at trial.  The parties also fully briefed several competing motions *in limine* regarding Defendants' reliance-on-auditor defense that were still pending at the time the parties reached a settlement.

### C.    Loss Causation and Damages

126.    Even if Plaintiffs succeeded in proving liability, a major risk going forward related to Plaintiffs' ability to prove loss causation and damages.  To establish loss causation and damages,

- 70 -

Plaintiffs' expert, Dr. Feinstein, was required to examine the decline in Pfizer's stock price that occurred on January 26, 2009, when Pfizer announced that it had reached a $2.3 billion settlement with the federal government to resolve the DOJ Off-Label Promotion Investigation.  Dr. Feinstein had the arduous and complex task of determining what portions of the $1.90 Pfizer residual stock price decline that day were related to the fraud.  Dr. Feinstein's task to apportion what parts of the decline were and were not related to the fraud was complicated by the other news Pfizer released on January 26, 2009: the Wyeth merger (the largest pharmaceutical acquisition in history), a 50% cut to Pfizer's dividend (the first cut in over 40 years) and a reduction in 2009 earnings guidance.  Faced with this mix of information, Dr. Feinstein calculated that only $1.26 of the $1.90 stock price decline on January 26, 2009, related to the fraud.  Dr. Feinstein reached this conclusion by carefully calculating what portions of the January 26, 2009 stock price decline were related to the Wyeth acquisition, the dividend cut and the reduced 2009 guidance.

127.    In opposition to Dr. Feinstein's methodology, as they did throughout the entire case, Defendants planned to argue at trial that there were no "corrective" disclosures directly related to any of the alleged misstatements or omissions during the Class Period.  Indeed, Defendants would have taken the position, supported by their expert's testimony, that Pfizer's stock price decline could not be attributed to the settlement announcement, and therefore Class Members had suffered no legal damages.  Instead, Defendants would have asserted that other information caused the share price to decline, *i.e.*, the Wyeth merger, the dividend cut and the reduced 2009 guidance.

128.    Because the determination of loss causation and damages is a complicated process requiring expert testimony, compounding the above factors was a risk that the Court would reopen and grant, in whole or in part, Defendants' motion to exclude the opinion and testimony of Plaintiffs' loss causation and damages expert at trial.  This motion was denied during a hearing on

- 71 -

January 6, 2015, but the Court indicated that Defendants could later reassert the motions.  Even if Plaintiffs' expert survived Defendants' *Daubert* motion, the loss causation and damage assessments of the parties' experts at trial could vary substantially, reducing this crucial element to a "battle of experts."

129.    This "battle of the experts" would have also impacted Plaintiffs' ability to establish damages at trial.  Plaintiffs' damage expert would have offered testimony at trial that Plaintiffs and the Class would be entitled to a constant inflation ribbon of $1.26 regardless of when they purchased shares during the Class Period.  Defendants were prepared to argue at trial that Dr. Feinstein's constant inflation ribbon was not appropriate in this case because the alleged falsity of Defendants' disclosures regarding the DOJ Off-Label Promotion Investigation evolved overtime as that investigation progressed.  Defendants asserted that the investigation became more serious for Defendants as the Company received subpoenas for documents regarding Geodon, Zyvox and Lyrica during the Class Period.  For this reason, Defendants would have attempted to refute Dr. Feinstein's constant inflation analysis at trial.

130.    In addition, Defendants intended to assert a truth-on-the-market defense.  In other words, that the market was already aware of Pfizer's off-label marketing issues and therefore the Company's stock price declines were primarily caused by factors other than the alleged fraud, also undercutting Plaintiffs' damages estimates.  While Plaintiffs disagreed with and had evidence to refute all of Defendants' contentions concerning the truth-on-the-market defense, there was a significant risk of recovering limited or no damages if the Court or jury agreed with ***any*** of Defendants' arguments.

131.    In short, the parties disagreed on the merits of this case, including whether or not damages were suffered and recoverable.  Defendants deny that they are liable in any respect or that

Plaintiffs or the Class suffered any injury.  Accordingly, recovery of any amount at trial was far from certain.  One cannot predict which expert's testimony or methodology a jury would find reliable.  If the jury agreed with Defendants and rejected Plaintiffs' expert's calculations to apportion Pfizer's January 26, 2009 stock price decline, Plaintiffs would have had their damages significantly reduced or their claims fail as a matter of law.

## IV.    SETTLEMENT NEGOTIATIONS AND TERMS

132.    The parties began settlement discussions in the fall of 2013, as suggested by the Court at the July 19, 2013 hearing.  The parties retained the Honorable Layn R. Phillips (Ret.), a nationally recognized mediator with extensive experience in securities cases.  At his direction, the parties submitted mediation memoranda in October and November 2013.  Counsel for all parties and Defendants' insurers attended the first formal mediation session on November 15, 2013, in Newport Beach, California.  During that session, the parties gave detailed and thoughtful presentations on the perceived strengths and weaknesses of their respective cases.  Although the mediation was confidential, it is fair to say that all parties understood that Defendants' reliance-on-counsel defense and the issues of loss causation and damages would be hotly contested during the remainder of the Litigation.  Although the first attempt at mediation was unsuccessful, the parties agreed to continue to communicate with one another and Judge Phillips regarding mediation issues and potential settlement.

133.    In September 2014, as the parties were in the process of completing expert witness depositions and several fact witness depositions, the parties again discussed mediating their differences.  At this time, in addition to Judge Phillips, the parties also retained Robert Fairbank, Esq., a mediator from Los Angeles.  The parties each prepared lengthy summaries of the facts and the law for Mr. Fairbank in October 2014.  Thereafter, Mr. Fairbank conducted one day separate

- 73 -

sessions with Defendants on November 13, 2014, in New York, New York and with Plaintiffs on November 19, 2014, in San Diego, California.  While meeting with Mr. Fairbank, Plaintiffs made presentations regarding the strengths and weaknesses of their case and discussed at length the legal and factual submissions given to Mr. Fairbank before the meetings.  In addition, during the week before the meetings, Mr. Fairbank sent each side a number of questions he created from reviewing Defendants' and Plaintiffs' submissions.  Lead Counsel spent considerable time preparing responses, and in some instances, demonstrative exhibits to share with Mr. Fairbank during the one-day session.  It is worth noting that these one-day sessions occurred at the same time the parties were briefing summary judgment.

134.    Following the one-day sessions with Mr. Fairbank, he and Judge Phillips continued to engage the parties regarding potential mediation dates and exploring whether the case could be settled.  These interactions with Mr. Fairbank and Judge Phillips continued throughout November and December 2014.  In addition, the parties themselves conducted separate meetings in San Diego and New York, in December 2014 and January 2015 regarding settlement.  However, the parties were unable to resolve the case prior to the January 6, 2015 final pretrial conference.

135.    Following the January 6, 2015 final pretrial conference, the parties began again to discuss mediation with the assistance of Judge Phillips.  On January 11, 2015, counsel for all parties attended a second mediation session.  Despite continued good-faith efforts, the parties were again unable to resolve the matter, but continued informal settlement negotiations with Judge Phillips.  A third mediation was held on January 18, 2015 with only two attorneys appearing for Defendants and a single representative for the Plaintiffs in attendance.  During the January 28, 2015 mediation session, the parties reached an agreement to settle the Litigation for $400,000,000 – only days

before trial was scheduled to begin.  On January 28, 2015, the parties advised the Court of the tentative settlement.  Dkt. No. 458.

136.    After January 28, 2015, the parties worked diligently to prepare preliminary approval papers and negotiate the complex Stipulation.  On February 17, 2015, the parties presented the Stipulation and preliminary approval papers to the Court.  Dkt. Nos. 466-468.  On February 26, 2015, the Court held a hearing to discuss whether a second opt-out opportunity should be provided to Class Members.  During the February 26, 2015 hearing, the Court asked Lead Counsel to amend the Notice of Settlement to provide more detailed information with respect to the effort necessary to achieve the settlement and about the claims and defenses at issue in the case.  Thereafter, in response to the Court's request, the parties enhanced the description of the case in the notice to Class Members.  Dkt. No. 470.  In addition, Lead Counsel created a website which contains links to the entire docket for the case and the notices to Class Members.  On March 5, 2015, the Court held a second hearing to review the motion for preliminary approval and granted that motion and approved the form and manner of notice of the settlement to the Class.  Dkt. No. 479.

137.    The settlement agreement resolves the claims of the Class against all Defendants and settles this Litigation for $400,000,000 in cash, subject to this Court's approval.

138.    The settlement is the result of vigorous arm's-length negotiations.  In Lead Counsel's judgment, the compromise embodied in the Stipulation represents an extremely successful resolution of a very complex class action.

## A.    The Settlement Is in the Best Interests of the Class and Warrants Approval

139.    Plaintiffs believe they would have prevailed on the merits at trial.  Defendants were just as adamant that Plaintiffs would not have.  There was a very real risk that Plaintiffs would not have convinced a jury that Defendants acted with scienter or that the alleged misrepresentations and

omissions were materially false or misleading when made.  Moreover, given that the Court had not yet ruled on all the parties' *Daubert* and *in limine* motions, and indicated it could reopen the *Daubert* and *in limine* motions it had ruled upon, Plaintiffs' ability to introduce evidence at trial to establish materiality, loss causation and damages was uncertain.

140.     Having considered the foregoing, and evaluating Defendants' defenses, it is the informed judgment of Lead Counsel, based upon all proceedings to date and their extensive experience in litigating class actions under the federal securities laws, that the proposed settlement of this matter before this Court is fair, reasonable and adequate, and in the best interest of the Class.

### B.     The Plan of Allocation

141.     The Net Settlement Fund will be distributed to Class Members who, in accordance with the terms of the Stipulation, are entitled to a distribution and who submit a valid and timely Proof of Claim and Release form.  The Plan of Allocation provides that a Class Member will be eligible to participate in the distribution of the Net Settlement Fund only if the Class Member has an overall net loss on all of his, her or its transactions in Pfizer common stock during the Class Period. For purposes of determining the amount an Authorized Claimant may recover under the Plan of Allocation, Lead Counsel conferred with their damages expert, Dr. Feinsten and the proposed Plan of Allocation reflects an assessment of the damages that could have been recovered by Class Members had Plaintiffs prevailed at trial.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 6th day of May, 2015, at San Diego, California.

                                        s/ HENRY ROSEN
                                        _____
                                        HENRY ROSEN

- 76 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 6, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 6, 2015.

<div style="margin-left:40%">

s/ HENRY ROSEN

HENRY ROSEN

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:HenryR@rgrdlaw.com

</div>

1008659_1

# Mailing Information for a Case 1:10-cv-03864-AKH

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Scott Bailey**
  michael.bailey@skadden.com

- **Sidney Bashago**
  sidney.bashago@dpw.com,jennifer.kan@davispolk.com,ecf.ct.papers@davispolk.com

- **Sheila L. Birnbaum**
  sheilabirnbaum@quinnemanuel.com

- **George Anthony Borden**
  gborden@wc.com

- **Kevin Anthony Burke**
  kaburke@sidley.com,nyefiling@sidley.com,efilingnotice@sidley.com

- **Michael Barry Carlinsky**
  michaelcarlinsky@quinnemanuel.com,brantkuehn@quinnemanuel.com,jomairecrawford@quinnemanuel.com

- **Lauren Kristina Collogan**
  lcollogan@wc.com

- **Patrick Daniel Curran**
  patrickcurran@quinnemanuel.com,justinemanzano@quinnemanuel.com

- **Keir Nicholas Dougall**
  kdougall@dougallpc.com

- **Michael Joseph Dowd**
  miked@rgrdlaw.com,debg@rgrdlaw.com,e_file_sd@rgrdlaw.com,tome@rgrdlaw.com

- **Alexander C Drylewski**
  alexander.drylewski@skadden.com

- **Charles S. Duggan**
  charles.duggan@dpw.com,ecf.ct.papers@davispolk.com

- **Steven M.. Farina**
  sfarina@wc.com

- **Jason A. Forge**
  jforge@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_SD@rgrdlaw.com

- **Ross Bradley Galin**
  rgalin@omm.com,mochoa@omm.com,neverhart@omm.com,lisachen@omm.com

- **Gary John Hacker**
  ghacker@skadden.com

- **James R. Harper**
  coljamesrharper@me.com

- **Howard E. Heiss**
  hheiss@omm.com,#nymanagingattorney@omm.com

- **Paul T. Hourihan**
  phourihan@wc.com

- **James M. Hughes**
  jhughes@motleyrice.com,kweil@pacernotice.com,mgruetzmacher@motleyrice.com,erichards@motleyrice.com,kweil@motleyrice.com

- **Jay B. Kasner**
  jkasner@skadden.com

- **Joe Kendall**
  administrator@kendalllawgroup.com,jkendall@kendalllawgroup.com,hlindley@kendalllawgroup.com

- **Brant Duncan Kuehn**
  brantkuehn@quinnemanuel.com

- **Leigh R. Lasky**
  lasky@laskyrifkind.com

- **Hamilton Philip Lindley**
  hlindley@deanslyons.com

- **Ryan A. Llorens**
  ryanl@rgrdlaw.com,nbear@rgrdlaw.com,kirstenb@rgrdlaw.com

- **Amanda M. MacDonald**
  amacdonald@wc.com

- **Lori McGill**
  lorialvinomcgill@quinnemanuel.com

- **Matthew Melamed**
  mmelamed@rgrdlaw.com

- **Donald Alan Migliori**
  dmigliori@motleyrice.com

- **Eugene Mikolajczyk**
  genem@rgrdlaw.com

- **Seema Mittal**
  smittal@wc.com

- **Cynthia Margaret Monaco**
  cmonaco@cynthiamonacolaw.com,cmmonaco@gmail.com

- **Juliana Newcomb Murray**
  juliana.murray@davispolk.com,lisa.hirakawa@davispolk.com,ecf.ct.papers@davispolk.com

- **Scott D. Musoff**
  smusoff@skadden.com,aviva.nusbaum@skadden.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com

- **William H. Narwold**
  bnarwold@motleyrice.com,vlepine@motleyrice.com,ajanelle@motleyrice.com

- **Ivy T. Ngo**
  ingo@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Joseph G. Petrosinelli**
  jpetrosinelli@wc.com

- **Theodore J. Pintar**
  tedp@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,ptiffith@rgrdlaw.com

- **Joseph F. Rice**
  jrice@motleyrice.com

- **Darren J. Robbins**
  e_file_sd@rgrdlaw.com

- **Daniel Prugh Roeser**
  droeser@goodwinprocter.com

- **Henry Rosen**
  henryr@rgrdlaw.com,dianah@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James P. Rouhandeh**
  james.rouhandeh@dpw.com,ecf.ct.papers@davispolk.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Stuart Michael Sarnoff**
  ssarnoff@omm.com

- **William E. Schurmann**
  wschurmann@wc.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,e_file_sd@rgrdlaw.com,nhorstman@rgrdlaw.com

- **Jennifer Lynn Spaziano**
  jen.spaziano@skadden.com

- **Meghan K. Spillane**
  mspillane@goodwinprocter.com,sewald@goodwinprocter.com,ttam@goodwinprocter.com

- **Richard Mark Strassberg**
  rstrassberg@goodwinprocter.com,nymanagingclerk@goodwinprocter.com

- **Mitchell M.Z. Twersky**
  mtwersky@aftlaw.com

- **John K. Villa**
  jvilla@wc.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Daniel          E. Hill**
Kendall Law Group, LLP
3232 McKinney Avenue
Suite 700
Dallas, TX 75204

**Catherine          J. Kowalewski**
Robbins Geller Rudman & Dowd LLP (San Diego)
655 West Broadway
Suite 1900
San Diego, CA 92101

**Jamie          J. McKey**
Kendall Law Group, LLP
3232 McKinney Avenue
Suite 700
Dallas, TX 75204

**David          C. Walton**
Robbins Geller Rudman & Dowd LLP (SANDIEGO)
655 West  Broadway
Suite  1900
San Diego, CA 92101